# Exhibit E

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    AMY CARLSON, individually, )

5          Plaintiff,          )

6             vs.              )  No. 1:20-CV-590

7    BERKLEY ACCIDENT AND      )

8    HEALTH, L.L.C.,           )

9          Defendant.          )

10

11        The videotaped deposition of AMY CARLSON

12   called for examination pursuant to Notice and

13   the Rules of Civil Procedure for the United

14   States District Courts pertaining to the taking

15   of depositions, taken before DENISE A. JOHNSON,

16   a certified shorthand reporter within and for

17   the State of Illinois, via video conference per

18   Executive Order 2020-14, on the 10th day of

19   November, 2020, at the hour of 9:04 a.m.

20

21   Reported By:   DENISE A. JOHNSON, C.S.R.

22   License No.:   084-004004

23

24

Page 2

```
 1   APPEARANCES:
 2      LISTON LEGAL GROUP, L.L.C., by
 3      MR. JOHN M. LISTON,
 4      5901 West Dempster Street, Suite 200
 5      Morton Grove, Illinois  60053
 6      (847) 528-5024
 7      john@listonlegal.com
 8         Representing the Plaintiff;
 9
10      LOCKE LORD, L.L.P., by
11      MR. KEVIN D. KELLY,
12      111 South Wacker Drive, Suite 4100
13      Chicago, Illinois  60606
14      (312) 443-0217
15      kkelly@lockelord.com
16         Representing the Defendant.
17
18
19   Also Present:  Mr. Kevin Duncan, the
20         videographer;
21         Ms. Josephine Raimondi;
22         Mr. Lee Davidson
23
24
```

Page 3

```
 1            I N D E X
 2   WITNESS                EXAMINATION
 3   AMY CARLSON
 4   By Mr. Kelly (direct)          5
 5   By Mr. Liston (cross)        247
 6   By Mr. Kelly (redirect)      252
 7
 8
 9
10
11
12
13         E X H I B I T S
14   NUMBER              MARKED FOR ID
15      (EXHIBITS PREVIOUSLY MARKED.)
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1      THE VIDEOGRAPHER:  Good morning.  We are
 2   going on the video record at 9:04 a.m. on
 3   November 10, 2020.  Please note that your
 4   microphones may be sensitive and could pick up
 5   whispering, private conversations, and cellular
 6   interference.  Please be mindful that this can
 7   interfere with the deposition's audio.  Audio
 8   and video recording will continue to take place
 9   unless all parties agree to go off the record.
10      Here begins media unit one in the video
11   recorded deposition of Ms. Amy Carlson taken on
12   behalf of the Defendant in the case matter of
13   Amy Carlson versus Berkley Accident and Health,
14   L.L.C., filed in the U.S. District Court,
15   Northern District of Illinois, Eastern Division
16   bearing Case No. 1:20-CV-590.  This is a remote
17   virtual deposition hosted by Veritext Legal
18   Solutions.
19      My name is Kevin Duncan, and I'm the
20   certified legal video specialist from the firm
21   of Veritext Legal Solutions.  And the court
22   reporter today is Ms. Denise Johnson from
23   Veritext Legal Solutions.
24      I'm not authorized to administer an
```

Page 5

```
 1   oath.  I'm not related to any party in this
 2   action, nor am I financially interested in the
 3   outcome.
 4      Counsel, will you please identify
 5   yourselves starting with the noticing party?
 6      MR. KELLY:  My name is Kevin Kelly, attorney
 7   for the Defendant.
 8      MR. LISTON:  My name is John Liston, attorney
 9   for Plaintiff, Ms. Carlson.
10      THE VIDEOGRAPHER:  Okay.  Will the court
11   reporter please administer the oath?
12      THE COURT REPORTER:  Can you raise your right
13   hand, please?
14         (Witness sworn.)
15      THE VIDEOGRAPHER:  You may proceed.
16            AMY CARLSON,
17   having been first duly sworn, was examined and
18   testified as follows:
19         DIRECT EXAMINATION
20   BY MR. KELLY:
21      Q.  Good morning, Ms. Carlson.  As I
22   stated, my name is Kevin Kelly.  And I represent
23   the Defendant in your lawsuit, Berkley Accident
24   and Health, L.L.C.  I want to just go over a
```

2 (Pages 2 - 5)

1 couple of ground rules before we start
2 especially because this is a virtual deposition.
3      It's very important if you don't hear
4 or understand a question that I ask just let me
5 know and I will repeat it or rephrase it, okay?
6      A.  Okay.
7      Q.  Everything that you testify about
8 today is going to be taken down by the court
9 reporter, and obviously the deposition is being
10 videotaped.  And the transcript will be used
11 later in this case.
12      Please answer out loud so that the
13 court reporter can take down your responses.
14 Even though it's being videotaped, it's
15 important that we get an accurate transcript.
16 And so gestures or uh-huh or huh-huh isn't
17 something that the court reporter can
18 transcribe.  So please answer in some verbal
19 fashion so we have a clear record, okay?
20      A.  Okay, sure.
21      Q.  If you need to take a break at any
22 time, just let me know and we can do that, all
23 right?
24      A.  Okay.

1      Q.  First of all, have you ever given a
2 deposition before?
3      A.  I have not, not that I recall.
4      Q.  Ever testified in any court case?
5      A.  Other than -- the only court case I can
6 think of is my own divorce proceeding.
7      Q.  Was there a testimonial hearing that
8 you testified in?
9      A.  Nothing other than like routine things
10 as far as maybe assets or something like that
11 but -- so, you know, at that point -- I'm trying
12 to think if I remember being on the stand.  I
13 think at some point I was, but it wasn't
14 anything major.
15      Q.  Okay.  It was actually in court.  It
16 wasn't a proceeding like a deposition like this?
17      A.  Right, correct.
18      Q.  Is there anything about your condition
19 today -- and by that I mean any illness, any
20 medication that you're taking -- that would
21 affect your memory or ability to recall past
22 events?
23      A.  No, not that I can think of.
24      Q.  Now, I want to just put this on the

1 record.  Your attorney, John, and I have
2 discussed this.  I sent you a -- I sent your
3 attorney a packet of exhibits.  Do you have
4 that available?
5      A.  I do, yes.  I have it.
6      Q.  We're going to go through those today.
7 There's actually -- feel free to open that now.
8 There's 57 individually marked exhibits in there
9 that we'll talk about throughout the day.  What
10 I've done is obviously provided those hard
11 copies to you and to your attorney.
12      Just for ease of reference today,
13 there's a system that Veritext uses called
14 Exhibit Share.  I have uploaded those identical
15 documents, all 57 pre-marked exhibits, to
16 Exhibit Share.  And that will be the official
17 exhibit record for this case.
18      But you needn't go and look at those
19 PDFs throughout the deposition.  You can simply
20 refer to the hard copies just to move this along
21 faster, okay?
22      A.  Yes.
23      Q.  What's your current home address?
24      A.  My current home address is Redacted

1
2 **Redacted**
3      Q.  And how long have you lived there?
4      A.  I've lived in LaGrange for -- this
5 particular house or in LaGrange?
6      Q.  No, in that house.
7      A.  For about 12 years.
8      Q.  And what's the extent of your
9 educational background?
10      A.  I graduated from high school, and I
11 have a bachelor's degree in communications from
12 University of Colorado.
13      Q.  And when did you receive that degree?
14      A.  1993.
15      Q.  Any formal education after your
16 bachelor's degree?
17      A.  I went -- I took some graduate courses
18 at University of Chicago in journalism.  And I
19 believe that's it.
20      Q.  No degree was awarded?
21      A.  No.
22      Q.  And are you presently employed?
23      A.  I am, yes.
24      Q.  And what's the name of your employer?

3 (Pages 6 - 9)

Page 10

1    A.  Symetra Financial.
2    Q.  How do you spell that?
3    A.  S-y-m-e-t-r-a and Financial.  I'm
4  guessing you know how to spell that.
5    Q.  What do you do for Symetra Financial?
6    A.  I am their -- I'm a director of
7  strategic partnerships for Southwest department.
8    Q.  What is Symetra Financial?  What kind
9  of business are they in?
10    A.  The division I work for is the stop
11  loss -- their stop loss division, which
12  is the same division that I worked for when I
13  worked for Berkley Accident and Health.
14    Q.  And is this the employer you worked for
15  immediately after leaving Berkley?
16    A.  No.  I worked for a company called
17  OneBeacon for a couple years.
18    Q.  When did you last work for OneBeacon?
19    A.  I last worked there in October -- or
20  actually September of 2019.
21    Q.  And then did you immediately start with
22  Symetra?
23    A.  I did not.  I started at Symetra in
24  February of this year.

Page 11

1    Q.  What did you do for OneBeacon?
2    A.  At OneBeacon I worked as a stop loss
3  sales rep.
4    Q.  Let me go ahead and start having you
5  look at some of these documents that are marked
6  as exhibits, if you wouldn't mind, in that
7  packet.  And go to Tab 1 and the document that's
8  been marked at the bottom Carlson Deposition
9  Exhibit No. 1.  Do you see that?
10    A.  I do.
11    Q.  Okay.  Do you recognize this document?
12    A.  I do.
13    Q.  What is it?
14    A.  This was the offer letter that I was
15  given concurrent or right about the same time or
16  after I had received a verbal offer from Berkley
17  Accident and Health.
18    Q.  Okay.  First of all, is that your
19  signature at the bottom of this?
20    A.  It is.
21    Q.  You mentioned something about a verbal
22  offer.  What do you mean by that?
23    A.  I had discussed the terms of my
24  employment with Jim Hoitt, and then he followed

Page 12

1  up with this offer in writing and also an E-mail
2  spelling out the terms.
3    Q.  Other than Exhibit 1, did you ever sign
4  any other offer letter or employment agreement
5  with Berkley Accident and Health?
6    A.  Yes.
7    Q.  What offer letter or employment
8  agreement did you sign?
9    A.  And let me clarify.  It wouldn't have
10  been an offer letter or an employment agreement,
11  but there were sometimes annual or semi-annual
12  just compensation plans.
13    Q.  But nothing similar to this Exhibit 1
14  that lays out just your employment in general,
15  your title, and things like that?
16    A.  No.
17    Q.  Is that correct?
18    A.  Yes.
19    Q.  Now, who is Jim Hoitt?
20    A.  Jim Hoitt, national -- was the national
21  director for Southwest sales.
22    Q.  For Berkley Accident and Health?
23    A.  Yes.
24    Q.  Now, if you look at the first paragraph

Page 13

1  of Exhibit 1.
2    A.  Yes.
3    Q.  It states, "I'm writing to confirm the
4  offer of employment recently made to you by
5  Berkley Accident and Health, L.L.C."
6        Did you understand Berkley Accident and
7  Health, L.L.C., to be your employer or Berkley
8  Insurance Company?
9    A.  I don't know that I differentiated
10  between the two.  I never gave it any thought.
11  It's my understanding --
12    Q.  Did you ever --
13    A.  I mean, I always thought that Berkley
14  Accident and Health was my employer, but they
15  were part of the larger corporation.
16    Q.  And what corporation would that be?
17    A.  W.R. Berkley.
18    Q.  Did you ever come to the understanding
19  that you were employed by an entity known as
20  Berkley Insurance Company?
21    A.  No.
22    Q.  So you believe that from the time you
23  started all the way until the end of your
24  employment that you were employed by the entity

4 (Pages 10 - 13)

Page 14

1 Berkley Accident and Health, L.L.C.?
2    A.   Correct.
3    Q.   Have you ever heard of Berkley
4 Insurance Company?
5    A.   I don't recognize anything specifically
6 as Berkley Insurance Company, but there are so
7 many different divisions.  So, no, I don't
8 recognize Berkley Insurance.
9    Q.   You never heard of Berkley Accident and
10 Health being referred to as an operating unit of
11 Berkley Insurance Company?
12   A.   No.
13   Q.   So you mentioned Jim Hoitt.  How did
14 you become employed by Berkley Accident and
15 Health?
16   A.   Can you clarify what you mean by --
17   Q.   Sure.  How did you come to apply for
18 and eventually receive a position of employment
19 there?
20   A.   So where it started is I was on a
21 plane, and I was sitting next to Jim Hoitt.
22 And we were both on our way to a national
23 conference.  And he reached out to me after
24 that flight, offered to give me a ride to the

Page 15

1 hotel from the airport.  And that's when we
2 started talking.
3       So it was after the conference when he
4 reached out to me.  And I wasn't interested
5 originally.  And then, you know, over time I
6 became more interested.
7    Q.   So had you ever met him before this --
8    A.   No.
9    Q.   -- airplane flight?
10      What was the conference you were both
11 attending?
12   A.   I believe it was a -- it was --
13 well, I know it was a SIIA conference, so
14 the Self-Insured Institute of America.  And
15 I believe the conference was in Palm Springs.
16   Q.   Where were you working at the time?
17   A.   I was working for Zurich.
18   Q.   The insurance company?
19   A.   Correct.
20   Q.   Doing what?
21   A.   I was in sales in their stop loss
22 department.
23   Q.   So after this initial conversation with
24 Jim Hoitt, can you tell me what happened next in

Page 16

1 terms of the process of you ultimately becoming
2 employed?
3    A.   Sure.  So Jim reached out to me,
4 and I don't remember if he asked me if I was
5 interested or if he asked me if I knew anybody
6 that would be interested.  And then eventually I
7 communicated -- I believe I communicated that I
8 wasn't interested.
9       And then he reached back out to me
10 after six months or so -- I believe it was
11 awhile -- and said what do I need to do to get
12 you to agree to come back here for a half-day
13 and back there being home office for Berkley
14 Accident and Health.
15   Q.   And where was that?
16   A.   That was in Massachusetts in I want to
17 say Marlborough.
18   Q.   Is that where Jim worked out of?
19   A.   Yes.
20   Q.   And did you go meet with him there?
21   A.   I did.
22   Q.   What happened during that meeting?
23   A.   Well, it was -- I spent a good portion
24 of the day there, and I met with the heads of

Page 17

1 the various departments and just had, you know,
2 back and forth conversation about my experience
3 and the opportunity that Berkley Accident and
4 Health.
5    Q.   What did you understand that
6 opportunity to be like?  What roles were
7 they talking to you about?
8    A.   They were talking to me about being the
9 stop loss rep.
10   Q.   Which is basically what you were doing
11 for Zurich?
12   A.   Correct.
13   Q.   Can you just educate me a little bit
14 about what a stop loss rep does?
15   A.   Sure.  You -- so it's a sales position.
16 It usually involves managing a territory and
17 picking what clients or entities that you think
18 will, you know, give you the best chance to
19 sell stop loss policies, which are partially
20 self-funded health insurance plans.
21   Q.   And up until the point that you were
22 hired by Berkley Accident and Health, how many
23 years of experience had you had in that
24 industry?

5 (Pages 14 - 17)

Page 18

1   A.  Thirty.
2   Q.  And was that all in stop loss sales?
3   A.  No.
4   Q.  What was your other industry
5   experience?
6   A.  I worked as a medical claims
7   examiner for a third-party administrator.
8   I worked in the customer service department for
9   a third-party administrator.  I worked for a
10  brokerage firm -- I started up a brokerage firm
11  in Colorado.  And I worked as an underwriter for
12  years in the industry.
13  Q.  So when you say 30 years, you are
14  talking about overall industry, not just sales
15  specifically?
16  A.  Sales -- no -- yes.  But out of that
17  time, there were probably only 4 years that
18  didn't involve sales.  So I believe I was in
19  sales for 26 -- 26 years.
20  Q.  So these meetings that you had at
21  Berkley Accident and Health's home office,
22  anything else you can recall about the details
23  of what was discussed in those meetings?
24  A.  Yes.

Page 19

1   Q.  What in particular?
2   A.  I mean, there is a lot of things I
3   remember about the meeting.
4   Q.  Well, was an offer of employment made
5   to you at that -- at that meeting or no?
6   A.  It was clear that they wanted me to
7   work there.  Chris Brown was the president of
8   the corporation at that point.  And when I left
9   his office, he told me if I didn't take the
10  position it will be the biggest mistake I ever
11  made.
12      And Jim made it clear that he wanted me
13  to come over and work for them.  They had some
14  goals for their department.  And he felt like,
15  you know, we could work together to try to get
16  them over the line on some of those goals that
17  had been outstanding for a while.
18  Q.  And do you know who made the decision
19  to hire you?
20  A.  I believe Jim said that it was solely
21  his decision, but it was something that they --
22  the reason -- part of the reason they were
23  having me come back there is because they wanted
24  everybody to meet me.  So I think Jim made the

Page 20

1   ultimate decision, but I believe -- you know,
2   everybody that was there was important.
3   Q.  And when you were ultimately hired, Jim
4   became your direct supervisor, correct?
5   A.  Correct.
6   Q.  During this -- and by the way, do you
7   remember the month -- this would have been 2013,
8   right, that you had this meeting?
9   A.  It would have been 2013.  I believe it
10  would have been late summer or early fall.  I
11  did not accept their original offer.  I turned
12  it down a couple of times.  And I remember final
13  negotiations happening in late November or
14  December of 2013.
15  Q.  And when you say you turned down
16  previous offers, were those written offers or
17  verbal?
18  A.  They were -- they were both.  They
19  weren't formal -- in the form of a letter.
20  It was more in the form of an E-mail or a
21  discussion, you know.  Most of the back and
22  forth surrounded comp and territory.
23  Q.  So with respect to the offers that you
24  rejected, what was the reason for rejecting

Page 21

1   them?
2   A.  I didn't have a comfort level
3   initially with the territory.  And then from a
4   compensation standpoint, it didn't make sense.
5   I had sold a lot of business at my current
6   company.  I was going to be walking away from a
7   lot of compensation.
8   Q.  And how did you communicate these
9   issues back to Berkley?
10  A.  I spoke on the phone with Jim and we
11  met.  There was another SIIA conference in
12  Chicago.  I met with Jim, and we talked about me
13  turning down the offer in person at that point.
14  Q.  Do you remember when that was?
15  A.  It was fall of 2013.
16  Q.  How did we then get to the point where
17  this offer letter, Exhibit 1, was presented to
18  you?
19  A.  Jim raised the comp.  He told me the
20  compensation, you know, was not an issue, that
21  he would -- that I would be made whole.  And we
22  just kept -- you know, we kept talking and
23  working through the issues as they came up.
24  Q.  And then Exhibit 1 was the outcome of

6 (Pages 18 - 21)

Page 22

1 those discussions?
2    A.   Correct.  And I believe -- I don't
3 know that it's relevant, but one of my first
4 thoughts when I saw this letter is -- and I
5 notice there's some circles on some numbers
6 here.
7        There was an offer letter that was
8 issued to me in, I believe -- there was
9 something incorrect about it.  And I believe it
10 was the compensation number was just an error in
11 understanding.  But I signed this one, so I'm
12 assuming that this is the corrected version.
13       Another thing about this offer letter
14 that I do know is that -- later in my employment
15 when I went back to this offer letter to review
16 it, it references an employment agreement.  And
17 I was not given an employment agreement.  And I
18 did bring that up to HR.
19       Because as I was working through my
20 compensation issues, I wanted to make sure
21 that I had all the documents.  So I think
22 somewhere in this letter there's reference
23 to an employment agreement that I didn't
24 receive.

Page 23

1    Q.   Can you refer me to what you're
2 speaking of --
3    A.   Sure.
4    Q.   -- in terms of this employment
5 agreement?
6    A.   So I don't see it right now.  It might
7 have been an E-mail.  I do remember -- and if
8 you want me to, I can go over this again slowly
9 because I was fairly certain it was in this
10 letter but --
11   Q.   No.  There is no need to do that.  I
12 mean, the document says what it says.  Just to
13 be clear, though, you don't have a copy of an
14 employment agreement that you signed, correct?
15   A.   No, correct.  And that wasn't -- it's
16 my -- there wasn't ever anything in addition to
17 this letter other than the comp agreement, but
18 that was something that came up right before
19 I left.  And I just -- it might have been
20 E-mailed.  And I've got some paperwork I could
21 refer to about it.
22   Q.   No, that's fine.  But, again, this --
23 your understanding is that this would have been
24 the document that governed your employment as

Page 24

1 opposed to some other employment agreement?
2    A.   Yes.
3    Q.   Okay.  Now, this -- since you were just
4 reading this, I just want to call your attention
5 to the paragraph -- it's about midway down in
6 the section.  It says, "Your stop loss territory
7 will be assigned by your assigned brokerage and
8 TPA sources in the following states," and then
9 it lists Illinois, Indiana, Wisconsin, Iowa, and
10 Michigan.  Do you see that?
11   A.   Yes, I do.
12   Q.   Okay.  It says, "Additional stop loss
13 sources outside of your territory may be
14 approved by the company."  Did that ever happen?
15   A.   No.
16   Q.   So you never were assigned or sold
17 anything outside of those listed states?
18   A.   So I was given some additional
19 territory twice.  There was a situation where
20 they had let go a rep up in -- I want to say
21 who was in Minnesota.  His name was Greg.  And
22 so I took over his territory.  And then towards
23 the latter stages of my employment, I was given
24 the state of Ohio.

Page 25

1    Q.   Do you know who made those decisions to
2 give you those additional territories?
3    A.   From a timing standpoint, it would have
4 been Jim Hoitt.
5    Q.   On both of them?
6    A.   I believe so.  I'm not sure about the
7 second one, but I believe so.
8    Q.   Well, let me ask this introductory
9 question.  Was Jim Hoitt your supervisor during
10 the entire time you were employed by Berkley
11 Accident and Health?
12   A.   No.
13   Q.   Who was your supervisor after
14 Jim Hoitt?
15   A.   Lee Davidson.
16   Q.   And Lee took over Jim's position?
17   A.   Correct.
18   Q.   And was Lee your supervisor all the way
19 up until the end of your employment?
20   A.   Yes.
21   Q.   If I could have you turn to what we've
22 marked as Deposition Exhibit No. 2, which is a
23 series of documents.  It's actually five pages
24 total.  Do you recognize these documents?

7 (Pages 22 - 25)

Page 26

1    A.  They look like pay -- my pay statements
2  from when I was there.
3    Q.  And you would have received these with
4  your various paychecks?
5    A.  They would have been available for me
6  to pull off an on-line system if I remember
7  correctly.
8    Q.  And if you could turn to the second to
9  last statement.  First of all, when did you --
10  you resigned your employment from Berkley
11  Accident and Health, correct?
12    A.  Correct.
13    Q.  And when did you resign?  What was the
14  effective date of that?
15    A.  It would have been late
16  November of 2017.
17    Q.  So this fourth page here, it's an
18  earning statement for the period ending
19  November 15, 2017.  And it shows commission
20  earnings of a little over $22,000.  Would that
21  have been your last commission check from
22  Berkley Accident and Health?
23    A.  I believe so.  It sounds about the
24  right timing.

Page 27

1    Q.  And then if you could turn to the last
2  page, it's the earning statement for the period
3  ending November 30, 2017.  There is a payment
4  of $923.  Was that -- do you know what that
5  represents?
6    A.  I'm not -- I'm not sure what it
7  represents, but I believe it represents just the
8  salary portion of my last period that I worked,
9  last pay period.
10    Q.  So to your knowledge, this would have
11  been your last paycheck?
12    A.  I believe so, yes.
13    Q.  When you resigned from Berkley Accident
14  and Health, how did you provide notice of that?
15    A.  In a written form.
16    Q.  Was that a hard copy letter or E-mail?
17    A.  It was an E-mail.
18    Q.  Do you still have that E-mail?
19    A.  I'm not sure.  I believe I probably do.
20    Q.  Who did you send the E-mail to?
21    A.  I believe I would have sent that E-mail
22  to Lee.  And I don't -- I might have copied
23  human resources, but I don't remember.  I don't
24  recall.

Page 28

1    Q.  And you don't remember the specific
2  date you would have sent that?
3    A.  I don't.
4    Q.  Did you work in an office or from home?
5    A.  Both.
6    Q.  And what was your office location for
7  Berkley Accident and Health?
8    A.  311 South Wacker.
9    Q.  How often were you physically in the
10  office versus either working from home or
11  travelling?
12    A.  In the beginning of my employment, I
13  worked in the office more than towards the end
14  of my employment.  And it wasn't often that I
15  would go into the office just due to travel and
16  various things.
17    Q.  But you were allowed to work from home
18  even if you weren't travelling?
19    A.  Yes.
20    Q.  The resignation E-mail that you sent to
21  Lee, what did it say as best you can recall?
22    A.  I believe it said that I regretfully
23  found myself in a position where I found it
24  necessary to resign.  I believe it gave him two

Page 29

1  weeks' notice.  And I don't know that it said
2  anything more than that.  Those are the two
3  things that I remember.
4    Q.  And did you then work those two weeks
5  of the notice period?
6    A.  No.  As far as I can recall, I
7  believe policy was if you were leaving that you
8  weren't -- they didn't want you working.  If you
9  were going -- and usually it had to do with
10  where you were going to be working next.  If you
11  were going to be working for a competitor, they
12  didn't want you in the office.
13    Q.  So did you -- did your access and so
14  forth stop on the day you gave that notice?
15    A.  I don't remember.  I don't recall.
16    Q.  Did you -- do you remember working
17  those two weeks?
18    A.  No.
19    Q.  No, meaning, you remember you didn't?
20    A.  Correct, I don't remember working those
21  two weeks.
22    Q.  So basically then your last day of
23  employment would have been that day you gave the
24  notice?

8 (Pages 26 - 29)

Page 30

1    A.  It would have been either that day or
2  when I was told soon after, you know, to just go
3  ahead and turn it in.
4    Q.  Who would have told you that?
5    A.  I believe it would have been either Lee
6  or human resources once again.
7    Q.  Would that have been a phone call?
8    A.  I don't remember.  I don't remember
9  a phone call.  It's possible it could have
10  happened.  It was a long time ago.  I don't
11  recall.
12    Q.  Let me have you turn to what we've
13  marked as Deposition Exhibit No. 3.  And by
14  the way, some of these copies, I apologize.
15  They may not be the clearest.  A lot of these
16  documents were produced by you, so I'm not sure
17  if there are better copies or not.
18        But in any event, to the extent that
19  you have any difficulties reading anything, let
20  me know.
21    A.  Okay.
22    Q.  But with respect to Exhibit 3, which is
23  a fairly lengthy E-mail chain, do you recognize
24  this --

Page 31

1    A.  I do.
2    Q.  -- E-mail chain?
3    A.  Um-hum.
4    Q.  Yes?
5    A.  Yes.
6    Q.  Okay.  And this is an exchange that you
7  would have had with Jim Hoitt prior to starting
8  work with Berkley Accident and Health?
9    A.  Yes.
10    Q.  If you look at the E-mail -- it's the
11  one on the second page -- from you to Jim, it's
12  November 22, 2013.
13    A.  Um-hum.
14    Q.  In the middle of this page -- and you
15  wrote this E-mail, right?
16    A.  Yes, I did.
17    Q.  Okay.  You say, "I don't like
18  not owning my entire territory for several
19  different reasons."  What did you mean by that?
20    A.  So when Jim and I had discussions about
21  the job, he referenced a couple named Craig and
22  Karin.  I don't know that -- I don't remember
23  him identifying them by name, but I know that
24  there were -- there were some issues that had to

Page 32

1  be worked out with regards to territory.  And I
2  don't know that Berkley -- you know, at the time
3  they didn't know how they were going to handle
4  it.
5    Q.  So there was some understanding on your
6  part that even though you would have a physical
7  territory that there would be some exceptions
8  to -- with respect to certain clients in that
9  territory that you wouldn't necessarily have?
10    A.  Only the -- only the clients with Craig
11  and Karin, but it was also my understanding that
12  those would eventually be mine.
13    Q.  And how did you come to that
14  understanding?
15    A.  Because I was told.
16    Q.  By who?
17    A.  By Jim.
18    Q.  And then the E-mail on the
19  first page, the one from Jim Hoitt to you,
20  November 22, 2013, 4:38 p.m., that's his
21  response to your E-mail that we just referred
22  to, correct?
23    A.  Yes.
24    Q.  So when you started work for Berkley

Page 33

1  Accident and Health, can you just tell me a
2  little bit about what you did?
3        I know you talked briefly about what a
4  stop loss sales representative does, but can you
5  just sort of walk me through a typical week in
6  terms of what you would actually be physically
7  doing?
8    A.  So you want me to talk -- just to
9  clarify, you want me to talk about what I did
10  the first week that I was at Berkley or what --
11    Q.  No, no, no.  I'm just trying to get a
12  sense for what your job entailed, what your
13  typical job duties were.  You know, what did you
14  do -- what was your function?  What were you
15  physically doing for Berkley?
16    A.  So I was familiarizing myself with
17  the -- with the personnel I would be working
18  with.  I was gathering --
19    Q.  Well, let me stop you.  I'm sorry to
20  interrupt.  I'm not talking, again, about the
21  first week of employment.
22    A.  Okay.
23    Q.  I'm just saying in general throughout
24  your entire employment what were your job

9 (Pages 30 - 33)

Page 34

1 duties? What did you do? What was your
2 function?
3     A.  So it was my job duty to either
4 maintain or create relationships that resulted
5 in submission volume that fit our appetite.
6     Q.  For someone who is not in the industry,
7 can you explain that to me --
8     A.  Sure.
9     Q.  -- in laymen's terms?
10     A.  Yes.  My job was to work with
11 employee benefits consultants or third-party
12 administrators who gave us a chance to bid on
13 individual employer benefit plans.
14     Q.  And basically sell stop loss insurance?
15     A.  Correct.
16     Q.  And so you were not selling directly to
17 particular employers.  It was always through
18 some kind of third-party?
19     A.  Correct.
20     Q.  And terms of your -- first of all, what
21 was your formal job title?
22     A.  It's on the letter.
23     Q.  Okay.  Well --
24     A.  Regional stop loss rep but I don't

Page 35

1 remember -- regional sales manager.
2     Q.  Stop loss regional sales manager?
3     A.  Yes.
4     Q.  How many other stop loss regional
5 sales managers were there when you started
6 with Berkley Accident and Health?
7     A.  I don't know, but I would guess
8 probably around 15.
9     Q.  Did that number fluctuate during
10 your --
11     A.  Yes.
12     Q.  -- employment?
13     A.  Um-hum.
14     Q.  How so?
15     A.  Their -- as they grew the block of
16 business, I believe that they -- well, I know
17 because it happened in my territory.  They hired
18 some additional reps.  And they also formalized
19 a plan to create two separate sales departments
20 from one.  And I believe they hired additional
21 reps during that time.  So they split off their
22 captive department.
23     Q.  So I want to sort of get into that and
24 help me understand that a little bit better.  I

Page 36

1 understand that there was this split between
2 traditional stop loss and captive; is that
3 right?
4     A.  Correct.
5     Q.  Okay.  Again, I'm not an insurance
6 expert, so maybe you could just in a minute tell
7 me what the difference is between traditional
8 stop loss and captive.
9     A.  You want me to tell you that now?
10     Q.  Yes.
11     A.  Okay.  So it's a different way of
12 layering risk.  So in a captive program, groups
13 will come together and share risk the insurance
14 company would normally take.
15     Q.  And so when this split occurred --
16 well, first of all, do you know when it
17 occurred?
18     A.  I don't, but I believe it was towards
19 the end of my employment.  I want to say either
20 early 2017 or mid to late 2016.
21     Q.  And when that split occurred, where did
22 you -- which bucket did you wind up in?
23     A.  The traditional employer stop loss.
24     Q.  Was there a captive sales rep for your

Page 37

1 territory?
2     A.  Yes.
3     Q.  And who was that?
4     A.  Jeff Sealey.
5     Q.  So prior to this split, were you
6 allowed to sell both traditional stop loss
7 and captive?
8     A.  Yes.
9     Q.  And then what about afterwards?
10     A.  We would -- we were to work in
11 conjunction with the captive rep.
12     Q.  Can you describe what you mean by work
13 in conjunction?
14     A.  If I had -- if my client wanted a
15 captive product, I was to refer that to the
16 captive rep.  And if he had a client that I
17 wasn't working with, you know, that he started
18 working with, he was to refer that client to
19 me.  And I believe there was compensation to
20 incentivize us to work with the captive program.
21     Q.  Now, was there a situation where
22 certain accounts were put on a national program?
23     A.  Yes.
24     Q.  When did that occur?

10 (Pages 34 - 37)

Page 38

1    A.   That occurred throughout my employment.
2    Q.   When I say national program, first of
3  all, what do you understand that national
4  program to be?  How did that differ from the
5  territory specific sales that you did?
6    A.   So it was identified prior to my
7  employment and after my -- beginning of my
8  employment to mean that any accounts coming in
9  from either the consulting firm Towers or Mercer
10 would be handled by John Wappelhorst who was the
11 national sales director -- I was told was the
12 national sales director.
13   Q.   Did you understand that he wasn't?
14   A.   It was my understanding that he was
15 demoted and then re-promoted to that position.
16   Q.   How did you come to that understanding?
17   A.   I was told that.  That was my
18 understanding of what I was told from Jim Hoitt.
19   Q.   When he was -- well, first of all, was
20 he the national sales director when you were
21 hired?
22   A.   I was told he was.
23   Q.   Did you ever learn through any other
24 sources that he was or wasn't at that time?

Page 39

1    A.   I don't know that I had an explicit
2  conversation about it, but there were definitely
3  some changes.
4    Q.   What do you mean by that?
5    A.   Well, it was my understanding -- like
6  I said, I was told that he was demoted.  And
7  then I was -- I was notified -- I believe we
8  all were -- via E-mail at some point that he
9  was being promoted.
10        I don't know that the title ever, you
11 know, matched up either time with national sales
12 manager.  And that's -- you know, that's why I'm
13 not sure.  It was confusing.
14   Q.   When he was demoted, do you know what
15 he was demoted to?
16   A.   I believe it was to handling those two
17 accounts but no longer necessarily vetting new
18 relationships.
19   Q.   And when he was re-promoted, how did
20 that change?
21   A.   What eventually happened -- I don't
22 know how long it was after the announcement of
23 his position, but the company created what they
24 called a centralized department.  And the

Page 40

1  national relationships were given a different
2  set of just kind of terms that they could choose
3  from.
4    Q.   And did other entities become part of
5  this centralized department other than Towers or
6  Mercer?
7    A.   Yes.  Prior to my departure, we were
8  told that Willis was going into that -- into
9  that kind of track.
10   Q.   Any others?
11   A.   I don't remember any others.
12   Q.   So if an entity -- and when I refer to
13 Towers or Mercer or Willis, is there a name for
14 those types of entities?
15   A.   Yes.  It's a brokerage firm or
16 consulting firm.
17   Q.   Okay.  So those brokerage firms --
18 any work that the company was doing with them
19 would have been handled through John and this
20 centralized department?
21   A.   Correct.
22   Q.   Regardless of the specific territory
23 where the work came out of like if it came out
24 of your territory or someone else's territory?

Page 41

1    A.   That is correct.
2    Q.   Now, could I have you turn to what
3  we've marked as Exhibit 4?
4    A.   Okay.
5    Q.   Do you recognize this document?
6    A.   It looks like the employee handbook.
7    Q.   And you received this?
8    A.   I do remember receiving employee
9  handbooks periodically when I worked at Berkley.
10   Q.   You specifically received this one,
11 right?
12        Because if you look at the bottom of
13 the first page and actually the bottom of every
14 page, do you see those little numbers there?
15 That refers to the fact that your attorney
16 produced this to us.  So I'm assuming this was
17 in your possession at some point?
18   A.   I did have one in my possession, yes.
19   Q.   Okay.  Do you remember when you
20 received this?
21   A.   I don't.  Usually -- I believe they
22 updated them annually, and then we were normally
23 asked to go in and review it and acknowledge
24 something -- or, you know, sign something

11 (Pages 38 - 41)

Page 42

1 acknowledging that we received it.
2    Q. If you could turn to Page 18, do you
3 see the section entitled, Vacation Accrual?
4    A. I do.
5    Q. Do you see in the first sentence it
6 says, "Except for the new hire eligibility
7 process as described above, employees accrue
8 one-twelfth of their annual vacation each full
9 month worked" --
10    A. Yes.
11    Q. -- and then it gives an example?
12       Is that -- was that consistent with
13 your understanding of how the vacation policy
14 was applied and implemented at Berkley Accident
15 and Health?
16    A. I don't remember even -- I don't
17 remember what the vacation policy was.
18    Q. And then let me have you turn to what
19 we've marked as Exhibit 5. Do you recognize
20 this document?
21    A. Yes.
22    Q. And is this the code of ethics and
23 business conduct that you would have received?
24    A. I believe so, yes.

Page 43

1    MR. KELLY: We've been going for about an
2 hour now. Why don't we take a five or
3 ten-minute break? Do you have a preference?
4    THE WITNESS: Ten minutes.
5    MR. KELLY: Okay.
6    THE VIDEOGRAPHER: Going off the record at
7 9:58 a.m.
8       (A short break was taken.)
9    THE VIDEOGRAPHER: We are back on the record
10 at 10:09 a.m. You may proceed.
11 BY MR. KELLY:
12    Q. Ms. Carlson, could you next take a look
13 at actually three documents that we've marked in
14 consecutive order as Exhibit 6, 7, and 8?
15    A. Yes.
16    Q. The reason why -- first of all, each
17 one of these at the top is entitled, Berkley
18 Accident and Health 2014 Sales Rep Compensation
19 Formula Summary-Stop loss?
20    A. Yes.
21    Q. But if you look at each of these, they
22 seem to be slightly different. Just to show
23 you, in Exhibit 6 there is a Paragraph 2 at the
24 bottom of the first page whereas in Exhibit 7 it

Page 44

1 looks like that paragraph runs into the second
2 page at Paragraph 2.
3       And then if you look at the third
4 document, Exhibit 8, there is a number of
5 look to be highlighted sections where the
6 word eligible is capitalized or not eligible
7 is capitalized. Do you see that?
8    A. I do.
9    Q. First of all, do you recognize what
10 these documents are?
11    A. Yes.
12    Q. And what are they?
13    A. They are the rep -- or sales rep --
14 sales rep compensation. And I remember there
15 being some changes on the 2014 plan.
16    Q. So which one of these do you believe
17 was applicable to you?
18    MR. LISTON: Objection, calls for
19 speculation. Please answer, Amy.
20    THE WITNESS: Well, I guess it depends -- can
21 you define what you mean by applicable?
22 BY MR. KELLY:
23    Q. Well, did you understand that there was
24 some sort of written compensation plan of some

Page 45

1 sort that would govern how you were paid?
2    A. Yes.
3    Q. Okay. And so what I'm just trying to
4 learn is of these three exhibits, six, seven,
5 and eight, which one, if any, do you believe
6 applied to you?
7    A. So with regards to the change that you
8 just brought up with the addition of the word
9 eligible or not eligible --
10    Q. That's in Exhibit 8, right?
11    A. Right, correct. I did not ever realize
12 that that part of the document changed. I will
13 say that what I remember about these documents
14 is -- I thought it was a second time, but
15 retroactively they added a provision that had a
16 minimum block size.
17       So I'm not sure which one that one was
18 captured on. So without going through all three
19 documents, I don't -- I can't say which one. I
20 don't feel comfortable with that.
21    Q. That's fine. I'm not trying to
22 trick you or anything. I just was trying to
23 understand -- since they were all produced by
24 you and your attorney, I was just wondering if

12 (Pages 42 - 45)

1 you knew which one of these three because,
2 again, they're all different was the applicable
3 one. But if you can't answer it, that's fine.
4    A. Yes. I would have to spend some time
5 looking at them.
6    Q. But just in general terms, though,
7 did you understand that there was some sort
8 of document for 2014 --
9    A. Yes.
10    Q. -- that you believe governed how you
11 were paid?
12    A. Yes.
13    Q. Now, can you turn to what we've marked
14 as Exhibit 9 --
15    A. Yes.
16    Q. -- which is entitled, 2016 Sales Rep
17 Compensation Formula?
18    A. Yes.
19    Q. Do you recognize this one?
20    A. This looks like the 2016 sales rep comp
21 plan.
22    Q. So you believe that Exhibit 9 did apply
23 to you?
24    A. I have no reason to think that it

1 didn't.
2    Q. And if you could turn to what we've
3 marked as Exhibit 10 which is entitled, 2017
4 Sales Manager Compensation Formula Stop-Loss,
5 do you recognize this one?
6    A. So my memory is a little -- I don't
7 recall that we -- whether or not we had one
8 for 2017. But as I think about it, I believe --
9 I remember pulling together these agreements
10 towards the end of my employment. And I believe
11 2015 was the only year where we didn't have one.
12    So, yes, I believe this is probably the
13 document. Once again, without -- I've learned
14 over the years that without like going through
15 every line item I'm somewhat hesitant to just
16 agree to everything that's in here.
17    Q. You would agree, though, that you had a
18 copy of this because it was produced by your
19 attorney, right?
20    A. If this is a document that was produced
21 by my attorney, yes.
22    Q. And if you look at the third page
23 at the bottom -- I know that this is rather
24 faint, but do you recognize that as your

1 signature?
2    A. I do.
3    Q. And look at the last page. Do you
4 recognize this addendum?
5    A. It looks like the addendum -- so I'm
6 not sure if this was the addendum that was for
7 people that were only selling captive business,
8 or there were some reps that were allowed to
9 sell both traditional and captive business.
10 I'm not sure if this applies to them.
11    Q. So you're not sure if Addendum A here
12 was actually something that applied to you?
13    A. As I look at it closer, yes. I believe
14 this was the addendum that was created -- I saw
15 the word EmCap there, so I was thinking it was
16 having to do with captives.
17    But this, I believe, was the addendum
18 because I had hired a direct report and it was
19 the schedule for my incentive compensation based
20 on her performance.
21    Q. But you do believe that addendum
22 applied to you?
23    A. I do.
24    Q. And 2017 would have been the last

1 compensation plan that would have been
2 applicable to your employment, correct?
3    A. Correct.
4    Q. Who is the person that you hired?
5    A. Pam Gallo.
6    Q. And when did you hire her?
7    A. I believe it was in 2015.
8    Q. Was that your decision, or did you have
9 to get approval for someone -- from someone else
10 to hire her?
11    A. I was -- I was given a letter that told
12 me that the company had been -- I'm summarizing
13 here, but challenged with a growth goal and
14 the based on my performance and reputation or
15 something to that extent at the company they
16 wanted me to look and think about who I could
17 bring in.
18    And I was told by Jim prior to joining
19 the company that he had plans to build out some
20 of these territories and that he saw me, you
21 know, fitting the criteria to be in that
22 position.
23    Q. And did Pam work -- well, you were her
24 supervisor then?

13 (Pages 46 - 49)

Page 50

1    A.   Correct.
2    Q.   And did --
3    A.   So there was some question about that.
4  I did hire her, but I remember at one point -- I
5  think there was a change in the HR system where
6  it no longer showed her reporting to me.  But it
7  didn't really affect anything on a day-to-day
8  basis, but I just remember that confusion.
9    Q.   Did she work -- was she working for the
10 company when you left?
11   A.   Yes.
12   Q.   Now, you mentioned before that there
13 wasn't a comp plan for 2015?
14   A.   I believe the 2014 comp plan applied
15 for 2015.
16   Q.   Let me just focus on the 2017 plan,
17 Exhibit 10.  Did you find this comp plan to be
18 easy or complicated in terms of applying it to
19 your sales?
20   A.   Extremely complicated.
21   Q.   Did you receive periodic reports about
22 how you were doing relative to the comp plan?
23   A.   I received PDF documents that did not
24 include detail for the most part.  They were

Page 51

1  almost impossible to tie back to the comp plan.
2    Q.   Were these documents that summarized
3  what you were earning under the plan?
4    A.   Yes.
5    Q.   Now, I would like to call your
6  attention to Exhibit 11.  I'm going to represent
7  to you -- and your attorney can tell me if I'm
8  wrong -- that these are -- this is a document
9  that was filed by your attorney in this case
10 basically articulating certain things that are
11 required by the court.  I'm not going to ask you
12 about the pages other than the last page, if you
13 could turn to that.
14   A.   I'm on there.
15   Q.   Okay.  Have you ever seen this document
16 before?
17   A.   Yes.
18   Q.   What is it?
19   A.   It's a summary of -- it's a summary of
20 dollar amounts that I had come up with applying
21 the same standard that I thought was applied to
22 different men reps of the company.
23   Q.   And it would be fair to say that this
24 document represents the damages you're claiming

Page 52

1  in this case?
2    A.   Yes.
3    Q.   So what I want to do -- so that I can
4  gain a better understanding of what you're
5  claiming and why, I want to walk through these
6  in some detail.
7    A.   Sure.
8    Q.   So there is a -- the first line says
9  new business production for, one, Lockton and
10 Segal accounts steered to JW.
11   A.   Correct.
12   Q.   What does that mean?
13   A.   There were accounts that weren't
14 part of the national agreement that I was
15 told I was going to be taking over or I had
16 received submissions on.  And they were -- the
17 credit for those was given to somebody named
18 John Wappelhorst, which is what JW means.
19   Q.   So these were accounts in your
20 territory?
21   A.   Correct.
22   Q.   And you believed you should have been
23 entitled to commission for the sales?
24   A.   I was told that I would be taking over

Page 53

1  the Lockton account, and I was also told that I
2  would be handling all Segal submissions.
3    Q.   Who told you that?
4    A.   Jim Hoitt.
5    Q.   When did he say that?
6    A.   Several times before my -- before I
7  agreed to accept the offer.  After I accepted
8  the offer, I was given a list of accounts I was
9  to take over.
10       The Lockton account was an existing
11 account.  I was told that account would be
12 transferred to me by Jim.  I was told that
13 account was supposed to be mined by the
14 underwriter on the account, Dorie Geistdorfer.
15       And the Segal account was a
16 submission that I drummed up.  And when I
17 sent it into -- or when I sent it to be
18 set up in underwriting, it was assigned to
19 John Wappelhorst.
20   Q.   Did you have any discussions with Jim
21 about why the Lockton account was assigned to
22 John?
23   A.   Yes.
24   Q.   What did he say?

14 (Pages 50 - 53)

Page 54

1    A.  He reiterated it was mine in the
2  beginning.  I told him that I had talked to John
3  and that John said that he didn't report to Jim
4  and he wasn't giving it up.
5    Q.  Do you know what, if anything, John had
6  to do with establishing the relationship with
7  Lockton?
8    A.  That was a relationship that I had
9  handled.  That was a relationship that I had
10  handled while I was at -- I never gave that
11  relationship up to him.  So I took over the
12  relationship.  He just refused to follow the
13  policy that was stated in the -- you know, I
14  believe it was in the compensation agreement.
15    Q.  When you say the compensation
16  agreement, what do you mean?
17    A.  The three agreements that you produced
18  earlier, the 2014, 2016, and 2017.  I believe
19  that there is a section of those agreements that
20  talks about changes in territory and when those
21  assignments will be moving.
22       So, in other words, they didn't have
23  rep in Chicago before I came here.  It was a
24  vacant position for a couple years.  I was

Page 55

1  handling the Lockton Chicago relationship.  I
2  wrote business with them when I was at Berkley.
3       On the first renewal when I was an
4  employee at Berkley, that account was supposed
5  to be transferred to me and John refused to
6  transfer it.
7    Q.  So did John -- and correct me if I use
8  the wrong word.  Was he the one who had the
9  credit for the relationship prior to your coming
10  on board Berkley?
11    A.  I don't know how that was handled.
12  Sometimes there were areas in more than -- you
13  know, relationships that more than one person
14  might work on.  So I don't know.
15       I know that with Segal company they did
16  not know John.  They told me they did not know
17  John after I started working there.  And like I
18  said, that was a submission that came in
19  directly to my E-mail.
20    Q.  Did Jim give you any explanation as to
21  why Segal was assigned to John?
22    A.  In the beginning he said that it
23  wasn't.  And then -- if I remember correctly,
24  there were some conversations between the

Page 56

1  president of the division, Chris Brown, and
2  John Wappelhorst.  And I do remember Jim asking
3  me to just let it go for him.
4    Q.  Did -- was there Berkley business with
5  Lockton and Segal outside of your territory or
6  just inside your territory?
7    A.  There was business with them outside of
8  my territory.
9    Q.  So were they -- in terms of the
10  relationship, do they have nationwide coverage?
11  Do they provide brokerage services nationwide?
12    A.  I was -- yes, they do.  I was
13  instrumental in bringing the Lockton
14  relationship on a national basis to Berkley,
15  but it was after the situation.  And there was
16  no sort of national agreement that we were a
17  part of.
18    Q.  So looking at the next part of this
19  first line in Exhibit 11, it says number two,
20  Stan Burt and Horton accounts given to Rocko
21  because client "requested to work directly with
22  underwriting" in the exact same situation Justin
23  Hansen was paid.  And then it says, parens,
24  accounts.  And then it's cut off.  What is that

Page 57

1  in reference to?
2    A.  Shortly after I brought on the United
3  HealthCare or UMR relationship, I was told that
4  Rocko was going to working on accounts that
5  were assigned to either an individual consultant
6  named Stan Burt or the consulting agency Horton.
7       I was originally told that they were
8  going -- he was going to be taking over that
9  business because of the volume that I had
10  brought in for UMR.  I had so many submissions
11  that were coming in in my territory that they
12  wanted to make room for the volume.
13    Q.  Who told you that?
14    A.  Jim Hoitt.
15    Q.  When did he tell you that?
16    A.  He told me that, I believe -- he told
17  me that in writing in 2014.  It might have been
18  early 2015.
19    Q.  That making room for the UMR volume was
20  the reason for this Stan Burt Horton work not
21  going to you?
22    A.  Yes.  There were two different
23  situations where this relationship came up,
24  and that was the first time.

15 (Pages 54 - 57)

Page 58

1    Q.   Okay.  What was the second time?
2    A.   The second time was shortly before
3  I left.  I believe -- I heard from an
4  underwriter -- Rocko had left.  And I heard
5  from an underwriter that these relationships
6  were coming back to me.
7        And then it was -- I believe Lee -- I
8  worked with Lee on this, and he had said that
9  the client had requested that they work directly
10 with an underwriter.
11   Q.   Who is Rocko?
12   A.   Rocko -- that's a nickname.  His
13 actual name is Robert Robertson, and he was
14 the underwriting director for our division.
15   Q.   And so he was not in a sales capacity?
16   A.   Correct.  And then the part that I
17 wrote down about Justin Hansen was male rep who
18 told me that he had a client that had requested
19 that they work directly with the underwriters,
20 but Berkley paid him for those accounts.
21   Q.   When did he tell you this?
22   A.   In 2016 or '17.  I think it was, 2017.
23   Q.   And he was a sales rep like you?
24   A.   Correct.

Page 59

1    Q.   What was his territory?
2    A.   I don't recall exactly what it was, but
3  he was on the Atlantic Coast.
4    Q.   And do you remember what client this
5  was?
6    A.   I don't remember off the top of my
7  head, but I do think that I might have some
8  notes on that.
9    Q.   Is that something you would have given
10 to your attorney?
11   A.   I believe.  I either gave it to an
12 attorney -- I might have brought that up to the
13 HR department as well, to Cathi Villano.
14   Q.   The E-mail you mentioned about
15 Jim Hoitt saying that the Stan Burt and Horton
16 work would not be going to you because of your
17 UMR volume --
18   A.   Well, it went to me.  So that was
19 part -- Jim was very clear about my territory.
20 So that business was assigned to me.  And then I
21 think it was after the first January 1 that we
22 had they saw how many quotes that we had
23 received in.  I think it was almost 1,100 pieces
24 of business from UMR.

Page 60

1        And so he was saying that I would be
2  too busy to -- trying to carve some of that out
3  to try to kind of frame me up for all the other
4  business that I had brought in.
5    Q.   Did you agree with that?
6    A.   I agreed with it, but we didn't have a
7  conversation about comp.  So I wasn't told, you
8  know, we're carving this stuff out and you are
9  not going to be paid for it.  I was told they
10 were carving it out and freeing me up.
11   Q.   And was there -- this quote about
12 working directly with underwriting, that's the
13 reference to later on after Rocko left?
14   A.   I know that that conversation took
15 place the second time it was brought up.
16   Q.   And when you say conversation, with
17 who?
18   A.   I don't remember whether or not it took
19 place in actual conversational form, so it might
20 be in an E-mail.  And I remember communicating
21 with Lee about that situation.
22   Q.   Let me -- I'm going to jump around
23 here but have you look at what we've marked as
24 Exhibit 24.

Page 61

1    A.   Yes.
2    Q.   So this is an E-mail exchange you had
3  with Lee; is that right?
4    A.   It's actually an E-mail that I
5  forwarded to human resources department, but the
6  contents are an E-mail exchange with Lee about
7  this situation.
8    Q.   So the very top part of Exhibit 24,
9  that's an E-mail from you to Cathi Villano?
10   A.   Correct.
11   Q.   And that's someone in HR at Berkley?
12   A.   Correct.
13   Q.   But the balance of this, the rest of
14 the pages, are an exchange between yourself and
15 Lee?
16   A.   Correct.
17   Q.   So let's start at the -- at the last
18 page then.  So you're saying that you're taking
19 over accounts from Horton Indiana.  And I'm
20 assuming -- it looks like a typo?
21   A.   Right.
22   Q.   I think you mean assuming Stan Burt's
23 office?
24   A.   Correct.

16 (Pages 58 - 61)

Page 62

1    Q.   And so this is -- at this point these
2   accounts were not assigned to you because of
3   what Jim had said about freeing you up?
4    A.   Correct.  Let me look at this a little
5   bit more.  So Rocko had left.  And I had hired
6   Pam, you know, at that point.  So these -- let
7   me see.  So if you go to No. 4 at the bottom --
8    Q.   Page 4 of the E-mail?
9    A.   Correct.  That last complete E-mail,
10  the second statement says, "Blanche sent me a
11  note last week and said I was taking over
12  Horton.  I assumed it came from you," meaning
13  Lee, "and it made sense since I handle Indiana."
14       So I had been told by somebody on the
15  underwriting team that I was going to be picking
16  these accounts back up because Rocko had left
17  employment.
18   Q.   What did -- I just want to make sure I
19  get this right.  Why was Rocko assigned the
20  accounts in the first place?
21   A.   Well, I was told originally that it was
22  because they wanted to free up the volume that I
23  was handling.  They expected to see a lot of
24  business based on the relationship.

Page 63

1        And if I remember correctly, I believe
2   I had a conversation with Jim after that where I
3   was told that Rocko had a relationship with this
4   entity.  And that's why when he left it made
5   sense to me that I would be picking it back up
6   for two reasons.  I had another rep hired to
7   help with volume, and then Rocko was no longer
8   there.
9        So I just assumed what Blanche told me
10  came from Lee and that I would be handling the
11  relationships.
12   Q.   Okay.  So it originally wasn't
13  assigned to you based on Rocko's relationship
14  with Stan Burt.  But when Rocko left, you
15  expected it would be assigned to you?
16   A.   I was -- I believe I was told -- I know
17  that I was told originally it was because of
18  volume.  That was the initial stance, I believe.
19       In follow-up conversations, I was told
20  Stan Burt had a relationship with Stan and Stan
21  wanted to work with him directly.  And then I
22  was told that he wants to be able to discuss the
23  cases directly with an underwriter.
24   Q.   And all of these things were told to

Page 64

1   you by who?
2    A.   Either Jim or Lee.
3    Q.   So I want to go back to Page 5.
4    A.   Page 5 or Exhibit 5?
5    Q.   No, Page 5 of Exhibit 24.
6    A.   Okay.
7    Q.   This is Lee to you on July 17, "Chris
8   assigned this relationship to Kevin."  Who is
9   Kevin?
10   A.   Kevin was an underwriter.
11   Q.   And it says Stan reached out to Chris.
12  Chris would have been Chris Brown?
13   A.   Correct.
14   Q.   And they wanted a direct underwriting
15  contact without a salesperson involvement?
16   A.   Correct.
17   Q.   You don't know whether or not that's
18  true.  That's just what this says, right?
19   A.   Correct.
20   Q.   And then above it in response, you
21  write to Lee, "I was told last week I was
22  handling Horton"?
23   A.   Correct.
24   Q.   Who said that?

Page 65

1    A.   Blanche.
2    Q.   And Blanche is who again?
3    A.   An underwriter.
4    Q.   Not someone who makes those decisions,
5   though, right?
6    A.   I -- no.  I would not think that she
7   would be making those decisions.  And I assume
8   that Lee had given her that direction, which I
9   saw in the other page of the E-mail.
10   Q.   Okay.  And then if you go to Page 4,
11  Lee writes to you 11:42 a.m. "The two Stan cases
12  will be handled by Kevin, and Stan has been told
13  to work with him directly."  And then it goes on
14  on Page 3.  You write back to Lee and you said
15  what about Horton?
16   A.   Correct.
17   Q.   And then Lee writes back and says,
18  "Those two accounts belong to Stan, so I'll have
19  to find out what is happening with the" -- it
20  looks like BOR.  Do you know what BOR means?
21   A.   Broker of record letter.  So Stan used
22  to work at Horton.  He had split off and started
23  his own agency, which is why you see Stan Burt
24  and Horton usually brought up in the same

17 (Pages 62 - 65)

Page 66

1 sentence.
2      And if I remember correctly, there
3 was confusion on what was a Horton Indiana
4 account and what was a Stan Burt account as
5 his independent agency.
6      Q.  And then on Page 1 of Exhibit 24, Lee
7 writes, "Stan's cases are going to Kevin.
8 Horton can go to you"?
9      A.  Correct.
10     Q.  And is that what happened?
11     A.  I left shortly after this.  I don't
12 believe that there was even time to see the
13 renewals.  I don't remember exactly.  I think
14 part of what prompted this exchange was that
15 Rocko had left.
16     Nobody was -- I wasn't sure anybody was
17 checking his E-mails because I had received a
18 call from an underwriter or from the account --
19 I can't remember which one, but somebody was
20 looking for a renewal.  And the information that
21 had been sent to Rocko.  And I was just wondering
22 if anyone was checking Rocko's E-mails since it
23 sounds like the client had not heard a response.
24     Q.  So was this -- the fact that Stan's

Page 67

1 cases went to Kevin as of July of 2017, did that
2 have any impact on you since you had -- you were
3 leaving the company in a few months?
4      A.  I don't know that -- I don't remember
5 what effective dates they were.  So it was -- it
6 did have an impact on me, though.
7      Q.  In what way?
8      A.  Because I knew at this point that the
9 situation had happened with a male rep and they
10 had been paid for the accounts in the exact same
11 situation.
12     Q.  That's the Justin situation --
13     A.  Correct.
14     Q.  -- you referenced?
15     Did you mention that to Lee?
16     A.  I don't know that I mentioned it to
17 Lee.
18     Q.  Other than what you learned through
19 Jason Hansen -- or Justin Hansen, excuse me, do
20 you have any other knowledge of that situation
21 where Justin got paid even though the client
22 wanted to work through an underwriter?
23     A.  I don't remember having any other
24 knowledge of a situation that was similar.

Page 68

1      Q.  Now, Lee goes on to say at the top of
2 Exhibit 24, in response to your question, "Can
3 you tell me Stan's reasoning for directly with
4 an underwriter with no rep," he says he wants to
5 be able to discuss cases directly with an
6 underwriter.  Do you have any basis to either
7 believe or disbelieve that statement?
8      A.  Our clients could always discuss cases
9 directly with an underwriter.
10     Q.  So do you think that what Lee was
11 telling you was not true?
12     A.  I do not think that -- I think Lee was
13 telling me what he was told.  I don't have any
14 believe reason to believe that Lee wasn't honest
15 with me.
16     Q.  Who do you think told that to Lee?
17     A.  Chris Brown.
18     Q.  Did you ever have any conversations
19 with Chris Brown about this situation?
20     A.  I do not remember having any
21 conversations with him about this situation.
22     Q.  So going back to Exhibit 11, the list,
23 for that first line which encompasses the
24 Lockton and Segal accounts and then Stan Burt

Page 69

1 and Horton accounts --
2      A.  Yes.
3      Q.  -- you have a total of $163,829?
4      A.  Um-hum.
5      Q.  How did you come to that figure?
6      A.  So I took the actual reported premium
7 on the Lockton account which was called Xylem
8 and on the Segal account and the Stan Burt and
9 Horton accounts, and I applied the produced --
10 or the compensation plan to the premiums for
11 each year.
12     Q.  So these are documents that you have in
13 your possession?
14     A.  Yes.  They were documents that were
15 made, you know, available to us as reps to check
16 our compensation, and they included all account
17 information.
18     Q.  Now, was there -- with respect to the
19 Horton work, did any of that wind up going to
20 Pam Gallo?
21     A.  At some point they said Pam was going
22 to be taking over that business.  But somewhere
23 along the line, if my memory is correct, Rocko
24 just took back those accounts with no notice

18 (Pages 66 - 69)

Page 70

1 given to Pam. And she never actively handled --
2 I don't believe she ever actively handled one of
3 their renewals. So they renew every year.
4    Q.   And Rocko -- correct me if you said
5 this already. What was his job title; do you
6 know?
7    A.   He was underwriting director.
8    Q.   So that was called -- not VP of
9 underwriting?
10    A.   He might have been VP of underwriting.
11 I'm not sure what his official title was.
12    Q.   But he was basically in charge of the
13 underwriting department?
14    A.   Correct.
15    Q.   Do you know whether or not he handled
16 any other clients similar to Stan Burt?
17    A.   I do not know.
18    Q.   If Stan Burt had requested to work
19 directly with an underwriter, do you think
20 that the company should have listened to that
21 request and honored it?
22    A.   All of our accounts had the ability to
23 work directly with an underwriter.
24       And the situation with Justin, it's

Page 71

1 my understanding that those clients did work
2 directly with the underwriter. I do not believe
3 he was involved, but they paid him since it was
4 part of his territory.
5    Q.   But if a client says I don't want to
6 work with a salesperson, I just want to work
7 with an underwriter, do you believe that the
8 company should listen and accept what the
9 client is requesting?
10    A.   I believe a company should listen to
11 what the client is requesting, yes.
12    Q.   Now, the next line in this Exhibit 11,
13 the last page, it says UMR direct business
14 accounts included on experience data through
15 8/31/2017 worksheet. Can you explain that?
16    A.   So the reference to the 8/31/2017
17 worksheet was a report of accounts that were
18 written by Berkley that were submitted from UMR.
19 So it was taking the premium on the direct --
20 and by direct business, what I mean is UMR sent
21 requests for bids directly to us.
22       We also received requests that we
23 were -- we were asked to pull out business
24 because of a relationship that I developed

Page 72

1 directly from brokers, but UMR would still
2 be the administrator and the request for the
3 bid didn't come from the broker. On direct
4 business -- on indirect business, it came from
5 a broker and not UMR.
6    Q.   So why do you think you're owed the
7 money that's listed here, this $140,000?
8    A.   So my rationale behind this was that in
9 situations -- you know, in a similar situation
10 with another male rep being John Wappelhorst,
11 when a national deal was negotiated, he -- the
12 support for him was built out. They didn't
13 carve out any accounts because the volume was
14 going to be too heavy. They gave him
15 underwriters, and everything still flowed
16 through him because of that support that they
17 gave him.
18       So on this direct business, I believe
19 that these were accounts that other reps had
20 written because of a relationship that I
21 brought to the company. So if I was paid like
22 John Wappelhorst was, a similarly situated male,
23 that was the compensation I would have received.
24    Q.   You use the word similarly situated.

Page 73

1 Why do you believe John Wappelhorst was
2 similarly situated?
3    A.   Because he was a stop loss rep who
4 brought in national -- who brought some national
5 relationships to the company.
6    Q.   Which national relationships did he
7 bring to the company?
8    A.   It's my understanding that he brought
9 the Willis and the Towers relationship -- I'm
10 sorry, not the Willis because I worked on that.
11 He brought Towers and Mercer to the company
12 prior to me being hired.
13    Q.   So you believe you brought the UMR
14 relationship to the company?
15    A.   I know I did.
16    Q.   Okay. Can you explain that?
17    A.   There's an E-mail from Chris Brown to
18 the entire company saying that we have won the
19 right to be on UMR, you know, on their approved
20 carrier list. And it would not have been
21 possible if it wasn't for the work that I
22 did, and they all owed me a huge -- you know,
23 expressions of gratitude.
24    Q.   What does it mean to be on the approved

19 (Pages 70 - 73)

1 carrier list?
2    A.   So UMR is United HealthCare.  United
3 HealthCare has a list of preferred carriers.
4 And what that means aside from, you know, volume
5 of direct submissions that you're going to
6 receive that you wouldn't normally receive it
7 means that they're going to give you a data dump
8 for United HealthCare discounts for the entire
9 company -- or the entire country.
10    So it allows you to not only produce
11 that business more accurately.  UMR is separate
12 from what we call UHC ASO.  It's going to allow
13 to price that business more accurately.
14    It's also going to allow you the
15 ability to have a better shot to compete on
16 national broker panels because you're preferred
17 with United HealthCare.
18    Q.   So you're not actually doing business
19 with UMR?
20    A.   We're doing business with UMR.
21    Q.   Okay.  I guess I'm not following
22 about what you just described.  How is that
23 different -- or how did that differ from any
24 other brokerage, or is there a difference?

1    A.   So it's not a brokerage.  It's what we
2 call a third-party administrator.  And it's
3 United HealthCare.  So when you think about the
4 major insurance companies out there, it's United
5 HealthCare and BlueCross.  They're really the
6 top two.
7    So this was getting them access to be
8 considered approved not only on the business
9 that United HealthCare was going to be
10 submitting us directly but also for every
11 submission across the country submitted from
12 a broker with United HealthCare as the
13 administrator.
14    Q.   So your -- when you're writing down
15 the UMR direct business, you're focusing
16 specifically on what in particular?
17    A.   The business that Berkley wrote after I
18 gave the work to get them on the UMR panel.
19    Q.   Did anyone else assist you with that
20 work at Berkley?
21    A.   To get them on the panel?
22    Q.   Yes.
23    A.   So I was told -- and I believe that UMR
24 had had discussions directly with Berkley prior

1 to me coming on.  One of the reasons I hesitated
2 to come on is because I called the head of UMR,
3 and I was told that Berkley was not going to be
4 approved anytime soon.
5    After I started working there,
6 Jim Hoitt sent an E-mail to somebody named
7 Steve Gazal saying we just hired Amy Carlson.
8 And in response to the E-mail announcing they
9 had hired me, they sent back what is referred to
10 as an RFI.  I was put in charge of completing
11 the RFI.  It was about 300, 400 questions.  I
12 took the lead with a completed document.
13    Other than having people review my
14 answers, Chris Brown accompanied me to do the
15 final presentation.  But I was lead on all of
16 that.  And I was told by UMR that the reason
17 that, you know --
18    Q.   This direct business that you're
19 referring to here, no one at Berkley promised
20 you compensation for that, did they?
21    A.   No, they did not.
22    Q.   Now, underneath that line you've
23 got UMR direct business written prior to my
24 departure not paid?

1    A.   Correct.
2    Q.   What's that in reference to?
3    A.   So that's business -- new business that
4 I had written and that I was just waiting for
5 the end of the quarter, but it was in due to be
6 paid.  If I hadn't have left, I would have been
7 paid.
8    Q.   So -- okay.  So if you had remained,
9 that was going to go to you, this $65,429?
10    A.   Correct.
11    Q.   I'm just trying to understand.  How
12 does -- the line above, UMR direct business
13 accounts included on my -- on experience data
14 through 8/31/2017 worksheet, the $142,086, you
15 were not paid that?
16    A.   Correct.  I wasn't paid either amount.
17    Q.   Right.  But the $142,086, would that
18 have been paid had you remained or no?
19    A.   No.
20    Q.   Okay.  So what -- why would the $65,429
21 have been paid?  What's the difference between
22 that direct business and the direct business
23 that's associated with the $142,086?
24    A.   The UMR direct business written prior

20 (Pages 74 - 77)

Page 78

1 to my departure was business -- and I'm not
2 looking at the documents, but I believe that
3 that was business that I had written. They
4 were submissions that had come to me or my
5 underwriter. So that was --
6    Q.  Was that in your territory?
7    A.  Yes, I believe so.
8    Q.  Okay.
9    A.  Yes.
10   Q.  So the $140,286 refers to UMR direct
11 business outside of your territory?
12   A.  Correct.
13   Q.  And you're claiming that you should
14 have received credit for the UMR direct business
15 nationally because of what you did to bring UMR
16 into the company?
17   A.  Correct.
18   Q.  Now, the next line says corrected
19 production share new business/renewal business,
20 $8,397.  What is that in reference to?
21   A.  So I believe -- hold on one second.
22 I've got to look at this for a minute.  I
23 haven't looked at this for a while.
24      I might have used the wrong word here.

Page 79

1 I believe this -- actually, it's the next
2 line, corrected profitability.  So corrected
3 production share, that applies, I believe, to a
4 kicker based on the volume that we wrote.
5      So there's something in the
6 compensation agreement where, you know, if
7 you get to a particular number, if you meet a
8 hundred percent of your goal, your production
9 share is changed.
10   Q.  And why do you believe you would be
11 owed this number, $8,397?
12   A.  I believe -- I believe that was based
13 on what I outlined above where if I was given
14 credit for the UMR business in the two lines
15 that are above.
16   Q.  Okay.  So had you received those other
17 things, this kicker would have kicked in?
18   A.  I believe this that's the case.  I
19 would need to look at this for a little bit
20 longer with backup documents which I don't have,
21 but I believe it was something along those
22 lines.
23   Q.  Okay.  What about the corrected
24 profitability bonus $102,013?

Page 80

1    A.  Yes.
2    Q.  What's that in reference to?
3    A.  So the last year that I was there I was
4 told that my block was not profitable.  The
5 pricing wasn't something that I controlled, but
6 there was a standard in place where there was an
7 account where they had set reserves on this
8 account.  The reserves were supposed to be let
9 go at a certain point, and the reserves had not
10 been let go on this business.
11      So I was arguing prior to leaving.  I
12 believe it was in an E-mail to Jim Hoitt and
13 Lee Davidson that the -- I believe there was a
14 claim that was denied.  It was standard to hold
15 onto reserves until the end of the year, and
16 those reserves had not been let go.
17   Q.  So had those reserves been let go,
18 what would have happened in terms of this
19 profitability bonus?
20   A.  It would have changed -- I would have
21 been paid that amount that I have listed there.
22   Q.  That would have been in 2017?
23   A.  I believe it was 2016 and 2017.  I
24 believe that there is an E-mail referencing -- I

Page 81

1 know that there is an E-mail that I wrote at one
2 point that captured the date on that.  And I
3 remember having those conversations or at least
4 E-mail exchanges in 2017.
5      It was after Lee came on.  I believe I
6 initially was working with Jim on it, and then I
7 copied him on the E-mails as well.
8    Q.  Do you remember what the name of that
9 business or client was?
10   A.  I don't.
11   Q.  Do you know why the reserves were not
12 let go?
13   A.  I don't.
14   Q.  Do you know who made the decision to
15 let the reserves go?
16   A.  I just think it was an error.  It was
17 something I was trying to point out, but I don't
18 know -- yes.  I don't think it was intentional.
19 I just think --
20   Q.  But had that situation been corrected,
21 would that one account have resulted in a
22 $102,000 bonus?
23   A.  Yes.
24   Q.  The next line says direct report bonus?

21 (Pages 78 - 81)

1    A.   I'm sorry.  Can I backtrack for a
2  second?
3    Q.   Sure.
4    A.   So the 102 sounds high for that for one
5  account.  I would have to go back -- this might
6  also include under this -- that 102 might
7  actually include other accounts that weren't
8  assigned to me.
9         And I didn't specify here.  There are
10 other backup documents here.  So it might have
11 been a matter of adding some of these other
12 accounts that we're talking to -- or that we
13 talked about previously that I thought should be
14 assigned to me, but I would need to look at
15 that.  That 102 seems high.
16        You know what?  I apologize.  So the
17 more I look at this document, the first set --
18 just looking at it in paragraph form, adjustment
19 for 2015-2016 profit share bonus, withhold
20 violated comp agreement, Medline claim denied,
21 see discovery, that was that account.
22        So that higher number would be based
23 on, you know, other accounts being credited to
24 me either through UMR or Lockton, Segal, or

1  Horton.  And my backup would show that.  I just
2  don't have access to that.
3    Q.   Okay.  So the $102,013 --
4    A.   Yes.
5    Q.   -- would have been had you received
6  all the line items above the $163,829 and so
7  forth --
8    A.   I believe that's -- I believe so.
9    Q.   So that's just a -- you know, on the
10 assumption that, you know, had you received
11 those other months that profitability bonus
12 would have kicked in at that level?
13   A.   Yes.
14   Q.   Okay.  So the thing that you just went
15 through with me about the error with respect to
16 the reserves not being let go with respect to
17 the $5,739 --
18   A.   Correct, yes.  And when I was looking
19 above, I looked -- I was looking at the $8,000
20 when you said so 102 would have been on that
21 account.  You know, as I thought it through, I
22 realized that, you know, that number was too
23 high, so yes.
24   Q.   Just so I'm crystal clear on this, the

1  line that says adjustment for 2015-2016 profit
2  share bonus, withhold violated comp agreement,
3  Medline claim denied, see discovery --
4    A.   Correct.
5    Q.   -- $5,739 --
6    A.   Yes.
7    Q.   -- that's the reference to this error
8  with the reserves not being let go?
9    A.   That's correct.
10   Q.   Okay.  All right.  So let's go back up
11 to these $5,000 entries.  There's two of them?
12   A.   Yes.
13   Q.   One says direct report bonus for
14 Pam Gallo, adjusted -- is that production?
15   A.   Yes.
16   Q.   Okay.  2015-2016 year, MEC account
17 steered to Scott Campbell?
18   A.   Correct.
19   Q.   And then you've got another one that
20 pretty much says the same thing.  It says --
21 except it has to Scott Campbell and ESL?
22   A.   That's correct.
23   Q.   So can you tell me what those are in
24 reference to?

1    A.   Sure.  When I hired Pam Gallo, she
2  had come from an entity that had expertise in
3  something called MEC accounts.  A MEC account
4  is what's known as a minimal essential coverage
5  account.
6         When she came on, I believe it was Jim
7  asked me to have Pam speak to the head of our
8  actuarial department and Scotty Campbell, who
9  was my peer located in California, and teach
10 them what she knew about writing these accounts
11 and how the structure works.
12        After that Berkley allowed
13 Scott Campbell to sell a lot of business on
14 what was called MEC accounts based on Pam's
15 coaching.  So that's just another situation
16 where I felt like, you know, the women were
17 treated differently than men at the company.
18   Q.   Pam was not allowed to sell those
19 accounts?
20   A.   Correct.
21   Q.   And do you know why?
22   A.   No.  Well, I was told it was a pilot
23 program, but I don't know if it was a matter of
24 filing -- state filings.  I don't know.

22 (Pages 82 - 85)

Page 86

1    Q.   Was Scott Campbell the only one who was
2   allowed to sell those accounts?
3    A.   I believe so.
4    Q.   Now, the next line has the words and
5   ESL.  What does that mean?
6    A.   ESL is referencing the underwriting
7   system.  That might have been a note to myself
8   because where I looked at -- when I looked at
9   his production numbers, it was based on a report
10  out of ESL.  That would be my guess.
11   Q.   So where did you get these $5,000
12  figures from?
13   A.   So those figures were from the
14  addendum.  I believe it was the 2017 comp
15  agreement where you pointed out that there was
16  some paperwork about direct reports instead of
17  comp for people with direct reports.
18       So had she been given the opportunity
19  to write those accounts, she would have easily
20  hit her goal and I would have been bonused.
21   Q.   Assuming she actually was able to make
22  the sales?
23   A.   They were -- Scotty was working with
24  old co-workers of Pam that she had very good

Page 87

1   relationships with.  Some of the -- that's my
2   understanding, some of the business that he
3   wrote.
4    Q.   Okay.  I'm just saying these numbers
5   are based on that assumption that --
6    A.   Yes.
7    Q.   We don't know what would have happened
8   obviously because it didn't happen?
9    A.   You can say that.  I'm fairly
10  confident.
11   Q.   No, no.  I get it.  I just want to make
12  sure I understand the situation that Pam didn't
13  make the sales, so we would --
14   A.   She wasn't allowed to.
15   Q.   Right.  So --
16   A.   Correct.
17   Q.   So these numbers are based on the
18  assumption that she would have made the sales
19  had she been allowed to?
20   A.   Correct.
21   Q.   And did Scott Campbell makes these
22  sales nationally or --
23   A.   Nationally.
24   Q.   -- only -- nationally, okay.

Page 88

1        So would these $5,000 figures that you
2   have here be based on sales that Pam would have
3   made nationally or just in her territory?
4    A.   I believe that it was national but I --
5   he wrote so much of this business that even
6   if -- I believe even if she was only assigned
7   business in her territory that she would have
8   easily hit her goal.
9    Q.   And what was Pam's territory?
10   A.   Pam's territory was Michigan, Indiana,
11  I want to say Iowa, possibly Minnesota.
12   Q.   Given that she was working for you, did
13  your territories overlap, in other words, that
14  both of you would be selling within the same
15  territory?
16   A.   Yes.
17   Q.   How did you manage that to avoid
18  sort of, you know, being in conflict with one
19  another, duplicating efforts and things like
20  that?
21   A.   So Pam had worked for me before.  This
22  is the second time I hired her.  We had a very
23  good relationship.  And when -- Jim left it up
24  to me how to structure the territory.

Page 89

1        And upon discussion of what would work
2   best for the company, we felt like me handling
3   UMR, United HealthCare, in Indiana, made sense
4   but her working with maybe some brokers on a
5   direct basis that I didn't work with, you know,
6   wouldn't cause any kind of a conflict or, you
7   know, lower production numbers.
8    Q.   So basically you worked it out --
9    A.   Correct.
10   Q.   -- with Jim and her?
11   A.   Correct.
12   Q.   All right.  The next line on here says
13  release of 25 percent withhold for the 2016-2017
14  production year, $17,940.  What is that in
15  reference to?
16   A.   So there was a portion of the comp
17  agreement where they would hold back 25 percent
18  of your incentive compensation, and they would
19  pay it to you only if the business hit a certain
20  level of profitability.
21   Q.   And so why do you believe you're owed
22  $17,940?
23   A.   I believe my offer letter or when I was
24  in discussion with Jim talked about waiving the

23 (Pages 86 - 89)

Page 90

1  withhold for the first two or three years that I
2  was there.
3      Q.  And did you raise this with him that
4  you believe that you should have been paid this?
5      A.  Yes.  There is a lot of confusion when
6  it came to the comp agreement.  I know that we
7  had communication at some point about the
8  25 percent withhold and, you know, it being
9  confusing.  I did raise it with him.
10     Q.  Do you know why you weren't paid this?
11     A.  I think because they were
12  interpreting -- or they weren't applying,
13  you know, what I had been told during the
14  negotiation of my -- of my comp.  The comp plan
15  was very loosely managed, and by that I just
16  mean there were errors all the time.
17     Q.  Were you the only one who complained
18  of these errors, or were there others who
19  complained about it as well?
20     A.  I tended to look at the comp in more
21  detail than anybody else did.  And I know that I
22  was told I was the only person that caught a few
23  errors.  I know my colleagues requested backup
24  often to try to match up how they were paid, and

Page 91

1  it was an ongoing problem because they didn't
2  receive it.
3      Q.  Did you have any discussions
4  with colleagues about what they felt were
5  discrepancies in their pay?
6      A.  Yes.
7      Q.  Who in particular?
8      A.  I remember having a discussion with
9  Justin about it.
10     Q.  That's Justin Hansen?
11     A.  Justin Hansen, yes.
12     Q.  Anyone else?
13     A.  I'm trying to think if I can remember
14  any specific situation.  I believe that when we
15  had meetings with either Lee or Jim -- I'm sure
16  with Jim that it was an issue that the reps
17  complained about.
18         But as far as like discussions, I know
19  for a fact I had it with Justin because I can
20  remember a few situations.  Nothing else comes
21  to mind right now.  That doesn't mean the
22  discussions didn't take place.
23     Q.  Understood.  What about the next line,
24  amount I paid back for advance 2016-2017 change

Page 92

1  in comp plan, $28,862?
2      A.  So when I started at Berkley, they -- I
3  came on under a three-year guarantee.  You can
4  see that in my offer letter.  The third year of
5  my guarantee Berkley changed the comp plan.
6          Instead of paying upfront when you
7  wrote a piece of new business -- they didn't
8  change the renewal portion.  But on the new
9  business production portion of that agreement,
10  they moved the plan to say that you would pay
11  as premium was received throughout the year.
12         So I felt like, number one, you know,
13  I had walked away from a lot of money at Zurich
14  understanding I was getting a three-year offer,
15  and it wasn't fair to change the plan in the
16  third year of employment.  So that's what that's
17  referencing.
18     Q.  But why do you believe you're owed
19  28,862 in particular?  Where did you get that
20  number?
21     A.  So that number was -- I believe that
22  what had happened on this, Kevin, was I had
23  complained about the change.  And so what Jim
24  said that they would do is they would advance me

Page 93

1  the number, but I ended up paying it back.
2          So they would pay me on paper -- and
3  Jim had also told the reps that if this change
4  in the comp plan caused any type of a hardship
5  that the company -- you know, financially that
6  the company would work with the rep to --
7  because they realized that the change was a
8  disadvantage.
9      Q.  Just correct me if I'm wrong, but the
10  change was one of timing in terms of when you
11  received the money?
12     A.  Correct.
13     Q.  Not a change in ultimate number but
14  just when you got paid because you got paid --
15     A.  Well, it changed the ultimate number.
16  Because if you left, you know, you weren't
17  getting paid on business and -- you know, that's
18  a long tail.
19         Like normally if I wrote an account in
20  January, I would be paid two percent of the
21  premium in April.  Well, in April the company
22  might have received two months of premium and
23  so -- and it was still in arrears.
24         So I received the money over an

24 (Pages 90 - 93)

Page 94

1 18-month period as opposed to 4 months after
2 in general when I wrote the business.
3     Q.   So this obviously had an impact on
4 your short-term income, right, because you got
5 less money now -- you know, you may have been
6 entitled to money, you know, down the road had
7 you remained employed, but there was a hit sort
8 of upfront to your income stream?
9     A.   Correct.  And in addition to that, I
10 would not -- you know, it's something I
11 negotiated when leaving another company and
12 leaving money on the table because their plan
13 worked that same way.
14        So I had at least $50,000 that I left
15 on the table for Berkley where if I had just
16 stayed with them until April I would have
17 received that money.  But based on the comp plan
18 and the three-year plan Jim had outlined, I, you
19 know, made the move.
20     Q.   And so you got -- the company did
21 advance you some money when this change
22 happened?
23     A.   Correct.
24     Q.   And then you said you paid it back?

Page 95

1     A.   Correct.
2     Q.   How did you pay it back?
3     A.   They withheld it from my pay stubs.
4     Q.   And so -- and they gave you $28,862?
5     A.   They applied the timing of the comp
6 like the original comp structure, and then they
7 withheld it.  I believe it was over a series of
8 the next three quarters --
9     Q.   So --
10     A.   -- while I transitioned -- they
11 called it a transition to the agreement.  So,
12 you know, you're going to have to get used to it
13 eventually.  We advance you the money here, and
14 then you can pay it back over the next three
15 quarters or two quarters or something like that.
16     Q.   So you get -- when the transition
17 happened, they advanced you some money.  But
18 then you paid it back, but you got what was --
19 after it was all netted out, you were on the new
20 comp plan.  You know, the advance was just money
21 early, and then you paid the early money back
22 over time?
23     A.   I believe -- I believe that that was
24 the case, yes.

Page 96

1     Q.   And your claim here is that they
2 shouldn't have changed the comp plan in the
3 first place.  That's why you believe you're
4 owed $28,862?
5     A.   Correct.
6     Q.   And then -- and this comp plan change
7 applied to --
8     A.   I'm sorry.  Can I just clarify that?
9     Q.   Yes.
10     A.   They have the right to change the comp
11 plan.  I just felt like the first three years we
12 had an understanding of how the comp would work.
13        And part of what I relied on, when it
14 came to my understanding, if you look at the
15 E-mails where Jim Hoitt explained how the comp
16 was going to work, I did not get a copy of the
17 final comp agreement until after I started.
18        There were E-mails where Jim Hoitt
19 would say if you make this much the first year
20 and then you renew half of it and you write this
21 much the second year here will be your comp for
22 year two.  That was never the case.
23        The way he outlined it in his E-mails
24 was never going to be the case because there was

Page 97

1 always going to be a lag even under the old comp
2 plan, but the new comp plan just compounded, you
3 know, the issue.
4     Q.   These were E-mails prior to your being
5 hired?
6     A.   Correct.
7     Q.   And the change in comp plan impacted
8 everyone in the traditional stop loss unit,
9 correct?
10     A.   I'm assuming that it impacted
11 everybody, but nobody else had ever had a
12 three-year agreement.
13     Q.   How do you know that?
14     A.   Because I was told that by Jim.
15     Q.   When you say three-year agreement, what
16 do you mean?
17     A.   So we called it a three-year bridge
18 where I would have to have a certain amount of
19 compensation guaranteed that's outlined in my
20 offer letter in order for me to walk away from a
21 large established block of business I had
22 written with Zurich.
23     Q.   But as far as you know, the idea of
24 changing to paying you -- or paying the reps as

25 (Pages 94 - 97)

Page 98

1 the premium was received, that was a change that
2 was companywide. It wasn't unique to you?
3    A. Correct, at least for people that were
4 under that comp plan, yes.
5    Q. Right. I mean, do you know what
6 the -- I mean, it was a different comp plan
7 for captive, right, I assume?
8    A. I think eventually, yes. That's my
9 understanding.
10    Q. And then just to finish this off and
11 then we'll take a break, the $542,496 is just
12 the subtotal of everything above, right?
13    A. Correct.
14    Q. And then you have a 401-K profit share
15 adjustment on additional comp owed, subtotal
16 above, $542,495, average award -- and I don't
17 understand --
18    A. It's supposed to say during discovery.
19 I know what this is.
20    Q. What is that in reference to?
21    A. So the company paid a profit share
22 award each year. And it varied based on, I
23 believe, the department's performance and the
24 company's performance. And I took the average

Page 99

1 of that profit share over the three-year period
2 I was there.
3       So I'll just give you an example,
4 although it's not -- so if one year it was 9
5 percent, one year we were paid 10 percent, one
6 year we were paid 11 percent, I would have taken
7 an average of 10 percent for this calculation.
8 It's an estimation.
9    Q. But this, again, is just on the
10 assumption that had you been paid the
11 $542,496 --
12    A. Correct.
13    Q. -- that you would have received profit
14 share of $51,537?
15    A. Correct.
16    MR. KELLY: All right. Let's take a
17 ten-minute break. Off the record.
18    THE VIDEOGRAPHER: Going off the video record
19 at 11:25 a.m.
20       (A short break was taken.)
21    THE VIDEOGRAPHER: We are back on record at
22 11:35 a.m. You may proceed.
23 BY MR. KELLY:
24    Q. Ms. Carlson, I'm going to have you look

Page 100

1 now at what we have marked as Exhibit 12.
2    A. Okay.
3    Q. Do you recognize this document?
4    A. I believe it's a response to the
5 preliminary discovery request.
6    Q. And have you reviewed this before?
7    A. Yes. It's been awhile, but I reviewed
8 everything that was -- that John produced.
9    Q. So specifically I want to turn your
10 attention to Interrogatory No. 2 and the
11 response to that.
12       And by the way, just a general
13 question, on the interrogatories there's five
14 listed here and these answers. Are all these
15 answers correct?
16    A. Under the preliminary statement portion
17 of the document or --
18    Q. No. Go to the -- the pages aren't
19 numbered.
20    A. I see.
21    Q. It's interrogatories. It starts
22 at one, and then it ends at five. There's
23 questions, and then there's responses. So the
24 first question I have, are all of these

Page 101

1 responses accurate?
2    A. Yes, they are all correct.
3    Q. So with respect to Interrogatory No. 2,
4 which was a request for the amount of accrued by
5 unused paid time off and other earned wages and
6 benefits including commissions owed to Carlson
7 for sales within her territory, there's a number
8 here of $577,601 in earned commissions.
9       With reference to the last page of
10 Exhibit 11, can you tell me where that 577
11 number comes from?
12    A. I'm sorry. What number was the
13 worksheet on again?
14    Q. It's Exhibit 11, the last page.
15    A. I'm not sure.
16    Q. Would it be accurate that at least
17 with respect to commissions that the number
18 would instead be the $542,496 or something else?
19    A. So $542,496 seems -- you know,
20 obviously that number is familiar and assuming
21 the other items that we didn't -- that we
22 haven't discussed yet that were on this initial
23 worksheet, yes.
24    Q. Right. But when we're just talking

26 (Pages 98 - 101)

Page 102

1 about commissions and --
2    A.  Yes.
3    Q.   -- focusing on that for a
4 second, looking at Exhibit 11, we say what
5 commissions -- well, let me just ask you this
6 question.
7       What commissions do you believe you're
8 owed in this lawsuit?
9    A.  I would reference the number -- or
10 the worksheet that we just walked through and
11 pulling the numbers that we've already discussed
12 on that.  So this worksheet is familiar to me.
13      Like I said, we haven't talked about
14 three of the items on this worksheet.  So the
15 $542,496 seems to be a more correct number.  I
16 didn't notice the discrepancy between those
17 numbers prior to you pointing that out.
18    Q.   So you believe of the two, Exhibit 11
19 and Exhibit 12, Exhibit 11 is correct as far as
20 commissions go?
21    A.  I believe so.
22    Q.   The $542,496?
23    A.  Correct.
24    Q.   Let me have you turn to what we've

Page 103

1 marked as Exhibit 13.
2    A.  Yes.
3    Q.   This is an E-mail exchange between
4 yourself and Jim Hoitt?
5    A.  Correct.
6    Q.   There is a reference in here to -- and
7 I'm referring to your E-mail to Jim on the first
8 page.  You say, "Can you clarify who will be
9 assigned to new producers in Wisconsin and
10 Indiana?"  And then you reference Dorie and then
11 Karin in the next sentence.  Can you tell me
12 what that E-mail is about?
13    A.  So this E-mail had to do with who would
14 be my underwriter on the accounts.  So the
15 bottom part of this E-mail, when I talk about
16 can you clarify who will be assigned to new
17 producers, Jim clarified it in the top part of
18 this E-mail that every broker in Wisconsin and
19 Indiana were mine.
20      And that meant one of two underwriters
21 would be doing the underwriting on the account.
22 So it was either going to be Craig or Karin --
23 I'm sorry, Karin or Dorie.
24    Q.   And how did you get along with those

Page 104

1 two?
2    A.  I got along really well with Dorie.
3 Karin was tough.
4    Q.   In what way?
5    A.  She called me names before I even
6 started and because -- and it was my feeling
7 that because she managed this territory prior
8 to me being hired that she was not going to do
9 anything to try to help me be successful in
10 taking it over.
11    Q.   But she was not a salesperson?
12    A.  She was prior to Berkley hiring me, so
13 they had -- from -- it's my understanding that
14 Karin and her husband Craig worked as what we
15 referred to as marketing underwriters.  So they
16 handled both the sales and the underwriting.
17      After I was hired, I believe
18 Chris Brown flew down there, told them that
19 I was going to be taking over the accounts,
20 and it was their job to support me during that
21 transition.  They were going to be handling
22 the underwriting on part of the business and
23 transitioning out of that sales role.  They
24 would no longer be managing the territory.

Page 105

1    Q.   And you said Karin called you names?
2    A.  Karin referred to me as the blond bimbo
3 prior to ever meeting me.
4    Q.   Directly to you or said something --
5    A.  To -- I worked with an underwriter that
6 was in their office.  I've known him for over
7 20 years, and he -- he shared some of what --
8 some of the discussions that went on about me
9 behind doors.
10    Q.   Who was that?
11    A.  John Mondragon.
12    Q.   So John told you that Karin said this
13 about you?
14    A.  John said that they referred to me --
15 yes.  That's where I heard that from.
16    Q.   And when you say that he said they
17 referred to you, who is they?
18    A.  Both Karin and her husband Craig.
19    Q.   And they both worked for the company in
20 that underwriting capacity?
21    A.  Correct.
22    Q.   Now, in the -- at the top of Exhibit 13,
23 Jim writes to you, "At this point the only
24 remaining exceptions are the few that Greg has,

27 (Pages 102 - 105)

Page 106

1 and I'm going to work with him on those. There
2 may be a few bugs to still work out in the
3 transition of Atlanta producers, but I expect
4 that sorted out shortly." Do you know what he
5 was referring to there?
6     A.  So Greg was a rep.  Unbeknownst to me,
7 he had a few producers on the border of northern
8 Wisconsin.  So I believe this E-mail was after
9 Jim notified Greg that I was going to be taking
10 over those relationships.  I don't believe there
11 was any business on the books.  It was just more
12 a matter of me handling incoming submissions.
13        And with regards to Jim's statement
14 there may be a few bugs to still work out in the
15 transition, I don't -- I'm not sure what he
16 meant by that.  But I believe it had to do with
17 underwriting.
18     Q.  And take a look at Exhibit 14.
19     A.  Yes.
20     Q.  This is another exchange between you
21 and Jim?
22     A.  Yes.
23     Q.  And the top of this E-mail chain when
24 Jim says, "We're going to keep K and C," that's

Page 107

1 Karin and Craig?
2     A.  Correct.
3     Q.  "Assigned to producer that they have
4 had relationships with in the past," that means
5 to be working with you as underwriter?
6     A.  Correct.
7     Q.  And take a look at Exhibit 15.
8     A.  Yes.
9     Q.  And this would be -- first of all, the
10 first E-mail on this page at the bottom is an
11 E-mail from you to Jim Hoitt, right?
12     A.  Um-hum.
13     Q.  Yes?
14     A.  Yes, sorry, yes.
15     Q.  And what are you writing about here?
16     A.  I had called Craig to talk about an
17 account, and he had screamed at me that day.
18 And that's -- you know, I had had a lot of
19 issues with both Craig and Karin.  And Jim was
20 aware of those issues.  I felt like they were
21 undermining me in front of the clients.
22     Q.  And what did Jim do in response, if
23 anything?
24     A.  I believe at this point Jim spoke with

Page 108

1 Chris Brown, and they were taken off of my -- of
2 being underwriters on my business.
3     Q.  So do you believe he was responsive to
4 your complaint?
5     A.  Yes.  He was responsive with my
6 complaint about working with them as far as
7 underwriters, yes.
8     Q.  Who is Shane Carlson?
9     A.  That's my brother.
10     Q.  Why did you send this to him?
11     A.  He's a counselor, and I was talking to
12 him about what was going on with work and how to
13 handle it.
14     Q.  Take a look at Exhibit 16.
15     A.  Yes.
16     Q.  That's another E-mail you sent to Jim?
17     A.  Um-hum.
18     Q.  Who were you referring to here?
19     A.  Craig and Karin.
20     Q.  Exhibit 17, do you recognize this
21 E-mail exchange?
22     A.  Yes.
23     Q.  The -- on the third page of this
24 exhibit is an E-mail from you to -- actually,

Page 109

1 they're all -- this is all an exchange between
2 you and Jim Hoitt other than the very top of the
3 first page where you were forwarding it to a
4 personal E-mail account?
5     A.  Um-hum.
6     Q.  Yes?
7     A.  Yes.
8     Q.  Why did you forward this to a personal
9 E-mail account?
10     A.  I forwarded this to my E-mail account
11 because at this point I was talking to my
12 lawyers and I wanted to have documentation of
13 this E-mail.
14     Q.  So the -- on the third page here,
15 this is the E-mail from you to Jim October 17
16 3:29 p.m.  You say, "Hi, Jim.  I show the
17 following traditional stop loss cases that I
18 have either renewed or up for renewal, but they
19 have not been assigned to me in the David Young
20 system."  What's the David Young system?
21     A.  It's the underwriting system that
22 Berkley Accident and Health underwrites services
23 on.
24     Q.  And the assignment in the David Young

28 (Pages 106 - 109)

Page 110

1 system, is that something that affects your
2 compensation?
3    A.   It's something that could affect my
4 compensation. It's also something when I'm
5 trying to get my arms around my block of
6 business -- I can't run accounts, you know,
7 territory, quote, metrics, things like that
8 unless I've got the accounts all aligned for
9 what I'm managing.
10    Q.   And then there is a subsequent
11 E-mail above it where you write to Jim
12 October 20, 2014, and you say "FYI, Indiana
13 State Council of Plasterers is Mo's account."
14 Who is Mo?
15    A.   Her name is Manjusha. Mo is a
16 nickname. So originally I was cross-referencing
17 the list of accounts I was given that they said
18 I was going to be taking over.
19       And then as I went through the accounts
20 and looked into whether or not they should be
21 mine, I believe what happened on this particular
22 account is I had spoken to Manjusha and the
23 producer for this block of business was in her
24 territory.

Page 111

1    Q.   Meaning, that you acknowledged that you
2 were not the one who should be getting credit
3 for that?
4    A.   Correct.
5    Q.   And then at the -- on Page 1 is
6 ultimately Jim's response?
7    A.   Correct.
8    Q.   And he is listing a number of accounts
9 here. Like the first one, Purity Dialysis
10 Systems, it says you should be assigned once the
11 case renews for the first time --
12    A.   Correct.
13    Q.   -- under your employment?
14       So is that your understanding of how
15 this sort of assignment process worked, that it
16 was the renewal that triggered the change?
17    A.   Correct.
18    Q.   And there's a number of lines where he
19 says same, but there's one that says Xylem
20 JW-Lockton Chicago. We know how that worked
21 out. That's the account that you referenced
22 before that you believe you should have received
23 credit for that John Wappelhorst did?
24    A.   Correct. So if the rules that were

Page 112

1 used on all the other accounts, the first one
2 and everything that says same as the above, I
3 took over handling all of the business for
4 Lockton Chicago and that account should have
5 been transferred.
6    Q.   But it didn't. It actually stayed with
7 John Wappelhorst?
8    A.   Correct, yes.
9    Q.   Now, Exhibit 18, this is an E-mail you
10 received from Jim Hoitt, correct?
11    A.   Yes.
12    Q.   And this is discussing ultimately your
13 bringing on a rep to work underneath you, right?
14    A.   Yes.
15    Q.   Were you supportive of that concept to
16 have somebody working with you?
17    A.   I had concerns about it. But I was
18 supportive in general of, you know, most of the
19 initiatives that were rolled out, yes.
20    Q.   What concerns did you have?
21    A.   Compensation, how that would be
22 handled, because I was told this was being done
23 based on their faith in me. And at the same
24 time if I'm handing off territory and the roles

Page 113

1 of comp are applied, then after the first
2 renewal, those accounts would be moving to Pam.
3    Q.   And then take a look at Exhibit 19.
4    A.   Yes.
5    Q.   This is an E-mail with an attachment
6 from Jim Hoitt with this addendum that you
7 referred to earlier?
8    A.   Um-hum.
9    Q.   Yes?
10    A.   Yes.
11    Q.   And did this -- you believe this went
12 into effect, this compensation addendum?
13    A.   Yes, I do.
14    Q.   And then take a look at Exhibit 20.
15 This is an E-mail from Jim Hoitt to you and some
16 others, correct?
17    A.   Yes.
18    Q.   And was this in reference to the
19 expansion of your territory I think you
20 mentioned before where you received Minnesota?
21    A.   Yes. It was not -- it didn't have
22 anything to do with hiring Pam. I will take
23 that back. The first statement has something to
24 do with producers I might assign to Pam, but

29 (Pages 110 - 113)

Page 114

1  yes.
2      It was -- Greg Anderson had been let
3  go.  And this is an E-mail to underwriting
4  department and some other individuals spelling
5  out that I would be taking over Greg's
6  territory.
7      Q.  So this would have been when that
8  happened, right?
9      A.  Correct.
10      Q.  And what happened with Greg?
11      A.  I'm not sure.  I don't think he was
12  producing, but I'm not sure.
13      Q.  Now, this says that -- it also
14  references Wisconsin.  Did Greg have accounts
15  in Wisconsin?
16      A.  We talked earlier about him having a
17  couple of accounts on that northern border.
18  I'm not sure of having -- him having a few
19  producers.  I'm not sure if there was business
20  on the books, but moving forward I would be
21  handling that territory.
22      Q.  And then take a look at Exhibit 21.
23  This is an E-mail exchange between -- well,
24  the first E-mail is between yourself and

Page 115

1  Brandon Deans?
2      A.  Correct.
3      Q.  Who is Brandon Deans?
4      A.  Brandon Deans is an AON employee that I
5  knew prior to coming to work for Berkley.  He
6  was in charge of what they call their structured
7  panel portfolio, and it is the AON national
8  panel of preferred producers.
9      Q.  Now, you say in your E-mail on Page 1,
10  "The E-mail below is from 2014.  It is an
11  example of the foundation I helped lay to help
12  Berkley get on a national panel.  As you can
13  see, I c.c.'d John Wappelhorst on the E-mail
14  and told him who my connection was at AON in an
15  effort to help Berkley."
16      A.  Correct.
17      Q.  "I know we are offering AON the
18  institutional platform."  What is -- what did
19  you mean by that, the institutional platform?
20      A.  Berkley's stop loss department had
21  created a separate kind of way of handling
22  business for national accounts.  There was
23  the institutional platform that John Wappelhorst
24  and an individual named Ken Kaprelian worked on.

Page 116

1  And there was the standard way of doing
2  business, which was through the local regional
3  reps.
4      Q.  Like you?
5      A.  Correct.
6      Q.  And then Lee responds by saying,
7  "We have offered AON both options for them to
8  choose.  AON has to decide which option is best
9  for them.  There is nothing that centralized can
10  offer that traditional can't, so a jump ball if
11  and when we get on the panel."  Do you know what
12  he meant by that?
13      A.  I believe what Lee was trying to say
14  is that they had -- they were leaving it up to
15  AON whether or not they wanted to work through
16  centralized distribution model or the
17  traditional distribution model.
18      Q.  Do you know whatever happened with
19  this?
20      A.  I don't.
21      Q.  Do you know who Lee reports to?
22      A.  Right -- when I was there?
23      Q.  Correct.
24      A.  I believe he reported to Chris Brown.

Page 117

1      Q.  And how about John Wappelhorst, do you
2  know who he reported to?
3      A.  In the beginning I was told he reported
4  to Jim Hoitt, and then I believe he reported to
5  Chris Brown.
6      Q.  Do you know when that changed?
7      A.  I believe that it changed around the
8  same time that the discussion around Segal
9  company and Xylem because those happened fairly
10  close to one another.
11      I had made a comment earlier today
12  about John Wappelhorst saying that he didn't
13  report to Jim Hoitt, and that's when I
14  understood he was demoted.  And then when he
15  was promoted, I believe he reported directly
16  to Chris Brown.
17      Q.  Is your understanding that
18  John Wappelhorst only reported to Jim Hoitt
19  during the time that he was demoted?
20      A.  No, before he was demoted.
21      Q.  How about after he was demoted, did his
22  reporting structure change?
23      A.  I don't know.  I believe he reported to
24  Chris Brown.  I'm not sure about that.

30 (Pages 114 - 117)

Page 118

1    Q.   Let me have you look at Exhibit 22.
2  So this original E-mail -- let's start at
3  the second page of it -- is an E-mail from
4  Chris Williams.  Who is that?
5    A.   Chris Williams was an underwriter that
6  worked for John Wappelhorst.
7    Q.   And this says duplicate quote.  Yours
8  came in from UMR.  And then for John, it says
9  yours came in from Alliant NY.  And then there's
10  a subsequent E-mail from Chris Williams.  It
11  says please decline UMR quote.  Do you see that?
12    A.   I do.
13    Q.   And then you write above that -- it
14  says September 12, 2017, 2:33 p.m.  It has your
15  name.  And it says, "I thought JW was giving up
16  his traditional brokers."
17    A.   Correct.
18    Q.   Who did you write that to?
19    A.   Rob Haupin, I believe.
20    Q.   Who is he?
21    A.   He was a rep that was located in the
22  same geographic territory as John Wappelhorst, a
23  sales rep.
24    Q.   And when you say same geographic

Page 119

1  territory, you mean like physically where they
2  worked?
3    A.   Correct.
4    Q.   And what was that?
5    A.   It was, I believe, the New England
6  area.  John is based in Marlborough.  And
7  Rob Haupin came on, and there's some kind of a
8  division of territory between the two of them.
9    Q.   When you say you thought JW was giving
10  up his traditional brokers, what did you mean by
11  that?
12    A.   So this -- during this time period, we
13  were notified that Willis, which is a consulting
14  firm common ownership with Towers, had expressed
15  their desire to go through the centralized or
16  the institutional route.
17       And, therefore, all of our local
18  relationships that we had traditionally
19  worked were going to be transferred to either
20  John Wappelhorst or Ken Keprelian who worked
21  with John.
22       It was my understanding at that time
23  and, I believe, the other reps' understanding
24  that as a concession for that change that John

Page 120

1  was going to be giving up anything outside of
2  that that he had maintained control on.
3    Q.   Meaning non-institutional clients?
4    A.   On -- for Rob's business.  When Rob
5  was hired, I believe there was some kind of an
6  understanding.  But I wasn't privy to it.  But
7  in talking with him, I believe that John had
8  traditional brokers that he maintained control
9  over and maintained.  I don't -- like I said, I
10  don't completely understand it.  But, yes, there
11  was some -- some territory shuffling --
12    Q.   So would --
13    A.   -- outside of my territory.
14    Q.   Right.  But this -- Rob Haupin, was he
15  impacted by any of this?
16    A.   Yes.
17    Q.   In what way?
18    A.   So, I guess, can I clarify?  When you
19  say was he impacted by any of this, what do you
20  mean by this?
21    Q.   So the idea that John Wappelhorst isn't
22  giving up his traditional brokers, how -- how
23  was Rob Haupin impacted by that, if you know?
24    A.   Well, in this -- the reason that I

Page 121

1  brought it up specific to this account was
2  because I noticed Alliant was the broker.  And
3  John Wappelhorst's underwriter, Chris Williams,
4  was making a call.  And the reason I contacted
5  Rob and asked him about it is because according
6  to my understanding at that point Rob Haupin
7  should have been responsible for that broker.
8    Q.   Okay.  Because it was in his territory?
9    A.   Correct.  And it wasn't normal that --
10  our rules were first in would receive a quote.
11  And my quote, you can see it on Page 2.  Mine
12  came in from UMR first.  And so I would have
13  been able to negotiate I felt like with Rob
14  where I have no say with John Wappelhorst.
15    Q.   And when you say negotiate, this would
16  have been something in Rob's territory?
17    A.   Right.  So normally -- there is a
18  process that goes on with sales reps when there
19  are duplicates.  There are rules of the road
20  which are first in -- first submission that
21  comes in they get a quote.  The second
22  submission, you know, they might get a quote if
23  they're the current broker on the account.
24       On this specific account, my quote from

31 (Pages 118 - 121)

Page 122

1 UMR came in first. But I was being told that
2 John was going to -- you know, it says right
3 here please decline the UMR quote. After a
4 conversation with John, Alliant is the
5 underlying broker so --
6   Q.  So I guess what I'm trying to
7 understand, though, is how would you have been
8 involved in this? If this wasn't in your
9 territory --
10   A.  The UMR quote was in my territory.
11   Q.  Okay. But -- so I'm confused then.
12 How would --
13   A.  That's --
14   Q.  How would Rob be involved?
15   A.  Because the Alliant office was in
16 John's territory.
17   Q.  So between you and John -- excuse me.
18 Between you and -- did you say John's territory?
19 I'm sorry. Let me go back.
20      So the Alliant office was in Rob's
21 territory?
22   A.  Correct.
23   Q.  Okay. And between you and Rob, who do
24 you believe should have received credit for

Page 123

1 this?
2   A.  If by -- it wasn't an existing account,
3 so it wasn't anything that anyone was paid on.
4 It was a perspective account. So I don't know
5 that like there was any financial credit. This
6 account didn't come up anywhere in my filings.
7 This was an account that we were bidding on.
8      And I'm not privy to all of the
9 agreements between, you know, everything that
10 Rob handled. But I just noticed it was in his
11 territory, and John wasn't following the rules.
12 So, you know, I learned not to push back at that
13 point.
14   Q.  Okay. But just -- I'm just trying to
15 get -- make sure I understand. It came in from
16 UMR. But if the office was in Rob's territory,
17 Rob should have been the one to get commission
18 on it if it had gone through?
19   A.  It came in from the UMR in the
20 Midwest, and that was my submission. So that
21 submission -- when it refers to UMR, that was my
22 submission. When it refers to --
23   Q.  Okay. I got you.
24   A.  It was a duplicate submission.

Page 124

1   Q.  I got you.
2   A.  So Alliant was in Rob's territory.
3   Q.  Okay. So between John and Rob, your
4 thinking was it should have gone to Rob?
5   A.  Correct.
6   Q.  Okay. But between you and John given
7 the fact that there's a duplicate quote, do you
8 believe you should have been credited for this?
9   A.  I should have been -- I should have
10 released a quote to UMR and then a duplicate
11 proposal should have gone to Alliant because
12 they were the current broker of record.
13   Q.  Let me have you look at Exhibit 23, and
14 this is an E-mail exchange between yourself --
15 well, it starts with Carolyn Kniffin, another
16 underwriter or underwriting assistant; is that
17 right?
18   A.  I believe so, yes.
19   Q.  Okay. And then this is -- well, maybe
20 you could tell me. This E-mail chain, what is
21 this about?
22   A.  So it's another -- it's me asking for
23 clarification on how duplicates are handled.
24 And in this situation, it has to do with the

Page 125

1 captive division.
2      So like I said during our last
3 exchange -- and Jim says it here on the first
4 page traditional route for duplicates is the
5 first submission in and BOR will release quotes
6 to them. And I was asking for clarification
7 on how that worked when it came to captive
8 business.
9   Q.  And what was the response?
10   A.  So I must have stated my understanding,
11 first in and broker of record. From there if we
12 only quote one or the other, we will quote both
13 if the situation changes.
14   Q.  And you are reading from Jim's E-mail
15 to you?
16   A.  Yes, sorry, right. I'm just trying to
17 understand what it was about. So it's supposed
18 to be first in and broker of record. Sometimes
19 when they request a quote from the captive
20 division there's a little bit more I will just
21 call like gray because they might not -- they
22 might want to look at a captive quote, but they
23 might not want to commit to going down that
24 road. So that is -- that's what the E-mail is

32 (Pages 122 - 125)

Page 126

1 about.
2  Q.  And so Jim says, "The rule of thumb
3 there is for us to do what's best for Berkley
4 at that point."  That's what he --
5  A.  Correct.
6  Q.  You use the word gray, so does he?
7  A.  Yes.
8  Q.  Basically do what's best for the
9 company.  Did you understand that that's what
10 his guidance was with respect to this situation?
11  A.  Yes.
12  MR. KELLY:  I think this would be a good
13 point to take a lunch break.
14  THE WITNESS:  Sure.
15  MR. KELLY:  John, do you want to do
16 45 minutes?  We can resume at 1:00 o'clock.
17  MR. LISTON:  Reconvene at 1:00, that works
18 for me.
19  THE VIDEOGRAPHER:  We are going off the video
20 record at 12:13 p.m.
21      (A lunch break was taken.)
22  THE VIDEOGRAPHER:  Good afternoon.  We are
23 going back on the video record at 1:01 p.m.  You
24 may proceed.

Page 127

1 BY MR. KELLY:
2  Q.  Ms. Carlson, we are back from lunch.
3 And you understand you are still under oath,
4 correct?
5  A.  Yes, I do.
6  Q.  All right.  I want to turn your
7 attention to what we've marked as Exhibit 25.
8  A.  Okay.
9  Q.  And this is an exchange that you are
10 having with -- well, somebody who is using the
11 E-mail BAHJW Quotes?
12  A.  Correct.
13  Q.  Do you know who that is?
14  A.  It looks like it's Judy Suzuki who
15 is -- she works in the underwriting department.
16  Q.  And at the very top, she writes,
17 "Hi, Amy.  Don just informed me that he spoke
18 with Lee and Lee said new admissions from Willis
19 go to centralized.  So this would be John's."
20  A.  Correct.
21  Q.  Do you see that?
22  A.  Yes.
23  Q.  Was that when you first learned that
24 Willis submissions would go to centralized, or

Page 128

1 did you learn that before this?
2  A.  That's when -- there had been
3 talk about Willis going centralized, but an
4 official announcement had not been made if I'm
5 remembering this point in time correctly.  And I
6 had sent something over.  And, yes, I received
7 an E-mail coming back.  And Don is part of
8 senior management.  So that is when I first
9 learned the Willis submissions would be going
10 centralized.
11  Q.  And who is Don?
12  A.  Don Gasparro.  He used to be president
13 of Berkley Accident and Health and he -- I
14 believe his official title was COO.
15  Q.  And then if I could have you turn to
16 Exhibit 26.
17  A.  Yes.
18  Q.  So let me start off at the very bottom
19 here.  This is, again, is a fairly lengthy
20 E-mail exchange.  I want to ask you some
21 questions about it.  You recognize this E-mail
22 exchange, right?
23  A.  I do, yes.
24  Q.  So let's start off at the third page at

Page 129

1 the beginning.  It looks to be an E-mail from
2 Kristine Thompson?
3  A.  Yes.
4  Q.  And who is she?
5  A.  She was a stop loss sales rep based out
6 of the Colorado area.
7  Q.  And then Lee responds to her -- and the
8 subject that they're discussing is Willis being
9 centralized, right?
10  A.  Correct.
11  Q.  And then Lee responds and then you --
12 because you are copied on this -- and by the
13 way, let me stop for a second.
14      The people that are c.c.'d on
15 Lee Davidson's E-mail to Kristine Thompson
16 July 24th at 8:41 a.m., can you just run
17 through who they are by job title?
18  A.  Sure.  So all of the people listed with
19 the exception of Jim Hoitt and Chris Brown are
20 traditional what we call -- they worked on the
21 non-centralized stop loss business in the sales
22 department.
23  Q.  Not captive but the traditional stop
24 loss?

33 (Pages 126 - 129)

Page 130

1    A.   There are about three people -- I think
2 three or four individuals -- Scott Campbell,
3 Chase Schneider maybe.  But there were three
4 individuals I worked with that could sell either
5 product, either captive or traditional stop
6 loss.
7    Q.   Who were they?
8    A.   Scotty Campbell, Chris Schneider.
9    Q.   Is that Chase Schneider?
10    A.   Chase Schneider, yes.  I'm sorry.  I'm
11 looking at the wrong page and David Frawley --
12 I'm sorry, not David Frawley.  I think that
13 that's it.
14    Q.   Wait.  Did you say yes to
15 David Frawley?
16    A.   No to David Frawley.
17    Q.   So Scott Campbell and Chase Schneider
18 you said could sell both traditional and
19 captive?
20    A.   Yes.  Honestly, I'm only sure about
21 Scott Campbell.  I remember there being three
22 individuals that I worked with, three men, that
23 could sell either product.  I know Scotty was
24 one of them.

Page 131

1        I don't know at what point in time,
2 though, and if that had changed at this point.
3 This was close to me leaving.  But, yes, all of
4 them have the ability to sell stop loss business
5 through the traditional stop loss route.
6    Q.   Okay.  Were they -- let me make sure I
7 get this right.
8    A.   Yes.
9    Q.   Scott Campbell and Chase Schneider were
10 in the captive division?
11    A.   No.  They could sell either product
12 for a period of time.  There were three reps
13 that I worked with where when we started to make
14 that change and hire a dedicated captive sales
15 staff -- when Jim Hoitt moved over, instead of
16 being my manager when he moved to managing the
17 captive division, there was a period of time
18 where some reps were allowed to sell captive
19 products or traditional stop loss.
20    Q.   And did that change to where they were
21 no longer allowed to do that?
22    A.   I believe so.
23    Q.   Do you know when that occurred?
24    A.   I think it was late 2017.

Page 132

1    Q.   Do you know why they were allowed to
2 sell both for a time?
3    A.   I don't.
4    Q.   Did you want to sell both?
5    A.   I did.
6    Q.   Who did you tell that to, if anyone?
7    A.   I don't know that I had a conversation
8 with anyone about it.  I don't recall having a
9 conversation with anyone about it.
10    Q.   And so after this period of time, where
11 did Scott Campbell and Chase Schneider wind up?
12 Did they wind up on the captive side of things
13 or on the traditional stop loss side of things?
14    A.   Scott Campbell ended up on the
15 traditional side of things.  Chase Schneider,
16 I think he left at some point.  And I might
17 be getting Chase's name confused.  There was
18 some -- there was a guy in New England that
19 ended up making a move to the captive
20 department.
21        Now that I think about it, Chase might
22 have been down in Texas.  And without having
23 additional notes to refer to, the only one that
24 I'm sure about is Scott Campbell.  But I'm

Page 133

1 fairly certain there were three people that were
2 able to sell both.
3    Q.   So just to go through this list,
4 Justin Hansen is a sales rep?
5    A.   Right.
6    Q.   In the traditional side, right?
7    A.   Correct.
8    Q.   Okay.  How about Matthew Bryon?
9    A.   He was brought in, I believe, just as a
10 traditional sales rep.  He worked in St. Louis.
11    Q.   William Fowler?
12    A.   I believe he was just traditional.  He
13 is in Seattle.
14    Q.   Sales rep again?
15    A.   Correct, yes.
16    Q.   David Frawley was a sales rep?
17    A.   In Texas, correct.
18    Q.   Okay.  Pam Gallo, what was her title?
19 I mean, she was not the same title as you,
20 right?
21    A.   She was.
22    Q.   She was?
23    A.   Yes.
24    Q.   But wasn't she reporting to you?  There

34 (Pages 130 - 133)

Page 134

1 was no differentiation in titles?
2     A.   Correct.
3     Q.   Rob Haupin, he is a traditional sales
4 rep, right?
5     A.   Correct.
6     Q.   You mentioned Chase Schneider.  How
7 about Joshua Shaffer?
8     A.   Shaffer, that might have been the
9 person that I'm thinking about in New England
10 who ended up staying with the captive route
11 after a brief time of being able to sell both
12 products.
13     Q.   So you write in response to Lee's
14 E-mail on Page 2 starting at Page 2 and going
15 onto Page 3, right?
16     A.   Yes.
17     Q.   And you state at the top, "I don't know
18 about the other reps out there, but I'm losing
19 sleep on a nightly basis over what is going on
20 at work with our centralized unit"?
21     A.   Yes.
22     Q.   Why did you say that?
23     A.   Because it was costing us business and
24 I did not feel like senior management had been

Page 135

1 clear about what was happening and it was
2 upsetting.
3     Q.   When you say costing us business, do
4 you mean you or the company?
5     A.   The company.
6     Q.   How was it costing the company
7 business?
8     A.   Because we were being told -- I will
9 take it back to an I statement.  I was being
10 told and other reps had said that they were
11 being told that Willis did not want to work
12 through a centralized distribution model,
13 that they wanted to work through the standard
14 distribution model.
15     Q.   And how did you learn this information?
16     A.   I was told by their -- the Willis reps
17 in Chicago initially.
18     Q.   So other sales reps besides you felt
19 similarly about how this would impact the
20 company?
21     A.   Correct.
22     Q.   Who in particular?
23     A.   I have to go back to the list,
24 Kristine Thompson, Justin Hansen,

Page 136

1 Scott Campbell, David Frawley, Pam Gallo,
2 Rob Haupin.  I --
3     Q.   Were these -- go ahead.  I'm sorry.
4     A.   These were individuals that I remember
5 either being on some kind of a call with or
6 having discussions about the situation with.
7     Q.   Were these people concerned about how
8 this might impact their own compensation?
9     A.   That was part of it.
10     Q.   So the move of Willis to the
11 institutional unit would have impacted all
12 the reps across the country, right?
13     A.   Maybe not all of them, but they
14 certainly would have lost out on opportunity.
15 Whether or not they had any business on the
16 books where it would have changed their
17 compensation, I can't be certain that that's
18 the case for all of them.
19     Q.   And then you say here, "I believe the
20 real motivation for Willis agreeing to move to
21 the centralized model lies in the incentives we
22 have offered them as outlined below," and then
23 you list a number of things.  Why do you believe
24 that?

Page 137

1     A.   We were offering them enhanced terms
2 to go through the centralized model.  So these
3 things when I go down through each item -- and
4 it looks like there are around seven or eight of
5 them.  They would only get these terms if they
6 went through the centralized unit.
7     Q.   Do you know what Willis promised in
8 exchange for these terms?
9     A.   I will just call them bats.  So we
10 would have been given the chance to quote out
11 business either way whether it was going to be
12 through centralized or institutional or standard
13 business, so we were just enhancing the terms.
14       So I don't think that there was
15 anything -- I don't know of anything that we
16 would receive for them going through the
17 centralized unit, but there were -- you know,
18 so I don't think it was a two-way thing.  I
19 think we were giving them a lot more to go
20 through centralized, but they weren't giving
21 us necessarily anything else back.
22       I think the feeling of management, if I
23 remember correctly, was that there were some
24 efficiencies that came from centralizing the

35 (Pages 134 - 137)

Page 138

1 business.
2    Q.  Do you know who made the decision to
3 bring -- or assign Willis to the centralized
4 institutional unit?
5    A.  I'm not -- I don't know.  I was not
6 part of that.
7    Q.  Now, at the very top of Page 1, there
8 is an E-mail from Justin Hansen to you --
9    A.  Yes.
10    Q.  -- that says Willis draft?
11    A.  Yes.
12    Q.  Do you know what this was supposed to
13 be?  I know you didn't write it.
14    A.  So Justin ran a lot of situations by
15 me before he spoke out.  And I believe in this
16 situation he wanted me to look at an E-mail
17 before he sent it.  I believe that's why it says
18 draft.
19    Q.  Did he express to you that he was upset
20 over this?
21    A.  Yes.
22    Q.  He says in his E-mail -- and, again, I
23 know you are not the author of this, but I
24 nevertheless I want to ask you about it.

Page 139

1       In his third paragraph he says,
2 "I'm concerned Berkley is pushing Willis,
3 Wells Fargo, AON, and others to a centralized
4 model when this is not something the market
5 is demanding.  In fact, I can make the case
6 centralized was a development out of internal
7 politics than Berkley responding to a market
8 need."
9    A.  Correct.
10    Q.  Do you know what he was referring to by
11 internal politics?
12    MR. LISTON:  Objection, calls for
13 speculation.  Can you please answer?
14    THE WITNESS:  I believe he was referring to
15 John Wappelhorst.  We felt like John was the
16 person pushing this and that it was a false
17 narrative, that Willis never -- we were being
18 told by Willis that they did not want to go
19 through the centralized unit, that they wanted
20 to work with the local reps.  So I believe
21 that's what he meant.
22 BY MR. KELLY:
23    Q.  John -- do you know why John would
24 have been pushing having this assigned to

Page 140

1 centralized?
2    A.  Because he was compensated on all of
3 it.
4    Q.  So I know you said you didn't know who
5 would have made the decision, but is it your
6 understanding that the decision would have been
7 made by someone other than John Wappelhorst?
8    A.  I'm not confident of that.
9    Q.  So in your mind, it's possible John
10 could have had decision-making authority over
11 assigning Willis to institutional?
12    A.  Yes.
13    Q.  Let me have you turn to Exhibit 27.
14 This is an E-mail from Chris Brown to you,
15 correct?
16    A.  Correct.
17    Q.  And it says among other things, "I was
18 startled to read in your E-mail that you have
19 discussed your displeasure with our company's
20 strategy with a competitor and with a producing
21 source that will be transitioning to this
22 distribution model."  When he wrote that to you,
23 did you know what E-mail he was referring to?
24    A.  Yes.

Page 141

1    Q.  What E-mail was that?
2    A.  So it was part of the last exhibit that
3 you had me look at.  And it was after Lee had
4 encouraged us to be open about how we felt, and
5 I had written an E-mail expressing my concerns.
6    Q.  And so that would have been the E-mail
7 in Exhibit 26, the one on the second page -- or
8 that begins on the second page?
9    A.  Correct, yes.
10    Q.  And so when Chris is referring to
11 discussing your displeasure with a competitor
12 and with a producing source, who -- do you know
13 who he was referring to from your E-mail?
14    A.  I think -- I believe that they were
15 two different sets of people.  Tom Costello
16 who I refer to to in the second paragraph is a
17 competitor, and the producing source was Willis
18 and my contacts at Willis.
19    Q.  Did you ever talk to Chris about this
20 E-mail that he sent to you, Exhibit 27?
21    A.  I don't remember having a conversation
22 with him about it.  I believe that he followed
23 up with me at some point.  And then based on his
24 response, I felt fairly backed in a corner where

36 (Pages 138 - 141)

Page 142

1 I wasn't sure what I could say. I was very
2 surprised by his response.
3    Q.  Are you aware of any sales reps who
4 quit over the issue of institutionalize taking
5 over accounts?
6    A.  I know there was quite a bit of
7 attrition in reps after I left or quite a few
8 people left, but I'm not quite sure what their
9 motivations were.
10    Q.  Now, take a look at what we've marked
11 as Exhibit 28.
12    A.  Okay.
13    Q.  Aside from the E-mail on Page 4 which
14 is between Kelly Webb and you, the rest of
15 this is an E-mail exchange between yourself
16 and Lee Davidson, correct?
17    A.  Yes.
18    Q.  This reference to Stealth, what is
19 Stealth?
20    A.  Stealth was production source based
21 in -- out of Arizona with offices around the
22 country.
23    Q.  And was there a situation where you
24 felt like either you or Pam didn't get credit

Page 143

1 for business from Stealth that was in your
2 territory?
3    A.  Yes.
4    Q.  And is that what's reflected in the
5 subject matter of Exhibit 28?
6    A.  Yes.  There were two accounts.
7    Q.  Are they both reflected in this
8 discussion; or when you say there's two, is
9 there a separate one?
10    A.  First account was Rogers Memorial
11 Hospital.  I reference two accounts, so the
12 bottom of Page 2.
13    Q.  So your E-mail to Lee on Page 2 says,
14 "It's my understanding Stealth did not tell us
15 he was in Kansas City.  It might have been our
16 mistake."  What did you mean by that?
17    A.  So Mike Monnich works for Stealth.
18 And I had talked to Kelly, who was one of the
19 underwriters on the main part of the Stealth
20 production.  And what Kelly had told me is that
21 there was an account that was assigned to a
22 rep -- I believe it was Matt Byron -- and
23 that -- I believe I was asking -- let me just
24 take a second here.

Page 144

1    So when I was looking into Lee to
2 rectify the situation for Pam and for myself,
3 I believe that he said we were told that Mike
4 was in Kansas City.  And then based on my
5 conversation with Kelly, I was just saying that
6 Kelly thought that we made an assumption and we
7 weren't told that.  So I was just trying to give
8 him more information about what I had been told.
9    Q.  So was this a situation where somehow
10 a mistake was made and an account was assigned to
11 a rep outside of your territory when it should
12 have been assigned to Pam?
13    A.  Correct.  And that rep -- the account
14 ended up selling.  It was a very large account.
15 It was over a million dollars.  And that rep
16 never worked on the account.
17    So sometimes the underwriter will do
18 all the work.  It's sold.  I was told by the
19 sales rep that it was accidentally assigned to
20 that he did no work on it.  It ended up selling.
21 So I was bringing up the error.
22    Q.  And Lee writes back to you -- and this
23 is on Page 2 -- that he's not going to make the
24 change until after the new year, correct?

Page 145

1    A.  Yes.
2    Q.  Now, do you know how the mistake
3 occurred?
4    A.  I was told by underwriting that we
5 assumed that -- the account is assigned by
6 where the Stealth employee is.  And I was told
7 that we made an incorrect assumption that he was
8 in Kansas City and that's why it was assigned to
9 Matt when, in fact, he lived in Michigan and it
10 should have been assigned to Pam.
11    Q.  Both of the accounts that are
12 referenced in here?
13    A.  I think there was one account.  I
14 believe it was with a separate rep.  And the
15 issue on that account was that Justin Hansen,
16 who was in the Carolinas, had been working the
17 account and was involved on the account.
18    And I can't remember the exact
19 situation, but I believe there was maybe a
20 transition when Mike came into the account
21 midway or something like that.  So that was
22 a little bit more understandable.
23    Q.  Was there ever a time where a --
24 something was mistakenly assigned to you that

37 (Pages 142 - 145)

Page 146

1 was ultimately -- you know, it was realized it
2 was a mistake?
3    A.   Not that I can think of.
4    Q.   Let me have you turn to Exhibit 29.
5 This is an E-mail from Jim Hoitt to a number of
6 people including yourself.  And would -- I know
7 this is probably a different time period than
8 when I asked you this before, so some of these
9 names might be different.
10     But are these -- to your knowledge the
11 people in the to line, are they all sales
12 reps --
13    A.   Yes.
14    Q.   -- of some sort?
15    A.   Most of them.  So Bethany wasn't,
16 Bethany Bomengen.  That was Jim's assistant at
17 the time.  And then Chris Brown, of course,
18 wasn't.  So it was underwriting, senior
19 management, or an executive assistant.
20    Q.   Okay.  So not everyone in the to line
21 is a sales rep?
22    A.   Correct.
23    Q.   And this is a communication stating
24 that Segal gets assigned to John Wappelhorst,

Page 147

1 correct?
2    A.   Yes.
3    Q.   Yes?
4    A.   Yes.
5    Q.   Okay.  Sorry.  I didn't hear your
6 answer.  And was that the case from then on,
7 meaning, going forward from the date of this
8 E-mail that all of the Segal RFPs for stop loss
9 went through John?
10    A.   Yes.
11    Q.   This is one of the -- one of the items
12 that you believe should have been assigned to
13 you, correct, at least the Segal work in your
14 territory, correct?
15    A.   I had initiated contact with a Segal
16 employee in Chicago.  I was reassured by Jim
17 midway through the process.  I received a
18 submission from him.  I sent it into intake,
19 and they assigned it to John.  And he wrote the
20 account, and that's what prompted this E-mail.
21    Q.   Right.  But what I'm just getting at
22 is, you know, in your -- what we went through in
23 Exhibit 11, the list of all the damage items --
24    A.   Correct.

Page 148

1    Q.   -- one of the damage items is Segal
2 accounts.  And so this is what -- when we're
3 talking about Segal accounts, we're talking
4 about what's reflected in Exhibit 29?
5    A.   Correct.
6    Q.   And your claim was not that you should
7 get Segal accounts nationally but just the Segal
8 accounts in your territory?
9    A.   Prior to them making this change
10 because I solicited the submission -- I was
11 sent the submission.  And I had been reassured
12 and other reps were assured by Jim Hoitt that --
13 you know, that John did not handle Segal on a
14 national basis.  I felt like I should be awarded
15 that account for the first year.
16    Q.   Who were the other reps that John
17 reassured about that?
18    A.   It was not John that reassured anyone.
19 It was Jim Hoitt.
20    Q.   Sorry, sorry.
21    A.   I know that Manjusha Sheobaran was part
22 of that conversation as was Scott Campbell.
23    Q.   And how do you know that?
24    A.   Because we talked about it.

Page 149

1    Q.   Meaning Manjusha, Scott, and you?
2    A.   Correct.
3    Q.   And Manjusha was a sales rep along with
4 Scott?
5    A.   Correct.
6    Q.   But just so I'm clear, because on the
7 UMR work, your contention is that that should
8 have been assigned to you on a national basis,
9 correct?
10    A.   Correct.
11    Q.   But with Segal your claim is only that
12 the work that would have derived from your
13 physical territory or geographic territory
14 should have been credited to you, not that you
15 should have been entitled to receive credit for
16 Segal nationally?
17    A.   Correct.  It was a local relationship.
18    Q.   Do you know why Segal was assigned to
19 John Wappelhorst?
20    A.   I was told it was to appease him.
21    Q.   Who told you that?
22    A.   Join Hoitt.
23    Q.   Did he explain what he meant by that?
24    A.   Let me think about that for a minute.

38 (Pages 146 - 149)

Page 150

1 So the timing was such -- this was shortly after
2 John Wappelhorst said that he didn't report to
3 Jim Hoitt, which upset Jim Hoitt.
4      I believe that there were some
5 conversations after that. It was my
6 understanding that's when I thought he was more
7 or less demoted. And as a -- as appeasement
8 they awarded him Segal on a national basis.
9      Q.   But did Jim tell you, I mean, anything
10 about why they needed to appease him? Like
11 what -- why, or did he tell you? Maybe you
12 don't know.
13      A.   Well, my understanding is that John
14 was upset as they hired reps, and I remember
15 thinking that he felt like he was losing power.
16      Q.   Now, you talked about previously this
17 Lockton Xylem account?
18      A.   Correct.
19      Q.   Okay. Let me have you turn to what
20 we've marked as Exhibit 30.
21      A.   Yes.
22      Q.   First of all, do you recognize this
23 E-mail chain?
24      A.   I do.

Page 151

1      Q.   Okay. And what is it?
2      A.   So I believe -- let me just look at
3 this for one more minute. So I had received
4 an account called Xylem from my contacts at
5 Lockton in Chicago. And I worked on all of
6 their business and was told I was taking over
7 that business.
8      So when I received that renewal in,
9 once again, it was assigned to John. And so I
10 picked up the phone and I called John to talk to
11 him about this account specifically. And he
12 asked me who -- who told me I was going to be
13 working on this account.
14      And I told him, you know, that I was
15 given an account -- or a list of accounts that I
16 was told I would be taking over. I was told by
17 Jim I would be taking over the account. I was
18 told by my underwriter, Dorie, I would be taking
19 over the account.
20      And that is when John told me that he
21 did not report to Jim Hoitt. Jim asked me if I
22 had talked to John, and I told him I had. He
23 asked me what he said. And I told him what John
24 said about not reporting to him. And so this

Page 152

1 last comment was Jim saying he needed to -- he
2 needed to cool down based on what I had shared
3 with him.
4      Q.   Just so I'm clear, when you started
5 with the company, you didn't have any
6 pre-existing relationship with this -- let
7 me back up even further.
8      When you say Lockton and Xylem, what's
9 the relationship between Lockton and Xylem?
10      A.   So Lockton is -- Xylem is the account
11 name, and Lockton is the consultant or the
12 broker name. So they were the producer on the
13 account.
14      Q.   And this was existing business in your
15 territory when you started with the company?
16      A.   Correct.
17      Q.   And it was your understanding that when
18 the renewal was coming up that you would get
19 credit for it like in other situations?
20      A.   Correct. That's addressed, I believe,
21 in the producer compensation statement. And it
22 was also brought up in the offer letter.
23      Q.   So when this wound up being assigned to
24 John, did John tell you why that was happening?

Page 153

1      A.   He just said that he didn't report to
2 Jim Hoitt, and I took it back to Jim at that
3 point.
4      Q.   Right. And that's reflected -- you
5 wrote to Jim -- this is starting on the second
6 page of your E-mail. You said -- and it goes
7 onto Page 3, "I just talked to John about Xylem.
8 He said he doesn't answer to you. He answered
9 to Chris and told everyone he's keeping it."
10      A.   Correct.
11      Q.   And that's reflective of a conversation
12 you had with John?
13      A.   Correct.
14      Q.   Okay. So did you have any
15 understanding as to why John would have
16 any relationship with this organization?
17      A.   Well, he would have worked with them
18 in the territory that he handled prior to
19 Rob Haupin being hired. So -- and I believe
20 that over time, because there was a vacancy in
21 my position, there were several different people
22 handling accounts. I don't know how all of
23 that, you know, came about, what the rhyme or
24 reason was. There wasn't just one person.

39 (Pages 150 - 153)

Page 154

1  So I would not be surprised to know
2 that he worked with Lockton in New England, and
3 maybe somewhere along the line he ended up with
4 a submission from the Chicago office.
5  Q.  And even though you were now the
6 new rep in the territory, he didn't want to
7 relinquish that?
8  A.  Correct.
9  Q.  And did he ever?
10  A.  No, no.
11  Q.  Now, turn, if you would, to Exhibit 31.
12 I apologize.  This one is a little faint, but I
13 think you can read it.
14  A.  Yes, I can read it.
15  Q.  This is an exchange -- the main body
16 of this is an exchange between yourself -- on
17 Page 1 anyways, an exchange between yourself and
18 Jim Hoitt, correct?
19  A.  Yes.
20  Q.  And underneath that is an E-mail from
21 you to John Wappelhorst and some others about
22 the Xylem account, right?
23  A.  Yes.
24  Q.  And you copied Jim Hoitt and he

Page 155

1 responds and says, "Thanks.  I owe you one
2 on this."
3  A.  Correct.
4  Q.  And then you respond, "No worries,"
5 right?
6  A.  Correct.
7  Q.  Do you know why he said that he owed
8 you on this?
9  A.  He asked me to let it go.
10  Q.  And did you agree to let it go?
11  A.  Yes, with the understanding that the
12 second year, you know, I would have a shot, you
13 know, at picking up the account.
14  Q.  And when you say you said let it go, I
15 will turn your attention to Exhibit 32.  That's
16 the exchange between yourself and Jim where he
17 asked you to let it go and you say, "No problem,
18 done," right?
19  A.  So that was the next year.  So 2014 was
20 the first year I worked at Berkley.  That is the
21 first time that he asked me to let it go.
22  And if you will notice the date on the
23 last exhibit that we looked at, it precipitated
24 John Wappelhorst being awarded Segal Company.

Page 156

1 And all of this was part of the time period
2 there were discussions about who John reported
3 to and what rules he had to play by.
4  Q.  Right.  But Exhibit 31 is still in
5 2015, right?  I mean, I know you forward it to
6 Cathi Villano in 2017.  But the body of the
7 E-mail, Exhibit 31, is still talking about
8 September of 2015, right?
9  A.  Exhibit 31 -- yes.  The one I forwarded
10 to Cathi Villano per her request was 2015.
11  Q.  Right.  So the first year it wasn't
12 assigned to you was 2014?
13  A.  Correct.
14  Q.  And then the renewal came up in 2015,
15 and that's what Exhibits 31 and 32 are in
16 reference to?
17  A.  Yes.
18  Q.  Now, Exhibit 33 is -- at the top there
19 is another one you forwarded to Cathi Villano,
20 right?
21  A.  Yes.
22  Q.  But the bulk of the E-mail
23 are exchanges that you are involved in
24 either with Jim or with John Wappelhorst

Page 157

1 in September of 2015, correct?
2  A.  Correct.
3  Q.  Okay.  Let's start at the second page
4 of this.  This is -- the first message is from a
5 jayhunt@lockton.com to you?
6  A.  Correct.
7  Q.  What was in that E-mail?
8  A.  That was the renewal packet for the
9 Xylem account.  And I had known this individual
10 for a long time.  And he assumed I was handling
11 it, so he sent me the renewal.
12  Q.  This individual -- what's his name?
13  A.  I think it's John Hunt.
14  Q.  Is this somebody in Chicago?
15  A.  At this point I believe -- it was
16 right around this time that they had moved to
17 marketing the Lockton Dunning business.  So all
18 Lockton offices centralized their operations
19 through the Dallas, Texas, office, but it was
20 based on where the actual producer was located.
21  Q.  So the next thing that happens on this
22 chain is you are forwarding this E-mail from
23 Mr. Hunt to John on September 18?
24  A.  Correct.

40 (Pages 154 - 157)

Page 158

1    Q.  And this would have been after you were
2  told or asked to let it go, right?
3    A.  I was asked to let it go for the first
4  year.  And when I received the submission in the
5  next year, I was going to check with Jim to see
6  if that was going to be the same way for the
7  next year because we hadn't talked about it for
8  a year.
9        And this time of year it's quite busy.
10  So I had received this submission in with
11  hundreds of other submissions.  I meant to talk
12  to Jim about it and I -- I believe -- if I'm
13  remembering the situation correctly, I neglected
14  to forward it over, just an oversight on my
15  part, to Jim to ask him.  And John was upset
16  because I had taken -- it had taken me awhile to
17  get him the submission.
18    Q.  That's what he says this is despicable?
19    A.  Correct.
20    Q.  But, again, this E-mail that you sent
21  to John follows your exchange with Jim Hoitt in
22  Exhibit 32 where he says I'm asking you to let
23  this one go and you said no problem, done?
24    A.  I would have to -- let me go back

Page 159

1  to 32.  Was that the 2015 one?
2    Q.  Sure.
3    A.  Yes.
4    Q.  And so going back to Exhibit 33, second
5  page, you apologize to John in the next E-mail,
6  correct?
7    A.  Correct.
8    Q.  And then you forwarded that to Jim?
9    A.  Correct.
10    Q.  Why did you forward that to Jim with
11  the comment -- I will let you pronounce it --
12  u-r-g-h?
13    A.  Because of John's reaction and him
14  thinking that -- I had worked on bringing the
15  Lockton relationship to Berkley on a national
16  basis, and Jim knew that.  So it was an uphill
17  battle with John Wappelhorst.
18        And, you know, that's why Jim
19  makes the comment where he says, "You have
20  my support.  After all the work we did, we
21  would not do anything purposely to screw up
22  the Lockton Dunning relationship."
23        So that was -- his comment was about
24  me, that I would never hold onto the E-mail and

Page 160

1  send it to John late intentionally because I was
2  trying to get the deal done on a national basis.
3    Q.  Did you agree that you had support from
4  Jim Hoitt when he was your supervisor?
5    A.  No.
6    Q.  In what way did he not support you?
7    A.  I felt like that his -- I felt like Jim
8  would say what would -- anything that it took to
9  get the deal done even if that was bringing me
10  on and then worry about the details later.
11        I had also been told by Craig and Karin
12  to get anything the company said in writing.  I
13  was told by John Wappelhorst the same thing,
14  that they lied.
15    Q.  When did Craig and Karin say this to
16  you?
17    A.  Shortly after I started.
18    Q.  How about John?
19    A.  Shortly after I started.
20    Q.  Did either of those individuals tell
21  you the basis for their belief that the company
22  lied and you needed to get things in writing?
23    A.  It was based on what events that had
24  happened specific to their situation.  If I am

Page 161

1  remembering correctly, I think that Berkley
2  Accident and Health bought Craig and Karin's
3  block of business.  And they felt like there
4  were promises made to them that the company went
5  back on.
6        And the situation with Wappelhorst, he
7  was telling me what Jim had told me about my
8  territory wasn't correct and that he had been
9  made promises.  And I -- I don't recall any
10  specifics on that.  It was just a unified kind
11  of -- and I remember it because it was soon
12  after I started, and I just was surprised.
13    Q.  And then let me have you turn to
14  Exhibit 34.
15    A.  Yes.
16    Q.  And this E-mail exchange pertains
17  to the third year renewal for the Lockton Xylem
18  account?
19    A.  Correct, 2016.
20    Q.  And Jim writes to you on the first
21  page, "Chris is fighting this battle with John.
22  For now assume John will handle the renewal."
23  And did that, in fact, happen, that John handled
24  the renewal for 2016?

41 (Pages 158 - 161)

Page 162

1    A.   Correct, yes.
2    Q.   What about 2017?
3    A.   I don't believe I was there.  You know,
4  looking at the timing, these renewals -- they
5  were January ones.  They usually come out in
6  August or September.
7         Yes, I didn't -- I didn't handle it in
8  2017.  So John would have handled it assuming
9  that the account was still with us.
10   Q.   Because sometimes accounts leave --
11   A.   Correct.
12   Q.   -- and go elsewhere?  Okay.
13        Did Jim ever follow up with you with
14 any additional details about Chris and his
15 battle with John over this account?
16   A.   I don't remember hearing anything with
17 regards to the timing that you mentioned.  I
18 think at that point -- you know, it's the third
19 year I had taken it to him and was told that he
20 was going to retain it.  And John wasn't much of
21 a topic of conversation at that point.
22   Q.   So you talked earlier about this
23 minimum essential coverage or MEC --
24   A.   Yes.

Page 163

1    Q.   -- work?
2         And I think you said Scott -- or
3  Scotty Campbell was the only one who sold that?
4    A.   Correct.
5    Q.   Were you ever told why that was?
6    A.   I was told it was a pilot project.
7    Q.   But in terms of why him versus somebody
8  else, was there any explanation that was
9  provided to you about why he was assigned this
10 versus anyone else?
11   A.   I believe it had something to do with
12 the production source, and it was Stealth.  And
13 Scotty, back when they assigned this business to
14 Stealth, he handled the relationship -- the
15 relationship at their home office.
16   Q.   And who told you this?
17   A.   Jim Hoitt.
18   Q.   How did you get along with Jim Hoitt
19 overall?
20   A.   For the first couple years I worked
21 there, I felt like I had a good relationship
22 with him.  But it deteriorated over time.
23   Q.   In what way?
24   A.   I didn't trust him.

Page 164

1    Q.   Why didn't you trust him?
2    A.   Because he had gone back on so many
3  things that he told me.
4    Q.   With respect to what in particular?
5    A.   Well, there was -- I remember sitting
6  down with him, and he said I seemed angry.  And
7  I outlined five issues.
8         There was a situation where I was
9  inappropriately touched by a sales rep along
10 with Pam Gallo who worked for me.  And Jim
11 and -- Jeff Sealey was the rep's name --
12 Jeff Sealey's boss were there.  They witnessed
13 it.  And they didn't report it to HR, which I
14 was disappointed with.
15        And he had -- Pam started working for
16 Berkley when I recruited her.  There were two
17 things that Jim promised Pam.  One of them was
18 that her underwriters would not be Craig and
19 Karin based on the problems that I had had with
20 them, and the other was that she would have
21 access to the underwriting system.  And then he
22 went back on those promises.
23   Q.   You said that you were inappropriately
24 touched by Jeff Sealey, and Jim and Jeff Sealey's

Page 165

1  boss witnessed.  Who was Jeff Sealey's boss?
2    A.   He reported to Sean Lanter.
3    Q.   Sean Lanter was Jeff Sealey's boss?
4    A.   Correct.
5    Q.   What was his title?
6    A.   I -- at the time this happened, I
7  think it would have been like my situation
8  where we had the same title.  I know that at
9  some point -- and it might have been before
10 that -- he was promoted in the captive
11 department.
12   Q.   So Sean Lanter was a sales rep like
13 you?
14   A.   With a direct report, correct.
15   Q.   And when did this occur, this
16 inappropriate touching?
17   A.   2015.
18   Q.   And what happened?
19   A.   Sean and Jim -- so Sean Lanter and
20 Jim Hoitt had flown into Chicago.  Pam Gallo was
21 there.  I was there.  We went to dinner.  And
22 went to -- we were in Old Town.  We went to the
23 Courthouse, which is a sports bar.  The World
24 Series was on, and Sean Lanter was a Kansas City

42 (Pages 162 - 165)

Page 166

1 fan.
2     And we went to the bar. We were
3 sitting at the bar. And Jeff stood up and
4 touched me on the backside as I was sitting in
5 the bar stool and then did it directly to my
6 direct report, Pam, and with Jim and Sean
7 standing there.
8     So I -- Pam and I were visibly upset.
9 We stood up. We walked down to the bathroom to
10 try and compose ourselves, and we left.
11   Q. You said Jim and Sean were standing
12 there. Do you know if they observed this?
13   A. I don't know if they observed it. The
14 TV was in front of them, and we were sitting to
15 the side of them. But they -- I mean, they
16 observed my reaction and Pam's reaction.
17   Q. And how do you know that?
18   A. Because I yelled at him.
19   Q. And what did Jim and Sean do at that
20 point?
21   A. They apologized for him.
22   Q. What did they say in particular?
23   A. I don't know that I can remember
24 particulars at the actual restaurant. They

Page 167

1 called me when I was on the train on the way
2 home, apologized, said that they were going to
3 talk to him about it, that they had stayed after
4 and talked to him about it. And they were going
5 to create some kind of a work-around.
6   Q. What do you mean work-around?
7   A. Jeff Sealey was assigned to selling
8 captive business, and we were supposed to work
9 together. I do remember Jim saying that he had
10 explained to Jeff that it was going to take time
11 to build trust back between Pam and me and him.
12 And, therefore, we were going to have to figure
13 out how we're all going to work at the same
14 company.
15     The work-around was that if I had
16 clients that wanted captive business I would not
17 take it to Jeff. I would take it to Sean Lanter
18 who wasn't assigned to that territory but was
19 managing him.
20   Q. And so that happened?
21   A. Yes.
22   Q. Did you report this incident to HR?
23   A. I did not report it to HR. And Jim did
24 not report it to HR the first year. I told Jim

Page 168

1 I thought he should have reported it to HR, and
2 he eventually reported it to HR.
3   Q. When did he do that?
4   A. The following year.
5   Q. How did you learn that he had reported
6 it to HR?
7   A. HR reached out to me and said they
8 wanted to talk to me.
9   Q. And did you talk to someone in HR and
10 relay what had happened?
11   A. I did.
12   Q. And what was the outcome of that
13 investigation?
14   A. There was another situation that had
15 happened that, I think, prompted Jim to report
16 it to HR. I was not there.
17     But at a captive conference in the
18 Cayman Islands, it's my understanding that
19 Jeff Sealey, the same individual I had problems
20 with, almost got into a physical altercation
21 with our keynote speaker. HR was looking into
22 it asking me what had happened, and then he
23 quit.
24   Q. Did -- are you aware of Pam reporting

Page 169

1 this to HR when it first happened?
2   A. Yes, not when it first happened.
3 We were -- but she talked to them after --
4 Cathi Villano was the HR director at the time.
5 She talked to Cathi after Cathi had come to me.
6   Q. Okay. But the year later Pam spoke to
7 HR, but she didn't report it contemporaneous
8 with this inappropriate touching happening at
9 the time?
10   A. Correct.
11   Q. Why didn't you report it to HR at the
12 time?
13   A. Well, being a woman in this industry,
14 there are not a lot of women that work at our
15 level. And we don't want to be -- I will speak
16 for myself. I didn't want to be -- I wanted to
17 be considered a team player, you know. And I
18 didn't want the drama.
19   Q. After this incident did Jeff Sealey
20 ever touch you inappropriately again?
21   A. He did not.
22   Q. Did he ever say anything to you that
23 was inappropriate in a sexual way?
24   A. No.

43 (Pages 166 - 169)

Page 170

1  Q.  Any other reason why you had lost trust
2 in Jim Hoitt other than what you just mentioned?
3  A.  I think comparing notes with a few of
4 the other reps just realizing that some of his
5 E-mails weren't necessarily sincere.
6  Q.  What other reps did you compare notes
7 with?
8  A.  Manjusha Sheobaran is somebody.  I just
9 remember laughing at an E-mail where he had said
10 something with me it was the only time that it
11 ever happened, and then she had the exact same
12 E-mail.  The name was just changed.
13  Q.  Do you have a copy of that E-mail?
14  A.  I do.  I believe I do somewhere.
15  Q.  Is that something you have provided to
16 your attorney?
17  A.  I believe so.  It was something -- it
18 was a vague reference.  It was just something
19 like -- when I turned down the job and he was
20 telling me how disappointed he was.  He said
21 that he had buy in from everybody -- all the
22 heads of the department and how that had never
23 happened before.
24      And then we were laughing at some point

Page 171

1 because we realized that he typed the same thing
2 to her.  So that's a, you know, fairly --
3  Q.  Sure.  Any other reps you would compare
4 notes with about Jim?
5  A.  Yes.  I compared notes with Justin
6 quite often.  Kristine Thompson was somebody who
7 would call me to talk about Jim.  It wasn't that
8 I didn't like Jim.  I just didn't trust Jim.
9 And I also saw, you know, him -- outside of my
10 relationship with him promising to clients and
11 then not live up to them.
12  Q.  How did you feel about Lee Davidson
13 taking over as your supervisor?
14  A.  I felt like I got along with Lee.
15 There is a lot of back story that I didn't feel
16 like Lee had about work, you know, maybe I had
17 done or a committee had done, but I trusted Lee.
18  MR. KELLY:  Why don't we go take another
19 ten-minute break before we continue?
20  THE VIDEOGRAPHER:  Going off the video record
21 at 2:02 p.m.
22       (A short break was taken.)
23  THE VIDEOGRAPHER:  We are back on record at
24 2:11 p.m.  You may proceed.

Page 172

1 BY MR. KELLY:
2  Q.  Ms. Carlson, when you sent that E-mail
3 to Lee resigning your employment --
4  A.  Yes.
5  Q.  -- do you remember where you were?
6  A.  I do.
7  Q.  Where were you?
8  A.  I was in Mexico.
9  Q.  On vacation?
10  A.  Yes, working vacation due to the time
11 of year, but yes.
12  Q.  What do you mean by that?
13  A.  So I was working.  It was during we
14 call it the January 1 crunch, so it's impossible
15 to take time off.  But since I work remotely, I
16 was able to keep an eye on my E-mails.
17  Q.  So were you taking vacation or not
18 taking vacation?
19  A.  Not taking vacation.
20  Q.  So you were working from home from
21 Mexico?
22  A.  Correct.
23  Q.  How frequently did you do that?
24  A.  Infrequently, but it was a frequent

Page 173

1 practice among reps.
2  Q.  How many -- well, how long was this
3 trip to Mexico?
4  A.  I don't remember, but I think it would
5 have been around five days.
6  Q.  Did you request vacation around those
7 days?
8  A.  I don't remember.
9  Q.  Did you work -- how many hours a day
10 did you work on that five-day trip to Mexico?
11  A.  I don't remember.  I remember being on
12 some calls while I was down there, but I don't
13 remember the specifics.
14  Q.  Well, would it be fair to say you
15 weren't working full days, that you were in
16 part taking time off?
17  A.  I honestly -- I don't remember, but
18 I would think that that time of year it was
19 necessary to be fairly engaged.  So it was
20 common practice to be looking at a phone all
21 day and typing people back on the phone or, you
22 know, having to do phone calls based on
23 renewals.
24  Q.  I mean, did you typically do some work

44 (Pages 170 - 173)

Page 174

1  on vacation?
2    A.  Yes.
3    Q.  Did Lee know that you were in Mexico?
4    A.  I don't know.  I don't remember.
5    Q.  And were you in Mexico by yourself or
6  with someone else?
7    A.  No.  I was in Mexico with someone else.
8    Q.  Who was that?
9    A.  Don McCully.
10   Q.  Who is he?
11   A.  He was my boyfriend at the time.
12   Q.  What was the process to your
13  understanding at Berkley in terms of requesting
14  vacation?
15   A.  I was told by Jim Hoitt that we were to
16  take time off when we needed it.  It wasn't
17  something they necessarily tracked because there
18  was so much -- so many times where we had to
19  work overtime.
20   Q.  Did you track your vacation?
21   A.  What do you mean did I track my
22  vacation?
23   Q.  Like independently did you keep a
24  record of days that you were taking vacation

Page 175

1  and not taking vacation?
2    A.  I don't believe I did.  It might have
3  been on my calendar.
4    Q.  I mean, specifically would you be able
5  to point to a record that you have that remains
6  in existence today where you could say these are
7  the days I was off work on vacation?
8    A.  This is just through the HR system.
9    Q.  But is that something you inputted the
10  data to or someone else did?
11   A.  That's something that I put data into.
12   Q.  So, in other words, you would record on
13  the HR system when you were taking vacation?
14   A.  Correct.
15   Q.  Do you know what that system was
16  called?
17   A.  I think it might have been ADP.
18   Q.  Did you have to get advanced permission
19  from anyone to take vacation?
20   A.  No.
21   Q.  Did you have to even tell your
22  supervisor that you were on vacation?
23   A.  No.
24   Q.  Did you ever receive permission to

Page 176

1  carry over vacation from one calendar year to
2  the next?
3    A.  I can't remember what the policy was on
4  that.
5    Q.  Even if you can't remember what the
6  policy was, do you ever remember requesting to
7  be able to carry over vacation from one calendar
8  year to the next?
9    A.  I don't remember requesting that, no.
10   Q.  Is there anything that would refresh
11  your memory on that?
12   A.  Not that I can think of.
13   Q.  So when you resigned when you were
14  down in Mexico, do you remember how many days
15  you remained in Mexico after you sent that
16  resignation E-mail?
17   A.  I don't.  It was -- it was my birthday,
18  right around that time.  And that's why I had
19  gone down there.
20   Q.  Was the resignation E-mail on your
21  birthday?
22   A.  No, I don't believe it was.
23   Q.  What day is your birthday?
24   A.  November 14th.

Page 177

1    Q.  I'm sorry.  Something fell.  I didn't
2  hear that.
3    A.  November 14th.
4    Q.  Now, I want to turn your attention back
5  to Exhibit 11 and that last page.
6    A.  Okay.
7    Q.  So one of the line items on here that
8  we haven't talked about is where it says vacation at
9  end of employment that was never paid?
10   A.  Correct.
11   Q.  $2,308?
12   A.  Um-hum.
13   Q.  Do you believe that you were owed
14  vacation at the end of your employment?
15   A.  Because I had pulled that my time --
16  my time on the system -- ADP system off of the
17  system to look at how many vacation days I had
18  not -- or I had remaining at that time.
19   Q.  And what did it show when you looked at
20  it?
21   A.  I can't remember.  But knowing that I
22  did some math on this, it would have been
23  prorated to whatever my salary and hourly or
24  daily amount was.

45 (Pages 174 - 177)

Page 178

1   Q.   So if you look back at what we marked
2   as Exhibit 2, the last page, this was your last
3   paycheck I think you said?
4       A.   Yes.
5       Q.   There is a -- it looks to be an hourly
6   rate of $30.76 based on your salary?
7       A.   Um-hum.
8       Q.   Does that sound about right?
9       A.   It -- I have no reason to think that it
10  wasn't right, but I never calculated my hourly
11  amount of pay since I was salary.
12      Q.   I'm just trying to figure out where you
13  derive this $2,308 number from.  Did you -- I
14  mean, you tell me.  You created this.  I'm just
15  trying to figure out where the -- where the
16  total comes from.
17      A.   So I believe I took my annual salary
18  and broke it down to a daily rate and then
19  multiplied the number of days I have remaining
20  on vacation that I do not believe that I was
21  paid for when I left.
22      Q.   Do you have any idea what that number
23  was, amount of days that you believe you were
24  owed?

Page 179

1       A.   I don't remember.
2       Q.   Do you have any documents that reflect
3   this figure?
4       A.   I have -- I believe I have a statement
5   from the ADP system.
6       Q.   And is that something you've given your
7   attorney?  I don't believe I've seen it.  There
8   is a lot of documents, though.  I could be
9   mistaken.
10      A.   I believe so.
11      MR. KELLY:  John, just as a request, if
12  you've got that and it hasn't been produced, I
13  would ask that that be produced.
14      MR. LISTON:  Yes, absolutely.  I will go
15  through the production as well as any other
16  documents, but we didn't hold anything back
17  that wasn't privileged.
18      MR. KELLY:  Understood.
19  BY MR. KELLY:
20      Q.   But whatever this printout you're
21  referring to shows is what you believe you were
22  owed in terms of vacation time?
23      A.   Correct.
24      Q.   When did you print out this document?

Page 180

1       A.   I believe it was -- I believe I had
2   access to that system after I left, and it was
3   when -- it was either shortly before I resigned
4   or after I resigned.
5       Q.   It's your understanding that any
6   records the company would have about vacation
7   that you used would have come from your own
8   input as opposed to somebody else inputting
9   that data, correct?
10      A.   I believe so, yes.
11      Q.   Did you input any data -- or did you
12  input any vacation time whatsoever for the
13  Mexico trip?
14      A.   I don't remember.  I do remember
15  working on the trip, but I don't remember
16  what was entered in the system.
17      Q.   Let me turn your attention next to
18  Exhibit 35.
19      A.   Okay.
20      Q.   The first E-mail in this chain is from
21  Cathi Villano to you?
22      A.   Yes.
23      Q.   Do you know why she's writing this to
24  you in 2015?

Page 181

1       A.   Yes.
2       Q.   Why?
3       A.   Because I had asked about why I
4   wasn't receiving profit share on part of my
5   compensation.
6       Q.   And then there is some back and forth
7   between yourself and Jim Hoitt, correct?
8       A.   Correct.
9       Q.   And then you end this with at the top
10  of the first page of Exhibit 35, "That clears it
11  up."
12      A.   That was not the end of the situation.
13      Q.   So why did you write that clears it up?
14      A.   Because I was accepting what I was
15  being told at that point.
16      Q.   And what happened with this situation
17  after your March 24th E-mail?
18      A.   I brought it up again and was told that
19  when -- as a result of me bringing it up a
20  second time that our HR department had checked
21  with corporate.  And, in fact, they had been
22  administering the plan wrong on a companywide
23  basis.
24      Q.   What happened at that point?

46 (Pages 178 - 181)

Page 182

1    A.   I was told that there was going to be a
2  correction and a deposit made in my account.
3    Q.   And did that happen?
4    A.   I received a deposit in my account.  I
5  never received any backup.  And I wasn't able to
6  tie it back to a particular number, but there
7  was a deposit made in my profit sharing account.
8  And it was a good year or two after the deposit
9  should have been made.
10    Q.   So you believe that the deposit was as
11  a result of this situation, but you don't know
12  the particulars of how that deposit was
13  calculated?
14    A.   Correct.  I did call the 401-K
15  administrator, and they weren't certain.
16  They said they did not have any backup.
17    Q.   Exhibit 36, this is an E-mail from you
18  to Sean Murphy?
19    A.   Correct.
20    Q.   Who is he?
21    A.   He was the CFO of our unit.
22    Q.   And what was this in reference to?
23    A.   The initial explanation that I had
24  received said that I was not supposed to get

Page 183

1  any 401-K match on my advance.  I had out earned
2  my advance.
3        So part of my argument was, you know,
4  why would I want the advance when I've written
5  enough business to get that compensation.  And
6  because you're coining it an advance, you are
7  not matching me on my 401-K?  So I had asked if
8  they could just do away with my advance so I
9  could get the 401-K match on my second year.
10    Q.   And did that happen?
11    A.   Yes.  But this was 2015.  And the
12  situation we talked about where there was
13  correction, that was for the time period
14  worked in 2014.
15    Q.   But the issue that you raised was
16  corrected after you brought it up?
17    A.   I believe so.
18    Q.   Exhibit 37, this is another chain
19  of E-mails involving you and Sean Murphy and
20  Jim Hoitt, correct?
21    A.   Yes.
22    Q.   What is this in reference to?
23    A.   Prior to starting I was given a comp
24  plan payment.  And the initial 2014 incentive

Page 184

1  comp plans did not include a minimum on a block
2  size in order to receive a profitability
3  component.
4    Q.   And what happened as a result of this
5  E-mail?
6    A.   I was not paid profitability for
7  the 2014 to 2015 time period on my block of
8  business.
9    Q.   So you disagreed with what the company
10  had done?
11    A.   Correct.
12    Q.   And this was --
13    A.   Yes.
14    Q.   Was this ever corrected?
15    A.   No.
16    Q.   Exhibit 38, is this also the same issue
17  as 37; or is this different?
18    A.   36 -- so 37 is different -- I'm sorry.
19  So 37 has to do with my profit incentive on my
20  block of business, so how that was performing
21  from a profitability standpoint.  The previous
22  E-mail had to do with something different, 401-K
23  match.
24    Q.   So 38 is profit sharing?

Page 185

1    A.   38 has to do with the 401-K situation.
2  This is after I was told that home office had
3  confirmed our department had not administered
4  the 401-K plan correctly.  And this is me
5  checking back because I was told that there was
6  going to be a deposit in my 401-K account.  And
7  it took quite a bit of time, so I was just
8  asking for a status update.
9    Q.   And this is the one that was corrected?
10    A.   Correct.
11    Q.   And then Exhibit 39, the top E-mail is
12  an exchange -- well, is an E-mail from Jim Hoitt
13  to you and the subject is AC sample plan?
14    A.   Correct.
15    Q.   Do you know what this is in reference
16  to?
17    A.   This is in reference to the timing of
18  the compensation payments in the third year of
19  my employment when they had changed compensation
20  from being paid upfront to as premium is
21  received.
22    Q.   So this is -- the attachment here is
23  just sort of an example of how that might impact
24  you?

47 (Pages 182 - 185)

Page 186

1    A.   So if I understand correctly, they ran
2  the new plan and the timing involved with those
3  changes and compared it to -- if they had been
4  paying me the previous -- under the previous
5  timing.
6    Q.   And then take a look at Exhibit 40.  Do
7  you recognize this E-mail exchange?
8    A.   Yes.
9    Q.   What is this in reference to?
10    A.   There was a report the company
11  produced, and it broke business in two different
12  I will just call it buckets.  And there were
13  accounts -- or there was a bucket of accounts I
14  didn't think was showing up on the report.
15    Q.   And how was that addressed, if at all?
16    A.   I don't remember the outcome of this,
17  but it was -- it was trying to cross-reference
18  the numbers on the -- I remember the situation,
19  but I don't remember the outcome.
20    Q.   Look at the second page of Exhibit 40.
21    A.   I don't have a second page.
22    Q.   This is an E-mail --
23    A.   Is it an E-mail from Justin?
24    Q.   So Exhibit 40 is a two-page document,

Page 187

1  an E-mail chain.
2    A.   I was under the wrong one.
3    Q.   There is an E-mail that starts at the
4  bottom of the first page from Jim Hoitt to you
5  April 21, 2017.  And then it says subject,
6  profit bonus results, "Just giving you a
7  heads-up at this point.  It looks like your
8  block loss ratio for the '15-'16 production year
9  has deteriorated significantly, and that may end
10  up reversing the withhold bonus that was paid
11  last year into a claw back."
12    A.   Yes.
13    Q.   Did that occur?
14    A.   Yes.
15    Q.   Was any of your response E-mail
16  addressing that issue in particular?
17    A.   No.
18    Q.   Take a look at Exhibit 41.  This is an
19  E-mail that you sent to several people.  What is
20  this in reference to?
21    A.   So I was looking at this exhibit
22  earlier.  I believe it was in the wrong
23  category.  This is -- as I explained before,
24  this is what I thought a bucket or a type of

Page 188

1  business was missing on my comp -- on my
2  financial score card.
3    Q.   And just so I'm clear, what was the
4  outcome of this, if anything?
5    A.   I don't -- this is what I don't
6  remember on.
7    Q.   Okay.  Exhibit 42.
8    A.   Yes.
9    Q.   This, again, is an E-mail exchange
10  between Jim Hoitt and you primarily?
11    A.   Correct.
12    Q.   What does that relate to?
13    A.   I found an error in the CFO's
14  computation of our profitability.  There was a
15  change in the plan and how they categorized
16  underperforming, high performance -- essentially
17  it was the cutoff point where you received
18  compensation with that 25-percent withhold that
19  I talked about.
20      And I pointed out the E-mail to Jim --
21  or I pointed out the error to Jim.  So this was
22  me bringing it up and him just saying that
23  nobody else had noticed it and that he would get
24  it corrected.

Page 189

1    Q.   And was it?
2    A.   Yes, I believe so.
3    Q.   And then you forwarded this onto
4  Justin Hansen?
5    A.   Correct.
6    Q.   And who is he?
7    A.   Justin was a peer with the same title
8  in -- based on the Carolinas.
9    Q.   Okay.  And he writes back a comment to
10  you.  Did you have a conversation with him about
11  this further after his E-mail?
12    A.   So Justin was -- Justin started after I
13  did.  And he relied heavily on me to help him
14  figure out the compensation.  And I was making
15  him aware of the errors, so he would be able to
16  check his reports to see if it affected him.
17    Q.   Because whatever this situation was
18  would have affected him potentially as well?
19    A.   Correct.
20    Q.   Exhibit 43, this is an exchange between
21  yourself and Cathi Villano, right?
22    A.   Yes.
23    Q.   Why were you having this exchange with
24  her?

48 (Pages 186 - 189)

Page 190

1    A.   I'm sorry.  I'm having trouble reading
2  this.
3    Q.   That's fine.  I understand.  It's --
4  some of these --
5    A.   So this is what I was talking about
6  earlier when I said I thought there was an
7  employment agreement referenced in the letter
8  and that I remember looking into it.
9        So I had sent Cathi an E-mail saying,
10  "Can you please send me a copy of the employment
11  contract I signed when I started at Berkley?  I
12  have a record of a contract I received in the
13  fall of 2014 from Jim, but I don't have a copy
14  of the contract I signed when I started.  Also,
15  can you confirm there wasn't a new contract in
16  2015?"
17        So there was some kind of paperwork.
18  And it might have been an E-mail as opposed
19  to the letter that I looked through where I
20  couldn't find the wording, but there was
21  reference to an employment agreement.  And I
22  didn't remember receiving one, and I was
23  checking with her to see if there was one.
24    Q.   And she didn't provide you one because

Page 191

1  there isn't --
2    A.   There isn't.
3    Q.   -- an employment agreement, correct?
4    A.   Correct.
5    Q.   Exhibit 44.
6    A.   Yes.
7    Q.   It's a fairly lengthy E-mail chain.
8  Let me sort of direct your attention -- first of
9  all, these are E-mails that you exchanged and
10  received -- or created and received?
11    A.   Yes.
12    Q.   So the -- let me draw your attention
13  starting on Page 5.  This is your E-mail to
14  Jim Hoitt, April 27, 2018, 1:43 p.m.  Do you
15  see that?
16    A.   Yes.
17    Q.   And would it be accurate that you wrote
18  this but then -- and I know it's not in color in
19  this copy but that some of what's written here
20  is actually Jim's response if you read his
21  E-mail above yours on Page 5 --
22    A.   Right.
23    Q.   -- right?
24    A.   Correct.

Page 192

1    Q.   Like, for instance, the smaller print
2  after the first paragraph where it says, "I'm
3  not aware of any employment agreement that we
4  had anyone sign"?
5    A.   Yes.
6    Q.   Now, you say in this E-mail, "The
7  change in comp this year" -- and this is on
8  Page 6 -- "to new business being paid as
9  premium is received versus our old plan has been
10  massively disruptive to my comp."  And we talked
11  about that already, right?
12    A.   Yes.
13    Q.   And then he responds and says -- I
14  believe this is his response, "I thought we
15  had made some accommodations to you for that
16  transition."
17    A.   Correct.
18    Q.   Were there accommodations made?
19    A.   There was, I believe, in the second
20  year -- or there was an advance that I had paid
21  back that we talked about earlier today, and I
22  believe that that's what he is referencing.
23    Q.   Now, above that paragraph there's a
24  reference you make to there was no mention of

Page 193

1  any penalties.  It talked about the 2012 comp
2  plan, and then I believe that the next piece of
3  this where it says, "I never put the waiver of
4  the withhold into your formal offer letter"?
5    A.   Correct.
6    Q.   That was written by Jim?
7    A.   I believe that you are talking about
8  the top of Page 6 of this E-mail and it's the
9  smaller print?
10    Q.   No.  There's -- look at the middle of
11  the page, Page 6.  It says, "Below I've included
12  two E-mails we exchanged regarding comp when I
13  was interviewing."  Do you see that?
14    A.   I see that paragraph.
15    Q.   And then I believe, correct me if I'm
16  wrong, that your text ends with, "I didn't
17  target or develop."  And then it looks to me
18  like the rest of that paragraph is --
19    A.   Yes.
20    Q.   -- his response to you.  Is that your
21  understanding?
22    A.   Yes.
23    Q.   What he writes here is, "I never put
24  the waiver of the withhold into your formal

49 (Pages 190 - 193)

Page 194

1 offer letter. So that was obviously overlooked.
2 Of course, it worked to your advantage on the
3 first payout when the loss ratios looked
4 favorable." Is that true?
5 A. Yes, yes, that's what he wrote. That
6 was his response.
7 Q. Right. But the fact that the waiver
8 wasn't in your offer letter, did that work to
9 your advantage on this first payout? Is that
10 accurate or not accurate?
11 A. No. The waiver -- I would have to go
12 back through. But if I understand it, the
13 waiver of the profitability withhold was
14 withholding the first 25 percent. So it did
15 not.
16 This was a second point with that
17 second year account that I talked about earlier
18 where there was reserves that weren't let go.
19 When I started cross-referencing my documents, I
20 couldn't understand why there was a withhold in
21 the first place.
22 Q. So let's look at --
23 A. It's not that they weren't going to pay
24 me. If the block was profitable, they just

Page 195

1 weren't going to withhold the profitability.
2 That's how I remembered and how, I believe, the
3 wording worked.
4 Q. So let me turn to page 4. Jim writes
5 here to you March 2nd 3:44 p.m., "The comp plans
6 says that if you inherit a case via broker
7 transmission mid-year that you do not get comped
8 until you renew it." Is that your understanding
9 of what the --
10 A. Yes.
11 Q. -- policy or procedure was?
12 A. Yes.
13 Q. Then starting on Page 2 you write this
14 E-mail back to Jim, May 2nd 12:08 p.m., right?
15 A. Yes.
16 Q. And then this is -- you write all
17 this -- all the way and it goes onto Page 4 up
18 until Jim's E-mail back to you -- or his
19 original E-mail to you March 2, 2017, right?
20 A. Yes.
21 Q. And then in response to you Jim writes
22 May 10, 2017, 7:51 a.m., starting on Page 1,
23 "Amy, I think we can make the exception for that
24 renewal account. I will discuss with Lee to

Page 196

1 make sure he is good with that." Do you know
2 what he is referring to?
3 A. Yes.
4 Q. What was that?
5 A. When Greg Anderson was let go, I
6 started doing work immediately on his business.
7 I was asking Jim -- the transition in comp and
8 waiting until the next year that normally
9 happens when there are territory arrangements,
10 I was asking him if that held true when the rep
11 had left.
12 Q. And so he said that normally you have
13 to wait until there's a renewal but that he
14 would make an exception and transition that
15 account to you immediately?
16 A. I think what -- I think what he was
17 saying, without having read the over the entire
18 E-mail, is that situation was not addressed in
19 the comp statement. And based on the work that
20 I had done on an account that did not end up
21 renewing and it took a lot of my time, that he
22 would approve an exception.
23 Q. So did that happen?
24 A. I believe so.

Page 197

1 Q. Let me have you turn to Exhibit 45.
2 This one might be pretty hard to read. This,
3 again, is an E-mail exchange between yourself
4 and Jim Hoitt, two pages, correct?
5 A. Yes.
6 Q. And then take a look at Exhibit 46.
7 This is another fairly lengthy exchange between
8 yourself and Jim Hoitt, correct?
9 A. Correct.
10 Q. On Page 2 of Jim's E-mail to you
11 June 16 references an advance. That was the
12 advance you referred to when we were discussing
13 an accommodation because of the new comp plan,
14 right?
15 A. No. That was another advance.
16 Q. What was that advance in relation to?
17 A. If I remember correctly, I believe
18 the CFO had made an error during my first year.
19 And when they caught the error, it led to me --
20 them withholding compensation for a quarter or
21 two.
22 And when -- so I wasn't going to be
23 getting any -- I think for some time I didn't
24 receive any kind of compensation or incentive

50 (Pages 194 - 197)

Page 198

1 compensation, so I believe that that's the
2 difference between the two.
3   Q.  So there was -- what was the advance
4 that you were given because the comp plan
5 changed?
6   A.  I believe that that number was in
7 the -- $26,000 or something like that and then
8 this is different.  This is the $13,000 advance
9 that I paid back.
10   Q.  Through payroll deductions?
11   A.  Correct, yes.
12   Q.  And on the first page of Exhibit 46,
13 you're writing to Jim copying Lee.  And then
14 you say, "There's not a meeting of the minds,"
15 in quotes, "with regards to how my incentive
16 production would be paid for the third
17 production period of my employment."
18   A.  Correct.
19   Q.  What did you mean by that?
20   A.  I believe I was referring to me
21 thinking -- because I was given assurances for
22 three years and we had talked about a bridge for
23 three years, that when they changed the comp
24 plan and it made a drastic impact on my income.

Page 199

1 I believe that that's what I was talking about.
2   Q.  What did you think --
3   A.  I'm sorry.  Can I add one more thing?
4   Q.  Yes.
5   A.  So it also had to do with the narrative
6 that he had given in the E-mail or the examples
7 of if I sold this much or renewed this much this
8 is what I would make here, too.
9   Q.  So what did you want the company to do
10 in your mind with respect to your comp for the
11 third production year of your employment?
12   A.  I wanted them to pay me the first
13 quarter or whatever that original wording was on
14 the 2014 incentive statement -- or incentive
15 comp plan.
16   Q.  I'm sorry.  I'm confused by that.  Can
17 you explain that?
18   A.  Sure.  During my third year of
19 employment, the comp plan was changed.  As
20 opposed to being paid a quarter in arrears after
21 new business was written, they changed the comp
22 plan to pay as premium was received over a
23 period of 15 to 18 months.
24   Q.  And when you said, though, you wanted

Page 200

1 the first quarter to be treated as it was under
2 the 2014 plan, why just the first quarter?
3   A.  I didn't mean first quarter.  I
4 meant -- what I wanted them to do was -- for
5 that third year of what I felt like had been
6 negotiated, that I wanted them to continue to
7 pay that year's production a quarter after
8 the business was written as opposed to over
9 18 months.
10   Q.  And up until when?  When in your mind
11 was the company entitled to change to the new
12 model of paying as you go so to speak?
13   A.  After the -- after the three years.
14   Q.  So that would have been what month and
15 year?
16   A.  February of 2017.  That's effective
17 dates up to February -- February 1, 2017.
18   Q.  So just so I'm clear, you wanted
19 this comp plan to be the same in terms of how
20 it was -- how the payments were made from
21 January of 2014 -- well, what was your actual
22 start date?  It was March of '14, right?
23   A.  February of '14.
24   Q.  February, okay.  So all the way up

Page 201

1 until February of 2017 you wanted to be subject
2 to essentially what we -- the 2014 comp plan?
3   A.  The timing on the 2014 comp plan,
4 correct.
5   Q.  But then after February of 2017, it's
6 your view that the company can change how they
7 structure the payments going forward to you?
8   A.  Correct.
9   Q.  And then Exhibit 47, this is an
10 exchange involving yourself and Jim Hoitt and
11 Sean Murphy referencing some kind of payment; is
12 that correct?
13   A.  Yes.
14   Q.  Do you know what this payment was in
15 reference to?
16   A.  Yes.  I believe this was in
17 reference to the third year comp, so from
18 February 1, 2016, through March -- through
19 January 1, 2017 -- so that would have been
20 the third year -- and Jim agreeing to advance
21 75 percent of the total.
22   Q.  And then on Exhibit 48 which is,
23 again, another E-mail exchange involving
24 yourself, Sean Murphy and Jim Hoitt, correct?

51 (Pages 198 - 201)

Page 202

1    A.  Yes.
2    Q.  This references a $28,000 advance
3 roughly?
4    A.  Correct.
5    Q.  So this would have been the other
6 advance that you were referring to between that
7 and -- there was a $13,000 advance and then this
8 $28,000 advance, right?
9    A.  I can't see the amount on this
10 July 2017 advance.
11    Q.  Yes.  It may be faint.  It looks to me
12 like -- I can't read the first word, but it says
13 attached advance in amount of and then it has an
14 at symbol dollar sign 28 K.
15    A.  I believe this was the second advance.
16    Q.  And then you received both of those,
17 right?
18    A.  Yes.
19    Q.  And both of those were at your request?
20    A.  Correct.
21    Q.  Now, take a look at Exhibit 49.  Do you
22 recognize this E-mail exchange with Chris Brown?
23    A.  I do.
24    Q.  What is this in reference to?

Page 203

1    A.  So earlier today you had asked me about
2 an E-mail that I sent after we were encouraged
3 to speak our minds about the changes with
4 regards to our institutional department.
5       And Lee had told me that Chris was
6 going to be reaching out to me and to Justin.
7 I believe the three of us had a conversation at
8 one point.
9       And at this point, Chris had reached
10 out after he had already sent an E-mail.  So it
11 was me acknowledging that he had reached out and
12 not wanting to talk about it.
13    Q.  When you say not wanting to talk about
14 it, who didn't want to talk about it?
15    A.  I'm sorry.  I think -- let me go back
16 and read this.  So it was -- what I say here is
17 that -- based on the E-mails that had been sent
18 that were part of that initial chain that you
19 had asked me about, I said "I've received
20 clarification from the company that Willis will
21 be going to institutional and the reasons behind
22 the decision."
23       So Chris had made it clear that the
24 company was moving in that direction.  And he

Page 204

1 explained in his opinion, you know, what was
2 motivating the change.
3    Q.  So you were basically just closing the
4 loop on that by responding to Chris?
5    A.  Correct.
6    Q.  And then let me have you look at
7 Exhibit 50.  This -- the E-mail at the bottom of
8 the first page and going onto Page 2, we've seen
9 that before, right, because that was in one of
10 the other chains?
11    A.  Yes.
12    Q.  But this top E-mail is you're
13 forwarding Jim's -- or excuse me, your E-mail to
14 Jim and then Jim's response to Cathi Villano,
15 right?
16    A.  On her request, yes.
17    Q.  And it says, "With regards to our
18 conversation earlier today"?
19    A.  Correct.
20    Q.  What conversation did you have with
21 Cathi Villano in August of 2017?
22    A.  I had several conversations with Cathi,
23 and I can't remember exactly what prompted the
24 conversations at this point.  But when I talked

Page 205

1 to her about several situations that I didn't
2 think had been handled correctly or fairly, she
3 asked me to send her some documentation.
4    Q.  Did you tell her why you believed they
5 weren't handled fairly?
6    A.  Yes.
7    Q.  What did you say?
8    A.  I think I spelled it out -- you
9 know, there were various issues.  But in
10 this particular situation, I talked about the
11 three-year time period that we talked about a
12 few minutes ago and how compensation -- or the
13 timing of compensation was paid.
14    Q.  That's the change in the comp plan?
15    A.  Correct.
16    Q.  What, if anything, did Cathi do in
17 response to your communication?
18    A.  Nothing.
19    Q.  Did you ever complain to Cathi that any
20 of these issues occurred because of your sex?
21    A.  I did.
22    Q.  When did you say that to her?
23    A.  I know that I said that to her in 2017.
24 I don't -- I had conversations with her in 2016

52 (Pages 202 - 205)

Page 206

1 where I might have said this, but I can't be
2 sure.
3    Q.   But you are sure you did raise this
4 issue in 2017 with her?
5    A.   Yes.
6    Q.   What specifically did you say to her?
7    A.   I said --
8    Q.   Go ahead.  I'm sorry.
9    A.   That's okay.  I can't be 100
10 percent sure of the specifics, but I believe
11 I said something to the extent that I thought
12 Chris Brown had a problem with me because I was
13 a woman.
14    Q.   And why did you believe that?
15    A.   I remember having a conversation with
16 a fellow female rep where she had brought up
17 feeling like women weren't set up to succeed at
18 this company and that it was a good old boys'
19 club.
20    Q.   Who said this?
21    A.   I had conversations with
22 Manjusha Sheobaran about this issue, and
23 I also had conversations with Kristine in
24 Colorado where she expressed feeling the

Page 207

1 same way.
2    Q.   But I just want to be clear.  You
3 said -- you made it sound like Chris said to
4 them that women weren't set up to succeed?
5    A.   No.
6    Q.   Are you saying that this is what these
7 women felt or that Chris told them something?
8    A.   This is what those women felt.
9    Q.   So your belief that Chris Brown had a
10 problem with women derived from the fact that
11 these two other women told you that that's what
12 they believed?
13    A.   I came to the conclusion on my own, but
14 I specifically remember having a conversation
15 with Cathi where I brought it up.  And there
16 were other things that went into me coming to
17 that determination.
18    Q.   So what are those things?
19    A.   Just my experience over time where I
20 felt like things always broke in the wrong
21 direction, you know.  It wasn't that -- I wasn't
22 getting the same breaks over time.  It always
23 seemed to go the opposite direction where, you
24 know, a man was allowed to sell a product line

Page 208

1 that I wasn't, but there was never a situation
2 where that same situation happened to benefit
3 me.
4    Q.   Anything else?
5    A.   No.
6    Q.   Did you ever hear Chris Brown,
7 Jim Hoitt, or Lee Davidson say anything that
8 you believed indicated that they would have a
9 propensity to discriminate against women?
10    A.   Yes.
11    Q.   What, what things?
12    A.   Shortly after starting at Berkley, I
13 heard Chris Brown talk about protecting the
14 culture.
15    Q.   Why do you believe that would
16 demonstrate that he would have a propensity
17 to discriminate against women?
18    A.   Part of it was -- well, I don't know
19 that I believed at that point that that would be
20 the case, but in retrospect I believe that it
21 was -- I came to believe that it was a situation
22 where women had a hard time succeeding and more
23 at a disadvantage to the men.
24    Q.   Do you feel like you succeeded at

Page 209

1 Berkley?
2    A.   I feel like I executed successfully.
3    Q.   Well, did you feel like you were able
4 to perform your job successfully?
5    A.   No.
6    Q.   In what ways did your job performance
7 fail?
8    A.   I needed backup.
9    Q.   In what way?
10    A.   So there were -- based on the volume
11 that I was getting and having to send my own
12 quotes out, there was -- there were a lot of
13 opportunities missed because I was doing
14 clerical work.
15    Q.   Who do you think should have done that
16 work?
17    A.   The same person that a few of the
18 men had.  So they either had administrative
19 assistants, or they had underwriters given to
20 them that did those duties for them.
21    Q.   Which men had administrative
22 assistants?
23    A.   I don't know what their -- what the
24 title was, but I do know the John Wappelhorst

53 (Pages 206 - 209)

Page 210

1 had assistance. And I mean assistance with a
2 c-e, not with a t-s. So he had support to do
3 things that I had to do by myself. And I
4 believe Sean Lanter eventually had that same
5 support as well.
6    Q.  But who would have provided that
7 assistance to either one of them?
8    A.  The company -- the company would have
9 hired somebody for that support role or moved
10 somebody into that support role.
11    Q.  So what would -- do you know what those
12 people's jobs were or who their -- what their
13 identities were?
14    A.  No.  I believe that the jobs would have
15 been either an underwriter that were performing
16 functions that my underwriters didn't do for
17 me or -- and that's in John's case.  In Sean's
18 case I believe that he hired some kind of an
19 administrative assistant.
20    Q.  And how do you know that?
21    A.  I'm just going off memory.
22    Q.  Do you know when that administrative
23 assistant was hired?
24    A.  For Sean I don't.

Page 211

1    Q.  Did you ask to hire an administrative
2 assistant?
3    A.  Yes.
4    Q.  Who did you ask?
5    A.  Jim Hoitt.
6    Q.  What was the response?
7    A.  No.
8    Q.  When did you ask him?
9    A.  I started asking I believe it was in
10 late 2014 or early 2015.
11    Q.  Any other reason why you think -- well,
12 first let me back up.  Let me restate it.
13       Any other statements that you heard
14 either Chris Brown, Jim Hoitt, or Lee Davidson
15 make that you believe demonstrated that they
16 would have propensity to discriminate against
17 women?
18    A.  I felt like they were -- when I was
19 complaining to Jim about Jeff Sealey after --
20 shortly after I found out that there was a --
21 some kind of an altercation or close to an
22 altercation when Jim had called me and asked
23 me how I was doing and I had recently expressed
24 to him that I felt like he should have gone to

Page 212

1 HR with that situation and I said I was living
2 the dream, I just thought it was crass to
3 respond I hope it was a wet dream.
4    Q.  Who responded with that?
5    A.  Jim Hoitt.
6    Q.  Was it -- this was in response to an
7 E-mail from you?
8    A.  No.  This was -- he called me up to
9 tell me what had happened in the Cayman Islands
10 with Jeff Sealey and our keynote speaker.  And
11 he asked me how I was doing, and I said I was
12 living the dream.  And he responded I hope it
13 was a wet dream.
14    Q.  So this was a phone call between you
15 and Jim?
16    A.  Correct.
17    Q.  Was anyone else on the call?
18    A.  No.
19    Q.  When did this occur?
20    A.  I believe that would have been in
21 March of 2016, possibly 2017.  But, you know,
22 there were other situations -- other events that
23 happened where I came to believe that it was a
24 culture that was hostile to women.

Page 213

1    Q.  What are these events?
2    A.  When I was told I could not attend a
3 SIIA conference because of the time of year and
4 my position and men were allowed to go.
5    Q.  What else?
6    A.  I'm sorry.  I was just thinking
7 of something and I blanked out.  So I felt
8 like based on the fact that I had started
9 conversations with the HR department and they
10 didn't go anywhere and I didn't get a response
11 that the company just wasn't taking the issue
12 seriously.
13    Q.  What issue in particular are you
14 talking about?
15    A.  Any of the issues that I brought up to
16 Cathi.
17    Q.  About the pay issues?
18    A.  Just how I felt, like it was -- it was
19 an unfair situation.
20    Q.  But what do you think was unfair in
21 particular?
22    A.  I covered most of the things that I
23 thought were unfair at the time.
24    Q.  So you said you --

54 (Pages 210 - 213)

Page 214

1    A.   The account steering, things like that.
2    Q.   So things you've talked about in this
3  deposition?
4    A.   Correct.
5    Q.   The things that you -- just to go back
6  and specifically reference it, the things that
7  you're claiming you're owed on Exhibit 11, the
8  last page?
9    A.   And things in addition to that.  There
10  is not everything that's captured with a dollar
11  amount.
12    Q.   Okay.  But just so I'm clear, though,
13  Exhibit 11 is the sum total of all the amounts
14  you're claiming in this case, correct?
15    A.   Correct.
16    Q.   And just since we're on it, all
17  of the things that are listed here from the
18  $542,000 up, do you believe all those things
19  occurred because of your sex?
20    A.   Ultimately, yes.
21    Q.   So the -- the accounts that went to
22  John Wappelhorst, you believe he was favored
23  over you and he is a man, right?
24    A.   Correct.

Page 215

1    Q.   The accounts given to Rocko, I mean,
2  are you saying that Rocko was treated more
3  favorably than you?
4    A.   Rocko wasn't in my same position, but
5  the fact that Justin was paid for them and I
6  wasn't.
7    Q.   Do you know what work, if anything,
8  Justin did in the situation for which he was
9  paid and you weren't?
10    A.   He told me he didn't do anything on it.
11    Q.   And you know that from what he told
12  you?
13    A.   Correct.
14    Q.   Do you know if Rocko received
15  compensation for this work he did with the
16  Stan Burt Horton account?
17    A.   I don't have any way of knowing that,
18  no.
19    Q.   The UMR direct business --
20    A.   Correct.
21    Q.   -- why do you believe that that was
22  denied to you because of your sex?
23    A.   If I look to how John Wappelhorst
24  was treated when he brought in a national

Page 216

1  relationship, he was given support.  And the
2  support was built out underneath him.
3        So there are two things here.  Number
4  one, he was allowed to control the business on a
5  countrywide basis.  And then in addition to
6  that, as opposed to making room for my UMR
7  business, I would have been given support to
8  keep that business.
9    Q.   Assuming you had been given
10  responsibility for it on a nationwide basis?
11    A.   I was responsible for bringing in UMR,
12  yes, correct.
13    Q.   We talked about the UMR direct business
14  written prior to your departure that wasn't paid
15  that would have been paid had you remained
16  employed, right?  That's the $65,429?
17    A.   Correct.
18    Q.   The profitability bonus and other sort
19  of bonuses here that you said were derivative of
20  these other the amounts, those are just tied to
21  the fact that you believe you were improperly
22  denied those original amounts, correct?
23    A.   Correct.
24    Q.   Why do you believe that -- or do you

Page 217

1  believe that the accounts -- the MEC accounts
2  going to Scott Campbell was discriminatory based
3  on your sex?
4    A.   Because Pam taught him how to -- how
5  that business was structured, and then they took
6  that information.  And instead of letting Pam
7  produce any of those accounts or giving her
8  production credit even though these were clients
9  of hers that she had worked with in the past,
10  you know, it was given to Scotty.
11    Q.   Do you believe that the change in the
12  comp plan to where you were no longer receiving
13  the money upfront was discriminatory based on
14  your sex?
15    A.   No.
16    Q.   Any other statements from either
17  Chris Brown, Jim Hoitt, or Lee Davidson that
18  you believe demonstrated that they would have
19  a propensity to discriminate against women?
20    A.   I don't -- I don't remember any other
21  statements right now.
22    Q.   Anything that would refresh your
23  recollection?
24    A.   Aside from going through documents, I

55 (Pages 214 - 217)

Page 218

1 mean, I could -- I could ask my lawyer.
2   Q.  Well, he doesn't get to testify.
3   A.  It's the end of a long day.
4   Q.  Well, I'm just trying to find out,
5 you know, why you believe that you were
6 discriminated against because of your sex.  And
7 I wanted to know specifically did you hear Jim,
8 Chris, Lee say anything that indicated to you
9 that they disfavored women, that they made a
10 statement that was discriminatory about women.
11 And you've answered.  I just wanted to make sure
12 there wasn't anything else.
13   A.  Yes.  Give me a minute here to just try
14 and focus.  I know that I never heard Lee say
15 anything.
16   Q.  Okay.
17   A.  And as far as statements, you know, I
18 guess there was one other situation that I was
19 surprised when Manjusha Sheobaran left the
20 company.  She's probably the best rep I ever
21 worked with.  And Jim made some comments about
22 her performance and about the quality of her as
23 a worker that were shocking to me because I
24 thought so highly of her.

Page 219

1       And I remember when he made those
2 statements thinking -- you know, it's probably
3 the beginning of me starting to think, you know,
4 maybe there is something more to this than just
5 bad luck.
6   Q.  Any other statements that you think
7 demonstrate that Jim or Chris would be biased
8 against women that you heard?
9   A.  Nothing that I heard that I can think
10 of right now.
11   Q.  Again, when we talk about male
12 employees that you believe were treated
13 more favorably than you, we've talked
14 about John Wappelhorst, right?
15   A.  Yes.
16   Q.  Anyone else -- and Scott Campbell we
17 talked about?
18   A.  Yes.
19   Q.  Anyone else in particular?
20   A.  Sean Lanter.  We talked about the
21 situation with the support with Sean and he --
22 can you state the question one more time?  I'm
23 sorry.
24   Q.  Sure.  I'm just trying to understand

Page 220

1 who you believe -- what male employees do you
2 believe were treated more favorably than you
3 because of their sex?
4   A.  So there was a situation where I was
5 told, once again, that I could not attend a SIIA
6 conference even though I was taking PTO and
7 attending it on my own dollar.  And I find out
8 that Scott Campbell and David Frawley had both
9 attended the conference at the company's -- on
10 the company's dime and also without having to
11 take time off.
12       I was told I couldn't go because of the
13 time of year and my position, and they both had
14 the same position that I did.
15   Q.  But the SIIA conference, that doesn't
16 directly relate to your pay, right?  I mean,
17 they weren't -- this had nothing to do with
18 your commissions or anything like that?
19   A.  It didn't have anything to do with my
20 commissions, but it did have to do with standing
21 in the industry.  And, also, there were reasons
22 for me to go because UMR was going to be there.
23 They told me that they wanted me there.  I felt
24 like that was probably more retaliatory.

Page 221

1   Q.  Why do you believe that?
2   A.  So Jim had told me that he got his
3 hands slapped pretty hard by corporate on a few
4 issues that I had brought -- that I had brought
5 up.  And with Chris Brown, Chris Brown was the
6 one that said that I couldn't attend.  And I
7 felt like he was upset with me as well.
8   Q.  Why do you believe he was upset with
9 you?
10   A.  I believe he was upset with me because
11 I was making him look bad with some of the
12 things that I was bringing up, some of the
13 issues.  And I believe that he was upset with me
14 based on his reaction.  After SIIA reached out
15 to me and asked me if I was interested in being
16 on their board, once again, I was just surprised
17 at his reaction.
18   Q.  Any other male employees who you think
19 were treated more favorably than you with
20 respect to compensation?
21   A.  I don't know how other reps were
22 compensated, but I think we have addressed
23 the main situations I can think of.  I can't
24 think of anything else right now.

56 (Pages 218 - 221)

Page 222

1  Q.  Did you ever make any written
2  complaints while you were employed to the
3  company where you said that you thought that
4  any of these pay issues were on account of your
5  sex?
6  A.  If I did, it would have been towards
7  the end.  It would have been to Cathi Villano.
8  I thought I had sent her an E-mail at one point
9  about that.  I know it was addressed.  I just
10  can't remember if it was an E-mail or if it was
11  just verbal.
12  MR. KELLY:  Why don't we take another break
13  here?  We've been going for a while.  Let's take
14  ten minutes.
15  THE VIDEOGRAPHER:  We are going off the video
16  record at 3:24 p.m.
17  (A short break was taken.)
18  THE VIDEOGRAPHER:  We are back on the record
19  at 3:35 p.m.  You may proceed.
20  BY MR. KELLY:
21  Q.  Okay.  Let's try this again.
22  Ms. Carlson, do you believe that
23  John Wappelhorst had a lot of clout within
24  the company?

Page 223

1  A.  Certain areas of the company, yes.
2  Q.  What areas?
3  A.  So I felt like he had a lot of clout
4  with Chris Brown but not necessarily outside of
5  Chris Brown.
6  Q.  Do you know anything about his
7  relationship with Chris Brown?
8  A.  I don't know much other than what I
9  observed or was told by either people I work
10  with or by Jim Hoitt.
11  Q.  What were you told by Jim?
12  A.  So it's my understanding that John had
13  been at the company for some time and that he
14  tended to run directly to Chris when there were
15  conflicts and not go through the normal channels
16  at least when he was reporting to Jim.
17  Q.  Do you know when John first started
18  working for the company?
19  A.  I don't.
20  Q.  But it preceded your hire, correct?
21  A.  Yes.
22  Q.  Could I have you turn to Exhibit 51?
23  A.  Yes.  Okay.
24  Q.  You may or may not recognize this

Page 224

1  document.  I just want to call your attention
2  to the second page.  There is a listing on this
3  document -- well, first of all, have you ever
4  seen this before?
5  A.  I have not.
6  Q.  Okay.  Do you have any -- do you
7  recognize any of these payments that are
8  listed on the second page?
9  A.  I don't.
10  Q.  And let me have you look at Exhibit 52
11  next.  So this is your amended complaint in this
12  case, correct?
13  A.  I'm assuming so.  It looks like
14  something -- it says amended complaint with
15  my name on it.
16  Q.  Have you seen this before?
17  A.  Just scanning it, it looks like
18  something that I have seen before.
19  Q.  Well, let me just ask a few questions
20  about the content of this document.
21  A.  Okay.
22  Q.  In Paragraph 12 which is on Page 2, you
23  see that?
24  A.  Yes.

Page 225

1  Q.  It says, "Carlson was paid
2  substantially less than her similarly situated
3  male peers in terms of salary, bonus, and stock
4  options"?
5  A.  Yes.
6  Q.  In what way were you paid less in
7  salary?
8  A.  So it was my understanding that some of
9  the men had higher salaries, some of the men
10  that were allowed to sell the captive product.
11  And then it's also my understanding that
12  John Wappelhorst had a different comp package
13  that included quite a few stock options.
14  Q.  Salary and stock options and bonus
15  aren't listed on Exhibit 11, are they?
16  A.  I'm sorry.  I'm a little bit --
17  Q.  I'm specifically referring to that list
18  you gave of all the claimed damages.
19  A.  Correct.
20  Q.  So are you not claiming damages with
21  respect to salary, bonus, or stock options?
22  A.  Well, bonus.
23  Q.  Okay.  But the damages you're claiming
24  are all listed on Exhibit 11, the last page,

57 (Pages 222 - 225)

Page 226

1 correct?
2    A.  Correct.
3    Q.  Now, in Paragraph 15 --
4    A.  Yes.
5    Q.  -- the first bullet point says,
6 "Assigned accounts in her territory to men
7 without justification."
8    A.  Correct.
9    Q.  You've told me about the situations
10 that you're claiming were discriminatory in
11 terms of accounts being assigned to men,
12 correct?
13    A.  Correct.
14    Q.  And in the next bullet point where it
15 says, "Denied her and her female subordinate the
16 ability to sell the same products as men."
17    A.  Correct.
18    Q.  You've told me about that already,
19 right?
20    A.  That's referring to the captive
21 product, that there were men that could sell
22 both products, and then also the MEC product
23 situation.
24    Q.  And the next bullet on the top of

Page 227

1 Page 3 says, "Failed to provide her with
2 appropriate and proportionate back office and
3 underwriting support." You've told me about
4 that already, right?
5    A.  Correct.
6    Q.  You did have underwriting support,
7 though, right?
8    A.  I did. They just did different things
9 than some of the other people with underwriting
10 support.
11    Q.  What in particular?
12    A.  So one of the things was sending out
13 quotes directly. I think I had close to 1,500
14 submissions a year. So my underwriter would
15 send those to me, and then I was responsible for
16 forwarding them out which I considered more of a
17 clerical -- you know, more of a clerical issue.
18       And then in addition to that, just
19 providing detailed -- you know, detailed
20 justification underwriting notes, things like
21 that that I didn't receive.
22    Q.  Is that a -- do you believe that that
23 underwriting support differential occurred
24 because of your sex, or do you think it

Page 228

1 occurred because maybe you didn't have as good
2 an underwriter because they just weren't as good
3 an employee?
4    A.  I believe it was easier to gloss over
5 some of these issues because I was a woman.
6    Q.  Well, the underwriters that you did
7 have, did you ask them to perform some of these
8 tasks --
9    A.  I did.
10    Q.  -- that you are talking about?
11    A.  Yes.
12    Q.  And what was their response?
13    A.  I asked -- actually, I asked Jim if we
14 could get that changed and he said no.  And then
15 I had also -- and I already addressed this --
16 asked if we could hire someone. I had an old
17 assistant that I wanted to bring on.
18    Q.  Who were -- after you -- Craig and
19 Karin were moved away from you, right, in terms
20 of underwriting support?
21    A.  Um-hum.
22    Q.  Yes?
23    A.  Yes.
24    Q.  Okay.  Who were your underwriters after

Page 229

1 that point?
2    A.  So Dorie Geistdorfer was my main
3 underwriter. And there were a couple of
4 underwriters that were newer that I worked
5 with before I left, and I quite honestly
6 don't remember their names.
7    Q.  Did you ever have input into their
8 performance reviews?
9    A.  No.
10    Q.  Now, there is another bullet point
11 here that says, "Denied her access to software
12 and systems that would enable her to more
13 effectively and efficiently do her job, although
14 her male peers were granted access to the
15 information she repeatedly sought to access."
16    A.  Correct.
17    Q.  Do you know what that's in reference
18 to?
19    A.  Yes.
20    Q.  What is that?
21    A.  I asked -- I repeatedly asked for
22 access to the underwriting system so I could see
23 details about why the underwriter wrote business
24 the way they did or underwrote the accounts the

58 (Pages 226 - 229)

Page 230

1  way they did, and I was not allowed to get into
2  that system.
3      And the -- just as an example,
4  John Wappelhorst got a detailed write-up with
5  all the information that I was seeking, you
6  know, just laid in front of him every time an
7  account went out.
8      Q.  Other than John do you know of any
9  other sales employees who were also provided
10 similar access to John or to what John was
11 provided?
12     A.  When it comes to -- I don't know
13 how all of -- I don't know how the other men's
14 structure was, but I -- and I remember it
15 specifically being more of an issue when I
16 compared what I received to what John received.
17     Q.  Okay.  So this bullet point is a
18 reference to a comparison between you and
19 John Wappelhorst?
20     A.  Correct.
21     Q.  The bullet point above says, "Passed
22 Carlson over for a national sale manager's
23 position for a less qualified candidate."
24     A.  Yes.

Page 231

1      Q.  What is that in reference to?
2      A.  So I spoke earlier about how it was my
3  understanding that John went through a period of
4  time where he was demoted, and then there was an
5  E-mail that came out saying that he was
6  promoted.
7      I don't remember if his title was
8  national sales manager, but he was in charge
9  of the institutional channel which was
10 handling national accounts.  And I was much
11 more qualified than John to do that position.
12     And it was my understanding -- and I
13 believe I was told from Jim Hoitt -- that part
14 of the reason that John was demoted is because
15 we were having a lot of initial success in
16 relationships that he hadn't been able to get
17 moving.
18     Q.  So you were the -- I'm sorry.  There
19 was initial success.  Why would that result in
20 his demotion?
21     A.  It was my understanding that he was
22 considered ineffective in that position.
23     Q.  And how did you come to that
24 realization?

Page 232

1      A.  Based on conversations I had with
2  Jim Hoitt.
3      Q.  But, nevertheless, he was promoted to
4  this national sales manager role?
5      A.  Correct.
6      Q.  You never applied for that position,
7  correct?
8      A.  It was never posted.  The company
9  policy was to post the position.  I don't ever
10 recall this job being posted.  It was just an
11 announcement.
12     Q.  Again, since it wasn't posted, you
13 didn't apply for it.  You never sought the
14 position?
15     A.  Correct.
16     Q.  Let me have you look at Exhibit 53.
17 That's the charge of discrimination you filed
18 with the EEOC, correct?
19     A.  Correct.
20     Q.  And that's your signature on both
21 Page 1 and Page 2?
22     A.  Is this Exhibit 54?  No.  It's 53,
23 right?
24     Q.  53, I'm sorry.  If I said 54, I

Page 233

1  misspoke.
2      A.  Yes.
3      Q.  Exhibit 53, just to be clear, is your
4  charge of discrimination with the EEOC, right?
5      A.  That's correct.
6      Q.  Okay.
7      A.  Yes.
8      Q.  And then your signature is at the
9  bottom of both Pages 1 and 2 of Exhibit 53?
10     A.  Yes.
11     Q.  And turning to Exhibit 54.
12     A.  Yes.
13     Q.  This is the right to sue letter that
14 was issued on your EEOC charge, correct?
15     A.  It looks like it is.
16     Q.  Did you receive this?
17     A.  I don't remember receiving this.
18     MR. LISTON:  I don't believe Amy received a
19 copy of it directly.
20 BY MR. KELLY:
21     Q.  So you don't know -- I'm not going to
22 ask your counsel to testify, but you don't know
23 when this was received by your counsel, do you?
24     A.  I don't.

59 (Pages 230 - 233)

Page 234

1 Q. And take a look at Exhibit 55.
2 A. Okay.
3 Q. Have you seen this document before?
4 A. I believe I have seen this document
5 before, yes.
6 Q. And when did you see this document?
7 A. I believe I saw this document earlier
8 this year.
9 Q. Do you know what this document is?
10 A. I believe it's a cover letter with
11 my right to sue letter, but I would defer to
12 counsel on this.
13 Q. Okay. So you are not sure?
14 A. I'm not sure.
15 Q. And then take a look at Exhibit 56.
16 A. Yes.
17 Q. Is this a letter you would have
18 received from the Illinois Department of
19 Human Rights?
20 A. I believe so, yes.
21 Q. And is that your address?
22 A. It is.
23 Q. Do you remember receiving this?
24 A. I don't.

Page 235

1 Q. And how about Exhibit 57, do you
2 recognize this document?
3 A. No, I do not.
4 Q. I believe you testified before and
5 correct me if I'm wrong that you don't know who
6 made the decisions with respect to assigning the
7 Xylem Lockton account or the Segal account to
8 John Wappelhorst; is that right?
9 A. I believe it was Chris Brown that made
10 those decisions.
11 Q. Is that -- why do you believe that?
12 A. If memory serves me, I believe
13 that Jim had said in an E-mail he was going
14 to be discussing the Segal account with
15 John Wappelhorst and Chris Brown at one point.
16 And based on the fact that -- it was
17 right around that same time, if not that same
18 discussion, where I was told that Chris had made
19 the decision to give John the Segal account as
20 some kind of consolidation prize -- or
21 consolation prize.
22 Q. Now, you've testified about ways in
23 which you believe that you were discriminated
24 against with respect to pay, right?

Page 236

1 A. Yes.
2 Q. Okay. Do you believe that any other
3 women besides yourself were discriminated
4 against with respect to pay?
5 A. Yes.
6 Q. Who in particular?
7 A. Manjusha Sheobaran and
8 Kristine Thompson.
9 Q. In what way do you think they were
10 discriminated against?
11 A. I was told by Manjusha that she wrote a
12 $5 million account that they did not pay her
13 for. They gave it to somebody else.
14 And I was also told about a similar
15 situation from Kristine Thompson, an account
16 that was taken away from her that she believed
17 that she should be compensated about -- or
18 should have been compensated on.
19 Q. So these are both things you learned
20 from them?
21 A. Correct.
22 Q. Did either of them tell you where those
23 accounts went like who -- who received those
24 accounts?

Page 237

1 A. I believe Kristine Thompson, the
2 account went to John Wappelhorst. And I don't
3 know what happened on the account with Manjusha.
4 Q. The one involving Kristine, do you
5 remember what the -- who the client was?
6 A. I believe the producer -- I believe it
7 was a Mercer of Colorado account, but I'm not
8 sure.
9 Q. And Mercer was one of these national
10 accounts that went to John?
11 A. Yes. I'm not sure about that producer,
12 though. It seemed like there was something --
13 there was -- there was another part of that
14 account. It wasn't as black and white as it
15 being part of a national relationship. I might
16 have the production source wrong.
17 Q. This Manjusha $5 million account, do
18 you have any knowledge of what the name of that
19 client was?
20 A. I don't. I believe it was a Gallagher
21 account.
22 Q. And when you say -- like when you use
23 the reference the $5 million, that's not the
24 profit the company is making in that account,

60 (Pages 234 - 237)

Page 238

1 right? That's the gross premium?
2    A.  Correct, the annualized premium.
3    Q.  Any other instances where you believe
4 other women were discriminated against with
5 respect to pay?
6    A.  Just the situations that we've already
7 covered with Pam.
8    Q.  Nothing else?
9    A.  No.
10    MR. KELLY:  What I would like to do, John, is
11 just take about 15 minutes just to go over my
12 notes and wrap up here in a little bit.  So if
13 we could take a 15-minute break, reconvene at
14 4:15.
15    MR. LISTON:  For economy of time, I have got
16 maybe three minutes of clarifying questions.
17 Would it be okay if I did those while you are
18 reviewing your notes, or do you want me to wait
19 until the end?
20    MR. KELLY:  Yes.  Why don't you wait until
21 the end and -- I mean, take a break like I'm
22 going to be off line.
23    MR. LISTON:  Sure.
24    THE VIDEOGRAPHER:  Going off the video record

Page 239

1 at 3:57 p.m.
2        (A short break was taken.)
3    THE VIDEOGRAPHER:  We are back on record at
4 4:15 p.m.  You may proceed.
5 BY MR. KELLY:
6    Q.  Ms. Carlson, could I have you go
7 back to Exhibit 11 again, the last page that
8 of the document that we've been referring to
9 repeatedly?
10    THE VIDEOGRAPHER:  Pardon me?  Did I say
11 4:15.  I meant 4:11 p.m. we are back on record.
12 Sorry about that.
13 BY MR. KELLY:
14    Q.  Do you have that in front of you?
15    A.  Not quite yet, but I'm getting there.
16    Q.  That's okay.  Take your time.
17    A.  I'm there.
18    Q.  Okay.  So we've talked about a lot of
19 these amounts, but there's a couple we haven't
20 talked about I just want to go over.
21        There is an amount here for refund SIIA
22 registration fees, $895?
23    A.  Correct.
24    Q.  That doesn't have anything to do with

Page 240

1 either the compensation, discrimination, or
2 unpaid wages claim that you are making in this
3 case, does it?
4    A.  Yes, it does.
5    Q.  In what way?
6    A.  I had registered to attend fall SIIA
7 conference and was told that I could not go to
8 the conference due to the time of the year and
9 my position.  And that is the same conference
10 that three male reps attended not taking PTO.
11 And the company paid for them to go, to travel
12 there, I believe.
13        And because I was banned from going to
14 the conference, I felt like it wasn't fair
15 because the men weren't -- men in the exact same
16 position that I was in the exact time of year
17 were allowed to go.  There was never any
18 directive saying we couldn't attend this
19 conference.
20    Q.  How do you know the men were paid to
21 go?
22    A.  I talked to David Frawley who told me
23 that he attended the conference, that Chris --
24 and what I mean by paid to go, I'm assuming

Page 241

1 their registration fees.  But at a minimum, I
2 know that Chris Brown took out their clients
3 and entertained them.  And it wasn't anything
4 that they either had to take PTO to go or had to
5 pay out of their own pocket.
6    Q.  And, again, you know this from what you
7 heard from David Frawley?
8    A.  And Jim had acknowledged that they had
9 gone, too, yes.
10    Q.  Jim told you that David went to the
11 conference?
12    A.  Correct.
13    Q.  Did Jim tell you anything about what,
14 if anything, was paid by the company in terms of
15 the registration fees?
16    A.  He did not.
17    Q.  So the only way you know anything about
18 registration being paid is through David Frawley
19 telling you?
20    A.  So I'm assuming that they had
21 registered to attend the conference because they
22 usually patrol these things.  They have a lot of
23 people that go without paying.
24        So I don't remember having a

61 (Pages 238 - 241)

Page 242

1  conversation with David Frawley about the
2  registration fees. But because I was told I
3  couldn't go even when I paid -- had paid for the
4  registration with my -- out of my own pocket, I
5  didn't feel like that was fair.
6  Q.  Right. So you don't have any personal
7  knowledge of whether or not the company paid the
8  registration fees for David Frawley or any other
9  sales representative?
10  A.  So, first, for both Scott Burn who is
11  in Denver and also John Wappelhorst, their names
12  were included as attendees on the event. And
13  you have to register in order to attend -- to be
14  on the attendee list.
15  Q.  Right. But what I'm asking you is
16  what, if any, knowledge do you have about
17  whether or not the company paid for the
18  registration fees for any other sales
19  representatives for that conference?
20  A.  Because they always paid for people to
21  go.
22  Q.  Well, but how do you know that?
23  What -- how do you know that the company paid
24  for the SIIA conference registration for anyone

Page 243

1  who was a sales representative?
2  A.  I don't have any reason, because
3  it had been practiced every year in every
4  conference, to believe otherwise. I don't know
5  that I ever had a conversation to confirm this
6  particular conference for those people.
7  Q.  So no one -- no one in the company
8  told you that. You are just assuming that the
9  company paid?
10  A.  Correct.
11  Q.  Now, the next item here says loss of
12  401-K vesting upon constructive termination?
13  A.  Correct.
14  Q.  And your attorney can correct me if I'm
15  wrong, but I understand that with the amended
16  complaint that was filed in this case that you
17  are no longer claiming constructive termination
18  in this lawsuit, correct?
19  A.  Yes.
20  Q.  And the final thing I want to ask
21  you about is on this last page of Exhibit 11
22  there's an amount of $150,000 under the heading
23  emotional distress. Do you see that?
24  A.  I do.

Page 244

1  Q.  Why are you claiming $150,000 in
2  emotional distress?
3  A.  I went through a lot going through this
4  situation. My son went through a lot. My son
5  was actually drawing pictures at school that the
6  school brought to my attention and was suffering
7  from some anxiety issues I believe that were
8  directly related to my stress at work.
9  Q.  Why do you believe that?
10  A.  Because he drew a picture depicting
11  me -- it was a character sketch, an assignment
12  that he was given at work. And he had
13  statements labelling different parts of the
14  picture referring to my job.
15  Q.  Have you seen any psychiatrists or
16  mental health care providers?
17  A.  I saw a counselor for my son's anxiety
18  issues and talked to her about the stress that I
19  had at work, and she advised me the best thing I
20  could do was to leave the position. And then I
21  also saw a counselor for myself about some
22  anxiety issues that I was experiencing.
23  Q.  So these are two different counselors?
24  A.  Correct.

Page 245

1  Q.  What are their names?
2  A.  I don't remember the name of the
3  child's counselor. And Gustovo was the first
4  name of the counselor I saw, but I would have
5  to get you additional information.
6  Q.  How many times did you see this
7  counselor for your own anxiety?
8  A.  I would guess I probably saw him 20
9  times or so.
10  Q.  In what time frame?
11  A.  I believe I started seeing him in 2017,
12  and I stopped seeing him in 2019 -- early 2019.
13  Q.  You mentioned previously about a
14  divorce in which you may have testified about
15  some things?
16  A.  Yes.
17  Q.  When was that?
18  A.  My divorce was in 2008.
19  Q.  So not during any of this time frame,
20  2017 to 2019?
21  A.  Correct.
22  Q.  The job you had immediately after
23  Berkley --
24  A.  Yes.

62 (Pages 242 - 245)

Page 246

1 Q. -- with -- sorry. You will have to
2 refresh my memory of the name.
3 A. OneBeacon.
4 Q. OneBeacon, yes. Why did you leave that
5 position?
6 A. I left that position because my
7 daughter was getting married, and I wanted some
8 time off. And I also felt like it was a time
9 commitment from a sales standpoint that it was
10 just hard to keep up with.
11 Q. It was a stressful job?
12 A. I don't know that it was any more
13 stressful than my normal job. But, yes, I mean,
14 being a stop loss rep is stressful.
15 But like I said, with that particular
16 job, my daughter was getting married. They had
17 some -- you know, I wanted to take some time off
18 and really enjoy the position -- enjoy the
19 event.
20 Q. Were you making more money there than
21 you did at Berkley?
22 A. I would have made more money the year
23 after I left, yes.
24 Q. So we've talked a lot today. It's

Page 247

1 obviously been a long day I know. And you've
2 covered a lot of ground in terms of the factual
3 basis for your claims in this case of sex
4 discrimination with respect to pay as well as
5 your claim that, you know, the company didn't
6 pay you what you believe you were promised.
7 Aside from what you've already
8 testified to, are there any other pieces of
9 information, any other evidence that you believe
10 would demonstrate that Berkley Accident and
11 Health, L.L.C., either discriminated you on
12 account of sex with respect to your pay or
13 failed to pay you amounts that you believe you
14 are owed?
15 A. Nothing I can think of.
16 MR. KELLY: I have no further questions.
17 MR. LISTON: I have just got a few minutes of
18 clarifying questions.
19 CROSS-EXAMINATION
20 BY MR. LISTON:
21 Q. Ms. Carlson, are you aware of any
22 females in the Berkley Accident and Health
23 C suite?
24 A. No, not in the stop loss division, no.

Page 248

1 Q. You mentioned during the course of
2 your testimony today that there were several
3 instances or products that certain salespeople
4 were able to sell and others were not. Are you
5 aware of any products that -- or were any women
6 allowed to sell any of those products?
7 MR. KELLY: Objection, vague.
8 THE WITNESS: No.
9 BY MR. LISTON:
10 Q. With respect to the MEC at captive
11 coverage, were women allowed to sell those
12 products?
13 A. No.
14 Q. Cathi Villano was the head of human
15 resources during most of your time at Berkley
16 Accident and Health; is that correct?
17 A. That's correct.
18 Q. What was her reputation to your
19 knowledge around the company in terms of how
20 she conducted herself and conduct she found
21 acceptable and conduct that she found
22 impermissible?
23 MR. KELLY: Objection, calls for speculation.
24

Page 249

1 BY MR. LISTON:
2 Q. Please answer the question.
3 A. I was told during the interview process
4 that Berkley Accident and Health had let two
5 other HR people go, that Cathi was in her
6 position because she wouldn't do anything.
7 And my experience with Cathi was just
8 complete lack of response. Even when she said
9 she would follow up on things, I would not hear
10 back. I am aware of situations where that
11 happened with Pam Gallo as well.
12 Q. Thank you. You mentioned your
13 understanding of compensation or being paid to
14 go to prior SIIA conferences. Did Berkley
15 Accident and Health ever pay your registration
16 fee for prior conferences?
17 A. Yes. I attended most conferences up to
18 that point. I think I was one of the first
19 Southwest reps to ever be named on the board of
20 the Self-Insurance Institute of America.
21 I went to the SIIA conference with
22 Chris Brown when I pitched United HealthCare or
23 UMR on coming to work on a national basis with
24 Berkley.

63 (Pages 246 - 249)

1    I also introduced Chris Brown, the
2 president of the company, to the head of
3 Lockton Dunning. Upon request of Jim Hoitt,
4 Kevin Steelman ran the Lockton Dunning panel.
5 Chris did not know him. He sat on the health
6 care committee with me, told me that he didn't
7 know anyone at Berkley other than me. So I had
8 arranged for him an introductory meeting there.
9    Q. You mentioned earlier in your testimony
10 that it was difficult to be successful at your
11 job. Could you elaborate on the impediments to
12 success that you dealt with?
13    A. Yes. So from a support standpoint, I
14 feel like given equal support -- underwriting
15 support that I could have been much more
16 successful.
17    I feel like the perception was that I
18 was very successful and that I had brought a lot
19 of good things to the company. My clients were
20 happy, but I don't feel like I was able to
21 capitalize on the opportunity given the lack of
22 support.
23    Q. And with respect to the company
24 culture, have you ever been at any company

1 events where lewd acts occurred or where after
2 the events people went to, say, less desirable
3 venues?
4    MR. KELLY: Objection, compound.
5 BY MR. LISTON:
6    Q. With respect to the company culture
7 after a corporate event, have you ever been
8 invited by superiors to a gentlemen's club?
9    A. Yes.
10    Q. And when did that occur?
11    A. My first week on the job,
12 February 2014, there was a conference in
13 New Orleans. And the group of people including
14 my supervisor ended up at a strip club. And I
15 left and asked another male rep to walk me home.
16    Q. And then was there any follow-up after
17 this event?
18    A. There was a meeting the morning of
19 departure where we were told to pull out our
20 cell phones and delete all pictures of the night
21 before.
22    And I believe I already stated -- at
23 that point Chris Brown had stated that he wanted
24 to protect the company culture. And there was

1 concern with the growth and new hires that had
2 happened that's in tandem with him asking us to
3 delete the pictures.
4    Q. With respect to the entry of your PTO,
5 was it common for you to perform work on days
6 when you had taken off using your PTO?
7    A. Yes.
8    Q. If you were to take a full day off,
9 eight hours of PTO, how many hours during that
10 day would you typically spend working?
11    A. I would monitor my E-mail several times
12 a day. I mean, it just -- you can't get away
13 from the job. There is no one there to back you
14 up. It doesn't go away. So it was very common
15 for me to work on PTO days.
16    MR. LISTON: I believe that is all my
17 follow-up questions.
18    MR. KELLY: I have just a few more then.
19    REDIRECT EXAMINATION
20 BY MR. KELLY:
21    Q. You mentioned just a moment ago that
22 Cathi -- when you were speaking of Cathi's
23 reputation, you were told during an interview
24 that Berkley let two prior HR people go and

1 Cathi wouldn't do anything?
2    A. Correct.
3    Q. Who told you that?
4    A. Rocko Robinson.
5    Q. He specifically told you that Cathi
6 wouldn't do anything?
7    A. Correct.
8    Q. You also mentioned that the company
9 paid for your registration fee to attend a SIIA
10 conference; is that right?
11    A. Several, yes.
12    Q. Several. So the company did allow you
13 to attend SIIA conferences?
14    A. Up until the last conference, yes.
15    Q. So the only one you weren't allowed to
16 go to was the one in what year?
17    A. 2017.
18    Q. And Chris Brown was the one who told
19 you you couldn't go, right?
20    A. Correct.
21    Q. And what did he tell you as the reason?
22    A. Actually, if I'm remembering correctly,
23 Chris Brown told Jim Hoitt who in turn told me.
24 I did not speak to Chris Brown directly about

64 (Pages 250 - 253)

Page 254

1  it. I believe there might have been an E-mail
2  at some point.
3      I was told due to the time of year the
4  sales reps would not be allowed to attend the
5  conference.
6      Q.  And this was by Jim Hoitt?
7      A.  Yes.
8      Q.  And then you mentioned this gentlemen's
9  club your first week on the job. You used the
10  word superiors. Who was there who was at a
11  higher level in the company besides yourself?
12      A.  I don't remember everyone that was
13  there, but I do remember Jim Hoitt being there.
14      Q.  And prior to going to this gentlemen's
15  club, where were you immediately preceding that?
16      A.  We were in the French Quarter in
17  New Orleans. And we had gone to several
18  different places just stopping in,
19  restaurants, bars, things like that.
20      Q.  Were people drinking?
21      A.  Yes.
22      Q.  Were you drinking?
23      A.  Yes.
24      Q.  Were you intoxicated?

Page 255

1      A.  No.
2      Q.  Going into the gentlemen's club, did
3  you have an opportunity to refrain from that if
4  you chose?
5      A.  I did.
6      Q.  But you willingly went in?
7      A.  I did, yes.
8      Q.  Did you complain to HR about that?
9      A.  I did not.
10      Q.  Had anything like that ever happened to
11  you before in your work experience?
12      A.  No, not at a company event, no.
13      Q.  Was this specifically a company event
14  or after a company event?
15      A.  It was -- I understood it to be a
16  company -- it was a -- it was a formal -- it
17  was a national sales conference.
18      Q.  But was there formal meetings that
19  preceded everyone going out to restaurants and
20  bars?
21      A.  Yes.
22      Q.  You said there was some instruction
23  about deleting pictures --
24      A.  Correct.

Page 256

1      Q.  -- from phones?
2      Who gave that instruction?
3      A.  Chris Brown.
4      Q.  Did you comply with that instruction?
5      A.  I did not have any pictures to delete.
6      Q.  Do you know if anyone else did?
7      A.  I'm assuming some people had taken
8  pictures.
9      MR. KELLY:  I have nothing else.
10      MR. LISTON:  No follow-up for me.
11      THE VIDEOGRAPHER:  Okay. We are going off
12  the video record at 4:34 p.m. That concludes
13  today's testimony. The video will be retained
14  by Veritext Legal Solutions. Thank you, all.
15          (Whereupon, the proceedings
16          concluded at 4:34 p.m.)
17
18
19
20
21
22
23
24

Page 257

1  STATE OF ILLINOIS    )
2              ) SS:
3  COUNTY OF W I L L    )
4      I, DENISE A. JOHNSON, a certified
5  shorthand reporter within and for the State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, on the 10th day of November 2020,
8  personally appeared before me AMY CARLSON, a
9  witness in a certain cause now pending and
10  undetermined in the United States District
11  Court, Northern District of Illinois, Eastern
12  Division, wherein AMY CARLSON, individually, is
13  the Plaintiff and BERKLEY ACCIDENT AND HEALTH,
14  L.L.C., is the Defendant.
15      I further certify that the said
16  AMY CARLSON was by me first duly sworn to
17  testify the truth, the whole truth, and nothing
18  but the truth in the cause aforesaid; that the
19  testimony then given by said witness was
20  reported stenographically by me in the presence
21  of said witness and afterwards reduced to
22  typewriting by Computer-Aided Transcription, and
23  the foregoing is a true and correct transcript
24  of the testimony so given by said witness as

65 (Pages 254 - 257)

Page 258

1 aforesaid.

2     I further certify that the signature to

3 the foregoing deposition was not waived by

4 counsel for the respective parties.

5     I further certify that the taking of this

6 deposition was pursuant to Notice and that there

7 were present at the deposition the attorneys

8 hereinbefore mentioned.

9     I further certify that I am not counsel

10 for nor in any way related to the parties to

11 this suit, nor am I in any way interested in the

12 outcome thereof.

13     IN TESTIMONY WHEREOF:  I have hereunto

14 set my hand and affixed my notarial seal this

15 23rd day of November, 2020.

16

17

18

19

20     DENISE A. JOHNSON

21     CERTIFIED SHORTHAND REPORTER

22

23

24

---

Page 259

1     Veritext Legal Solutions
    1100 Superior Ave

2     Suite 1820
    Cleveland, Ohio 44114

3     Phone: 216-523-1313

4

November 24, 2020

5

To: JOHN C. LISTON

6

Case Name: Carlson, Amy, etc. v. Berkley Accident And Health, L.L.C.

7

Veritext Reference Number: 4288642

8

Witness: Amy Carlson    Deposition Date:  11/10/2020

9

10 Dear Sir/Madam:

11

Enclosed please find a deposition transcript.  Please have the witness

12

review the transcript and note any changes or corrections on the

13

included errata sheet, indicating the page, line number, change, and

14

the reason for the change.  Have the witness' signature notarized and

15

forward the completed page(s) back to us at the Production address

16 shown

17 above, or email to production-midwest@veritext.com.

18

If the errata is not returned within thirty days of your receipt of

19

this letter, the reading and signing will be deemed waived.

20

21 Sincerely,

22 Production Department

23

24 NO NOTARY REQUIRED IN CA

---

Page 260

1     DEPOSITION REVIEW
    CERTIFICATION OF WITNESS

2

ASSIGNMENT REFERENCE NO: 4288642

3 Carlson, Amy, etc. v. Berkley Accident And Health, L.L.C.
   DATE OF DEPOSITION: 11/10/2020

4 WITNESS' NAME: Amy Carlson

5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of

6 my testimony or it has been read to me.

7     I have made no changes to the testimony
   as transcribed by the court reporter.

8

9 Date       Amy Carlson

10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11 the referenced witness did personally appear
   and acknowledge that:

12
   They have read the transcript;

13    They signed the foregoing Sworn
   Statement; and

14    Their execution of this Statement is of
   their free act and deed.

15
   I have affixed my name and official seal

16
this    day of       , 20  .

17

18    Notary Public

19
   Commission Expiration Date

20

21

22

23

24

25

---

Page 261

1     DEPOSITION REVIEW
    CERTIFICATION OF WITNESS

2

ASSIGNMENT REFERENCE NO: 4288642

3 Carlson, Amy, etc. v. Berkley Accident And Health, L.L.C.
   DATE OF DEPOSITION: 11/10/2020

4 WITNESS' NAME: Amy Carlson

5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of

6 my testimony or it has been read to me.

7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as

8 well as the reason(s) for the change(s).

9     I request that these changes be entered
   as part of the record of my testimony.

10
    I have executed the Errata Sheet, as well

11 as this Certificate, and request and authorize
   that both be appended to the transcript of my

12 testimony and be incorporated therein.

13
Date       Amy Carlson

14
   Sworn to and subscribed before me, a

15 Notary Public in and for the State and County,
   the referenced witness did personally appear

16 and acknowledge that:

17    They have read the transcript;
   They have listed all of their corrections

18    in the appended Errata Sheet;
   They signed the foregoing Sworn

19    Statement; and
   Their execution of this Statement is of

20    their free act and deed.

21    I have affixed my name and official seal

22 this    day of       , 20  .

23
   Notary Public

24

25    Commission Expiration Date

---

66 (Pages 258 - 261)

Page 262

1      ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2     ASSIGNMENT NO: 4288642
3  PAGE/LINE(S) /   CHANGE   /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

_____
20  Date     Amy Carlson
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
     Notary Public
24
     _____
25  Commission Expiration Date

67 (Page 262)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 1



# BERKLEY
### Accident and Health™



*A BERKLEY COMPANY*

January 13, 2014

Amy Carlson
Redacted

Dear Amy:

I am writing to confirm the offer of employment recently made to you by Berkley Accident and Health, LLC. Your position will be Stop Loss Regional Sales Manager with an annual salary rate of $60,000 and a start date of February 1, 2014.

You will also receive a salary subsidy in the amount of $6,666 per month for your first 24 months, and a contingent salary subsidy in the amount of $3,333 per month for the third 12 months (months 25-36). The third year subsidy is contingent upon sales resulting in new business premium production of $5,000,000 for the first 24 months of employment. Additionally, you will receive an advance on your incentive compensation in the amount of $6,666 per month for your first 12 months, and a contingent advance on your incentive compensation in the amount of $3,333 in your second 12 months (months 13-24). The second year advance is contingent upon sales resulting in new business production of $2,500,00 for the first 12 months of employment. If you have not earned enough incentive compensation to satisfy your advance on cases written with effective dates through February 1, 2015 (Year 1) and February 1, 2016 (Year 2), the "advance deficit" will be forgiven. You may immediately become eligible for incentive compensation for some inforce business in your assigned region, with a provision that you must first draw down the annual advances. The profit withhold referenced in the Berkley A&H Sales Rep Compensation formula will be waived through 2/1/16 effective dates both new and renewal.

You will be eligible for group medical and dental benefits on your first day of employment and Profit Sharing after the completion of a calendar quarter. You will be eligible to contribute to the 401K after your first payroll. In addition, you will be eligible to earn 15 days vacation with the first year being pro-rated. Vacation will accrue and may be used in accordance with Company policy.

Berkley Accident & Health is a drug free workplace and does require all employees to pass a pre-employment drug screen. Lori Overman has included the form and contact information in the offer package for completing the pre-employment drug screen. Berkley Accident & Health also requires a criminal background screen. Should you have any questions you may contact Lori at 1-800-366-1511, ext. 7425.

We have broadly described the provisions of the Incentive Compensation Plan to you. The Company reserves the right to change the Incentive Compensation Plan at any time, and expects to make periodic changes that are consistent with your efforts to sell and to develop a profitable block of business. A description of the Incentive Compensation Plan will be made available to you following commencement of your employment.

Your Stop Loss territory will be defined by your assigned brokerage and TPA sources in the following states: IL, IN, WI, IA and MI. Additional Stop Loss sources outside of your territory may be approved by the company. Exact details of your assigned territory will be determined at the sole discretion of the company. You will report to Vice President of Sales, Jim Hoitt.

Included in this package are the forms needed on your first day of employment; W-4, IL-W4, employee confidential summary, I-9 verification form, and direct deposit form. Identification must be presented within three days of employment in order to continue employment. Employees may present one selection from List A or a combination of one selection from List B and one selection from List C (lists of acceptable documents found on page 9 of I-9 package which is enclosed).

By accepting this offer of employment, you warrant and represent to us that: 1) you have honored, and will honor, to the extent enforceable and required by law, confidentiality agreements you may be legally obligated to honor with regard to your current employer, and 2) you are not bound by any non-competition restriction or covenant not to compete. Further, you understand that you may not, and we require that you not, bring with you any of your current employer's confidential, proprietary or trade secret information, such as, but not limited to, underwriting manuals, pricing guidelines, loss information, client lists, certificate wordings and/or forms, etc., whether electronic or otherwise.

Please indicate your acceptance of this position and understanding of this letter by signing and returning a copy to my attention. This letter is not intended to create an employment contract for a specific term, or to alter the at-will employment relationship.

Sincerely,

BERKLEY ACCIDENT AND HEALTH, LLC

Cathi Villano
Assistant Vice President
Human Resources

Amy Carlson                                    1/28/2014
                                               Date

**EXHIBIT**

0001

**CARLSON DEP. EX**

# Exhibit 4

# *Berkley Insurance Company by its member*

## **Berkley Accident and Health**

# **EMPLOYEE HANDBOOK**



January 1,

Carlson v. BAH
Page 001097

**CARLSON DEP. EX.**

EXHIBIT

0004

## TABLE OF CONTENTS

**Page**

ACKNOWLEDGMENT OF RECEIPT & RESPONSIBILITY TO READ EMPLOYEE
    HANDBOOK ........................................................................................................... iii

SECTION 1   INTRODUCTION TO EMPLOYEE HANDBOOK ................................... 1

SECTION 2   AT-WILL EMPLOYMENT RELATIONSHIP ........................................... 3

SECTION 3   EQUAL EMPLOYMENT OPPORTUNITY ............................................... 4

SECTION 4   POLICY AGAINST DISCRIMINATION, HARASSMENT AND
    RETALIATION ........................................................................................... 5

SECTION 5   EMPLOYMENT ........................................................................................ 8

    A.     EMPLOYMENT CLASSIFICATIONS ..................................... 8

    B.     WORKWEEK, WORKDAYS, AND WORK HOURS.................. 9

    C.     MEAL AND REST PERIODS .................................................... 9

    D.     BREAK TIME FOR NURSING EMPLOYEES ....................... 10

    E.     OVERTIME .............................................................................. 11

    F.     OTHER PAY ............................................................................. 11

    G.     TIME AND PLACE OF PAY .................................................... 11

    H.     EMPLOYEE TIMEKEEPING ................................................. 12

    I.     TRAVEL AND ENTERTAINMENT GUIDELINES AND BUSINESS
      EXPENSE REIMBURSEMENT POLICY ................................ 13

SECTION 6   EMPLOYEE BENEFITS ......................................................................... 14

SECTION 7   TIME OFF ............................................................................................... 17

    A.     COMPANY HOLIDAYS .......................................................... 17

    B.     FLOATING HOLIDAYS ........................................................... 17

    C.     VACATION .............................................................................. 17

    D.     SICK LEAVE............................................................................ 19

    E.     LEAVES OF ABSENCE ........................................................... 21

        1.     FAMILY CARE, MEDICAL, AND MILITARY FAMILY LEAVE ........ 21

        2.     DISABILITY LEAVES OF ABSENCE ..................... 24

        3.     MILITARY LEAVE OF ABSENCE .......................... 24

        4.     JURY DUTY AND WITNESS SERVICE ................. 25

        5.     VOTING TIME OFF .................................................. 26

        6.     BEREAVEMENT LEAVE .......................................... 26

        7.     OTHER LEAVES OF ABSENCE .............................. 26

Carlson v. BAH
Page 001098

| SECTION 8 | WORKPLACE POLICIES | 28 |
| A. | ATTENDANCE | 28 |
| B. | PRE-EMPLOYMENT AND PROOF OF RIGHT TO WORK | 29 |
| C. | PERSONAL APPEARANCE AND DEMEANOR | 30 |
| D. | OPEN DOOR AND INTERNAL PROCEDURE FOR REPORTING CONCERNS/COMPLAINTS | 30 |
| E. | NON-FRATERNIZATION/DATING | 31 |
| F. | EMPLOYEE RECORDS AND INFORMATION | 31 |
| G. | SOLICITATION, DISTRIBUTION OF LITERATURE & BULLETIN BOARDS | 32 |
| H. | EXTERNAL COMMUNICATIONS | 33 |
| I. | SMOKING | 33 |
| J. | PARKING | 33 |
| SECTION 9 | SAFETY AND SECURITY | 34 |
| A. | DRUG AND ALCOHOL FREE WORKPLACE | 34 |
| B. | HEALTH & SAFETY POLICY | 36 |
| C. | COMPANY PROPERTY; CONFIDENTIAL & PERSONAL INFORMATION | 36 |
| D. | TECHNOLOGY USE & SECURITY | 41 |
| E. | SOCIAL MEDIA POLICY | 47 |
| F. | POLICY ON MOBILE DEVICE USAGE WHILE TRAVELING | 47 |

APPENDIX A –U.S. Department of Labor's Rights and Responsibilities notice (Form WHD 1420)
APPENDIX B – Prohibition Against Trading on Inside Information Memorandum
APPENDIX C – W. R. Berkley Corporation: Data Breach Notification Policy
APPENDIX D – W. R. Berkley Corporation: Social Media Policy

Carlson v. BAH
Page 001099

## ACKNOWLEDGMENT OF RECEIPT & RESPONSIBILITY TO READ EMPLOYEE HANDBOOK

By signing this Acknowledgement form, I acknowledge:

I have received and read a copy of the Company's Employee Handbook effective January 1, 2015. I understand that there may be specific state and/or local laws that provide different employment benefits than those described in this main Employee Handbook, and the Company may have prepared a state-specific Addendum to this Handbook addressing them. I further understand that while the Company will try to notify me of any such state-specific Addendum applicable to me, it is my responsibility to find out if such an Addendum exists, and to ask my local Human Resources representative about any state or local laws that may apply to me.

- This Employee Handbook and any state-specific addenda (including any revisions to either), the W. R. Berkley Corporation Code of Ethics and Business Conduct, and any separate policies issued by the Company from time to time (such as policies prohibiting trading on inside information, data security procedures policies, etc.), govern my employment and replace any prior inconsistent employee policies, practices, and procedures on the topics covered. In the event any such policies conflict with one another, the policy giving greater protection to the Company will govern. Also, in all cases, in the event of a conflict between a Company policy and applicable law, the law will govern.

- The Company may revise this Employee Handbook from time to time. I understand that future changes to the Employee Handbook policies may supersede, modify or eliminate the policies in this Employee Handbook. Policy changes typically will be communicated to me by the Company. At the same time, while the Company will try to give me advance notice, any changes are effective with or without advance notice. It is my responsibility to keep informed of any changes.

- This Employee Handbook does not create a contract. The Company is free to demote or discipline me, terminate my employment, or otherwise alter the terms of my employment, at any time, with or without cause or notice or progressive discipline.

- Only the Company's President, or his or her designee, has the authority to alter my at-will employment, and only in writing that (i) the President or his or her designee signs, and (ii) that expresses a clear and unambiguous intent to change my at-will status.

- I should talk with my local Human Resources representative if I am unclear about any employment policies, practices, or procedures.

_____      _____
Signature                                     Date

_____
Print Name

*Please print, sign & date, and return this page to your local HR representative.*
*This Acknowledgement form will be placed in your personnel file.*



-iii-

## SECTION 1   INTRODUCTION TO EMPLOYEE HANDBOOK

Welcome to the Berkley Group.  Whether you have just joined or been with us for a while, we are confident you will find the Company a dynamic and rewarding place in which to work. We consider our employees to be one of our most valuable resources.  For this reason, our employment policies and practices are designed to provide a work environment that fosters a sense of pride and job satisfaction and that offers opportunities for growth and development.

This Employee Handbook, including the state-specific policies in any applicable addendum, as well as the W. R. Berkley Corporation's Code of Ethics and Business Conduct and any separate policies issued by the Company from time to time, describe the basic terms and conditions of employment with Berkley Accident and Health (the "Company") and expectations of you as an employee.  A few key points:

\*      ***Please read & ask questions if needed.***

Please take the time to carefully read this Employee Handbook.  It is your responsibility to know and understand its contents.  At the same time, bear in mind that it was written as guidelines, and cannot address all possible applications of, or exceptions to, the general policies and procedures described.  Contact Human Resources for information about specific employment guidelines, policies or procedures.

*California, Connecticut, New York, Iowa, Minnesota and Nebraska Employees only*:  Employees located in California, Connecticut, New York, Iowa, Minnesota and Nebraska should review the California Addendum, Connecticut Addendum, New York Addendum, Iowa Addendum, Minnesota Addendum and Nebraska Addendum for policies and information that may specifically apply to them.

*Employees in other states*:  State and local law may provide you with additional benefits.  Please contact Human Resources for information about any such specific benefits in your state.

\*      ***Your employment is "at-will."***

Your employment at the Company is "at will."  This means that you and the Company each have the right to end your employment at any time, with or without advance notice or cause. Nothing in this Handbook creates a contract or guarantee of employment for a specific period of time.  You should not interpret anything in this Handbook as creating a contract or guarantee of continued employment.

\*      ***Changes to this Handbook may be necessary – stay informed.***

Business needs change.  The Company reserves the right to make changes to this Employee Handbook.  Please keep informed of any changes.  It is your responsibility to do so.

Carlson v. BAH
Page 001101

\*      ***This Employee Handbook replaces earlier ones.***

This Employee Handbook replaces all earlier handbooks and supersedes all prior inconsistent policies, practices, and procedures. Your continued employment means you accept the terms and conditions of employment set forth within this Employee Handbook.

\*      ***This Handbook is for internal reference only.***

This Employee Handbook is Company property, intended for our employees' internal use, and may not be circulated outside the Company.

2

## SECTION 2   AT-WILL EMPLOYMENT RELATIONSHIP

Your employment at the Company is "at-will." This means that both you and the Company have the right to terminate your employment at any time, with or without cause or notice.

The at-will relationship also means that the Company can change the terms or conditions of your employment at any time, with or without cause or advanced notice. For example, the Company can change your job duties or your entitlements to certain benefits. The Company will provide you notice of such changes whenever practicable.

Nothing in this Handbook creates a contract or guarantee of employment for a specific period of time. Moreover, your at-will employment relationship cannot be modified by any oral or implied agreement. No one other than the Company President, or his or her designee, is authorized to change your at-will employment, or to enter into an agreement to employ you for a specific period of time, or to make any agreement different from this at-will status. If the Company President, or his or her designee, makes this kind of different agreement with you, it will not be effective unless it is in writing, clearly states that your at-will employment relationship is changed, and is signed by the Company President or his or her designee.

Carlson v. BAH
Page 001103

## SECTION 3   EQUAL EMPLOYMENT OPPORTUNITY

The Company provides equal employment opportunities to all employees and applicants. No person shall be discriminated against in employment or harassed because of race, color, religion, sex, national origin, ancestry, citizenship, age, disability, genetic information, veteran or military service or obligation, reserve status, national guard status, military caregiver status, or any other category protected by federal, state or local law.  This policy includes the commitment to maintaining a work environment free from unlawful harassment.

This policy applies to all Company operations and every aspect of the employment relationship, including personnel actions such as recruitment, selection procedures (*e.g.*, hiring, work assignments, shift selection), compensation decisions, employee development, training, performance evaluations, promotions, transfers, benefits, disciplinary action and Company social and recreational programs.

It is the responsibility of every manager and employee to conscientiously follow this policy.  In addition, managers have a special responsibility to understand and follow anti-discrimination laws and regulations that apply in their operating locations and to ensure that all hiring, promotion, and any other employment decision and action is free of unlawful discrimination.

The Company also makes reasonable accommodations for disabled applicants and disabled employees, and employees whose sincerely held religious beliefs, practices or observances conflict with work requirements, in accordance with applicable law.  Requests for reasonable accommodations should be directed to the Human Resources Department.  Requests for reasonable accommodation may be made by an applicant or employee, or by a third party on his or her behalf.  All medical or disability-related information provided to the Company in connection with a request for reasonable accommodation will be treated as confidential medical records and maintained in separate files in accordance with the law.

Any employee having any questions regarding this policy should discuss them with his or her Human Resources representatives.  To report a possible violation of this policy, employees should follow the procedure set forth in the Policy against Discrimination and Harassment.

Carlson v. BAH
Page 001104

## SECTION 4   POLICY AGAINST DISCRIMINATION, HARASSMENT AND RETALIATION

The Company is committed to providing a professional work environment that is free of unlawful discrimination and harassment in accordance with applicable laws.  This includes sexual harassment (which includes harassment based on gender, pregnancy, childbirth, or related medical conditions), as well as discrimination and harassment based on such factors as race, color, religion, national origin, ancestry, citizenship, age, disability, genetic information, veteran or military service or obligation, reserve status, national guard status, military caregiver status, or any other category protected by federal, state or local law.

The Company will not tolerate discrimination or harassment of employees by managers, supervisors, or co-workers.  Similarly, the Company will not tolerate discrimination or harassment by our employees directed toward non-employees with whom our employees have a business, service, or professional relationship (such as independent contractors, vendors, and clients).  In addition, the Company will make every effort to protect employees from such inappropriate behavior by non-employees in the workplace.

Please note that this policy applies to the workplace (both on and off of Company property) and in other settings in which employees may find themselves in connection with their jobs (which can occur after regular work hours or away from the regular workplace).

**HARASSMENT DEFINED**

Harassment is generally defined as unwelcome verbal, physical, or visual conduct that creates an intimidating, offensive, or hostile working environment, or that interferes with an employee's work performance.  Such conduct constitutes harassment when (1) submission to the conduct is made either an explicit or implicit condition of employment; (2) submission or rejection of the conduct is used as the basis for an employment decision; or (3) the harassment interferes with an employee's work performance or creates an intimidating, hostile, or offensive work environment.

Harassing conduct can take many forms and may include, but is not limited to, the following:  slurs, jokes, statements, foul or obscene language, gestures, pictures, drawings, cartoons, stalking, staring, noises, offensive emails, texts or voicemail messages, assault, violating "personal space," and impeding or blocking another's movement or otherwise physically interfering with normal work.

Sexually harassing conduct in particular may include all of these prohibited actions, as well as other unwelcome conduct, such as requests for sexual favors, conversation containing sexual comments, and other unwelcome sexual advances.  Please note that sexually harassing conduct can be by a person of either the same or opposite sex.

Carlson v. BAH
Page 001105

## REPORTING AND INVESTIGATING DISCRIMINATORY OR HARASSING CONDUCT

All Company employees must promptly report any incidents of discrimination or harassment so that the Company can take appropriate action.

### *Supervisory Responsibility*

All levels of management are responsible for compliance with this Policy against Discrimination and Harassment AND for ensuring that everyone in their department is aware of, understands and adheres to this policy. **Any management employee who becomes aware of a possible violation of this policy must promptly bring it to the attention of their local Human Resources representative or a member of senior management.**

### *Complaint Process*

It is the responsibility of all of us to contribute to a working environment that is free of bias, discrimination and harassment. Failure to bring forth a complaint prevents the Company from having the opportunity to correct the situation.

Any applicant or employee who witnesses or experiences any conduct he or she believes violates this policy must immediately report the incident either to Human Resources or a senior officer of the Company as soon as possible. Alternatively, the applicant or employee must report the conduct as soon as possible using the Berkley Ethics Line (an independent third party reporting service available 24 hours a day/7 days a week), accessible via the web/internet at www.wrberkleyethicsline.com, or by calling 1-866-253-0583 if you are located in the U.S., or the contact number for such other appropriate country in which you are located as set forth in the W. R. Berkley Corporation Code of Ethics and Business Conduct.

Employees must report the facts as accurately and as completely as possible.

Reports of discrimination and harassment are taken seriously by the Company. Every reported complaint will be promptly investigated. The investigation will be handled in as confidential a manner as possible consistent with a full, fair, and proper investigation. Employees making complaints are expected to cooperate fully with the person or persons designated to investigate the complaint.

In addition to filing a complaint using the Company's internal complaint procedure, some states and/or localities may have agencies where such complaints may be directed. Employees should refer to any applicable state-specific Addendum to learn more about such resources in their state or locality. Human Resources can also provide additional information.

## NO RETALIATION FOR REPORTS OR COOPERATING IN INVESTIGATIONS

The Company will not tolerate retaliation against any applicant or employee for making a good faith complaint of discrimination or harassment or for cooperating in such an investigation. Such retaliation is a separate violation of Company policy, and of the law.

Carlson v. BAH
Page 001106

If you believe you have been retaliated against for reporting or opposing discrimination or harassment, or for participating in an investigation or proceeding, you should immediately report the incident using the same Complaint Process described in this policy, above.

**CORRECTIVE ACTION**

The Company will take prompt and effective corrective action any time it is established that discrimination, harassment or retaliation in violation of this policy has occurred. Corrective action may include, for example: training, referral to counseling, or disciplinary action ranging from a verbal or written warning to termination of employment, depending on the circumstances. The Company will also take steps to prevent any further discrimination or harassment.

7

---

## SECTION 5  EMPLOYMENT

---

### A.     EMPLOYMENT CLASSIFICATIONS

The Company adheres to federal, state and local wage and hour laws relating to work hours and employee compensation.

#### Classifications

For purposes of salary administration and eligibility for overtime and employee benefits, the Company classifies employees and other workers as follows:

- *Exempt* – Employees who are <u>not</u> eligible for overtime pay.  A position's exempt status is based on its specific job duties and salary in accordance with FLSA and applicable state law exemption criteria.

- *Non-Exempt* – Employees who are eligible for overtime pay.

- *Regular Full-Time* – Employees who are regularly scheduled to work 37.5 or more hours per workweek.  Regular full-time employees are either exempt or non-exempt employees.

- *Regular Part-Time* – Employees who are regularly scheduled to work less than a full-time schedule per workweek.  Regular part-time employees are only eligible for employee benefits such as health and insurance benefits, if at all, if the official plan documents governing such benefits specifically provide for such benefits to regular part-time employees.  The complete official plan documents are available from your Human Resources representative for your review.  *Please note:  The official plan documents govern in the event of any inconsistent statements contained in this Handbook and the Company reserves the right in its absolute discretion to amend, modify or terminate employee benefits in whole or in part, with or without notice.*

Regular part-time employees regularly scheduled to work at least 30 hours per workweek also may be eligible for benefits like holiday pay, vacation, and leaves of absence in accordance with Company policies addressing those benefits, and in accordance with applicable law.  Please contact your Human Resources representative with any questions.

Regular part-time employees are either exempt or non-exempt employees.

- *Temporary Employees* – Temporary employees typically are hired for a specific assignment and/or time period, paid by the Company, and considered a Company employee.  They are not eligible for employee benefits.  Temporary employees are either exempt or non-exempt employees.

Carlson v. BAH
Page 001108

- *Independent Contractors/Consultants* – Workers who provide services to the Company pursuant to an agreement (usually written) with the Company, and who submit their own invoices for the services that they provide. They are not employees of the Company. Independent Contractors and Consultants are not employees of the Company and not eligible for Company benefits.

If employees have any questions regarding their employment classification or exempt/non-exempt status, or believe they are wrongly classified, they should contact their Human Resources representative.

## B.    WORKWEEK, WORKDAYS, AND WORK HOURS

- Workweek – For payroll purposes, the workweek is a consecutive 7-day period, with the same starting time and day, and same ending time and day. Please contact your local Human Resources representative for information as to your location's workweek's specific starting and ending times/days.

- Workday – For purposes of calculating hours worked, each workday starts at 12:01 a.m. and ends at midnight the same day.

- Work Hours – Normal Company work hours are established at your location. The Company reserves the right to modify employees' starting and ending times and the number of hours worked.

## C.    MEAL AND REST PERIODS

The Company adheres to federal, state, and local wage and hour laws relating to employee meal and rest breaks, and has established policies addressing these areas, as well as timekeeping practices.

When employees work at a location where no state or local laws regulate meal and/or rest periods, the Company will follow the federal Fair Labor Standards Act ("FLSA"). Depending on applicable law, an employee may not necessarily be legally required to take a meal period or rest period.

Employees should refer to any applicable state-specific Addendum to learn more about meal and rest period rules in their state or locality. Human Resources can also provide additional information.

Employees who feel they were wrongly denied the opportunity to take a meal period or rest period should inform their manager, and (if not corrected) Human Resources immediately.

Where state or local law does not require otherwise, the policies below are generally followed subject to the demands of business on a particular day or related to a particular position:

9

### Meal Periods

The Company generally provides employees who work a minimum of 7.5 or 8 hours in a workday with at least a 30-minute unpaid meal period. Non-exempt employees taking meal periods are required to record on the Company timekeeping system both the time when they begin their meal period and the time when they return to work from their meal period. Non-exempt employees who return to work before the end of their meal period for any reason should be sure to accurately record all time worked, and they will be paid for such time.

#### Use of Meal Period

Employees taking a meal period are free to spend their meal period time as they choose (consistent with any other Company policies that may apply during off-duty time).

#### Rest Periods

The Company provides employees with rest periods in accordance with state or local law. Where no state or local laws regulate rest periods, they will be provided as determined by the employees Department Head.

## D.    BREAK TIME FOR NURSING EMPLOYEES

The Company provides break time for employees to express breast milk in accordance with applicable law. In most (but not all) locations, this means that an employee may take a reasonable break each time the employee needs to express breast milk for her nursing child, for up through 1 year after the child's birth, and the Company will provide a place other than a restroom where the employee is shielded from view and free from intrusion from coworkers and the public.

Where possible, the Company encourages non-exempt employees taking breaks under this policy to do so concurrently, or simultaneously, with any paid rest periods already being provided to the employee. However, if a non-exempt employee needs to take additional breaks to express breast milk beyond the extent of a paid rest period already provided, then such additional break time is unpaid time unless the employee performs work. Non-exempt employees must adhere to the timekeeping practices set forth in the Company's separate Employee Timekeeping policy.

State or local law may afford employees with greater workplace protections related to break time to express breast milk than those set forth above. Employees should refer to any state-specific Addendum (available through Human Resources) that applies to their location to learn more about meal and rest period rules in their state or locality. Human Resources can also provide additional information.

Carlson v. BAH
Page 001110

## E.   OVERTIME

Business requirements may result in the need for overtime work. Exempt employees perform this work without additional compensation because they are paid a salary. Non-exempt employees are paid for their overtime. Exempt and non-exempt employees alike are required to assist with overtime work when it is assigned.

Non-exempt employees may not perform overtime work without the prior approval of their manager. Working overtime without authorization or refusing to work required overtime may result in discipline, up to and including termination. Working "off the clock"—for example, unpaid work by a non-exempt employee before or after the official work day, or on weekends—is prohibited.

State law or local law may require different overtime pay rules. Non-exempt employees should refer to any applicable state-specific Addendum (available through Human Resources) to learn more about meal and rest period rules in their state or locality. Human Resources can also provide additional information.

Where state or local law does not require otherwise, all non-exempt employees are paid at the rate of 1.5 times their regular rate of pay for hours worked in excess of 40 in a workweek. Hours paid but not worked (for example, sick or vacation days, jury duty or bereavement leave) do not count toward the 40-hour total. Normally, non-exempt employees will be paid for overtime worked in the pay period following the period in which the overtime was worked.

## F.   OTHER PAY

Depending upon applicable state law, non-exempt employees may be entitled to additional pay under specific circumstances. Please refer to the state-specific addenda at the end of this Employee Handbook, and contact Human Resources for more information.

## G.   TIME AND PLACE OF PAY

Employees are paid on a semi-monthly basis, usually on the 15th and last day of each month. If a pay day falls on a holiday or weekend, paychecks normally will be issued on the last workday before the payday.

To ensure timely payment and employee access to their earnings, the Company has a policy of direct deposit of payroll for employees at all locations. The Company also provides a self-service portal 24 hours per day/7 days per week where employees may access and view their paycheck and pay stub records, as well as a secure printing location at all Company locations where employees may print out copies of such records for their personal files. Paycheck stubs itemize employees' pay along with the various deductions required by law and others authorized in writing by employees. If an error should ever occur on an employee's paycheck, employees must report it at once to their manager so action may be taken for review and adjustment. If employees have any questions or experience any hardship regarding these protocols and desire a hard copy paycheck, please see your local Human Resources representative.

Carlson v. BAH
Page 001111

Since the deductions from paychecks are based on the information on your IRS Form W-4, it is important that you make any changes that affect the amount of your deductions, such as changes in marital status or the addition of a dependent, in the Company's self-service system, and submit any required supporting documentation (i.e.: marriage/birth certificate, etc.) to Human Resources.

## H.    EMPLOYEE TIMEKEEPING

The Company entrusts all non-exempt employees with the responsibility to accurately record all time worked on the Company's timekeeping system. This enables the Company properly to pay employees for all work time.

To this end, if you are a non-exempt employee, you must accurately record all time worked – wherever and whenever you are performing work for the Company. You must record the time when you start work and the time when you stop work for every day worked, for meal periods, and for any time that personal reasons take you away from work, including all leaves of absence.

A non-exempt employee who forgets to document his or her work starting time or work ending time, or otherwise makes an error in recording work time, must notify his or her manager. Employees must submit any changes to their time records to their manager or to Human Resources in a timely manner, and any changes must be approved in writing by the department manager.

Unless you receive prior approval from your manager, you may not work before your scheduled workday begins, continue to work after your workday ends, work through lunch, or take work home. This means non-exempt employees must receive their managers' approval before using their blackberry, PDA, smart phone, or other mobile device for work-related purposes outside of employees' regularly scheduled work hours. Further, any such time must be recorded on employees' time records and will be counted and paid for as hours worked (even if the employee did not receive prior approval from his or her manager).

**Work performed "off-the-clock" is prohibited, a violation of the Company's policy, and subject to discipline up to and including termination.**

### Recording Time Off – All Employees

For allocation purposes, all employees must accurately record time off, such as vacation, sick time, bereavement leave, jury leave, floating holiday, and leaves of absences.

In addition, non-exempt employees must record on the Company's timekeeping system whether they are off or working during Company holidays.

Carlson v. BAH
Page 001112

**Falsification/Manipulation of Time Records**

No employee may record time other than his or her own, or falsify time records. Any inappropriate manipulation of the time tracking system or failure to provide accurate work time information by any employee or manager is subject to disciplinary action, up to and including termination.

**Any employee who feels that he or she was not paid for all time spent working should inform his or her manager, and (if not corrected) Human Resources immediately.**

## I. TRAVEL AND ENTERTAINMENT GUIDELINES AND BUSINESS EXPENSE REIMBURSEMENT POLICY

The Company reimburses employees for necessary business expenses that employees incur on behalf of the Company in carrying out Company business. Requests for reimbursements should be submitted through the normal employee expense account process and supported by appropriate documentation of such expenses. **Within 60 days of completion of a business trip or incurring a reimbursable business expense, an employee must submit an expense reimbursement form with supporting documentation to obtain reimbursement of expenses.**

With specific regard to cell phones, the Company has discontinued the purchase of cell phones and cell phone plans, except in limited circumstances. Employees may be reimbursed for the cost of their own cell phone plans at their actual monthly cost but no higher than the company's predetermined monthly amount, provided there is a substantial business reason for requiring the employee to maintain a cell phone, and as approved by the Company president. Usage cost of international voice and data services for business purposes is also reimbursable. The Company is not responsible for purchasing, maintaining, or replacing personal cell phones.

Specific policies addressing travel and entertainment, and/or business expense reimbursement, are issued from time to time. Please see your local Human Resources representative for any such policies.

Carlson v. BAH
Page 001113

## SECTION 6   EMPLOYEE BENEFITS

The Company provides a variety of employee benefit programs for its regular full-time and regular part-time employees (meaning part-time employees who are regularly scheduled to work at least 30 hours per workweek). These benefits are designed to assist such employees and their eligible dependents in meeting the financial burdens that can result from illness, disability and death, and to help plan for retirement, deal with job-related or personal problems, and enhance job-related skills. Eligibility for each such benefit is determined by the official plan documents governing such benefits. A brief description of certain insurance benefit programs is provided below.

The Company reserves the right to amend or terminate any of its benefit programs or to require or increase employee premium contributions, at any time in its discretion, with or without advance notice. For more complete information regarding any of our benefit programs, please contact your local Human Resources representative.

### Group Insurance Programs

Our group insurance plans are described in Summary Plan Description ("SPD") booklets which are provided under separate cover to employees at the time they become eligible to participate. If you did not receive SPD booklets outlining the primary features of these plans and programs, contact your local Human Resources representative.

This Employee Handbook is not an employee benefit plan document and does not create any enforceable rights with respect to benefits or otherwise. To the extent that any of the information contained herein is inconsistent with official plan documents for benefits, the provisions of the official plan documents will govern in all cases.

As noted above, the Company reserves the right to amend or terminate any of its benefit programs or to require or increase employee premium contributions, at any time in its discretion, with or without advance notice. This reserved right may be exercised in the absence of financial necessity.

### State Disability Insurance

Some states/commonwealths in which the Company operates have government-sponsored disability insurance programs designed to help cover the cost of lost working time resulting from non-job-related illness or injury. (These differ from workers' compensation benefits, which provide for partial income continuance for injuries or illnesses sustained by employees in the course of employment). These benefits are funded by Company and/or employee contributions. Required employee contributions are automatically withheld from employees' paychecks.

14

Generally, in order to obtain full benefits under such programs, it is the employee's responsibility to apply for the benefits that may be available by filing a claim with the appropriate state/commonwealth agency immediately upon disability. Claim forms for these benefits are available in most hospitals or physician's offices. After a claim is filed, benefits generally become payable as of a certain date, such as after seven days of illness or the first full day of hospitalization, whichever occurs first.

An employee's eligibility to receive such state/commonwealth disability insurance benefits does not independently entitle the employee to a leave under the Family Care, Medical, and Military Family Leave policy. The employee must still meet the eligibility requirements for such leave.

For more information, employees should contact their Human Resources representative, and refer to any state-specific addenda applicable to their location.

### Workers' Compensation Insurance

The Company carries workers' compensation insurance coverage as required by law to protect employees who are injured on the job. This insurance provides coverage for certain medical, surgical, and hospital treatment in addition to payment for a portion of any lost earnings that result from work-related injuries. Compensation payments generally begin on the first day of an employee's hospitalization or after the third day following the injury if an employee is not hospitalized. The cost of this coverage is paid completely by the Company.

The Company absolutely prohibits discrimination or retaliation against any employee for filing a workers' compensation insurance claim, or otherwise exercising his or her rights under any applicable state workers' compensation law.

### Affordable Care Act Non-Retaliation Policy

The Company prohibits any form of retaliation against any employee who:

- Reports what the employee reasonably believes to be a violation of Title I of the Patient Protection and Affordable Care Act ("Affordable Care Act"); or

- Refuses to participate in an activity that the employee reasonably believes to be a violation of the Affordable Care Act; or

- Receives tax credits or cost-sharing reductions in connection with participation in a health insurance exchange.

No employee shall discharge or otherwise retaliate against, including, but not limited to, intimidating, threatening, restraining, coercing, blacklisting or disciplining, any employee with respect to the employee's compensation, terms, conditions, or privileges of employment because the employee (or an individual acting at the request of the employee) engages or has engaged in one of the above activities.

15

In the event an employee believes that he or she has been subjected to retaliation under this policy, the employee must immediately report the matter to his or her manager or to Human Resources. Any manager who receives a report or a complaint of retaliation, or who learns that conduct of the nature prohibited by this policy may be occurring, must report that offense immediately to a Human Resources Manager. Any manager failing to comply with this policy will be subject to disciplinary action, up to and including employment termination.

Complaints of retaliation will be investigated promptly, appropriately and as discreetly as possible. Where appropriate, the Company will take appropriate corrective measures. Any act determined by the Company to be retaliation in violation of this policy may result in disciplinary action, up to and including employment termination.

16

## SECTION 7   TIME OFF

### A.      COMPANY HOLIDAYS

The Company observes paid holidays according to a schedule announced at the beginning of each year.

#### Eligibility

Unless otherwise provided in this policy, all regular full-time employees and eligible regular part-time employees will receive time off with pay at their normal base rate for each Company-observed holiday.  All other employees are not eligible for paid holiday benefits. Moreover, exempt and non-exempt employees are ineligible for holiday pay while on leaves of absence.

#### Weekends and Vacations

Holidays falling on Saturdays will normally be observed on the preceding Friday. Holidays falling on Sundays will normally be observed on the following Monday.  Holidays that occur during an eligible employee's vacation will not be counted as vacation days taken.

#### Rate of Pay

Exempt regular full-time employees receive holidays off with pay.  On such holidays, non-exempt regular full-time employees and non-exempt regular part-time employees are paid their regular straight time hourly rate of pay for all hours worked on the Company holiday, and overtime pay if such hours constitute overtime under applicable law.  In addition, such employees are paid an extra amount of holiday pay for each such holiday worked, at a rate determined by each business.

### B.      FLOATING HOLIDAYS

In addition to time off on designated holidays, the Company permits regular full-time employees to take one (1) floating holiday annually for personal business that cannot be taken care of outside regular business hours or for religious observances, ethnic holidays, and other events of personal significance.  Unless state or local law provide otherwise, an unused floating holiday does not carry over to the next year.  Please see your local Human Resources representative for more information on whether state or local laws provide different benefits related to floating holidays, or for more information regarding eligibility, accrual and use of a floating holiday.

### C.      VACATION

The vacation policy of the company is designed to provide employees with annual periods of rest and relaxation.  Vacations are valuable to your personal health and effectiveness.  Eligible employees accrue and may use vacation time as described in this policy.

17

### Vacation Eligibility

All regular full-time employees are eligible for vacation benefits under this policy based on their position title and continuous length of service, measured from the date of hire. All regular part-time employees regularly scheduled to work less than a full-time schedule, but at least thirty (30) hours per week, accrue vacation benefits on a *pro rata* basis. Part-time employees working fewer than 30 hours per week and temporary employees do not accrue vacation benefits. Vacation time is compensated at the employee's normal rate of pay at the time vacation is taken. Non-exempt employees may take vacation time incrementally. Exempt employees must take vacation time in half or full day increments.

### New Hire Eligibility Process

If newly hired and employment begins on or before the 15th day of the month, the employee receives credit for that month; if hired after the 15th day of the month, credit for accrual begins the following month.

### Vacation Accrual

Except for the New Hire Eligibility Process as described above, employees accrue $1/12^{th}$ of their annual vacation each full month worked. For example, an employee who is eligible for 15 days of vacation would accrue 1.25 days per month (15 days/12 months = 1.25 days accrued per month).

An employee whose years of continuous service reaches a milestone anniversary is treated as accruing the additional vacation levels starting with January 1st of the year in which the employee will achieve the milestone anniversary. For example, if an employee will reach 10 years of service on May 2, 2016, then the employee will be treated as accruing 20 days of vacation per year (instead of 15 days of vacation per year) as of January 1, 2016.

Separately, if an employee's position title changes so that he or she qualifies to accrue greater vacation benefits, new eligible days are prorated based upon the promotion date using the New Hire Eligibility Process set forth above.

Because vacations are intended to enhance employee health and effectiveness, the Company expects all employees to use their vacation time in the year in which it is accrued. However, subject to an employee's advance written approval by his or her manager, employees may carry over a maximum of five (5) vacation days accrued and unused in one calendar year into the next calendar year. No payments will be made in lieu of taking vacation (except upon termination, as required, or as otherwise mandated by state law).

18

### Vacation Scheduling

Scheduling of vacation time is to be handled in a manner consistent with the Company's operational requirements. Vacations must be approved in advance by the employee's manager before the employee uses the vacation time.

### Holidays Occurring During Vacation

If an observed Company holiday (see Company Holidays Policy) occurs during an employee's scheduled vacation, no deduction from accrued vacation will be made for the holiday.

### Vacation During Leave of Absence

Unless otherwise required by applicable law, employees on a leave of absence will not accrue vacation time unless and to the extent that they substitute vacation and/or sick time during the leave of absence. This however, does not mean the employee will lose any benefits accrued as of when the leave commenced.

### Vacation Pay Upon Employment Termination

When employment terminates, the employee will not be paid for any accrued, unused vacation time, except where mandated by state law. To the extent permitted by law, if an employee has used advanced vacation, meaning used more time than he or she had accrued at that time, any used advanced time is deducted from their final paycheck, or if funds are not available from final paycheck, employee must repay any overdrawn amount to the Company.

## D.    SICK LEAVE

To help prevent loss of earnings that may be caused by illness or injury, and to secure necessary treatment for disabilities, the Company has established paid sick leave benefits. Please note that these benefits are not intended to be in addition to any sick leave benefits to which an employee is entitled under state or local law. Please contact your local Human Resources representative for more information as to whether you are entitled to sick leave benefits under a state law or local ordinance.

### Eligibility

All regular full-time employees are eligible for sick leave benefits under this policy. All regular part-time employees regularly scheduled to work less than a full-time schedule, but at least thirty (30) hours per week, are eligible for sick leave benefits on a *pro rata* basis (see below).

Part-time employees working fewer than 30 hours per week and temporary employees are ineligible for sick leave benefits under this policy, though they may be entitled to sick leave benefits according to state or local laws.

19

## Sick Leave Accrual

Regular full-time employees are eligible for five (5) sick days per calendar year. Regular part-time employees are eligible for four (4) sick days per calendar year. Eligible employees accrue sick days at the rate of 1/12 of their yearly amount per month. Eligible employees may carry over accrued, unused sick leave from one calendar year to the next to a maximum of 60 days, or less/more based upon applicable state or local law.

## New Hire Eligibility Process

Eligible employees' hire date dictates the sick days to which they are entitled within the first calendar year in which they join the Company, as follows:

| Hired | Full-time # of Sick Days | Part-time # of Sick Days |
|---|---|---|
| Jan – Feb | 5 | 4 |
| March – Apr | 4 | 3 |
| May – Jun | 3 | 2.5 |
| Jul – Aug | 2 | 1.5 |
| Sep – Oct | 1 | .5 |
| Nov – Dec | 0 | 0 |

Unless otherwise required by applicable law, employees on a leave of absence will not accrue sick leave unless and to the extent that they substitute sick and/or vacation time during the leave of absence.

## Approval

Employees who are unable to report to work due to illness or injury should notify their direct manager before the scheduled start of their workday in accordance with the Company's Attendance policy and any local office requirements. The direct manager must also be contacted on each additional day of absence. If the direct manager or department head is not available when the employee calls in, the employee must contact the Human Resources Department.

If an employee is absent for three (3) consecutive working days due to illness or injury, a physician's certification may be required to verify the injury or illness and its beginning and expected ending dates. Such verification may be requested for other sick leave absences as well and may be required as a condition to receiving sick leave benefits.

## Compensation

Sick pay is calculated based on the employee's normal rate of pay at the time of absence.

20

**Use**

Sick leave may be taken for a personal illness, an emergency, a disability, for family care or medical leave as described in the Company's "Leaves of Absence" policy. If required by state or local law, eligible employees may also use sick leave to attend to an illness of a family member or as otherwise entitled under such law. Additionally, hours missed for medical and dental appointments will be treated as sick leave.

Non-exempt and exempt employees may use sick leave incrementally. If all sick leave time has been exhausted, employees may use vacation days for illness or injury.

### Sick Leave Pay Upon Employment Termination

When employment terminates, the employee will not be paid for any accrued, unused sick leave unless mandated by state or local law.

## E.    LEAVES OF ABSENCE

While regular attendance is crucial to maintain business operations, we recognize that, for a variety of reasons, employees may need time off from work. As detailed below, we have available various types of leave of absence plans, some of which are governed by law and others which are discretionary.

State or local law may afford employees with different or greater leave benefits than those set forth here. Employees having any questions regarding this policy should contact their local Human Resources representative; the Company's leaves of absence administrator, and/or refer to any state-specific Addendum applicable to your location.

Please note: Aside from leaves of absence authorized to perform military or reserve training or activities for which the employee is compensated by the military/reserves, the Company prohibits employees from accepting or performing outside employment while the employee is on a leave of absence from the Company. Violation of this policy is grounds for discipline, including employment termination. Please contact your local Human Resources representative if you have questions about this policy.

## 1.        FAMILY CARE, MEDICAL, AND MILITARY FAMILY LEAVE

The Company provides eligible employees with family care, medical, and military family leave in accordance with the federal Family and Medical Leave Act of 1993 ("FMLA") and applicable state law. If a state or local leave law provides for any broader right, the broader right will apply to employees covered by such law.

21

For a full description of FMLA eligibility, requirements, and benefits, please see the U.S. Department of Labor's Rights and Responsibilities notice (Form WHD 1420) at Appendix A to this Employee Handbook. Please also refer to any state-specific Addendum applicable to your location, and consult with Human Resources for more information.

### Reasons for FMLA Leave

FMLA leave may be requested for (1) the birth or adoption of an employee's child; (2) the placement of a foster child with the employee; (3) the serious health condition of an employee's child, spouse, or parent; (4) an employee's own serious health condition; (5) military exigency leave; or (6) military caregiver leave.

### Advance Notice and Medical Certification

Employees should give written notice to their local Human Resources representative or the Company's leaves of absence vendor, and also to their manager, of their request for FMLA leave as soon as they are aware of the need for such leave, and no later than 30 days in advance when the need for such leave is foreseeable. (Any questions as to how to reach out to the leaves of absence vendor or request FMLA leave should be directed to the Human Resources Department.) All requests for FMLA leave should include enough information to make the Company aware that the employee needs qualifying leave, and the anticipated timing and duration of the leave, if known.

Sufficient information may include that the employee is unable to perform job functions; the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for FMLA leave. Employees also must inform the Company if the requested leave is for a reason for which FMLA leave was previously taken or certified.

The Company requires a healthcare provider's medical certification if leave is requested for the employee's own serious health condition, or for that of the employee's child, spouse, and domestic partner, or parent. It is the employee's responsibility either to furnish a complete and sufficient certification or to furnish the health care provider providing the certification with any necessary authorization from the employee or the employee's family member in order for the health care provider to release a complete and sufficient certification to the Company to support the leave request.

In terms of timing, employees generally must provide the required certification within 15 calendar days after the Company requests it. For foreseeable leaves, employees must provide the certification before the leave begins. When this is not possible, employees must provide the certification within 15 calendar days after the Company requests it, unless it is not practicable under the circumstances to do so, despite the employee's good faith efforts.

The company may require a second or third medical opinion for leave related to an employee's own serious health condition, and may require certification from the employee's health care provider that he or she is fit for duty and able to return to work at the end of the leave.

Carlson v. BAH
Page 001122

The Company may delay restoring the employee to employment or terminate employment for failure to cooperate or furnish such certification.

### Leave's Effect on Pay

FMLA leave is unpaid leave. However, employees may be entitled to paid medical or disability benefits (such as state-mandated sick pay and short term disability benefits) depending on the type of leave and their work location. For more information, please contact the Company's leaves of absence vendor or your local Human Resources representative. Employees should also refer to any applicable state-specific Addendum.

In addition, the Company requires that employees use accrued, unused vacation time (use of accrued, unused sick leave is optional) concurrently with leave for all family care and military family leaves, consistent with applicable law. The Company requires that employees use accrued, unused sick leave (use of accrued, unused vacation time is optional) concurrently with leave for the employee's own illness, consistent with applicable law. The use of paid leave does not extend the total duration of family care and medical leave or medical exigency leave to which an employee is entitled beyond 12 weeks in any rolling 12-month period, or beyond 26 weeks in a single 12-month period in the case of military caregiver leave.

### Leave's Effect on Benefits

During FMLA leave, the Company will continue to pay for the employee's participation in the Company's group health plans to the same extent and under the same terms and conditions as would apply had the employee not taken leave.

The employee must continue to pay his or her share of the health insurance premiums during the leave. If the employee substitutes paid leave for the unpaid leave, such payments will be deducted from the employee's pay through the regular payroll deductions. Otherwise, the employee must make arrangements with Company for payment of such premiums.

All other benefits will be governed in accordance with the terms of each benefit plan and are the sole responsibility of the employee.

If an employee on FMLA leave fails to pay his or her share of the premiums during leave, or fails to return from the leave at the expiration of 12 weeks (or 26 weeks in the case of a military caregiver leave) for a reason other than the recurrence, continuation, or onset of a serious health condition for which leave under this policy is allowed or other circumstances beyond the employee's control, the Company may recover its share of allowable premiums paid to maintain coverage.

Employees on FMLA leave accrue employment benefits such as vacation or seniority only when paid leave is being substituted for unpaid leave and only if the employee would otherwise be entitled to such accrual.

Use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

Carlson v. BAH
Page 001123

**No Interference, Discrimination, or Retaliation**

The Company prohibits interference with, restraint of, or denial of the exercise of rights provided under the FMLA, and prohibits discrimination or retaliation of any kind taken against any person for exercising such rights, or for opposing any practice made unlawful by the FMLA, or for involvement in any proceeding under or relating to the FMLA.

Employees with questions, or who would like further clarification about their rights under the FMLA or other types of leave, should contact their local Human Resources representative, and refer to any applicable state-specific Addendum.

2.        **DISABILITY LEAVES OF ABSENCE**

In addition to medical disability leaves described in the FMLA policy, employees may take a temporary disability leave of absence if necessary to reasonably accommodate a workplace injury or a disability under the ADA. Such leave may also be available under state or local law. For more information, employees should contact the Company's leaves of absence vendor or their local Human Resources representative, and refer to any applicable state-specific Addendum.

Any disability leave under this policy will run concurrently with any medical leave to which the employee is entitled under the FMLA policy, as well as any medical leave to which the employee is entitled under any state or local law.

Disability leaves under this policy will be unpaid.

Employees taking disability leave must comply with the FMLA policy provisions regarding substitution of paid leaves, notice, and medical certification. For the purpose of applying these provisions, a disability leave will be considered to be a medical leave.

If a disability leave under this policy extends beyond 12 weeks in a 12-month period, the employee will not be entitled to any continued employer contributions towards any employee benefit plan unless otherwise required by law. An employee, however, may elect to continue participating in such benefit plans, at the employee's own expense, to the extent permitted by such plans.

3.        **MILITARY LEAVE OF ABSENCE**

The Company provides leaves of absence to all employees for military or reserve duty in accordance with applicable state and federal laws. The Company will also follow and comply with all other requirements under the Uniform Services Employment and Reemployment Rights Act ("USERRA") and state law.

Unless otherwise required under applicable law, military or reserve duty leave is unpaid. Employees may elect to substitute accrued vacation or available floating holiday during any portion of an unpaid military leave of absence.

Carlson v. BAH
Page 001124

To request such leave, and for more information, employees should contact the Company's leaves of absence vendor or their local Human Resources representative. Employees should also refer to any state-specific Addendum applicable to their location for information about any applicable state military leave laws.

**4.        JURY DUTY AND WITNESS SERVICE**

The Company will provide employees time off to serve on a jury or grand jury, or to appear in court or other judicial proceedings as a witness to comply with a valid subpoena or other court order, as required by law. If such jury/witness duty occurs when business needs require the employee at work, the Company may request that the court allow the employee to choose a different time to serve in accordance with the court's procedures. Employees are requested to work cooperatively with their supervisor or manager in making such requests.

Unless otherwise required by applicable state or local law, regular full-time employees who have been employed by the Company for at least one year and who take leave for jury duty under this policy will be paid their standard pay for each day of absence, for up to 5 days of compensable time, less the amount of juror's fees. All other employees taking leave for jury duty, and any employee taking leave for witness service, will be provided unpaid time off unless otherwise required by applicable law. In any case, exempt employees who work any portion of a workweek in which they also serve on jury duty or appear as a witness will receive their full salary for that workweek. Employees may elect to substitute accrued vacation or available floating holiday during any unpaid portion of such leave.

Employees are expected to report to work each day they are not performing jury/witness duty, including on any day they are excused from service with more than half of the workday open.

Most courts provide a certification of completed jury duty/witness service. Upon returning to work after completing jury/witness duty, employees should deliver the completion of service certification to their local Human Resources representative.

To request jury duty or witness service leave, and for more information, employees should contact their manager or their local Human Resources representative. Employees will be required to notify the Company's leaves of absence vendor if jury duty or witness service leave are included in the state leave regulations. Employees should also refer to any state-specific Addendum applicable to their location for information about any applicable state jury duty and/or witness service leave laws.

Carlson v. BAH
Page 001125

**5.      VOTING TIME OFF**

Employees who do not have sufficient time outside of their regular working hours to vote in a statewide or national election will be given time off in accordance with applicable law. Such time off is unpaid unless otherwise required by law, or unless employees substitute accrued vacation or any available floating holiday to such time. Exempt employees who work any portion of a workweek in which they also take voting time off will receive their full salary for that workweek.

To request voting time off, and for more information, employees should contact their manager or their local Human Resources representative. Employees should also refer to any state-specific Addendum applicable to their location for information about any applicable state voting time off laws.

No employee will be penalized or retaliated against for requesting or taking time off to vote.

**6.      BEREAVEMENT LEAVE**

Regular full-time employees will be allowed up to 3 consecutive working days off to arrange and attend the funeral of an immediate family member, which is defined to include the employee's current spouse, domestic partner, father, mother, domestic partners father and mother, father-in-law, mother-in-law, sister, brother, brother-in-law, sister-in-law, son-in-law, daughter-in-law, children, grandparents (including of spouse or domestic partner), and grandchildren. Pay is at the regular base rate of pay for each day of absence. Employees should record their absence as bereavement leave on time records.

If more than a 3-day bereavement leave is requested, regular full-time employees may request to substitute accrued vacation, sick time, or an available floating holiday for the additional period beyond 3 days. All other employees may request an unpaid leave of absence for bereavement time. Those employees may request to use accrued vacation, sick time, or an available floating holiday for part or all of such leave. If such employees are classified as exempt, the bereavement leave must be taken in full day increments. Employees are required to notify their manager of the need for bereavement leave. The Company may require proof of death and relationship to the deceased to approve leave under this policy.

For more information, employees should contact their local Human Resources representative, and refer to any state-specific Addendum applicable to their location for information about any applicable state laws related to bereavement.

**7.      OTHER LEAVES OF ABSENCE**

In accordance with applicable laws, the Company will grant employees time off without pay:

Carlson v. BAH
Page 001126

(a)     Educational/Daycare Purposes – To participate in the activities of schools or licensed childcare facilities attended by their children;

(b)     Volunteer Firefighter, Reserve Peace Officer, and Emergency Rescue Personnel Duties – To perform duties as a volunteer firefighter, reserve peace officer, and/or emergency rescue personnel;

(c)     Domestic Violence or Sexual Assault – If the employee has been the victim of domestic violence or sexual assault, to seek any relief, including, but not limited to, a temporary restraining order, restraining order, or other injunctive relief, to help ensure the health, safety, or welfare of the victim or his or her child;

(d)     Crime Victim's Leave – To attend judicial proceedings related to a crime, if that employee is a victim of crime or an immediate family member of a victim; or

(e)     Organ and Bone Marrow Donation – For the purpose of organ or bone marrow donation.

Unless otherwise required under applicable law, leave under this policy for any of the above purposes is unpaid. Exempt employees who work any portion of a workweek in which they also take time off under this policy will receive their full salary for that workweek. Employees may substitute accrued vacation or floating holiday for any unpaid portion of leave taken under this policy.

No employee will be penalized or retaliated against for requesting or taking time off under this policy.

To request time off for one of the reasons above, and for more information, employees should contact the Company's leaves of absence vendor or their local Human Resources representative. Employees should also refer to any state-specific Addendum applicable to their location for information about any applicable time off laws.

Carlson v. BAH
Page 001127

## SECTION 8   WORKPLACE POLICIES

### A.   ATTENDANCE

The Company relies on its employees to contribute productively to the Company's success and profitability. Employees who do not report for work on time, or who miss all or part of a day's work, place an extra burden on their fellow employees. Regular attendance and punctuality are essential functions of all jobs. Each employee is expected to maintain regular, predictable, on-time and reliable attendance in accordance with his/her scheduled hours and days.

#### Definition

An absence is defined as time lost (partial or full day) due to illness, injury, personal business or other similar reasons.

#### Excessive Absences and Tardiness

An employee may be counseled if his or her absence/tardiness becomes excessive (unless due to a medical condition that is substantiated by a physician) so that the employee can take steps to improve his or her attendance or punctuality.

#### Protected Absences

An employee will not be adversely affected by absences protected by the Family and Medical Leave Act, Americans with Disabilities Act, and other laws.

#### Absence/Tardy Call-In Procedures

An employee is requested to notify his or her supervisor in advance if an absence or tardiness is foreseeable. If not foreseeable, an employee is expected to call his or her manager as soon as practicable and, in no event, later than the start of the work day. If the manager is not available, the employee should contact his or her local Human Resources representative. If the employee is unable to make the call personally, a family member or friend should do so.

Failure to follow these procedures may result in disciplinary action. Employees absent for 3 consecutive full days (disregarding intervening weekends) without reporting to their manager are considered to have voluntarily quit their employment.

The Company reserves the right to grant exceptions to this policy as it deems necessary to provide accommodations to employees with disabilities consistent with applicable law.

For more information, employees should contact their local Human Resources representative, and refer to any state-specific Addendum applicable to their location.

28

## B. PRE-EMPLOYMENT AND PROOF OF RIGHT TO WORK

### Post-Offer/Pre-Employment Background Checks and Verifications

Consistent with applicable law, offers of employment extended to job candidates will be conditional upon the satisfactory completion of financial background checks, criminal background checks, employment verification checks, education verification checks, and OFAC checks, as well as such other verification as may be required pursuant to federal regulations.

### Post-Offer/Pre-Employment Drug Testing

The Company has a strong commitment to ensuring a safe and productive work environment. Drug abuse can have a serious negative impact on our Company's operations, employee relations, safety and health, and the workplace in general, absenteeism and tardiness, substandard job performance, increased workloads for coworkers, behavior that disrupts other employees, and inferior service. To effectuate a work environment that is free from the effects of drug abuse, and subject to all applicable laws, we have established the following pre-employment drug screening policy:

Job applicants to whom a conditional offer of employment has been extended are required to undergo urinalysis drug testing as a condition of employment with the Company. The job applicant will be informed in writing that the Company intends to conduct such a drug test. In the event a job applicant tests positive to a drug test, and unless otherwise specifically prohibited under applicable state or other law, the Company will rescind its conditional offer of employment and decline employment to the job applicant on the basis of an independent and confirmatory test review by a Medical Review Officer. Failure or refusal of a job applicant to submit to a conditional drug test may result in the failure to obtain employment with the Company.

(a)     No representative, agent or designee of the Company shall directly observe any prospective employee in the process of producing a urine sample. However the Company may implement appropriate measures, consistent with all applicable laws, other than direct observation, to ensure the reliability of the urine sample.

(b)     All drug testing will be performed in accordance with state and local regulations, and all test results will be maintained by the Company along with other employee medical records and will remain strictly confidential, except as otherwise provided by law.

(c)     Where any law or government regulation imposes restrictions upon the implementation of this policy, the Company will modify its pre-employment drug-screening procedures in accordance with such law or regulation.

Carlson v. BAH
Page 001129

## Proof of Right to Work

In accordance with federal law, all prospective employees must work together with the Company's background check vendor to produce original documentation establishing their identity and right to work in the United States, and complete USCIS Form I-9, swearing that they have a right to work in the United States. Authorization documents, together with the employee's Form I-9, will be maintained electronically with the Company's background screening vendor, separate from the employee's personnel file. These documents will be retained at least three years after the date of hire or one year after an employee's employment terminates, whichever is later.

## C.     PERSONAL APPEARANCE AND DEMEANOR

The Company considers the presentation of the Company image to its customers, suppliers, and the public at large to be extremely important. The Company is a service business. This means that since the Company's insurance products can only be delivered through excellent service, and that can only be provided through its employees, the Company not only seeks good performance and conduct from its employees, but also expects them to observe high standards in their personal presentation. Please refer to your local Human Resources representative for more specific information as to when business attire is required versus business casual attire.

Employees failing to adhere to proper standards of appearance and demeanor as required by their local office are subject to disciplinary action, up to and including employment termination. Questions should be directed to your local Human Resources representative.

## D.     OPEN DOOR AND INTERNAL PROCEDURE FOR REPORTING CONCERNS/COMPLAINTS

The Company has a longstanding policy of open communication to foster an environment conducive to open dialogue, and encourages employees to initially raise any potential concerns they may have with their manager, if possible. If the employee is not comfortable discussing the concern with this individual, we encourage the employee to raise the concern with Human Resources, the WRBC Chief Compliance Officer, or the Ethics Line. The Company believes that employee concerns are best addressed through this type of informal and open communication, which often can lead to resolution before serious problems develop. At the same time, concerns and complaints about particular subjects should be brought according to the guidelines below.

### Concerns and Complaints Related to Possible Discrimination, Harassment or Retaliation

Any and all concerns or complaints about conduct believed to violate the Company's Equal Employment Opportunity policy, or its Policy against Discrimination, Harassment and Retaliation, should be brought in accordance with the complaint procedure listed in the Policy against Discrimination, Harassment and Retaliation. Employees should refer to that policy for specific information about how to bring such complaints forward. If an applicant or employee is unsure about where to bring his or her concern or complaint, he or she should contact a member of the Human Resources team.

Carlson v. BAH
Page 001130

**Concerns and Complaints About Accounting and Other Corporate Governance Matters**

The W. R. Berkley Code of Ethics and Business Conduct, available online or from your local Human Resources representative, as well as our Company policies, including our Standards of Conduct policy, address our high standards in areas including insider trading, conflicts of interest, and financial reporting, among other important areas. Any complaints or concerns related to accounting matters, compliance with legal and regulatory requirements or other matters related to corporate governance should be made using the procedures set forth in the "Complaint Procedures for Accounting and Other Corporate Governance Matters" section in the W. R. Berkley Code of Ethics and Business Conduct. Concerns or complaints about possible violations of any other Company policy should be reported according to the "Asking Questions and Raising Concerns" procedures outlined in the Code of Ethics and Business Conduct.

**No Retaliation or Discrimination of Any Kind for Reporting Concerns or Complaints**

Regardless of the type of concern or complaint, the Company prohibits discipline or retaliation of any kind against an individual for raising a good-faith concern or complaint about alleged violations of Company policies, laws, or ethical rules. The Company will not dismiss, demote, suspend, threaten, harass or in any manner discrimination against any applicant or employee in the terms and conditions of employment based upon any lawful actions of such employee taken with respect to good faith reporting of any complaints covered in this policy, including any complaints as specified in Section 806 of the Sarbanes-Oxley Act of 2002.

If the individual believes he or she is being retaliated against for doing so, he or she should immediately report this concern using the same procedures as above.

**E.      NON-FRATERNIZATION/DATING**

To promote efficient operations and avoid misunderstandings, complaints of favoritism, other problems of supervision, security and morale, and possible claims of sexual harassment, managers and supervisors are strongly discouraged from dating or pursuing romantic or sexual relationships with employees whom they supervise, directly or indirectly. Should such a relationship develop, both individuals are required promptly to disclose the relationship to Human Resources. The Company will take those steps it deems necessary to avoid the problems described above. This policy applies without regard to gender or sexual orientation.

**F.      EMPLOYEE RECORDS AND INFORMATION**

All personnel and medical records are treated with strict confidentiality, in accordance with applicable law. The Company does not release employee information outside the Company, except verification of job title and dates of employment, without prior employee authorization, unless required by law.

31

Carlson v. BAH
Page 001131

Employees also have a right to inspect certain documents in their personnel file, in the presence of Human Resources or other designated person, at a mutually convenient time. Except where mandated by the law, the Company generally does not permit copies to be made of personnel records. Questions about document inspection and copying should be directed to Human Resources.

As required by law, all written medical information will be kept in medical files separate from employee personnel files. Consistent with the Genetic Information Nondiscrimination Act of 2008 ("GINA") prohibition on covered employers requesting or requiring genetic information of an individual or family member of the individual (except as specifically allowed by this law), neither employees nor their health care provider should provide any genetic information when responding to any work-related requests for medical information. "Genetic Information" as defined by GINA includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Employees should inform their local Human Resources representative immediately with changes in personal data such as name, address, telephone number, and marital status, number of dependents, insurance beneficiaries, and names and contact information of person to notify in case of emergency.

For more information, contact your local Human Resources representative, and refer to the state-specific addenda at the end of this Employee Handbook.

## G. SOLICITATION, DISTRIBUTION OF LITERATURE & BULLETIN BOARDS

Solicitation or distribution in any way connected with the sale of any goods or services for profit is strictly prohibited anywhere on Company property at any time absent Human Resources' prior approval and designation of an area in advance. Solicitation or distribution of literature for any purpose by non-employees is strictly prohibited on Company property at any time.

The Company has bulletin boards located throughout facilities for the purpose of communicating with employees. Postings on these boards are limited to items posted by the Company, including statutory and legal notices, safety and disciplinary rules, Company policies, memos of general interest relating to the Company, and local operating rules. All postings require the prior approval of the department head or Human Resources. No postings are permitted for any other purpose.

Carlson v. BAH
Page 001132

**H.     EXTERNAL COMMUNICATIONS**

Occasionally, outside sources may contact employees requesting information about the Company, including information regarding current or former employees, projects, or other workplace issues.  Employees are not authorized to respond on behalf of the Company, and instead, should refer:  media representatives (e.g., television, radio, or newspaper reporters) to the Public Relations Officer, Chief Financial Officer, or Legal Department; outside attorneys or investigators to WRBC Legal; and companies or individuals seeking employment references or verifications for a current or former employee to Human Resources.

**I.     SMOKING**

The Company prohibits smoking (including the use of e-cigarettes, or "vaping") in the workplace.

**J.     PARKING**

To the extent that your local office provides parking, employees should park their automobiles in designated lots provided for this purpose and not park in areas designated for handicapped, emergency, visitor or reserved parking.  The Company asks its employees to drive slowly and cautiously and not exceed the maximum speed limit.  The Company is not responsible for loss, theft or damage to an employee's vehicle while on Company premises.

Carlson v. BAH
Page 001133

## SECTION 9   SAFETY AND SECURITY

### A.   DRUG AND ALCOHOL FREE WORKPLACE

It is the Company's intent to maintain a workplace that is free of alcohol and illegal drugs and to discourage drug and alcohol abuse by our employees. Employees who are under the influence of a drug or alcohol on the job compromise the Company's interests and endanger their own health and safety and the health and safety of others. Substance abuse in the workplace can also cause a number of other work-related problems, including absenteeism and tardiness, substandard job performance, increased workloads for co-workers, behavior that disrupts other employees, and inferior quality of service.

Our Company has established this policy concerning the use of alcohol and drugs to further our interest in avoiding accidents, to promote and maintain safe and efficient working conditions for our employees, and to protect our business, property, equipment, reputation and operations. As a condition of continued employment with the Company, each employee must abide by this policy.

For purposes of this policy:

"*Illegal drugs or other controlled substances*" mean any drug or substance that: (i) is not legally obtainable, or (ii) is legally obtainable but has not been legally obtained, or (iii) has been legally obtained but is being sold or distributed unlawfully.

"*Legal drug*" means any drug, including any prescription drug or over-the-counter drug, that has been legally obtained and that is not unlawfully sold or distributed.

"*Abuse of any legal drug*" means the use of any legal drug for any purpose other than the purpose for which it was prescribed or manufactured, or in a quantity, frequency, or manner that is contrary to the instructions or recommendations of the prescribing physician or manufacturer.

The prohibitions of this policy apply whenever the interests of the Company may be adversely affected. This includes any time an employee is on Company premises; conducting or performing Company business, regardless of location; operating or responsible for Company equipment or other property; or responsible for the safety of others in connection with Company-related business.

Behavior that violates the Company policy includes the following:

- Possession or use of an illegal drug or controlled substance, or being under the influence of an illegal or controlled substance.

- Purchase, sale, manufacture, distribution, transportation, or dispensation of (i) an illegal drug or controlled substance or (ii) of a legal prescription drug in a manner inconsistent with the law.

Carlson v. BAH
Page 001134

- The abuse of any legal drug.

- The possession, consumption, purchase, or sale of alcohol.

- Being under the influence of alcohol while performing work.

Violation of these rules and standards of conduct will not be tolerated. The Company also may bring the matter to the attention of law enforcement authorities if appropriate.

The Company also recognizes that employees may, from time to time, be prescribed legal drugs that, when taken as prescribed or according to the manufacturer's instructions, may result in impairment. Employees may not work while impaired by the use of legal drugs if the impairment might endanger the employee or someone else, pose a risk of significant damage to the Company property, or substantially interfere with the employee's job performance. If an employee is so impaired by the appropriate use of legal drugs, he or she may not report to work. To accommodate the absence, the employee may use accrued sick leave or vacation time. The employee may also contact Human Resources to determine whether or not he or she qualifies for an unpaid leave of absence, such as family care or medical leave, or whether a reasonable accommodation can be made for that employee.

Nothing in this policy is intended to diminish the Company's commitment to employ and reasonably accommodate qualified disabled individuals. The Company will provide a reasonable accommodation, as needed, to qualified disabled employees who must take legal drugs because of their disability.

Disclosures made by employees to Human Resources regarding their use of legal drugs will be treated confidentially and will not be revealed to managers or supervisors unless there is an important work-related reason to do so.

The Company maintains an Employee Assistance Program which provides help to employees who seek assistance for drug or alcohol abuse, as well as for other personal or emotional problems. Employees who suspect that they may have alcohol or drug problems, even in the early stages, are encouraged to voluntarily seek diagnosis and to follow through with the treatment as prescribed by qualified professionals. Employees should be aware that participation in the Employee Assistance Program will not necessarily shield them from disciplinary action for a violation of this Policy, particularly if discipline is imposed for a violation occurring before the employee seeks assistance.

The Company reserves the right, subject to applicable federal, state and local law, to require employees to undergo appropriate testing designed to detect the presence of alcohol, illegal drugs, or other controlled substances when it has reason to believe, based on objective evidence, that an employee may be under the influence of any of these substances. Any testing for drug or alcohol use will be conducted in accordance with all applicable federal, state, and local laws. Refusal to consent to such a test, cooperate in the testing procedures, or authorize disclosure of the results to the Company may result in disciplinary action up to and including employment termination, consistent with the law.

35

## B. HEALTH & SAFETY POLICY

The Company has adopted policies and procedures to provide employees with a safe workplace and protection from injuries while on the job. Employees should review safety rules at each location.

All Employees are expected to do their part by keeping their work area free of potential hazards, by knowing and complying with the Company's health and safety rules and practices, and by following safe and healthy work practices at all times. Employees are not permitted to bring onto the property or into the office any explosives, fireworks, or hazardous, illegal, or unsafe materials or items, including weapons to the extent permitted by law. Employees also are required to report immediately to their manager, building security, or local Human Resources representative any potential health or safety hazards, and all injuries or accidents. No matter how minor an on-the-job injury may appear, it is important that it be reported immediately.

In addition, and as addressed in the W. R. Berkley Code of Ethics and Business Conduct, the Company is committed to maintaining a safe environment free from violence, threats of violence, and other intimidating, unsafe or disruptive conduct. Accordingly, the following conduct on work premises, while performing work or at any work-related event is a violation of this policy and will not be tolerated:

- Threats, verbal or physical in nature

- Abusive language

- Bringing weapons to work, or displaying weapons or objects that look like weapons

- Stalking employees, contractors, vendors, customers or others

- Physically assaulting someone

- Using physical size or strength to intimidate

Employees believing someone's behavior poses a threat to an employee or the Company should report it immediately to their manager, local Human Resources representative, or Ethics Line at www.wrberkleyethicsline.com or (from inside the U.S. at) 1-866-253-0583.

Failure to comply with the Company's health and safety policies and procedures may result in disciplinary action, including possible employment termination.

## C. COMPANY PROPERTY; CONFIDENTIAL & PERSONAL INFORMATION

The security of Company property is of vital importance to the Company. Company property includes not only tangible property, like desks and computers, but also intangible property such as confidential information. It is critical for the Company to preserve and protect its confidential information, as well as the confidential information of customers, suppliers, and third parties.

36

As noted in the W. R. Berkley Corporation Code of Business Ethics and Conduct, it is the responsibility of all employees to follow Company standards and ensure that proper security is maintained at all times. In this regard, in addition to the policy below, from time to time the Company issues policies addressing data security issues. Employees are subject to such policies and required to take steps to keep informed of such policies, including the "W. R. Berkley Corporation: Data Breach Notification Policy" attached as an Appendix to this Handbook, which establishes very specific procedures by which potential data breaches are identified, addressed, and documented. All employees are responsible for reading and understanding such policy so that they are prepared to respond appropriately in the event of a data breach.

Also, as a condition of employment and continued employment with the Company, employees may be required to sign confidentiality, nondisclosure and/or non-compete agreements as may be required by the Company from time to time. In the event of any conflict between a policy in this Employee Handbook and a separately-issued policy or agreement, that provision providing the greater protection to the Company will govern.

### Confidential and Personal Information

"Confidential Information" means all information, not generally known, belonging to, or otherwise relating to the business of the Company or its clients, customers, suppliers, vendors, affiliates or partners, regardless of the media or manner in which it is stored or conveyed, that the Company has taken reasonable steps to protect from unauthorized use or disclosure. For example, in the course of our business, we collect, use and store information from individuals including customers, policyholders, claimants and others. All of this is Confidential Information. Other examples may include pricing models, business plans, agency or policyholder information, budgets, forecasts, and other financial information about the Company or its clients. In addition, Confidential Information includes but is not limited to trade secrets as well as other proprietary knowledge, information, and know-how; non-public intellectual property rights, including business plans and strategies; manufacturing techniques; formulas; processes; designs; drawings; discoveries; improvements; ideas; conceptions; test data; compilations of data; and developments, whether or not patentable and whether or not copyrightable.

"Personal Information" includes personally-identifiable information about employees, consultants or other individuals, such as Social Security numbers, background information, credit card or banking information, health information, or other non-public information entrusted to the Company. There are laws in the United States and other countries that protect certain types of personal information, and employees should not disclose personal information about the other individuals to any third party or from one country to another without prior managerial approval.

37

## Proper Use and Protection of Confidential and Personal Information

Given the nature of the Company's business, protecting Confidential and Personal Information is of vital concern to the Company. This information is one of the Company's most important assets. It enhances the Company's opportunities for future growth, and indirectly adds to the job security of all employees. Such information may be of great interest to a variety of third parties, such as competitors, industry and security analysts, members of the press, consultants, customers, and anyone else interested in our business—some of whom are eager to obtain this information any way they can. Even more, failure to take reasonable measures to protect the Company's Confidential Information may jeopardize its status as a trade secret, and cause other serious repercussions.

Also, much of our Confidential and Personal Information, and particularly customer and claimant data, are available in electronic format, often on Company laptops, desktop computers, flash drives, Blackberry devices, smart phones and other PDAs. Most states have passed laws concerning data security, including notification requirements in the event of breach. Failure to properly protect that data can expose the Company to significant risk. Security breaches are costly in several ways: time, money and reputation.

For these reasons, we rely on you to safeguard this information from disclosure, whether deliberate or accidental. As part of every employee's job, employees are expected not only to protect Confidential and Personal Information as defined in this policy and Handbook, but also to help protect the Company's assets in general. Your alertness to specific situations can prevent the loss, theft or misuse of Company property.

In particular, while employed by the Company, employees must not use or disclose any Confidential or Personal Information that they produce or obtain during employment with the Company, except to the extent such use or disclosure is required in connection with performing their jobs. The following are guidelines and procedures to help safeguard Confidential and Personal Information during the employment relationship:

- Employees are expected to keep Confidential and Personal Information secure from outside visitors and all other persons who do not have legitimate reason to see or use such information.

- Unless employees have express authorization to do so from the Company, employees must not disclose outside the Company policyholder or claimant information. Improper use of this information can violate privacy laws and regulations, and lead to serious consequences for you and the Company. Such information should only be shared if you are expressly authorized to disclose it, and the recipient is expressly authorized to receive it.

- Do not post Confidential or Personal Information to websites, share it on social media sites, or store it in any cloud-type environment (e.g., iCloud).

- Prevent Confidential and Personal Information from falling prey to information thieves. Be suspicious of any websites or other third party requests for your password or other Confidential or Personal Information, especially those that contain a warning or require you to act immediately.

- E-Mail:

  o Think twice before e-mailing Confidential or Personal Information, particularly when it contains social security numbers, credit card information, personally identifiable data or other similar information, including to your own personal e-mail.

- Laptop Computers/Tablets:

  o Password protect documents, spreadsheets, etc. that are stored on your laptop or tablet.

  o Place laptop and tablet in a secure location at the end of the day.

  o Do not leave laptops or tablets unattended and place them in a secure location when not in use.

  o Do not leave a laptop or tablet in a visible location in your unattended vehicle.

  o When traveling, do not check laptop or tablet in your luggage; carry them on and keep them in sight as they move through security checks.

  o Place contact information on the device's exterior.

- Passwords:

  o Ensure all passwords meet Company requirements and your computer passkey function is active.

  o Use complex, non-obvious passwords and regularly change them.

  o Protect your passwords. Do not write down passwords or, if you do, store the written password in a secure location separate from your computer, laptop, desktop, flash drive, smart phone, Blackberry, PDA, etc.

- Mobile Devices (Blackberries, smart phones, PDAs):

  o Password protects access to the device when not actively in use (so that the device only can be opened if you enter a password).

  o Protect your mobile devices from theft, locking them up when possible.

Carlson v. BAH
Page 001139

- o Do not leave laptops or devices unattended, including in a visible location inside your unattended vehicle.

- o When traveling, do not check them in your luggage; carry them on and keep devices in sight as they move through security checks.

- o Place contact information on the device's exterior.

- o Watch for opportunities for virtual theft, such as through the use of unsecured wireless networks.

- o Limit the storage on mobile devices of personally identifiable data to that which is absolutely necessary and if so stored, remove the data from the device when no longer needed. Generally, it is safer not to store such data on mobile devices.

- • Desktops:

  - o Lock access when not in use (even when you leave your desk during the day) through the use of screen saver locking mechanisms

  - o Log out at the end of the day.

- • Disks, USB Drives, Flash Drives, and Other Portable Data Storage Devices:

  - o Think twice about storing sensitive information on disks, USB drives, flash drives and other portable devices that are easily lost or misplaced. Any such information stored on these devices must be encrypted and PIN-protected.

  - o Keep storage devices in a secure location.

  - o If a storage device is transported out of the office, place it in a closed container to help avoid losing it inadvertently.

  - o Do not download sensitive data to such devices unless absolutely necessary.

  - o If the storage device has a security or encryption feature, use it.

- • Paper Files:

  - o Secure files containing personally identifiable data and sensitive data when not in use.

  - o Shred documents containing personally identifiable data or sensitive data when disposed.

40

After the employment relationship ends, employees may not use or disclose Confidential or Personal Information for any reason (except when ordered to do so by law).

Misuse or unauthorized disclosure of Confidential or Personal Information may result in immediate employment termination, as well as potential personal and criminal liability.

### Obligations on Termination

On retirement or termination of employment, whether voluntary or involuntary, all Confidential Information, Personal Information, Company documents, computer records, and other tangible Company property in the employee's possession or control must be returned to the Company immediately.

### Security

To avoid loss of Company property, the Company maintains and promulgates security procedures, which include maintaining control of entrances, exits, restricted areas, document control, and record keeping. Specific procedures regarding the protection of Company property, traffic throughout the facilities, and designation of restricted areas are issued by the Company. Proper identification may be required by the Company as a condition of access to Company facilities. Employees are expected to abide by all of the company's security procedures.

Given the sensitivity of Confidential and Personal Information, employees may only dispose of such information by secure methods approved by the Company. If an employee has any doubt or question about how to handle Confidential or Personal Information, the employee should contact Human Resources or Regulatory Compliance department.

### D.  TECHNOLOGY USE & SECURITY

The Company provides various Technology Resources (defined below) to authorized employees to assist them in performing their job duties. Each employee has a responsibility to use the Company's Technology Resources in a manner that increases productivity, enhances the Company's public image, and is respectful of other employees.

Employees should be aware that all personal and other messages, data, and information sent, received and/or stored on the Company's Technology Resources (including on its electronic mail system, voicemail system, computer systems and/or electronic databases whether supported by the Company or a third party vendor system) are Company property regardless of the content. As such, the Company reserves the right to access all of its Technology Resources, including its systems, software, computers, data, voicemail, and email systems, at any time for any reason, and without warning, in its sole discretion. This includes, but is not limited to, accessing Technology Resources for the purpose of determining compliance with Company policies, for legal proceedings, to investigate misconduct, to locate information, or for any other business purpose.

41

Failure to follow the Company's policies regarding Technology Resources may lead to disciplinary measures, up to and including employment termination. Moreover, the Company reserves the right to advise appropriate legal authorities of any violation of law by an employee.

Employees are reminded that, in addition to the requirements of this policy, all usage of Technology Resources is also subject to the "Company Property; Confidential & Personal Information" policy and any other related policies issued by the Company from time to time.

### Technology Resources Definition

"Technology Resources" consist of all electronic devices, software, and means of electronic communication including any of the following: personal computers and workstations; laptop computers; mini and mainframe computers; computer hardware such as disk drives and tape drives; peripheral equipment such as printers, modems, fax machines, and copiers; computer software applications and employee files and data, including software that grants access to external services, such as the Internet; electronic mail; telephones; mobile phones; smart phones; personal organizers and other handheld devices; pagers; voicemail systems; and instant messaging systems.

### Authorization

Access to the Company's Technology Resources is within the sole discretion of the Company. Generally, employees are given access to the Company's various technologies based on their job functions. Only employees whose job performance will benefit from the use of the Company's Technology Resources are authorized to access and use the necessary technology. Additionally, employees must successfully complete Company-approved training before they are authorized to access and use the Company's Technology Resources.

### Use

The Company's Technology Resources are to be used by employees only for the purpose of conducting Company business. Employees should keep personal use of the Company's Technology Resources to a minimum, for incidental personal uses, as long as such use does not interfere with the employee's duties, is not done for pecuniary gain, does not conflict with the Company's business, and does not violate any Company policy. Employees should note that the Company monitors both the amount of time spent using online services and the sites visited by individual employees, and reserves the right to limit such access by any means available to it, including revoking access altogether.

42

**Prohibition Against Harassing, Discriminatory and Defamatory Use**

The Company is aware that employees use electronic mail for correspondence that is less formal than written memoranda. Employees must take care, however, not to let informality degenerate into improper use. As set forth more fully in the Company's Policy Against Harassment, the Company does not tolerate discrimination or harassment based on race, color, religion, sex, national origin, citizenship, ancestry, age, disability, genetic information, family care status, military caregiver status, veteran or military service or obligation, reserve status, national guard status, or any other basis protected by federal, state, or local laws. Under no circumstances shall employees use the Company's Technology Resources to transmit, receive, or store any information that is discriminatory, harassing, defamatory, obscene, indecent, threatening, or that otherwise could adversely affect any individual, group, or entity (e.g., sexually explicit or racial messages, jokes, or cartoons).

**Prohibition Against Violating Copyright Laws**

Employees may not use the Company's Technology Resources to copy, retrieve, forward, or send copyrighted materials unless the employee has the author's permission or is accessing a single copy only for the employee's reference.

**Other Prohibited Uses**

Employees may not use the Company's Technology Resources for any illegal purpose, violation of any Company policy, in a manner contrary to the best interests of the Company, in any way that discloses Confidential Information or Personal Information of the Company or confidential or proprietary information of third parties, or for personal or pecuniary gain.

**No Reasonable Expectation Of Privacy**

Although the Company does not wish to examine personal information of its employees, on occasion, the Company may need to access its Technology Resources, including computer files, electronic mail messages, and voicemail messages, as noted above. Employees should understand, therefore, that they have no right of privacy with respect to any messages or information created, collected, or maintained on the Company's Technology Resources, including personal information or messages.

**Passwords**

Certain of the Company's Technology Resources can be accessed only by entering a password. Passwords are intended to prevent unauthorized access to information. Passwords do not confer any right of privacy upon any employee of the Company. Thus, even though employees may maintain passwords for accessing Technology Resources, employees must not expect that any information maintained on Technology Resources, including electronic mail and voicemail messages, are private. Employees are expected to maintain their passwords as confidential, and must not share passwords or access coworkers' systems without express authorization.

43

### Data Collection

The best way for employees to ensure the privacy of personal information is not to store or transmit it on the Company's Technology Resources. So that employees understand the extent to which information is collected and stored, examples of information currently maintained by the Company are provided below. The Company may, however, in its sole discretion, and at any time, alter the amount and type of information that it retains.

1.      Telephone Use and Voicemail: Records are kept of all calls made from and to a given telephone extension. Although voicemail is password-protected, an authorized administrator can listen to voicemail messages and also reset the password.

2.      Electronic Mail: Electronic mail is backed up and archived. Although electronic mail is password-protected, an authorized administrator can read electronic mail and also reset the password.

3.      Desktop Facsimile Use: Copies of all facsimile transmissions are maintained in the facsimile server.

4.      Document Use: Each document stored on Company computers has a history that shows which users have accessed the document for any purpose.

5.      Internet Use: Internet sites visited, the number of times visited, and the total time connected to each site are recorded and periodically monitored.

### Deleted Information

Deleting or erasing information, documents, or messages maintained on the Company's Technology Resources is, in most cases, ineffective. All employees should understand that any information kept on the Company's Technology Resources may be electronically recalled or recreated regardless of whether it may have been "deleted" or "erased" by an employee. Because the Company periodically backs up all files and messages, and because of the way in which computers reuse file storage space, files and messages may exist that are thought to have been deleted or erased. Therefore, employees who delete or erase information or messages should not assume that such information or messages are confidential or ever were confidential. If a legal dispute arises, or may arise in the future, it may be unlawful to attempt to delete or erase certain information. Employees shall fully comply with Company policy regarding retention or destruction of information.

### The Internet And On-Line Services

The Company provides authorized employees access to online services such as the Internet. The Company expects that employees will use these services in a responsible way and for business-related purposes only. Under no circumstances are employees permitted to use the Company's Technology Resources to access, download, or contribute to Internet sites that contain inappropriate content such as that which is discriminatory, harassing, defamatory, obscene, indecent, threatening, or that otherwise could adversely affect any individual, group, or entity.

44

The Company strongly encourages employees who wish to access the Internet for non-work-related activities to obtain their own personal Internet access accounts that are unaffiliated with the Company, and to use such accounts at home on their own personal computer without making any reference to the Company.

### Confidential Information

The Company is very sensitive to the issue of protection of Company Confidential and Personal Information, as defined above in the "Company Property; Confidential and Personal Information" policy. Employees are expected to use good judgment, adhere to the highest ethical standards, and take all appropriate measures to safeguard the security of such information when using or transmitting such information on the Company's Technology Resources, including by adhering to the security and other guidelines set forth in the "Company Property; Confidential and Personal Information" policy.

Confidential and Personal Information should not be accessed through the Company's Technology Resources in the presence of unauthorized individuals, nor left visible or unattended. Moreover, any such information transmitted via Technology Resources should be marked with the following confidentiality legend: "This message contains confidential information. Unless you are the addressee (or authorized to receive for the addressee), you may not copy, use, or distribute this information. If you have received this message in error, please advise [employee's name] immediately at [employee's telephone number] or return it promptly by mail."

Employees should avoid sending Confidential or Personal Information via the Internet, except when absolutely necessary. Employees should also verify electronic mail addresses before transmitting any messages containing such information.

### Software Use

License Restrictions

All software in use on the Company's Technology Resources is officially licensed software. No software is to be installed or used that has not been duly paid for and licensed appropriately for the use to which it is being put. No employee may load any software on the Company's computers, by any means of transmission, unless authorized in writing in advance by a duly authorized technology Officer of the Company and thoroughly scanned for viruses or other malware prior to installation.

45

## Remote Access To Technology Resources

The Company may, at its sole discretion, provide certain employees with remote access systems such as a laptop, netbook, smart phone, BlackBerry, or other personal organizer to allow such employees to handle the tasks associated with their jobs while working away from the office. Employees must take care to ensure the security of all Company-provided equipment. Employees must not share network passwords or other PINs with anyone. As soon as an employee believes Company-provided equipment is lost or that the security and confidentiality of the data on that equipment has been compromised, he or she must notify Berkley Technology Services and Human Resources. If Company-provided equipment is lost, or if it is damaged as a result of carelessness, employees may be responsible for replacement fees. The Company-provided remote access system should only be used for Company-related business. The Company may decide that it is no longer necessary for certain employees to possess a remote access system and their ability to use such systems may be discontinued, in which case such employees are expected to return any Company-issued remote access systems in accordance with Company's "Company Property; Confidential and Personal Information" policy.

The Company does not expect or require employees to work on tasks (including e-mail, work product, etc.) during meal periods or after scheduled working times. Any and all use of remote access systems shall be made in compliance with Company's Recording Employee Time policy.

Because use of public or home networks, such as unencrypted Wi-Fi networks, can be a threat to the security and reliability of the Company's Technology Resources, employees must only access Company Technology Resources via means that are specifically approved by the appropriate technology Officer.

## Email Guidelines

Employees are expected to use good judgment when using email. Email is an easy way to communicate, but it may not be appropriate to say in an email something that would never be said in person or in formal correspondence. All employees should adhere to the following guidelines:

1.    Always ask before sending an email if it is the appropriate method of communication. For sensitive subjects, employees should consider if email is an appropriate medium. Using the phone may be more appropriate (though voicemail may also be stored on a computer server and forwarded to third parties).

2.    Use the "front page" test. Assuming email is the appropriate medium of communication, each email should be treated as a formal written document. Employees should not write anything in an email that could not be printed on the front page of the newspaper. Sarcastic, off-the-cuff, or angry comments can come back to haunt the author.

46

3.    Email is part of the workplace. Email containing rude and insensitive comments is not only personally embarrassing, but can create legal liability. Employees and managers should exercise the same care and sensitivity in communicating by email as they would in person or in traditional forms of writing. Offensive email received from others should not be forwarded and the recipient should tell the sender to stop sending inappropriate email.

4.    Provide context. Because email messages may be taken out of context, employees should consider including the original message to which the reply email relates.

5.    Know the audience. Employees should always double-check the email recipients—especially when using the "reply all" button. They should ask themselves if it is appropriate for each addressee to receive the email, and whether sending the email to a particular addressee will result in the unauthorized disclosure of Confidential or Personal Information. If in doubt, the doubted addressee should be removed.

6.    Do not use a home PC for business purposes. A court hearing a business dispute involving the Company and a third party may require an employee to provide the hard drive from his or her home computer. If this is a concern, the employee should not use a home computer for business purposes. Emails relating to Company business, even though stored on a home computer, may have to be recovered and provided in litigation.

## E.    SOCIAL MEDIA POLICY

Employees are required to review and abide by the separate Social Media Policy included as an Appendix to this Handbook (also available from Human Resources), which governs all employees of the Company. Please contact your local Human Resources representative if you would like a written copy of such policy.

## F.    POLICY ON MOBILE DEVICE USAGE WHILE TRAVELING

The Company complies with all state laws prohibiting the use of all handheld mobile devices including smart phones, cell phones, data, personal organizer, or other devices, for work purposes while operating a motor vehicle, or for personal purposes while operating a motor vehicle during work hours or while on Company business. Moreover, all use of Company-issued mobile devices, or personally purchased mobile devices used for work-related purposes, must be made in accordance with Company policy, including the Technology Use and Security policy, and specifically, the section of that policy entitled "Remote Access to Technology Resources."

Consistent with applicable law, employees may use hands-free mobile devices while driving when safe to do so. Special care should be taken in situations where there is heavy traffic, inclement weather, or the employee is driving in an unfamiliar area. Employees must adhere to all federal, state, and local rules and regulations regarding the use of mobile devices while driving.

Under no circumstances are employees allowed to use text devices to type or review text messages for work purposes while operating a motor vehicle, or for personal purposes while operating a motor vehicle during work hours or while on Company business.

Carlson v. BAH
Page 001147

Employees must contact Berkley Technology Services immediately if their mobile device is lost or stolen, and either the Company issued such device to the employee, or the employee used a personal device to access Company information (e.g., via authorized business access applications).

For state-specific information regarding mobile devices, please refer to any applicable state-specific Addendum or consult Human Resources.

48

## APPENDIX A:  U.S. Department of Labor's Rights and Responsibilities notice (Form WHD 1420)

### EMPLOYEE RIGHTS AND RESPONSIBILITIES
### UNDER THE FAMILY AND MEDICAL LEAVE ACT

**Basic Leave Entitlement**

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth.
- To care for the employee's child after birth, or placement for adoption or foster care.
- To care for the employee's spouse, son or daughter, or parent, who has a serious health condition, or
- For a serious health condition that makes the employee unable to perform the employee's job.

**Military Family Leave Entitlements**

Eligible employees with a spouse, son, daughter, or parent on active duty or call to active duty status in the National Guard or Reserves in support of a contingency operation may use their 12-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is a current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty that may render the servicemember medically unfit to perform his or her duties for which the servicemember is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list.

**Benefits and Protections**

During FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Eligibility Requirements**

Employees are eligible if they have worked for a covered employer for at least one year, for 1,250 hours over the previous 12 months, and if at least 50 employees are employed by the employer within 75 miles.

**Definition of Serious Health Condition**

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Use of Leave**

An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

**Substitution of Paid Leave for Unpaid Leave**

Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

**Employee Responsibilities**

Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**

Covered employers must inform employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the employees' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**

FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA;
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Enforcement**

An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

**FMLA section 109 (29 U.S.C. § 2619) requires FMLA covered employers to post the text of this notice. Regulations 29 C.F.R. § 825.300(a) may require additional disclosures.**





For additional information:
1-866-US-WAGE (1-866-487-9243) TTY: 1-877-889-5627
**WWW.WAGEHOUR.DOL.GOV**

U.S. Department of Labor | Employment Standards Administration | Wage and Hour Division

U.S. Wage and Hour Division

49

## APPENDIX B:  Prohibition Against Trading on Inside Information

## MEMORANDUM

TO:         All W. R. Berkley Corporation Directors and all
            W. R. Berkley Corporation and Subsidiary Employees

FROM:       Ira S. Lederman, General Counsel

DATE:       January 2014

RE:         Prohibition Against Trading on Inside Information

It is important to reaffirm that each director and employee of W. R. Berkley Corporation (the "Company") and its subsidiaries understands that he or she (directly, or indirectly through family members or other persons or entities) cannot trade in the securities of the Company when in the possession of material, non-public ("inside") information. Such conduct is a violation of the Company's policy to comply with all applicable governmental laws and regulations and may result in a violation of law.

Generally, the most scrutinized time to engage in a purchase or sale of the Company's stock would be in advance of the public release by the Company of important information, while the safest time would be the period shortly following the release and publication of such information (always assuming that you are not aware of other material information which has not been publicized). Even after the Company has released such information, it is important to be sure that sufficient time has elapsed to enable the information to be disseminated to, and considered by, investors.

*"Material"* information includes any information that would influence a reasonable investor to buy, hold or sell stock of the Company. Any non-public information that could be expected to affect the Company's stock price, either positively or negatively should be considered material. Examples of information that the courts have found to be material, depending upon the circumstances, are:

*   Projections of future earnings or losses, or other earnings guidance;

*   Earnings that are inconsistent with the consensus expectations of the investment community;

*   A pending or proposed merger, acquisition or tender offer;

*   A pending or proposed acquisition or disposition of a significant asset;

*   A material change in dividend policy or an offering of additional securities;

*   A material change in senior management; or

*   The gain or loss of a significant contract or business relationship.

Carlson v. BAH
Page 001150

Any director or employee of the Company or its subsidiaries who obtains inside information concerning the Company cannot legally:

1. Buy or sell the Company's stock or options on such stock; or

2. Communicate such information to other persons (sometimes referred to as *"tipping")*.

Persons who trade on inside information, persons who tip others and the *"tippees"* of such information may be the subject of civil and criminal proceedings. The Company, its directors and executive officers may also be exposed to violations of law.

In addition, any employee of the Company or its subsidiaries who engages in such illegal conduct is subject to dismissal.

In conclusion, neither you nor your family, relatives, acquaintances or anyone else should attempt to benefit from inside information. Under no circumstance should you or they buy or sell securities of the Company, or of any other company with which the Company may be involved, on the basis of inside information.

**Finally, you are reminded that, in order to guard against the release of non-public information and ensure the accuracy and consistency of public information, all press releases or similar planned public announcements and all inquiries about the Company, its subsidiaries or affiliates from financial analysts, stockholders, reporters and others should be referred to Bill Berkley, Rob Berkley, Gene Ballard, Karen Horvath or me. No director or employee should issue a press release or respond to any such inquiries absent specific authorization to do so.**

If you have any questions concerning this memorandum or its applicability in a particular situation, please call me at W. R. Berkley Corporation.

**Please Note:** Certain executive officers and the directors of the Corporation are subject to additional restrictions, including reporting requirements, short-swing trading restrictions and other provisions of the securities laws. Please contact me for information concerning those restrictions.

Carlson v. BAH
Page 001151

**APPENDIX C – W. R. Berkley Corporation: Data Breach Notification Policy**

## I.     Purpose

The purpose of this Data Breach Notification Policy (this "Policy") is to establish procedures by which potential Data Breaches are identified, addressed, and documented throughout W. R. Berkley Corporation and all of its U.S. operating units and direct and indirect subsidiaries (collectively, the "Berkley companies").

The goals of this Policy are to:

- Provide a working definition of a "Data Breach" and related terms;
- Outline procedures for reporting (internally and externally), investigating, remedying, and documenting Data Breaches;
- Ensure employees collect and report pertinent information;
- Ensure responses and communications are timely and consistent;
- Establish procedures for centralized reporting and uniform documentation of Data Breaches; and
- Facilitate the sharing of knowledge and experience regarding Data Breaches among Berkley companies.

## II.    Scope and Applicability

In the regular course of business, the Berkley companies interact and communicate with clients, employees, business partners, and others.   Through such communications, the Berkley companies frequently collect information, which may include Personal Information that is subsequently processed and electronically stored.   Data Privacy laws and state insurance regulations require the Berkley companies to investigate any report of unauthorized disclosure or acquisition of Personal Information and determine if notification to clients, individuals, third parties, or state authorities is required.[1]   All such investigations will be documented and kept on file for a predetermined length of time, in accordance with the applicable Record Retention Policy.

This Policy applies to all U.S. Berkley companies, divisions and employees, and third parties who interact with Personal Information collected on behalf of the Berkley companies as a part of their work responsibilities.   This Policy also applies (but is not limited) to Personal Information of Berkley companies' customers and employees, third party contractors and consultants.

---

[1] The information contained in this Policy is current as of April 1, 2013, except where explicitly noted otherwise.   The IRT should always consult the Legal Department at the time of a Data Breach to determine whether state law or regulatory requirements for Data Breach notification have been modified and whether any new legal or regulatory requirements shall apply.

52

Data Breach Notification Policy
W. R. Berkley Corporation

## III.    Definitions

| TERM | DEFINITION |
|---|---|
| **Berkley Technology Services, LLC ("BTS")** | Information technology services provider that provides centralized technology support for, and is a member of, the Berkley companies. |
| **Chief Compliance Officer** | Identified contact within W. R. Berkley Corporation's legal team that manages privacy policies, investigations, and breach notification. |
| **Data Breach** | State statutes typically define Data Breach as the unlawful and unauthorized acquisition of Personal Information that compromises the security, confidentiality, or integrity of Personal Information.  Contracts with customers may include a broader definition or include circumstances where the security of the information system was breached regardless of whether any information was compromised.  Data Breach may also include the loss, theft, alteration or other unlawful and/or unauthorized accessing of Personal Information. |
| **Data Privacy** | The right of the individual to the safeguarding of his or her Personal Information. |
| **Incident Response Team ("IRT")** | All Data Breach incidents require the participation of the IRT.  The IRT shall be composed of the Chief Compliance Officer and individuals from the following areas within the Berkley companies: BTS Information Security, W. R. Berkley Corporate Legal and Public Relations, and the affected operating unit's Management and IT Department (if any).  The IRT may bring in additional members as necessary to assist with any investigation. |
| **Personal Information** | State statutes most commonly define Personal Information as:   An individual's first name or first initial and last name plus one or more of the following data elements: (i) Social Security number; (ii) driver's license number or state-issued ID card number; (iii) account number, credit card number or debit card number combined with any security code, access code, PIN or password needed to access an account, and generally applies to computerized data that includes Personal Information. Some states also include health information, which is also covered by the Health Insurance Accountability and Portability Act (HIPAA).  Personal Information does not typically include publicly available information that is lawfully made available to the general public from federal, state or local government records, or widely distributed by media.<br><br>A table summarizing state Data Breach laws, including definitions of Personal Information, is attached as **Exhibit E.** |

53

Data Breach Notification Policy
W. R. Berkley Corporation

| Security | Administrative, physical and technical safeguards, used to control access to information, protect information from accidental or intentional disclosure to unauthorized persons and from alteration or destruction, ensure proper disposal of information, and maintain the integrity of the information. |
|---|---|

## IV. Examples of Potential Data Breaches

There are many variations of potential Data Breaches. Below are some examples, though other types of occurrences may be classified as potential Data Breaches as well. Note that the occurrence of one or more of the following may, or may not; ultimately constitute a Data Breach following further investigation in accordance with the terms of this Policy.

### EXAMPLES OF POTENTIAL DATA BREACHES

**Systems Security Breach:**

- **Internal or external hacking attack or attempt to breach information technology system Security**
- **Unauthorized destruction, loss, alteration or theft of, or unauthorized access to information contained on information technology systems**

**Theft or Loss – Computers or Other Portable Media:**

- Lost or stolen laptops
- Lost or stolen USB data devices or any other movable data devices (*e.g.*, iPhone, Blackberry, tablet computer, or other PDA device)
- Data CD or other movable data device taken home and improperly disposed of
- Hard drive improperly disposed of after replacement

**Theft or Loss – Paper Files:**

- Papers with confidential, customer or employee information or Personal Information improperly disposed of (*e.g.*, not shredded)
- Incorrect confidential, customer or employee information or Personal Information faxed/emailed to improper party

Carlson v. BAH
Page 001154

Data Breach Notification Policy
W. R. Berkley Corporation

---

**Role-based Improper Access:**

- Personal Information or other sensitive information stored in physical locations or online with broader access rights than is appropriate

**Insecure Transmission of Personal Information:**

- Unencrypted emails containing Personal Information
- Personal Information transferred using unsecured file transfer protocol or by other non-encrypted means
- Work-related sensitive information emailed by employees to personal email accounts

**Vendor Breach:**

- Loss of package containing Berkley company (or customer) data by shipping or delivery company
- **Compromise of** Berkley company (or customer) information maintained by a vendor

---

## V.    Data Breach Procedures

### A.    Notification of Appropriate Berkley Company Personnel

Any Berkley company employee who becomes aware of a potential Data Breach shall report the incident <u>immediately</u>, and under no circumstances later than 24 hours after discovery of the potential incident. Initial notification shall be made to BTS Help Desk by calling (302) 439-2000 (select option 1) and, if the operating unit affected has one, to the operating unit's information technology (IT) department. The employee should also notify his supervisor. The affected operating unit shall be responsible for notifying the Chief Compliance Officer immediately of the incident.

In all cases, the reporting employee shall complete a Security Breach Incident Report, further described below and attached as **Exhibit A.** The form should be completed to the best of the reporter's ability and should be based upon all known facts at the time of the report. This report should be emailed or faxed to the Chief Compliance Officer as soon as possible following initial notification.

### B.    Preliminary Investigation

All reported potential Data Breaches or Security incidents shall be investigated to determine the root cause, and whether the event was an isolated incident or the result of a wider systemic gap or deficiency. Upon learning of a Security incident, the Chief Compliance Officer will convene the IRT to discuss the nature and scope of the incident, identify what systems and types of information may have been accessed or misused, and determine appropriate next steps. If the IRT determines that further investigation is necessary, it shall determine the structure of the investigation and appoint an investigative team.

Data Breach Notification Policy
W. R. Berkley Corporation

Throughout the investigation, the investigative team, IRT, and the affected operating unit's management should be in frequent communication to discuss the progress of the investigation. The investigation should focus on the following objectives:

- Identifying any representations made to any individuals or businesses whose data may have been exposed or affected about how Personal Information they provided would be used, stored and protected. Consider not only direct communications made to data subjects, but also representations posted on websites, on intranets, in employee handbooks, in corporate codes of conduct, and in places where more general statements about Data Privacy and Security might have been made. A review of the contract with the business customer is essential to determine any contractual obligations regarding security and notification.

- Reviewing relevant employees' knowledge about Data Privacy and Security and Berkley company policies, practices and principles regarding the importance of Data Privacy and Security.

- Identifying the technology involved and how it functioned in the process (*e.g.*, encryption, a program to block all outbound emails with more than one address, a prompt that comes up when an out-of-the-ordinary field is selected for a mailing, blocking of attempts at unauthorized access of computer systems).

- Evaluating third-party vendor relationships that might have been involved in the incident (*e.g.*, by reviewing contracts, making alterations in procedures and/or training, change control process). Securing the cooperation of the vendor in the investigation is important as well as understanding any indemnity rights that may be applicable under the terms of the applicable contract.

- Noting dates and times as part of documentation, including when the potential Data Breach or Security incident occurred, when it was discovered, and for each step of process thereafter.

### C.    Further Investigation

If the Chief Compliance Officer determinates that an incident involving unauthorized access to or use of Personal Information has occurred, the investigative team shall conduct a further reasonable investigation to determine the likelihood that the Personal Information at issue has been or will be misused. This additional investigation may require the use of forensic analysis and other professionals.

### D.    Corrective Action

Based on the findings of the investigation, the IRT shall determine appropriate corrective action, including any necessary measures to prevent further unauthorized access or use of Berkley company information as a result of the breach, taking into account that substantial harm or inconvenience is most likely to result from improper access to Personal Information, as this type of information is most likely to be misused (*e.g.*, in the commission of identity theft). Other measures taken to contain the harm caused by the incident may include:

- Providing notice of the incident to appropriate entities, individuals, third parties, and state authorities, in accordance with the standards summarized in Section VII (Notice to Businesses) and Section VIII (Notice to Individuals) of this Policy;

Carlson v. BAH
Page 001156

Data Breach Notification Policy
W. R. Berkley Corporation

- Taking appropriate steps to contain and control the breach to prevent further unauthorized access to or use of Berkley company information, such as putting updated controls in place to remove the potential for future exploitation; and

- Taking any necessary steps to protect against unauthorized access to or use of Berkley company information that could result in substantial harm or inconvenience to any client, individual, or internal constituency.

To the extent that remediation requires either (a) shutting down applications or third party connections, (b) reconfiguring firewalls, (c) changing system access codes, or (d) modifying physical access controls, BTS Information Security and/or the appropriate personnel in the unit's IT department shall take all such steps necessary and keep the IRT and investigative team fully advised of their progress and all corrective actions taken.

### E.      Documentation of Incident and Response

The investigation and remediation of all Data Breach incidents should be documented, including all of the following that apply: the details of the source of the attack, IP addresses, the attack vector, the scope of the penetration, and any corrective actions taken. The Chief Compliance Officer, the affected operating unit's management and/or IT Department, and BTS Information Security will review and advise with respect to all documentation and records to ensure that all appropriate information is collected and included in the file.

### F.      Plan Public Response

No public statement should be made by any Berkley company regarding any potential Data Breach, as the public response shall be managed by the IRT in accordance with this Policy. The IRT will determine how the Berkley companies will respond to any press, third-party, government, or affected party queries. As preparation for this response, the IRT will designate one or a small number of individuals to serve as the sole press contact(s) regarding the incident. Berkley company employees should be instructed to direct all press inquiries regarding the incident to the designated person(s).

An effective public response may require retaining a public relations firm, outside legal counsel, an investigation or forensic investigation firm, and third parties to staff and maintain customer service telephone numbers. Appropriate internal contacts are set forth in **Exhibit B.**

The public response plan may also include the preparation of FAQs to ensure a standardized response to inquiries from businesses or individuals affected. Sample FAQs for affected businesses and organizational clientele are attached as **Exhibit C** (for illustrative purposes only). Sample FAQs for affected individuals are attached as **Exhibit D** (for illustrative purposes only).

Carlson v. BAH
Page 001157

Data Breach Notification Policy
W. R. Berkley Corporation

## VI.    Notification Requirements

Consistent with state Data Breach laws and other applicable laws and regulations, the Berkley companies may be required to notify certain business entities, individuals, third parties, and government authorities of Security incidents involving unauthorized access to or use of Personal Information. A table summarizing these requirements is attached as **Exhibit E.** The Chief Compliance Officer should monitor state law for additional requirements and changes, and should update this table accordingly.

It is each Berkley Company's intent to will comply with all relevant notice requirements. To determine whether and to whom notification is required, the Chief Compliance Offer should identify and review applicable legal requirements and contractual obligations that may create a notice obligation. This review may address, but is not limited to, laws related to:

- Data Security;
- The type of information at issue;
- The means by which the breach occurred (email, computer network, hardcopy mailing, website);
- The nature of the disclosure (directed to certain individuals, public posting);
- The means by which the information was first collected and representations made in connection with that collection; and
- State insurance regulations and mandates and other industry-specific laws.

If the Chief Compliance Officer concludes that a "Data Breach" has occurred under any of the applicable state Data Breach laws, the Chief Compliance Officer will then determine whether and to whom notification is required. In general, the Berkley companies are only required to notify affected individuals when the information compromised by the Data Breach is information owned or licensed by the Berkley Group (*e.g.*, where the Berkley Group stores Personal Information collected from employees or other natural persons directly in the course of business). Where a Berkley company maintains, but does not own or license, Personal Information affected by a Data Breach, it may be required to notify the business that does own or license the information, and that business may in turn be required to notify the affected individuals (*e.g.*, where the Berkley company stores, processes, or uses Personal Information provided by an agent or broker).

Where the information affected is owned or licensed by another business, contractual obligations to that business should also be carefully reviewed, as contracts may impose additional notice or other obligations or requirements. In the most likely scenario, where the Chief Compliance Officer determines that notification to a business is required, notification shall proceed in accordance with the framework in Section VII of this Policy. Where the Chief Compliance Officer determines that notification to individuals is required, notification shall proceed in accordance with the framework in Section VIII of this Policy. In certain limited circumstances (typically arising from contractual obligations to third parties), should the Chief Compliance officer determine that notification must be given to another third party, notification shall proceed in accordance with the framework in Section IX of this Policy.

Carlson v. BAH
Page 001158

Data Breach Notification Policy
W. R. Berkley Corporation

## VII.    Notification to Businesses

Where the Chief Compliance Officer determines that notification to a business is required because of state Data Breach laws or contractual obligations, he should notify and work with the rest of the IRT as necessary to ensure that the affected business or businesses are notified by the applicable Berkley companies as soon as possible and in accordance with applicable state law and/or contractual requirements.

When providing notice to businesses, the IRT should also review and be familiar with the notification requirements and standards for individuals, discussed in Section VIII of this Policy. Although Berkley companies may not be required to notify individuals in these circumstances, the businesses to which the Berkley companies provide notice of the Data Breach likely will have this responsibility. Whenever possible, the Berkley companies should ensure that the businesses it notifies are aware of and in compliance with their respective notification requirements and should receive regular notices from such businesses of steps being undertaken to notify affected individuals or applicable local, state or federal authorities.

### A.    Standards for Notifying Businesses

The manner, content, and timing of delivery of notices to businesses should be in accordance with applicable law, under the standards summarized below. Where contractual obligations impose additional notice obligations or higher standards for notification than the law, notice should proceed in accordance with these contractual requirements. In no circumstances, however, should notification proceed in any way that violates the law. Should contractual obligations impose a duty to notify individuals, such notification should proceed in accordance with the framework in Section VIII of this Policy.

The Berkley companies will delay providing required notice to the affected businesses or individuals *only* if the appropriate law enforcement agency with jurisdiction over the matter, having determined that notification will interfere with a criminal investigation, provides the Berkley companies with a written request for the delay. If such a request is received orally, the Chief Compliance Officer shall request a written confirmation from the requesting agency or document the oral request if no written confirmation is received. In instances where providing a required notice is delayed at the request of law enforcement, the Berkley companies will provide the notice as soon as doing so will no longer interfere with the investigation.

#### 1.    Affected Businesses

If the Chief Compliance Officer, based on findings of the breach investigation, can determine which Personal Information has been improperly accessed and misused or is reasonably likely to be misused, notification may be limited to those businesses that own or license the impacted information.

Data Breach Notification Policy
W. R. Berkley Corporation

However, if the Chief Compliance Officer determines that a group of files has been accessed improperly, but is unable to identify what specific data has been accessed, and the circumstances of the unauthorized access lead the Chief Compliance Officer to determine that misuse of the information is reasonably possible, all businesses that own or license information stored in the affected group should be notified.

### 2.    Content of Notice

Notice to affected businesses should be given in a clear and direct manner. The notice should describe in general terms the incident, the information that was, or may have been, accessed, and the steps the Berkley companies have taken to protect the information from further unauthorized access. The notice should also specify a time that the Berkley companies will follow up, and should include a contact name and phone number for questions. A sample script of talking points for notifying businesses by phone is attached as **Exhibit F** (for illustrative purposes only). A sample notification letter for businesses is attached as **Exhibit G** (for illustrative purposes only).

### 3.    Manner of Delivery

Notifications to businesses shall be delivered in a manner such that businesses can reasonably be expected to receive them. The IRT should determine the appropriate medium for delivery of the notice to each affected business (*e.g.*, by mail, by e-mail) upon consideration of the circumstances. Factors to consider include the type of relationship between the Berkley companies and the business, whether a particular medium or level of formality has generally been used in communications with the business, the relative urgency of the situation, and the total number of businesses that must be notified.

### B.    Notice to Government Authorities

When notice obligations are to businesses rather than individuals, state Data Breach laws generally do not require notification to government authorities, with one exception discussed in Part 1 below. Notification to government agencies and law enforcement may, however, be advisable in certain circumstances to maintain good regulatory relationships, even it is not required. Regulators would prefer not to find out information about regulated entities from the news media.

### 1.    Notice to State Government Agencies

At least one state (Connecticut) may require notification to state insurance authorities in conjunction with required notification to businesses following a Data Breach. *See* Connecticut Insurance Department Bulletin IC-25, attached in full as **Exhibit H.** The Chief Compliance Officer should determine whether, under the circumstances, notification to the Connecticut Insurance Department is required. A sample letter to a state agency is attached as **Exhibit I** (for illustrative purposes only).

Even where it is not required, the IRT should determine whether, under the circumstances, notice to state insurance regulators should be provided. In making this determination, the IRT should consider the potential benefits of informing the relevant state insurance regulatory authorities, as well as the potential costs and drawbacks of providing such notice.

60

Data Breach Notification Policy
W. R. Berkley Corporation

### 2.   Notice to Law Enforcement

Incidents involving unauthorized access to or use of Personal Information that involve criminal violations requiring immediate attention (for example, an unauthorized employee copies or downloads Personal Information with the intent to sell and/or misuse it) should be reported to law enforcement in an expeditious manner, including, in appropriate cases, by telephone. In other cases, a letter to law enforcement should be sent. A sample letter to law enforcement is attached as **Exhibit J** (for illustrative purposes only). In particular, the notice should require that, if giving notice to businesses would impede the criminal investigation, the Berkley companies be informed as soon as possible when it can notify the affected businesses without impeding such investigation.

Appropriate law enforcement contacts to notify of Data Breach incidents that may involve illegal activities shall be identified. Such agencies may include the Regional High-tech Crimes Task Forces, the Federal Bureau of Investigation, the U.S. Secret Service, and the local police or sheriff's department.

## VIII.  Notification to Individuals

Where the Chief Compliance Officer determines that notification to individuals is required, the Chief Compliance Officer will notify and work with the rest of the IRT as necessary to ensure that the affected individuals are notified as soon as possible and in accordance with applicable state law. A table summarizing state law requirements for notification of individuals is attached as **Exhibit E.**

### A.   Standards for Notifying Individuals

The manner, content, and timing of delivery of notices to individuals should be in accordance with applicable law, under the standards summarized below.

The Berkley companies will delay providing required notice to the affected businesses or individuals *only* if the appropriate law enforcement agency with jurisdiction over the matter, having determined that notification will interfere with a criminal investigation, provides the Berkley companies with a written request for the delay. If such a request is received orally, the Chief Compliance Officer shall request a written confirmation from the requesting agency or document the oral request if no written confirmation is received. In instances where providing required notice is delayed at the request of law enforcement, the Berkley companies will provide the notice as soon as doing so will no longer interfere with the investigation.

### 1.   Affected Individuals

If the Chief Compliance Officer, based on findings of the breach investigation, can determine which Personal Information has been improperly accessed and misused or is reasonably likely to be misused, notification may be limited to those impacted individuals.

Data Breach Notification Policy
W. R. Berkley Corporation

However, if the Chief Compliance Officer determines that a group of files has been accessed improperly, but is unable to identify which specific Personal Information has been accessed, and the circumstances of the unauthorized access lead the Chief Compliance Officer to determine that misuse of the information is reasonably possible, all individuals whose Personal Information was included in the affected group should be notified.

## 2.     Content of Notice

Notice should be given in a clear and conspicuous manner. The notice should describe the incident in general terms and the type of Personal Information that was the subject of unauthorized access or use. It also should generally describe the steps the Berkley companies have taken to protect the individuals' information from further unauthorized access. In addition, it should include a telephone number that affected persons can call for further information and assistance. The notice should include a reminder to remain vigilant over the next twelve to twenty-four months, and to promptly report incidents of suspected identity theft to credit reporting agencies. A sample notice is attached hereto as **Exhibit K** (for illustrative purposes only). This sample will require modifications to comply with certain state laws.

The notice should include the following additional items, when appropriate:

- A recommendation that the individual review account statements and immediately report any suspicious activity to the Berkley companies;

- A description of fraud alerts and an explanation of how an individual may place a fraud alert on his consumer reports to put creditors on notice that he may be a victim of fraud;

- A recommendation that the individual periodically obtain credit reports from each nationwide credit reporting agency and have information relating to fraudulent transactions deleted;

- An explanation of how to obtain a credit report free of charge; and

- Information about the availability of the FTC's online guidance regarding steps a consumer can take to protect against identity theft. The notice should encourage the individual to report any incidents of identity theft to the FTC, and should provide the FTC's website address and toll-free telephone number that consumers may use to obtain the identity theft guidance and report suspected incidents of identity theft.

## 3.     Manner of Delivery

Notices to individuals shall be delivered in a manner designed to ensure that the individuals can reasonably be expected to receive them. For example, based on the facts and circumstances, the Berkley companies may choose to contact all persons affected by mail, or by electronic mail for those individuals for whom it has a valid e-mail address and who have agreed to receive communications electronically.

62

Data Breach Notification Policy
W. R. Berkley Corporation

### B.     Notice to Government Authorities and Credit Reporting Agencies

Where individuals are notified of a Data Breach, state law may also require notification to government authorities, such as certain state agencies or law enforcement, and/or credit reporting agencies. When required, the manner, content, and timing of delivery of such notices should be in accordance with applicable law, under the standards summarized below. The table in **Exhibit E** includes a summary of state law requirements for notification to state authorities and credit reporting agencies.

#### 1.     Notice to State Government Agencies

As described above, in addition to notifying individuals affected, several state laws require notice to a designated state regulator. A sample notice letter is attached as **Exhibit I** (for illustrative purposes only).

#### 2.     Notice to Law Enforcement

Incidents involving unauthorized access to or use of Personal Information that involve criminal violations requiring immediate attention should be reported to law enforcement in an expeditious manner, including, in appropriate cases, by telephone. In other cases, a letter to law enforcement should be sent. A sample letter to law enforcement is attached as **Exhibit J** (for illustrative purposes only). In particular, the notice should require that, if giving notice to individuals would impede the criminal investigation, the Berkley companies be informed as soon as possible when it can notify the affected persons without impeding such investigation.

Appropriate law enforcement contacts to notify of Data Breach incidents that may involve illegal activities shall be identified. Such agencies may include the individuals' Regional High-tech Crimes Task Forces, the Federal Bureau of Investigation, the U.S. Secret Service, and the local police or sheriff's department.

#### 3.     Notice to Credit Reporting Agencies

##### a.     Notice by the Berkley Companies

Where a Data Breach involves the Personal Information of a large number of individuals, state law may require the Berkley companies to contact credit reporting agencies before sending out notices. Notifying credit reporting agencies of the Data Breach while preparing to give notice ensures that the large influx of calls to such agencies from affected individuals will not result in an unreasonable delay in the notice process.

In instances where a large number of individuals are to receive notice that includes contact information of the three nationwide consumer reporting agencies, Equifax, Experian and TransUnion, the Chief Compliance Officer shall determine whether it is appropriate to provide the consumer reporting agencies with advance notice. The contact information for these credit reporting agencies is included in **Exhibit K** (for illustrative purposes only).

63

Data Breach Notification Policy
W. R. Berkley Corporation

### b.    Notice by Individuals

The Fair Credit Reporting Act permits consumers to place alerts on their credit files under certain circumstances. Individuals have the right to ask that nationwide consumer credit reporting agencies place "fraud alerts" or extended alerts in their file to let potential creditors and others know that they may be a victim of a security breach. State laws may provide consumers with additional rights.

### c.    Fraud Alert

A fraud alert can be placed by calling one of the three nationwide consumer credit reporting agencies, Equifax, Experian and TransUnion. As soon as that agency processes the fraud alert, it will notify the other two, who then also must place fraud alerts in the concerned file(s). **Exhibit K** includes contact information for these credit agencies (for illustrative purposes only). An *initial fraud alert* stays in an individual's file for at least 90 days. A consumer credit reporting agency will require the individual to provide appropriate proof of identity, which may include Social Security number.

### d.    Extended Alert

An extended alert can only be included in a credit file if the individual provides a copy of an identity theft report filed with a federal, state, or local law enforcement agency. Identity theft occurs when someone uses an individual's Personal Information without his permission to commit fraud or other crimes. An *extended alert* stays in the individual's file for seven years. An *identity theft report* includes a copy of a report filed with a federal, state, or local law enforcement agency.

### e.    Freeze

A number of states permit residents to effectively freeze access to their credit files under certain circumstances. Whether an individual is eligible to take such action will depend upon applicable state law.

## IX.    Notice to Third Parties

In some circumstances, the Berkley companies may have a contractual or legal obligation to notify another third party. The Chief Compliance Officer shall make the determination as to whether such notice is required, keeping in mind that many confidentiality and service provider agreements are broadly drafted to require notice in the event of any breach or suspected Data Breach involving data provided in the course of dealing or Personal Information. If a determination is made to provide notification to such third parties, the type and form of notification should be consistent with the standards summarized in Section VII (Notification to Businesses) and Section VIII (Notification to Individuals) of this Policy.

## X.    Preservation of Evidence Following a Data Breach

When a Data Breach has occurred, the Chief Compliance Officer will determine appropriate measures to preserve evidence relating to the incident. Such measures may include:

Carlson v. BAH
Page 001164

Data Breach Notification Policy
W. R. Berkley Corporation

- Documenting the various actions taken (*e.g.*, phone calls made, files modified, system jobs that are stopped, etc.); and

- Making copies of files that may have been left or touched by intruders (*e.g.*, malicious code, log files, etc.) and storing them off-line.

The Berkley companies will maintain all records obtained or generated in reporting, investigating, and remediating a Data Breach for a reasonable period of time after the incident in accordance with the applicable Record Retention Policy. A retention period may also be required by applicable laws, regulations, and/or policies, or, for a particular incident, may be specified by an applicable regulatory or law enforcement agency. For example, under New Jersey law (N.J. Stat. § 56:8-163a.), any determination of Data Breach "shall be documented in writing and retained for five years." Such records will be maintained by the Berkley companies in a secure location.

## XI.   Post-Incident Review

Once the investigation and remediation of the incident has been completed, the IRT, in consultation with the investigative team, shall review the technological and physical safeguards and information security policies in place at the time of the breach to determine whether any improvements should be made. If this review reveals areas with room for improvement, corrective actions to consider include: changes to written or stated policies, principles, or procedures; employee training initiatives; implementation of new technology or changes to existing technology; and changes to vendor relationships, contracts, or processes.

## XII.   Change History

All revisions to this Policy should be recorded in the space below. All official versions of this document should be retained for a reasonable period of time, in accordance with applicable Record Retention Policy.

| Date | Name | Summary of Changes |
|------|------|--------------------|
|      |      |                    |
|      |      |                    |
|      |      |                    |
|      |      |                    |

## XIII.   Next Scheduled Review Date

This Policy should be reviewed periodically and in no event later than: (a) every two years from the date of the last revision (per Section XII hereof); or (b) six months after a Data Breach incident, whichever is earlier.

65

Data Breach Notification Policy
W. R. Berkley Corporation

## Exhibit A – Security Breach Incident Report

Part A (*to be completed by operating unit IT Department or other reporter*)

Report Date _____ (mm/dd/yy)

Incident Date _____ (mm/dd/yy)  Time _____ AM / PM  Time Zone _____

Reported by _____

Primary contact at entity _____

Reported to _____

Business Unit _____

Business Unit Location (city/state/country) _____

Location of Incident _____

Describe the Incident / Potential Exposure _____

_____

_____

_____

_____

_____

Immediate Action Taken _____

_____

Part B (*to be completed by operating unit IT Department or BTS Information Security*)

Assess Initial Company Risk Assessment (circle one) High    Med    Low

Assess Initial Impact Assessment (circle one) High    Med    Low

Explain _____

_____

_____

Has Compromise been contained? (Circle one)  Yes    No

Explain _____

_____

Nature of Breach (data, property, network, etc.) _____

_____

66

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit B – Contact List**

| ROLE | NAME | TITLE | CONTACT INFORMATION |
|------|------|-------|---------------------|
| **Subject Matter Expert** | Mike Sciole | Executive Vice President, Berkley Technology Services | (203) 542-3208<br>msciole@wrberkley.com |
| **Chief Compliance Officer** | Scott Mansolillo | Vice President – Chief Compliance Officer, W. R. Berkley Corporation | (203) 629-3039<br>smansolillo@wrberkley.com |
| **Public Relations** | Karen Horvath | Vice President – External Financial Communications, W. R. Berkley Corporation | (203) 629-3040<br>khorvath@wrberkley.com |

67

Data Breach Notification Policy
W. R. Berkley Corporation

### Exhibit C – Sample FAQs for Businesses in Event of Server Breach

**FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS
AND CIRCUMSTANCES – ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE
TERMS OF THE DATA BREACH NOTIFICATION POLICY**

**Question 1.** What was the incident that leads to unauthorized access of Berkley's servers?

**Question 2.** When did Berkley learn of this?

**Question 3.** Was Berkley's internal networked accessed?

**Question 4.** Was confidential information accessed?

**Question 5.** What steps have been taken to prevent further unauthorized access or use?

**Question 6.** How will a client know if its customer information was compromised?
*Suggested Response:* Berkley suggests that its clients be vigilant and monitor customer information for any unusual or suspicious activity.

**Question 7.** What assistance will Berkley provide if customer information was compromised?
*Suggested Response:* Berkley will work closely with its clients as it investigates this issue. Berkley will provide any information about the status and findings of the investigation as becomes necessary and relevant.

**Question 8.** How and when is Berkley notifying affected clients?

**Question 9.** How do I know whether or not a client has been affected?

**Question 10.** Is law enforcement involved in the investigation?

**Question 11.** Is Berkley required to report this to authorities?

**Question 12.** Does Berkley have policies or procedures in place that could have prevented this?
*Suggested Response:* Berkley respects the privacy and integrity of data, with longstanding policies, processes, and tools in place to ensure the protection of customer data       and       other confidential information. Berkley was following all of the policies it currently has in place when this incident occurred, and will look to this situation to determine if further procedures need to be implemented.

**Question 13.** What is Berkley doing to ensure that this does not happen again?
*Suggested Response:* Berkley is working to investigate potential causes of the Data Breach and to develop safeguards to prevent similar incidents from occurring in the future. Berkley is also evaluating its current policies and procedures and will make any necessary changes or updates.

Carlson v. BAH
Page 001168

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit D – Sample FAQs for Individuals in Event of**
**Exposure of Social Security Number**

**FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS**
**AND CIRCUMSTANCES - ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE**
**TERMS OF THE DATA BREACH NOTIFICATION POLICY**

**Questions 1-11: General Questions**

**Question 1.** What was the incident that leads to unauthorized access or use of my information?

**Question 2.** What information about me was, or may have been, compromised?

**Question 3.** What steps have been taken to prevent further unauthorized access or use?

**Question 4.** Is law enforcement involved in the investigation?

**Question 5.** How soon after you learned about the incident did you notify me?

**Question 6.** How will I know if my identity has been stolen?

**Question 7.** I believe my identity may have been stolen, what should I do?

**Question 8.** I'm already a victim of identity theft. What is your company going to do to reimburse me for my losses?

**Question 9.** What if I find out that my identity is stolen as a result of this incident; will your company reimburse me for my losses? What assistance will your company provide if my identity is stolen?

**Question 10.** Did the information about me that was compromised include my credit card numbers(s)?

**Questions 11-18: Include if credit monitoring offered**

**Question 11.** What is credit monitoring?

**Question 12.** What good will credit monitoring do?

**Question 13.** What is involved to enroll in credit monitoring?

**Question 14.** How long will it take until I begin receiving credit monitoring notices?

**Question 15.** Do I need to enroll in the credit monitoring service if I have contacted the credit bureaus and placed a fraud alert on my file?

**Question 16.** If I enroll in credit monitoring, do I still need to contact the credit bureaus to place a fraud alert on my file?

**Question 17.** If I place a fraud alert on my file, will this affect my credit? If so, how?

**Question 18.** What is a "freeze" on my file?

69

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit E – Table: Data Breach Notification Requirements by State**

70

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit F – Sample Talking Points for Notifying Business
of Potential Data Breach by Phone**

**FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS
AND CIRCUMSTANCES - ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE
TERMS OF THE DATA BREACH NOTIFICATION POLICY**

- I am calling to let you know about a situation we recently became aware of regarding a Data Breach.

- On [Date] we were notified of a breach. [Describe breach and how Berkley became aware of incident. Describe corrective actions taken.]

- Over the last [time period since breach], with the assistance of our IT group, we have been conducting a thorough investigation of the incident. Although that investigation is ongoing, it appears that [describe current findings of investigation.]

- *If applicable:* Most importantly, at this time there is no indication that any of your policyholder PII (Personally Identifiable Information) was accessed or compromised, so we expect no impact for [Company Name] or for your customers. Further, we have confirmed that no part of our internal network has been accessed or compromised.

- Because of the importance of our relationship and the trust you put in us, I wanted to personally reach out to you to brief you on this situation, provide the initial results of our investigation, and reinforce how seriously we take data security.

- Unfortunately, incidents such as this continue to confront data driven businesses such as ours. However, we will consistently review and upgrade our processes, procedures and systems in our commitment to enhancing our defenses against such attacks.

- We expect to finish up our investigation in the coming days, and I will be back in contact to update you on our findings and the steps we are taking going forward. In the interim should you or anyone at [Company Name] have any questions or concerns please let me know.

- *If applicable:* Given that there is an active investigation by law enforcement ongoing, I hope you will treat this information as confidential between our companies.

- I want to thank you for your understanding and support.

71

Data Breach Notification Policy
W. R. Berkley Corporation

### Exhibit G – Sample Letter Notifying Business of Potential Breach

### FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS AND CIRCUMSTANCES – ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE TERMS OF THE DATA BREACH NOTIFICATION POLICY

Date

Business Name
Address

RE:     [W. R. Berkley Corporation/Operating Unit
        Account #/ Policy #/ Customer #]

Dear [Business Name]:

I am writing to let you know about a situation we recently became aware of regarding [server, website, network, etc. that was subject of breach].

On [Date], we were notified by [appropriate party] that they had detected a breach of our [server, website, network, etc. subject of breach]. We immediately [describe corrective actions taken].

Over the last [time period since breach occurred], with the assistance of our IT group [also list additional experts or outside consultants brought in]; we have been conducting a thorough investigation of the incident. While that investigation is ongoing, it appears that [describe current findings of investigation].

*If applicable:* Most importantly, at this time there is no indication that any of your policyholder PII (Personally Identifiable Information) was accessed or compromised so we expect no impact for [Company Name] or your customers. Further, we have confirmed that no part of our internal network has been accessed or compromised.

Because of the importance of our relationship and the trust you put in us, I wanted to inform you now about this situation, provide the initial results of our investigation and reinforce how seriously the Berkley companies treat data security. Unfortunately, incidents such as this continue to confront data driven businesses such as ours. However, we will consistently review and upgrade our processes, procedures and systems in our commitment to enhancing our defenses against such attacks.

We expect to finish up our investigation in the coming days and I will be back in contact to update you on our findings and the steps we are taking going forward. In the interim, should you or anyone at [Company Name] have any questions or concerns, please let me know.

*If applicable:* Given that an active investigation by law enforcement is ongoing, I hope you will treat this information as confidential between our companies.

Thank you for your understanding and support.

Yours sincerely,

72

Data Breach Notification Policy
W. R. Berkley Corporation


[Contact Name]
[Position]

**Exhibit H – State of Connecticut Insurance Department, Bulletin IC-25**

(begins next page)

73

Data Breach Notification Policy
W. R. Berkley Corporation



# STATE OF CONNECTICUT
### *INSURANCE DEPARTMENT*

**BULLETIN IC - 25**
August 18, 2010

TO:    All Regulated Entities in Connecticut, including, Insurance Producers,
Public Adjusters, Bail Bond Agents, Appraisers, Certified Insurance Consultants, Casualty Claim Adjusters, Property and Casualty Insurers, Life and Health Insurers, Health Care Centers, Fraternal Benefit Societies, Captive Insurers, Utilization Review Companies, Risk Retention Groups, Surplus Line Companies, Life Settlement Companies, Preferred Provider Networks, Pharmacy Benefit Managers, and Medical Discount Plans

RE:    Information Security Incidents

In order to assure that Connecticut consumers are fully protected **and** informed in the event of any information security incident, as defined below, that could pose a potential risk to the privacy of an individual's personal health and/or financial information, the Connecticut Insurance Department ("Department") is requiring that all licensees and registrants **of the Department notify the Department of any** information security incident which affects any Connecticut residents as soon as the incident is identified, but no later than five (5) calendar days after the incident is identified. Notification should be sent to the Insurance Commissioner ("Commissioner") in writing via first class mail, overnight delivery service or electronic **mail.**

The Department understands and even expects that with the overwhelming amount of information obtained and maintained by all businesses that there will be at times information security incidents which are beyond the control of the best management practices. The Department's concern is to make certain that in addition to minimizing these incidents, licensees and registrants react quickly and affirmatively to let affected Connecticut consumers know that they may be at risk and what is being done to protect sensitive and confidential information. The Department also wants to make sure that there is an opportunity for the Department to actively monitor the situation and guarantee those consumer protections throughout the process.

## AUTHORITY TO COMPEL NOTIFICATION

The authority to compel this notification to the Department is provided to the Commissioner under Conn. Gen. Stat. §38a-8 **which** provides the Commissioner with "all powers specifically granted, and all further powers that are reasonable and necessary to enable the commissioner to protect the public interest" in accordance with the duties imposed on the Commissioner by the insurance statutes. To maintain licenses to do business **in** Connecticut, insurers and health care centers are required to exhibit evidence of good management as required by Conn. Gen. Stat. §38a-41. The other licensee and registrant entities have similar requirements to do business in Connecticut. In addition,

------------------------------------------------------------

Relevant Conn. Gen. Stat. §§: 38a-465- Life Settlement Brokers and Life Settlement Companies; 38a-479aa — Preferred Provider Network; 38a-479rr — Medical Discount Plans; 38a-702b — Producers; 38a-660 — Bail Bond agents; 38a-769 -Public Adjuster, Casualty Adjuster, Motor Vehicle Physical Damage Appraiser, Certified Insurance Consultant. Surplus

www.cl.govlcid

Carlson v. BAH
Page 001174

Data Breach Notification Policy
W. R. Berkley Corporation

P.O. Box 816 • Hartford, CT 06142-0816 An Equal
Opportunity Employer

Bulletin IC-25
Information Security Incidents August 18, 2010
Page 2

Conn. Gen. Stat. §38a-478o requires that each managed care organization shall conform to all applicable state and federal antidiscrimination and confidentiality statutes, shall ensure that the confidentiality of specified enrollee patient information and records in its custody is protected, and shall have written confidentiality policies and procedures and sections 38a-8-124 through 38a-126, inclusive, of the Regulations of Connecticut State Agencies provides requirements for safeguarding customer financial information.

In addition to the authority of the Commissioner under the insurance laws, the Commissioner has been given additional authority to protect the personal information of insurance consumers pursuant to the relevant portions of Conn. Gen. Stat. §42-471:

(a) Any person in possession of personal information of another person shall safeguard the data, computer files and documents containing the information from misuse by third parties, and shall destroy, erase or make unreadable such data, computer files and documents prior to disposal.

(c) As used in this section, "personal information" means information capable of being associated with a particular individual through one or more identifiers, including, but not limited to, a Social Security number, a driver's license number, a state identification card number, an account number, a credit or debit card number, a passport number, an alien registration number or a health insurance identification number, and does not include publicly available information that is lawfully made available to the general public from federal, state or local government records or widely distributed media.

(d) For persons who hold a license, registration or certificate issued by a state agency other than the Department of Consumer Protection, this section shall be enforceable only by such other state agency pursuant to such other state agency's existing statutory and regulatory authority.

**INFORMATION SECURITY INCIDENT DEFINED**

The Department considers an information security incident to be any unauthorized acquisition or transfer of, or access to, personal health, financial, or personal information, whether or not encrypted, of a Connecticut insured, member, subscriber, policyholder or provider, in whatever form the information is collected, used or stored, which is obtained or maintained by a licensee or registrant of the Insurance Department, the loss of which could compromise or put at risk the personal, financial, or physical well-being of the affected insured's, members, subscribers, policyholders or providers.

**NOTIFICATION PROCEDURES**

Any information security incident which affects any Connecticut resident must be reported in writing to the Commissioner as soon as the incident is identified, but not later than five

---

75

Data Breach Notification Policy
W. R. Berkley Corporation

Lines Broker or any insurance-related occupation for which a license is deemed necessary by the commissioner, other than an occupation as an insurance producer; 38a-603 and 620 — fraternal societies may not operate in a manner which is hazardous to its members, creditors or public; Conn. Agencies Regs. § 38a-740-4(h) — standards for eligible surplus lines insurers.

Bulletin IC-25
Information Security Incidents August 18, 2010
Page 2

(5) calendar days after the incident are identified. Notification should include as much the following as is known:

- Date of the incident
- Description of incident (how information was lost, stolen, breached)
- How discovered
- Has lost, stolen, or breached information been recovered and if so, how
- Have individuals involved in the incident (both internal and external) been identified
- Has a police report been filed
- Type of information lost, stolen, or breached (equipment, paper, electronic, claims, applications, underwriting forms, medical records etc)
- Was information encrypted
- Lost, stolen or breached information covers what period of time
- How many Connecticut residents affected
- Results of any internal review identifying either a lapse in internal procedures or confirmation that all procedures were followed
- Identification of remedial efforts being undertaken to cure the situation which permitted the information security incident to occur.
- Copies of the licensee/registrants Privacy Policies and Data Breach Policy.
- Regulated entity contact person for the Department to contact regarding the incident. (This should be someone who is both familiar with the details and able to authorize actions for the licensee or registrant)
- Other regulatory or law enforcement agencies notified (who, when)

The Department will want to review, in draft form, any communications proposed to be made to affected insured's, members, subscribers, policyholders or providers advising them of the incident. Depending on the type of incident and information involved, the Department will also want to have discussions regarding the level of credit monitoring and insurance protection which the Department will require to be offered to affected consumers and for what period of time.

The Department Market Conduct Division has the responsibility for monitoring the activities associated with any information security incident and will contact the designated licensee or registrant contact for additional information as necessary and to set up a monitoring process. Because each incident is unique, each monitoring process will be unique.

**VENDORS / BUSINESS ASSOCIATES**

The Department also considers that an information security incident at or by a vendor or business associate of a licensee or registrant, which has the potential of affecting personal health, financial or personal information of a Connecticut insured, member, subscriber, policyholder or provider of a licensee or registrant should be reported by the licensee or registrant to the

76

Data Breach Notification Policy
W. R. Berkley Corporation

Department. The Department will want to be kept informed of how the licensee or registrant is managing the vendor's/business associate's activities and what protections and remedies are being put in place by the vendor/business associate for the Connecticut consumers.

**ADMINISTRATIVE ACTIONS**

Each incident will be evaluated on its own merits and depending on the circumstances, some situations may warrant imposition of administrative penalties by the Department. To minimize that potential, licenses and registrants are urged to follow these procedures.

Please contact the Insurance Department Market Conduct Division at cid. mcPct.gov with any questions.

Thomas R. Sullivan
Insurance Commissioner

77

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit I – Sample Letter to a State Agency**

**FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS
AND CIRCUMSTANCES – ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE
TERMS OF THE DATA BREACH NOTIFICATION POLICY**

Date

[State Agency Name]
[State Address]

RE:     Recent Unauthorized Disclosure of Consumer
        Personal Information

Dear [              ],

We write to provide you notice pursuant to [State Statute].

We have recently discovered_____

_____. [Describe incident, including the date and time the incident occurred, date and time the incident
was discovered, make/model, IP address (es), assigned name or other details of the affected technology,
computer(s) or systems, and how Berkley became aware of it.  Describe information targeted (whether or not
directly related to compromising individuals' Personal Information), and corrective actions taken.]

We notified our [businesses/individuals/third parties] of this incident as expeditiously as possible by
[phone/email/writing to them at their last known addresses].  By such communication, a sample of which
is attached hereto as <u>Exhibit A</u>, we informed our affected [clients/employees/other] of: (i) the details of
this security incident; (ii) the actions we are taking; and (iii) a toll-free number to call with inquiries.  *[If
applicable, also include:* (iv) steps they can take to protect against identity theft, including specific
guidance on monitoring their credit reports.]

We thank you for your time and consideration of this matter.  If you have any questions, please contact
me at _____.

Yours sincerely,

[Contact Name]
[Position]

78

Data Breach Notification Policy
W. R. Berkley Corporation

**Exhibit J – Sample Letter to Law Enforcement**

**FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS
AND CIRCUMSTANCES - ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE
TERMS OF THE DATA BREACH NOTIFICATION POLICY**

Date

[High-tech Crimes Task Force/Federal Bureau of Investigation/U.S. Secret Service/Local Police or
Sheriff's Department]
Address

RE:     [W. R. Berkley Corporation/Operating Unit]
        Account(s) #:  _____


Dear [          ],

We have recently discovered _____
_____
_____. [Describe incident, including the date and time the incident occurred, date and time the
incident was discovered, make/model of the affected computer(s), IP address (es) of the affected
computer(s), assigned name of the affected computer(s), and how Berkley became aware of it. Describe
information targeted (whether or not directly related to compromising individuals' Personal Information), and
corrective actions taken.]

Our investigation has revealed that some of [individuals' names personal information OR businesses'
names information, including elements of personal information], including _____ may
have been viewed/improperly accessed by a third party.

Please take note of our intention to notify the above-mentioned affected [businesses/individuals] within
ten (10) business days. Please contact us within that time period if giving notice to such parties would
impede your criminal investigation. If so, we will put a hold on sending out notices.

If that is the case, please also inform us as soon as your investigation is complete, so that we can notify
those affected immediately after.


Yours sincerely,

[Contact Name]
[Position]

79

Data Breach Notification Policy
W. R. Berkley Corporation

## Exhibit K – Sample Breach Notification Letter to Individual

## FOR ILLUSTRATIVE PURPOSES ONLY – TO BE REVISED AS REQUIRED UNDER FACTS AND CIRCUMSTANCES - ONLY TO BE USED BY IRT IN ACCORDANCE WITH THE TERMS OF THE DATA BREACH NOTIFICATION POLICY

Date

Name
Address

RE:    [W. R. Berkley Corporation/Operating Unit
        Account #/ Policy #/ Customer #]

Dear [Name]:

We    have    recently    discovered    _____

_____. [Describe incident, how Berkley became aware of it, information targeted (whether or not directly related to compromising individuals' Personal Information), and corrective actions taken.]

Our investigation has revealed that some of your personal information, including your _____ _____ may have been viewed/improperly accessed by a third party. [W. R. Berkley Corporation/Operating Unit] is monitoring your account for any unusual activity and will continue to do so. To that end, we strongly recommend that you take the following precautionary measures to ensure the integrity of your personal information:

(1) Notify your bank and credit card companies of your receipt of this letter.

(2) Carefully review your account statements over the next 12-24 months and report any unusual or unauthorized activity to [W. R. Berkley Corporation/Operating Unit].

(3) Order a copy of your credit report from the three (3) nationwide credit reporting agencies every 3-4 months over the next year. The agencies are:

        **Equifax:** 1-800-525-6285; www.equifax.com

        **Experian:** 1-888-EXPERIAN; www.experian.com

        **TransUnion:** 1-800-680-7289, www.transunion.com

OPTIONAL – [W. R. Berkley Corporation/Operating Unit] will reimburse you in full for all credit reports you request from any of these three agencies over the next year. Please submit copies of bills to:

    [Contact Name]
    [Position]
    [Address for Submission]

Data Breach Notification Policy
W. R. Berkley Corporation

When you receive your credit reports, please review them carefully. Reviewing your report frequently for inaccuracies is one way to prevent identity theft. Look for inquiries you did not initiate, accounts you did not open and unexplained debts or delinquencies on the accounts you opened. If there are accounts or charges you did not authorize, immediately notify the appropriate credit bureau by telephone and in writing.

You also should check to see that information, such as your most recent address (es), first and last names and middle initial are correct. Errors in this information are often warning signs of identity theft. You should notify the credit bureaus of all inaccuracies as soon as possible so that the information can be investigated.

You may wish to contact the fraud departments of one of the three major credit bureaus to place a fraud alert on your credit file. The fraud alert requests that creditors contact you before opening any new accounts or making any changes to your existing accounts. As soon as one credit bureau confirms your fraud alert, the other two credit bureaus will be automatically notified to place fraud alerts, and all of these credit reports will be sent to you free of charge.

Visit the Federal Trade Commission's ("FTC") website (www.ftc.gov), which contains a link to useful information concerning identity theft. You can also contact the FTC at their toll-free number, 1-877-FTC-HELP (1-877-382-4357); TTY: 1-866-653-4261.

[Add any state-specific information here]

We take this matter very seriously and we sincerely apologize for any inconvenience this incident may have caused you.

If you have any questions or require assistance, please contact me [toll-free at 1-888-xxx-xxxx].


Yours sincerely,



[Contact Name]
[Position]


81

**APPENDIX D – W. R. Berkley Corporation:  Social Media Policy**

At W. R. Berkley Corporation, we understand that social media can be a productive and rewarding way to communicate and share information.  However, it is important for employees to realize that use of social media also presents certain risks and carries with it certain responsibilities. The purpose of this policy is to assist you in making responsible decisions about your use of social media by creating these guidelines and recommended best practices regarding use of social media to the extent it may directly or indirectly impact the Company.

This policy applies to all employees (full- and part-time) of, and consultants, independent contractors, interns and temporary workers for, W. R. Berkley Corporation and its member companies around the world (the "Company").

GUIDELINES

In the rapidly expanding world of electronic communication, social media can mean many things. Social media includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else's web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, whether or not associated or affiliated with the Company, as well as any other form of electronic communication.

The same principles and guidelines found in the Company's Code of Ethics and Business Conduct apply to your activities online. Ultimately, you are solely responsible for what you post online. Before creating online content, consider some of the risks that are involved. However, keep in mind that any conduct that adversely affects your job performance, the performance of fellow employees or otherwise adversely affects customers, business associates, people who work on behalf of the Company or the Company's legitimate business interests could potentially result in disciplinary action, up to and including termination.  Remember, even your personal use of social media can create situations that can damage your reputation, as well as the Company's.  In the event your personal use of social media negatively affects the Company, such usage will fall within the application of this policy.

Know and follow the rules

Carefully read these guidelines, the Company's Code of Ethics and Business Conduct, the Company's directives regarding discrimination, harassment, insider trading and outside inquiries and the Company's other policies and guidance and ensure your postings are consistent with them.  Inappropriate postings that may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct are not acceptable and may subject you to disciplinary action up to and including employment termination.

Post only appropriate and respectful content

•       Maintain the confidentiality of the Company's trade secrets and private or confidential information.  Trade secrets may include information regarding the development of systems, processes, products, know-how and technology.  Do not post or comment on internal reports, policies, procedures or other internal business-related confidential communications.

82

•      The Company operates in a highly-regulated industry. Ensure that your use of social media does not violate applicable laws, rules or regulations, especially when communicating with or about the Company's employees, business associates, including producers, brokers, agents and insured's. Common sense tells us that correspondence or dealings that are malicious, abusive or unlawful in other contexts should not under any circumstances take place on or through social media.

•      Respect financial disclosure laws. It is illegal to communicate or give a "tip" on inside information to others so that they may buy or sell stocks or securities. Do not post about important Company non-public business or financial results. Such online conduct may also violate the Company's prohibition on insider trading.

•      Do not create a link from your blog, website or other social networking site to a Company website or post without identifying yourself as an employee of the Company.

•      Express only your personal opinions. Never represent yourself as a spokesperson for the Company. If the Company is a subject of the content you are creating, be clear and open about the fact that you are an employee and make it clear that your views do not represent those of the Company, fellow employees, customers, business associates or people working on behalf of the Company. If you do publish a blog or post online related to the work you do or subjects associated with the Company, make it clear that you are not speaking on behalf of the Company. It is best to include a disclaimer such as "The postings on this site are my own and do not necessarily reflect the views of W. R. Berkley Corporation and its member companies."

•      Ensure that you regularly review and, if necessary, properly moderate discussions that take place on pages or profiles you maintain that reference your professional affiliation to the Company. Such discussions, including any information posted by others, will be subject to the terms of this Policy, including (but not limited to) the prohibition on posts that contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by law or Company policy.

Be respectful

Always be fair and courteous to fellow employees, customers and people who work on behalf of the Company. Also, keep in mind that you are more likely to resolve work-related complaints by speaking directly with your co-workers or with a supervisor or manager than by posting complaints to a social media outlet.

Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or audio that reasonably could be viewed as malicious, abusive, and threatening or intimidating, that disparage customers or fellow employees, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by law or Company policy. Nothing in this policy should be interpreted to limit your ability to engage in any legally protected activity under the National Labor Relations Act and similar laws.

Carlson v. BAH
Page 001183

Be honest and accurate

Make sure you are always honest and accurate when posting information or news, and if you make a mistake, correct it quickly. Be open about any previous posts you have altered. Remember that the Internet archives almost everything; therefore, even deleted postings can be searched. Never post any information or rumors that you know to be false about the Company, fellow employees, customers, business associates, vendors, and people working on behalf of the Company or competitors.

Using social media at work

Refrain from using social media while on work time or on equipment we provide, unless it is work-related as authorized by your manager or consistent with the Employee Handbook. You may not use your Company email addresses to register on social networks, blogs or other online tools. When your employment with the Company ends, be sure to update any social media sites/profiles where you have identified yourself as a W. R. Berkley employee to accurately reflect that you are no longer employed by the Company.

Retaliation is prohibited

The Company prohibits retaliation in any form against any employee for reporting a possible deviation from this policy or for cooperating in an investigation. Any employee who retaliates against another employee for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including employment termination.

Outside inquiries

Employees should not speak to the media or otherwise on the Company's behalf and should follow all directives from W. R. Berkley Corporation regarding outside inquiries as set forth in the Code of Ethics and Business Conduct and the Employee Handbook.

For more information

If you have questions or need further guidance, please contact your local Human Resources representative or the WRBC Legal Department.

LEGAL_US_W # 79438497.9

84

# Exhibit 9

<u>Berkley Accident & Health</u>
<u>2016 Sales Representative Compensation Formula Summary – Stop Loss</u>

## ANNUAL PRODUCTION YEAR: Effective dates between February 1 through following January 31

<u>I. New business Incentive Compensation</u>

   a. 2% on the first $400K on each case
   b. 1% on the next $600K on each case
   c. ½% on the next 1 million on each case
   d. ¼% on amounts over $2 million on each case
   e. Paid at 100% of earned premium at close of each quarter. See schedule in section VII.).

<u>II. Sales Goal Achievement Bonus – New Business Sales</u>

   a. Up to 25% more New Business Incentive compensation can be earned based on new sales in the annual production year.
   b. NOTE: This bonus is payable ONLY on the incentive compensation earned. Excludes salary. Formula: New business commission earned in production year X Achievement % = Bonus
   c. Subjective based on individual performance.
   d. Timing is the same as the profitability bonus.
   e. Percent of achievement bonus is payable on 100% of incentive commission earned on new business. Excludes profitability bonus. Excludes EmCap incentive compensation.
   f. Achievement Parameters:
      i. <80% Production Goal = Underperforming = No Bonus*
      ii. 80% to <100% Production Goal = Average = No Bonus
      iii. 100% to <110% Production Goal = Good = Up to 5% Bonus
      iv. 110% to <125% Production Goal = Excellent = Up to 10% Bonus
      v. >125% Production Goal = Extraordinary = Up to 25% Bonus
   g. *Underperforming representatives may be subject to management action plan

<u>III. Renewal business Incentive Compensation</u> (cases in their second and subsequent year)

   a. 1% on the first $400K on each case
   b. ½% on the next $600K on each case
   c. ¼ % on the next 1 million on each case
   d. 1/8 on amounts over $2 million on each case
   e. Paid at 100% of earned premium at close of each quarter.

<u>IV. Profitability Bonus – New Business and Renewal Business</u>

1

EXHIBIT
0009

CARLSON DEP. E

a. Eligibility: Profit bonus component applies at the beginning of the first full production year that sales representative is employed. Profit formula is based on production year pooled profitability for all new and renewal business as calculated in section VIII of this document.
b. Paid out at 100% on second May following the expiration of the last policy of that production year.
c. Amounts paid under this section will be treated as profit share payment for benefit purposes and **are therefore NOT benefit eligible**.
d. EmCap business is excluded.
e. Parameters
    i. 7.0% to <10.0% = Excellent = Bonus of up to 12.5% of earned commission
    ii. 10%+ = Outstanding = Bonus of up to 25% of earned commission

## V. Hamilton EmCap and EmCap Select Referral Compensation

a. All amounts paid out based on earned revenue at the close of each quarter.
b. For Hamilton EmCap:
    i. 3% of sales representative's earned revenue (retained excess plus fees) for the first twelve months of the employer's coverage.
    ii. 1.5% of sales representative's earned revenue (retained excess plus fees) after the first twelve months of the employer's coverage
    iii. All Hamilton EmCap compensation is paid at 50% of levels noted above until representative achieves 100% of ESL new business production goal in current production year.
    iv. Once representative achieves 100% of ESL new business production goal in current year, Hamilton EmCap compensation is paid at 100% for all new and renewal business sold in that production year.
    v. ESL representative will be paid out 1 years advance of earned compensation for Hamilton EmCap agency business that transitions to a Select Program
c. For EmCap Select Referrals to assigned EmCap Sales Managers: Up to 50% of available EmCap Compensation is payable to ESL representatives for the first two year of the program
    i. Determination of the final compensation amount is at the discretion of VP Sales
    ii. No more than 50% of available compensation will be paid.
    iii. ESL Representative must be part of initial lead generation, all subsequent meetings and communications, and the entire sales and renewal process.
    iv. EmCap Select Compensation Schedule (no more than 50% of the following schedule will be paid out to ESL representatives):
        A. 5% of earned revenue (retained excess and fees) on new business for the first 12 months
        B. 2.5% of earned revenue (retained excess and fees) on renewal business after the first 12 months.
        C. A $10,000 bonus is earned and paid when a Select program adds its fifth member. The 5th member must be added to the program within 13 months of program inception. Includes Hamilton accounts rolled into a Select Program.
        D. Hamilton EmCap accounts that roll into a Select Program after its inception will qualify for the Select Program renewal business compensation levels

2

E. Non East Isles Re program renewal business is subject to a reduction to 1% of earned revenue (retained excess plus fees) subject to the discretion by management after the 3 year of stop loss coverage

**VI. Salary:** $60,000. The salary is not a draw.

**VII. Payment Schedule Sample:**

| Type | Activity Period | Payment Date |
|---|---|---|
| Salary | Annual | Bi-weekly |
| Subsidy | To be determined | Bi-weekly |
| Advance | To be determined | Bi-weekly |
| I, III, and V New and Renewal Incentive | February to April | May 31 annually |
| I, III, and V New and Renewal Incentive | May to July | August 31 annually |
| I, III, and V New and Renewal Incentive | August to October | November 30 annually |
| I, III, and V New and Renewal Incentive | November to January | March 1annually |
| Sales Goal Achievement Bonus | February to January | May 15 annually |
| ICP Addendum A (those with direct reports) | February to January | May 15 annually |
| Profitability Bonus | February to January | Second May 15 |

**VIII. Underwriting Profitability Bonus Calculation**

**Underwriting Profit is equal to:**

1. Gross Written Premium (GWP), less
2. Premium adjustments or provisions for uncollected premium, less
3. Incurred losses (including IBNR as determined by the Company), less
4. Commissions and other brokerage, acquisition fees and expenses, less
5. Premium Taxes, less
6. Stop Loss Pooling [excess $500k of specific deductible] Charge equal to 2.5% of       GWP, less
7. Berkley A&H Administrative Charge equal to 10% of GWP

- For purposes of the calculation of Underwriting Profit, the minimum for incurred losses in item #3 above is 40%of GWP.
- The Plan Year runs from February 1, through January 31.
- The calculation of the Underwriting profit for a particular plan year will made and paid on the second May following the expiration of the last policy of that production year.
- Underwriting Profit is not impacted by Experience Rewards

**Profit Margin is equal to:**

- Underwriting Profit divided by Gross Premium

3

## IX. Other Considerations

a. Producer transitions: Regional Sales Manager that inherits a case due to Broker of Record change will not be paid incentive on the case until it has renewed under their BOR assignment. Regional Sales Manager that loses a case due to Broker of Record change to another Regional Sales Manager will be paid incentive on the case until the next renewal date.

b. New Business on Old Case: Additional business that is added to an existing account will qualify as new business for goal credit and compensation assuming the case required full underwriting review (more than 15% initial policy growth, signed disclosure, census/experience). The new business incentive will be paid on the additional business through the initial policy renewal date, at which time the entire policy will be payable at the renewal incentive level.

## X. Addendums

A. Addendum for Direct Reports (if applicable)
B. Addendum for Business Travel Accident Compensation

*This is a conceptual summary of the compensation plan for a prospective Stop Loss Sales Rep with Berkley Accident & Health. The Company may change the compensation plan at any time at its sole discretion. All payment accruals end at the employee's termination date – no payments extend beyond an employee's termination date.*

Carlson v. BAH
Page 001073

**Berkley Accident & Health**

**ESL and EmCap Regional Sales Manager – ICP Addendum B**

**Compensation Formula For Production of Business Travel Accident Sales**

**ANNUAL PRODUCTION YEAR: Effective dates between February 1 through following January 31**

I.     **New business Incentive Compensation**

| Annual Gross Premium Range | New |
|---|---|
| First $100,000 (per policy) | 6.00% |
| $100,001-$500,000 | 4.50% |
| $500,001-$1,000,000 | 2.00% |
| $1,000,001 and over | 1.00% |

II.     No renewal compensation available.

III.    Paid at 100% of earned premium at close of each quarter. See schedule in section VII of ICP Plan on estimated annual premium written(paid quarterly after quarter close).

# Exhibit 10

## Berkley Accident & Health
## 2017 Sales Manager Compensation Formula Summary – Stop Loss

## ANNUAL PRODUCTION YEAR: Effective dates between February 1 through following January 31

### I. New business Incentive Compensation

- a. 2% on the first $400K on each case
- b. 1% on the next $600K on each case
- c. ½% on the next 1 million on each case
- d. ¼% on amounts over $2 million on each case
- e. Paid at 100% of earned premium at close of each quarter.

### II. Sales Goal Achievement Bonus – New Business Sales

- a. Up to 25% more New Business Incentive compensation can be earned based on new sales in the annual production year.
- b. NOTE: This bonus is payable ONLY on the incentive compensation earned. Excludes salary. Formula: New business commission earned in production year X Achievement % = Bonus
- c. Subjective based on individual performance.
- d. Percent of achievement bonus is payable on 100% of incentive commission earned on new business. Excludes profitability bonus.
- e. Achievement Parameters:
    - i. <80% Production Goal = Underperforming = No Bonus*
    - ii. 80% to <100% Production Goal = Average = No Bonus
    - iii. 100% to <110% Production Goal = Good = Up to 5% Bonus
    - iv. 110% to <125% Production Goal = Excellent = Up to 10% Bonus
    - v. >125% Production Goal = Extraordinary = Up to 25% Bonus
- f. *Underperforming representatives may be subject to management action plan

### III. Renewal business Incentive Compensation (cases in their second and subsequent year)

- a. 1% on the first $400K on each case
- b. ½% on the next $600K on each case
- c. ¼ % on the next 1 million on each case
- d. 1/8% on amounts over $2 million on each case
- e. Paid at 100% of earned premium at close of each quarter.

### IV. Profitability Bonus – New Business and Renewal Business

- a. Eligibility: Profit bonus component applies at the beginning of the first full production year that sales representative is employed. Profit formula is based on production year pooled profitability for all new and renewal business as calculated in section VIII of this document.

1

EXHIBIT
0010
CARLSON DEP. EX.

b. Paid out at 100% on second May following the expiration of the last policy of that production year.
c. Amounts paid under this section will be treated as profit share payment for benefit purposes and **are therefore NOT benefit eligible**.
d. EmCap business is excluded.
e. Parameters
    i. 7.0% to <10.0% = Excellent = Bonus of up to 12.5% of earned commission
    ii. 10%+ = Outstanding = Bonus of up to 25% of earned commission

## V. EmCap Referral Compensation

To Be Determined.

**VI. Salary:**$60,000. The salary is not a draw.

## VII. Payment Schedule Sample:

| | | |
|---|---|---|
| Salary | Annual | Bi-weekly |
| Subsidy | To be determined | Bi-weekly |
| Advance | To be determined | Bi-weekly |
| I, III, and V New and Renewal Earned Incentive | February thru April | May 31 annually |
| I, III, and V New and Renewal Earned Incentive | May thru July | August 31 annually |
| I, III, and V New and Renewal Earned Incentive | August thru October | November 30 annually |
| I, III, and V New and Renewal Earned Incentive | November thru January | March 1annually |
| Sales Goal Achievement Bonus | February to January | May 15 annually |
| ICP Addendum A (those with direct reports) | February to January | May 15 annually |
| Profitability Bonus | February to January | Second May 15 |

## VIII. Underwriting Profitability Bonus Calculation

### Underwriting Profit is equal to:

1. Gross Written Premium (GWP), less
2. Premium adjustments or provisions for uncollected premium, less
3. Incurred losses (including IBNR as determined by the Company), less
4. Commissions and other brokerage, acquisition fees and expenses, less
5. Premium Taxes, less
6. Stop Loss Pooling [excess $500k of specific deductible] Charge equal to 2.5% of        GWP, less
7. Berkley A&H Administrative Charge equal to 10% of GWP

2

- For purposes of the calculation of Underwriting Profit, the minimum for incurred losses in item #3 above is 40%of GWP.
- The Plan Year runs from February 1, through January 31.
- The calculation of the Underwriting profit for a particular plan year will made and paid on the second May following the expiration of the last policy of that production year.
- Underwriting Profit is not impacted by Experience Rewards

**Profit Margin is equal to:**

- Underwriting Profit divided by Gross Premium

## IX. Other Considerations

a. Producer transitions: Regional Sales Manager that inherits a case due to Broker of Record change will not be paid incentive on the case until it has renewed under their BOR assignment. Regional Sales Manager that loses a case due to Broker of Record change to another Regional Sales Manager will be paid incentive on the case until the next renewal date.

b. New Business on Old Case: Additional business that is added to an existing account will qualify as new business for goal credit and compensation assuming the case required full underwriting review (more than 15% initial policy growth, signed disclosure, census/experience). The new business incentive will be paid on the additional business through the initial policy renewal date, at which time the entire policy will be payable at the renewal incentive level.

## X. Termination

*a. Upon termination, voluntary or involuntary, no additional or future commissions or bonus will be paid out.*

*b. Upon termination, voluntary or involuntary, all prior commission and bonus payments will be final. No future settlement based upon changes in enrollment or policy terminations will be provided.*

## XI. Addendums

*A. Addendum for Direct Reports (if applicable)*
*B. Addendum for Business Travel Accident Compensation*

*This is a conceptual summary of the compensation plan for a prospective Stop Loss Sales Rep with Berkley Accident & Health. The Company may change the compensation plan at any time at its sole discretion. All payment accruals end at the employee's termination date – no payments extend beyond an employee's termination date.*

Regional Sales Manager Name (Print) _____

Regional Sales Manager Name (Signature) _____

Date _____

3

ESL and EmCap Regional Sales Manager – ICP Addendum A

For Direct Report/Producing Sales Representatives within Regional Assigned Territory

Annual production period matches ICP Plan

Regional sales managers are responsible for overall territory development, sales strategy, producer relationship management, and ultimate profitability of territory block. Based on direction from company, some regional markets may be determined as appropriate for additional producing staff members. Those staff members will report to the Regional Sales Manager. Regional Sales Managers will continue to maintain production goals and expectations.

Supplemental addition to ESL and EmCap RSM's with direct reports will be as follows:

a) Up to $5k for each direct report achieving Minimum Threshold in production year
b) Up to $15k for each direct report achieving a Stretch Goal in production year
c) Up to $25k for each direct report achieving Extraordinary Goal in production year
d) An additional Total Territory Challenge Goal will be set in each production year. If achieved, up to an additional $15k bonus will be payable. Total Territory Challenge Goal can be met by combination of RSM and direct report production totals.
e) Actual pay is at the discretion of VP of Sales
f) Goals will be adjusted yearly based on overall company goals, overall territory goals, tenure at Berkley for direct report, and historical production.
g) Each RSM will complete a Territory Goal Assessment by February 1 each year. Goals will be approved by VP of Sales.

# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Amy Carlson, an individual,                    )
                                               )
      Plaintiff,                          )
                                               )    Civil Action No: 1:20-cv-00590
      v.                                  )
                                               )
Berkley Accident & Health, LLC,                )
    a corporation,

      Defendant.

**PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO**
**MANDATORY INITIAL DISCOVERY PILOT PROJECT**

Pursuant to the Court's Standing Order Regarding Mandatory Initial Discovery Pilot Project (the "MIDP"), and without waiving any claim of attorney-client privilege, attorney work product protection, right to privacy protection, or other basis for non-disclosure, Plaintiff, Amy Carlson, by and through her attorneys HR Law Counsel, sets forth the following Initial Disclosures:

**PRELIMINARY STATEMENT**

Ms. Carlson has not fully completed discovery or preparation for trial in this action. The information contained herein and the documents identified, described, or produced are based only upon information presently available to Ms. Carlson and are given in a good faith effort to comply with the MIDP. These Initial Disclosures are therefore made without prejudice to Ms. Carlson's right to produce, pursuant to the Federal Rules of Civil Procedure, any information that may subsequently be discovered or determined to be relevant to the subject matter of this action. These Initial Disclosures should not be construed as prejudicing or in any way limiting Ms. Carlson with respect to further discovery, research, analysis, or proof.

**EXHIBIT**
**0011**

**CARLSON DEP. EX**

Each of the following Initial Disclosures is made subject to any and all objections, including, but not limited to, competency, materiality, relevance, propriety, admissibility, or any other grounds that would require their exclusion in any proceeding. Any and all such objections and grounds are expressly reserved and may be interposed at the time of trial. Ms. Carlson generally asserts the attorney-client privilege and the protection of the work-product doctrine as to any and all relevant documents that may exist and that are subject to these privileges. To the extent any such disclosure contains or refers to matters otherwise protected from discovery by the work-product doctrine or the attorney-client privilege, no waiver is intended; nor is any waiver intended as to any other matters that are or may be subject to such protection or otherwise privileged; nor is the relevancy of any such matter conceded.

Ms. Carlson has submitted these Initial Disclosures solely in compliance with the MIDP, and these disclosures are solely for the purpose of and in relation to this action.

Ms. Carlson makes these Initial Disclosures based on information reasonably available to her at this time. Ms. Carlson reserves the right to supplement these Initial Disclosures based on her continuing investigation of the case and as discovery continues.

1. **State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.**

Ms. Carlson has not fully completed discovery concerning Defendant and its defenses. As discovery proceeds, Ms. Carlson will seek to discover the names and addresses of individuals likely

to have discoverable information relevant to the disputed facts in this case. Unless otherwise noted, the below individuals are employees of Defendant and, as such, Defendant should have contact information for them.

Without waiving or limiting the foregoing statements in anyway, individuals likely to have discoverable information relevant to any party's claims or defenses in this action, unless solely for impeachment, include the following persons:

| NAME | ADDRESS AND TELEPHONE NUMBER (IF KNOWN) | SUBJECTS OF DISCOVERABLE INFORMATION |
|---|---|---|
| Amy Carlson | *Address and telephone number known to Defendant's counsel* | Plaintiff is expected to have knowledge of Plaintiff's employment with Defendant and Defendant's wrong doings, including Plaintiff's job duties, responsibilities and assignments, job performance and on-the-job conduct; the claims and damages asserted in Plaintiff's Complaint; Plaintiff's mitigation efforts and request for damages; all other information regarding Plaintiff's allegations and claims in the Complaint. |
| Jim Hoiit | *Known to Defendant* | Ms. Carlson's manager for the first 3 years of employment, witness to sexual harassment, 401K issues, David Young issues, |
| Shawn Lanter | *Known to Defendant* | Witnessed sexual harassment and gender discrimination at Berkley Accident and Health |
| Craig Ewig | *Known to Defendant* | Underwriter assigned to Ms. Carlson who referred to her as "Blonde Bimbo". |
| Karin Ewig | *Known to Defendant* | Underwriter assigned to Ms. Carlson who referred to her as "Blonde Bimbo |
| kristine Thompson | *Known to Defendant* | Information regarding the working environment and corporate culture about culture |
| John Wappelhorst | *Known to Defendant* | Relationship and compensation agreements, support staff |
| Bethany Kochanski | *Known to Defendant* | Verification Mr. Wappelhorst deleted Ms. Carlson's work product, with management's knowledge. |
| Don Gasparro | *Known to Defendant* | Knowledge of Defendant's compensation plan |
| Manjusha Sheobaran | Redacted | Female rep who can testify to culture |
| Pam Gallo | Redacted | Female rep who can testify to culture and verify account steerage |

| | | |
|---|---|---|
| Justin Hansen | Redacted | Male rep who witnessed treatment of Ms. Carlson by Chris Brown, unfairness of comp structure, fact that he was paid in exact same situations |
| Scotty Campbell | *Known to Defendant* | Male rep hired the same time Ms. Carlson, witness mistreatment of Ms. Carlson by Chris Brown, MEC account issue, Steerage of other account away from Pam, comp plan structured to hurt Ms. Carlson |
| Dorie Geistdorfer | Redacted | Ms. Carlson's underwriter who can testify accounts were steered away and support wasn't equal |
| Cathy Villano | *Known to Defendant* | HR Director at Berkley who can provide information on Ms. Carlson's attempts to resolve information, what she reported |
| Robert Robinson | *Known to Defendant* | Comments about why Cathi Villano was hired, two other managers let go, |
| Sean Murphy | *Known to Defendant* | Lack of detail on comp plan, change of terms mid-contract |
| Jeff Sealey | Redacted | Corporate culture |
| John Mondragon | Redacted | Witness to name calling by Craig and Karin W |

Ms. Carlson further identifies the following categories including individuals who are likely to have discoverable information relevant to any party's claims or defenses in this action:

A. Any and all individuals Defendant identifies in its MIDP disclosures and amendments or supplements thereto or in Defendant's responses to Ms. Carlson's discovery requests and amendments or supplements thereto.

B. Any and all individuals Defendant identifies in any depositions or on any witness lists for trial.

C. Any and all individuals identified by Ms. Carlson in any depositions taken in this matter.

D. Any and all individuals identified in Defendant's responses to Plaintiff's discovery requests and amendments or supplements thereto.

E. Any and all individuals identified in the documents listed under paragraph 3 below.

Ms. Carlson reserves the right to assert additional claims and facts in support of its additional claims or any of the claims asserted above in the event discovery indicates that it would be appropriate to do so.

5. **Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered.**

Ms. Carlson's damages exceed $818,000. This calculation includes, lost wages and commissions, loss of future income, emotional distress, and attorney's fees. See attached damages calculation.

6. **Specifically identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made by the party to satisfy the judgment.**

Not applicable.

I declare under penalty of perjury that the foregoing is true and correct as of this date based on Ms. Carlson's knowledge, information, and belief formed after a reasonable inquiry.

March 4, 2020

By:     /s/ John M. Liston
        One of Plaintiff's Attorneys

John M. Liston
50 South Main Street
Suite 200
Naperville, IL 60540
Phone: 847.528.5024
Facsimile: 630.566.0705
Email john@hrlawcounsel.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Amy Carlson, an individual,     )
         )
     Plaintiff,     )
         )     Civil Action No: 1:20-cv-00590
     v.     )
         )
Berkley Accident & Health, LLC,     )
     a corporation,     )
         )
     Defendant

## CERTIFICATE OF SERVICE OF DEFENDANT'S INITIAL DISCLOSURES PURSUANT TO <u>MANDATORY INITIAL DISCOVERY PILOT PROJECT</u>

I hereby certify that on this 4th day of March 2020, I served **Plaintiff's Initial Disclosures Pursuant to Mandatory Initial Discovery Pilot Project** by email a copy of the same to the following counsel of record:

Kevin David Kelly
W. Patrick Conlon
*Attorneys for Defendant*

Date:  March 4, 2020     Respectfully submitted,

     /s/ *John M.  Liston*
     One of Plaintiff's Attorneys

John M. Liston
50 South Main Street
Suite 200
Naperville, IL 60540
Phone: 847.528.5024
Facsimile: 630.566.0705
Email john@hrlawcounsel.com

Amy Carlson v. Berkley Accident and Health - Damage Calculation for MIDP Disclosure

| Description | Amount |
|---|---|
| New Business Production for 1 -Lockton & Segal Accounts (steered to JW)  2- Stan Burt & Horton Accounts (given to Rocko because client "requested to work directly with underwriting" in the exact same situation Justin Hansen was paid (accounts | $ 163,829 |
| UMR Direct Business accounts included on experience Data through 8/31/2017 worksheet | $ 140,286 |
| UMR Direct Business Written Prior to my Departure not paid | $ 65,429 |
| Corrected Production Share New Business/Renewal Business | $ 8,397 |
| Corrected Profitability Bonus | $ 102,013 |
| Direct Report Bonus for Pam Gallo adjusted productiong 2015/2016 Year - MEC Accounts Steered to Scott Campbell | $ 5,000 |
| Direct Report Bonus for Pam Gallo adjusting production 2016/2017 Year - MEC Accounts Steered to Scott Campbell and ESL. | $ 5,000 |
| Release of 25% Withhold for the 2016/2017 Production Year | $ 17,940 |
| Amount I paid back for "advance" 2016/2017 change in comp plan.  Change in comp plan. | $ 28,862 |
| Adjustment for 2015/2016 Profit Share Bonus - withhold violated comp agreement Medline Claim denied (see discovery) | $ 5,739 |
| Sub total on all of the above items | $ 542,496 |
| 401K Profit Share adjustment on additional comp owed Subtotal above of $542,495 @ avg award ouring discovery (see | $ 51,537 |
| Refund SIIA Registration Fees (see SIIA file Discovery & attached receipt) | $ 895 |
| Loss of 401k Vesting Upon Constructive Termination | $ 16,456 |
| Vacation owed at end of employment that was never paid | $ 2,308 |
| Sub Total | $ 613,691 |
| Emotional Distress | $ 150,000 |
| Attorney's Fees | $ 55,000 |
| Total | $ 818,691 |

# Exhibit 19

Carlson, Amy R.

| | |
|---|---|
| From: | James Hoitt |
| Sent: | Thursday, July 09, 2015 3:05 PM |
| To: | Carlson, Amy R. |
| Subject: | ICP Plan for those with direct reports |
| Attachments: | ESL and EmCap RSM ICP Addendum for Direct Reports.docx |

Amy- Here is the ICP addendum we have put together for those that will have direct reports. It will be a bonus program that pays based on achievement of pre-established/agreed goal levels for each direct report. Each year you and I will go through the goals and come to agreements on minimum, standard, and challenge goals for your direct report. Depending on how they do will result in a bonus to you.

In lieu of a salary bump, I've also added in a Total Territory Goal bonus. This is an additional bonus that you would get if any combination of production (you or direct report) results in hitting that global goal.

Take a look and let me know any questions/comments.

Jim Hoitt
Vice President, Sales
Berkley Accident & Health
(a W. R. Berkley Company)
400 Donald Lynch Blvd
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Home Office:
2445 Kuser Road, Suite 201
Hamilton Square, NJ 08690

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

1

EXHIBIT

0019

**CARLSON DEP. EX.**

### ESL and EmCap Regional Sales Manager ~ ICP Addendum A

### For Direct Report/Producing Sales Representatives within Regional Assigned Territory

### Annual production period matches ICP Plan

Regional sales managers are responsible for overall territory development, sales strategy, producer relationship management, and ultimate profitability of territory block. Based on direction from company, some regional markets may be determined as appropriate for additional producing staff members. Those staff members will report to the Regional Sales Manager. Regional Sales Managers will continue to maintain production goals and expectations.

Supplemental addition to ESL and EmCap RSM's with direct reports will be as follows:

a) Up to $5k for each direct report achieving Minimum Threshold in production year
b) Up to $15k for each direct report achieving a Stretch Goal in production year
c) Up to $25k for each direct report achieving Extraordinary Goal in production year
d) An additional Total Territory Challenge Goal will be set in each production year. If achieved, up to an additional $15k bonus will be payable. Total Territory Challenge Goal can be met by combination of RSM and direct report production totals.
e) Actual pay is at the discretion of VP of Sales
f) Goals will be adjusted yearly based on overall company goals, overall territory goals, tenure at Berkley for direct report, and historical production.
g) Each RSM will complete a Territory Goal Assessment by February 1 each year. Goals will be approved by VP of Sales.

# Exhibit 20

## Carlson, Amy R.

| | |
|---|---|
| From: | Hoitt, James |
| )nt: | Monday, February 22, 2016 8:15 PM |
| o: | Mandile, Diana |
| Cc: | Byrne, Scott; Carlson, Amy; Robinson, Robert W.; Bannach, Julian; Curry, Andrew; Thompson, Kristine; King, Linda; Bethany Kochanski; Bonder, Linda |
| Subject: | Greg Anderson's producers |

Diana-

We are set to make some final changes for these producers. Here is how it should look going forward:

- Minnesota: All MN producers should be assigned to Amy Carlson. She can determine if any producers from there should be assigned to Pam Gallo.
- Wisconsin: All WI producers should also be assigned to Amy.
- Dakotas: Any producers in ND or SD should be assigned to Kristin Thompson (i.e. Dakota Care).

RSMs: Note that you will not be credited any comp for inforce business until after the next renewal for any of these accounts.

Linda King: This will apply to our state assignments on website, etc.

If there are any others in question please let me know. Thank you!


m Hoitt
Vice President, Sales
Berkley Accident & Health
(a W. R. Berkley Company)
400 Donald Lynch Blvd
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Home Office:
2445 Kuser Road, Suite 201
Hamilton Square, NJ 08690

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

CARLSON DEP. E

EXHIBIT
0020

# Exhibit 24

Carlson, Amy R.

**From:** Carlson, Amy R.
**~nt:** Thursday, August 24, 2017 3:40 PM
**~o:** 'Cathi Villano'
**Subject:** FW: Is someone checking Rocko's emails

**From:** Davidson, Lee D.
**Sent:** Monday, July 17, 2017 12:32 PM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

He wants to be able to discuss cases directly with an underwriter.

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone: 978-821-2820
~-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 1:31 PM
**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Can you tell me Stan's reasoning for going directly with an underwriter with no rep?

**From:** Davidson, Lee D.
**Sent:** Monday, July 17, 2017 12:29 PM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Stan's cases are going to Keven. Horton can go to you. Maybe that is the confusion. The breakup between those two.

1
Carlson v. BAH
Page 001343

**EXHIBIT**
**0024**

**CARLSON DEP. EX.**

Thanks

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone:    978-821-2820
E-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitxcaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 1:23 PM
**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

I just confirmed with Joyce at Horton that Middlebury Community Schools stayed with Horton and did not leave with Stan (part of the agreement) and Mossberg and Company was never a Stan Burt account. Not sure if this helps.


**From:** Davidson, Lee D.
**Sent:** Monday, July 17, 2017 12:01 PM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Chris told me Stan called him on those two renewals

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone:    978-821-2820
E-Mail: ldavidson@berkleyah.com

www.wrberkley.com

www.berkleyah.com
www.benefitscaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 12:56 PM
**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Ok. Horton Indiana sent us the renewal information and confirmed Stan is no longer there. I'm confused by what you mean that he has the BOR?

**From:** Davidson, Lee D.
**Sent:** Monday, July 17, 2017 11:55 AM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Those two accounts belong to Stan so I will have to find out what is happening with the BOR. Hold tight.

Chris has a meeting in Greenwich this afternoon and Tuesday am. He is planning on reaching out to both of you. I also told him he should chat with Ken 1x1.

Thanks, Lee

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone: 978-821-2820
E-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 12:53 PM

**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Ok. What about Horton? Am I taking over their two accounts. I had a call with Joyce this morning and I told her I would .e handling the business going forward.

On a separate note, is Chris going to reach out to me and or Justin?

**From:** Davidson, Lee D.
**Sent:** Monday, July 17, 2017 11:42 AM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

The two Stan cases will be handled by Kevin and Stan has been told to work with him directly. Once of the cases will be getting a max renewal so I don't expect much to be coming out of these renewals except a little lost love.

Lee

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
ell Phone:    978-821-2820
e-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 12:39 PM
**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** RE: Is someone checking Rocko's emails

Stan is not at Horton Group Indiana any more. He's back out on his own.

Blanche sent me a note last week and said I was taking over Horton. I assumed it came from you and it made sense since I handle Indiana.

From: Davidson, Lee D.
**Sent:** Monday, July 17, 2017 11:37 AM

To: Carlson, Amy R. <ACarlson@berkleyah.com>
Subject: RE: Is someone checking Rocko's emails

Who told you that? Lee

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone:   978-821-2820
E-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com



From: Carlson, Amy R.
Sent: Monday, July 17, 2017 12:37 PM
To: Davidson, Lee D. <LDavidson@berkleyah.com>
Subject: RE: Is someone checking Rocko's emails

I was told last week I was handling Horton.

From: Davidson, Lee D.
Sent: Monday, July 17, 2017 11:36 AM
To: Carlson, Amy R. <ACarlson@berkleyah.com>
Subject: RE: Is someone checking Rocko's emails

Chris assigned this relationship to Kevin.  Stan had reached out to Chris and they wanted a direct underwriting contact without a sales person involvement.

Lee

Lee D. Davidson
Senior Vice President, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
400 Donald Lynch Blvd Suite 201
Marlborough, MA 01752

Office Phone: 508-573-6085
Cell Phone:   978-821-2820

E-Mail: ldavidson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com



**From:** Carlson, Amy R.
**Sent:** Monday, July 17, 2017 12:34 PM
**To:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** Is someone checking Rocko's emails

I'm taking over some account's from Horton Indiana and I'm assuing Stan Burts office. I had a call this morning and introduced myself to Joyce at Horton and asked her if she had anything she was working with Rocko on (that they were in the middle of). There's a 10/1 that Rocko had quoted and she said she sent updates and was waiting on a revision (based on updated claims she sent in).

I don't see any updates in the folder.

Thanks!

Amy Carlson
Regional Marketing Representative, Stop Loss Division
Berkley Accident and Health
(a W.R. Berkley Company)
311 S. Wacker Drive #3225
Chicago, IL 60606

Office Phone: 312-705-1133
Redacted
E-Mail: acarlson@berkleyah.com

www.wrberkley.com
www.berkleyah.com
www.benefitscaptives.com

# Exhibit 29

## Carlson, Amy R.

| | |
|---|---|
| **From:** | James Hoitt <JHoitt@berkleyah.com> |
| **Sent:** | Monday, November 03, 2014 4:41 PM |
| **To:** | Greg L Anderson; Fowler, William J.; Byrne, Scott A.; Charlie Swahn; Wapelhorst, John; Sayles, David; Lanter, Shawn P.; Kandzer, Jeffrey; Frawley, David; Manjusha Sheobaran; Bethany Bomengen; Campbell, Scott A.; Carlson, Amy R.; Hansen, Justin J. |
| **Cc:** | Brown, Christopher; Mandile, Diana; Rrobinson@berkleyah.com |
| **Subject:** | Segal |

We have made the company decision to have all RFPs for Stop Loss for Segal flow through and be assigned to J-Wap. Please be sure to guide any future submissions or inquiries from any national Segal offices over to John.

If you have any questions please call me directly.

JIM

Jim Hoitt
Vice President, Sales
Berkley Accident and Health
(a W. R. Berkley Company)
400 Donald J. Lynch Boulevard
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Home Office:
2445 Kuser Road, Suite 201
Hamilton Square, NJ 08690

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

**CARLSON DEP. EX.**

EXHIBIT
0029

# Exhibit 44

## Carlson, Amy R.

**ˉent:**                    Wednesday, May 10, 2017 2:05 PM
**.o:**                       Davidson, Lee D.
**Subject:**               RE: Comp Plan

Lee,

I appreciate Jim's reply but I'm very disappointed that he doesn't feel a discretionary bonus is deserved after the efforts I've made with UMR, Lockton and other national brokerage firms.

Chris Brown asked me to introduce him to Kevin Seelman who was on SIIA's healthcare committee and runs the Lockton Dunning panel. I hounded Kevin monthly about getting on the Berkley panel and he said it wasn't going to happen, his comment was he didn't know anyone from Berkley but me. I stayed on him and set up an introductory meeting for Chris Brown. I've attended all three Lockton annual meetings when no one from management was able to attend.

I work daily with other reps who want advice about how to handle UMR/other misc issues. If you asked Justin, he would tell you I have helped him out with several of the new business sales he's made. Managing Pam takes time out of my schedule every day and she has written business with producers I gave to her and I most likely would have written and she will renew accounts I've handed over to her with the new territory assignments. The company asked me to hire someone and it's ended up being money out of my pocket with no compensation and it's taken time away from me closing business on my own block. I think the company should recognize these things.

Would you mind clarifying the following items with Jim – when he refers to the "renewal account" does he mean the ˙ylem account (John W) or the Performance Bankers account (Greg Anderson). Regardless of which account he's ˌeferring to, what about the other account that he doesn't bring up.

I'd like to see a quarterly advance equal to the amount I would have been paid under the old plan for the 2016/2017 production year only. I appreciate that he understands the short term disadvantages of the change in comp structure for the rep but it's compounded by the fact that my block is so January 1 heavy on both the renewal an new business side.

Regarding profitability the 2015/2016 block was still profitable for Berkley after the 10% held out for Berkley's admin expenses. New business profit was 2.2% after the 10% for the Berkley Admin Charge and Renewal Business will be adjusted to 9.2% (Medline Rx denial for $306,385 that we had reserved on the 3/31 profit reports Sean used for his profitability calculations). Using the 9.2% figure on renewal business, the overall profit for Berkley would be $840,786 for the 2015/2016 year. If the denial is overturned and we end up paying the Rx claim on Medline, the profit would still be $534,402.

I'd rather communicate with you going forward on comp for reasons that I don't want to address in this email. As I said to you during our conversation last week, my goal is to be assertive not aggressive.

**From:** Hoitt, James F.
**Sent:** Wednesday, May 10, 2017 7:51 AM
**To:** Carlson, Amy R. <ACarlson@berkleyah.com>
**Cc:** Davidson, Lee D. <LDavidson@berkleyah.com>
**ˌubject:** RE: Comp Plan

Amy- I think we can make the exception for that renewal account. I'll discuss with Lee to make sure he is good with that.

1

**CARLSON DEP. EX. NO.**

EXHIBIT

0044

The comp plan change to pay on earned premium is something that does in fact have a short period of downside, but eventually creates a much more even spread of compensation throughout the year. We had an open discussion at one of our national conferences about that with all of the sales team prior to rolling this out. Most of our reps were in favor . going that route, and in fact that is the method I have used historically for the sales teams I ran before. The impact was only going to be felt on new biz, since renewals were paying out quarterly on earned premium anyway. Essentially, by paying on earned premium the reps gets paid when Berkley gets paid. The ultimate motivations and total opportunity for incentives are the same, just more stabilized vs. advance lumps.

One option we could look into is creating some type of draw towards your quarterly earned premium payouts so that you don't have to wait each quarter out. Let me know if that is of interest.

Based on the fact that we did not hit our company goals combined with a challenging loss year for the company, and the fact that both of those challenges apply to your market as well, I don't think I would support any sales goal achievement bonus exceptions for this past year. Again I'll discuss with Lee for his input as well.

I'll drop you a line later today to catch up.

Jim Hoitt
Senior Vice President, Captives Division
Berkley Accident & Health
(a W. R. Berkley Company)
400 Donald Lynch Blvd
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
loitt@berkleyah.com

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

**From:** Carlson, Amy R.
**Sent:** Tuesday, May 02, 2017 12:08 PM
**To:** Hoitt, James F. <JHoitt@berkleyah.com>
**Cc:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** Comp Plan

Jim,

Thank you for the responses.

With regards to the withhold, I was surprised when I rec'd a bonus last year but I've never stopped learning about how our comp plan works. I figured there was an upside when the profitability was good but no downside because the withhold was waived. Honestly, I thought the withhold was waived through year three – "I'll
eliminate the profit based withhold until year 3 policies" because we were negotiating a three year bridge but hen I referenced the offer I realized it says "until year 3 policies" not through year three policies. Regardless, I am ok with paying the $17K that I was given back.

2

When you outlined the 3 years of comp in the email you sent me below, I was fairly confident I could meet the sales targets you used and figured the comp listed was sufficient for each year. What I didn't think through is that the calculations you laid out wouldn't be paid out in the same year (even under the old plan). The change om the old comp plan to the new comp plan has obviously made this a bigger issue.

Year 1: Base of 60k. Guarantee of 80k. Subsidy of 80k. That totals 220k in year 1.

If you write 5M in new biz in year 1 you surpass the subsidy of 80k (5M = @90k in commission) and therefore earn more than the220k.

You don't have to pay the subsidy back if you write less, but you only make more than the subsidy if you sell more than that
commission

In an effort to illustrate my point with regards to how the differences in Incentive Comp agreements affects rep comp, I've created a spreadsheet that compares the two plans for all new business written from 2/1/2016 through 1/31/2017.

2016/2017 New Business component only – If my calculations are correct, I would have earned $96,553 in comp and had a 25% withhold which would equal $72,414 in what paid comp would be under the old plan. To date, I have been paid $15,405 for new business incentive comp for this time period (see AC Q4 2016 Calculation Backup). That's a $57K difference in payout on the new vs. the old comp plan. When I talked to you during the 4th quarter last year about this issue, you talked to Sean and you were willing to work with me on an dvance which I really appreciated. On 11/30/2016, Berkley deposited $9,038 in my checking account. I never received any backup on how this calculation was arrived at but I pulled the paystub and the gross amount was $13,000. There was spreadsheet you shared with me that compared old vs. new accounts but it was missing several sold accounts if I recall things correctly.

If you add up the $15,405 in new business bonus money I received on this business (as of last quarter) and the $13K advance you provided me, the total amount paid ends up being $28,405. $72,414 less $28,405 is $44,009. If I didn't have the advance, the difference would have been $57,009. That's a lot of money.

Something to think about with regards to how this affects most rep's mindsets - most of our sales for this production year will take place Jan 1 and we will not be completely paid out until mid-2019 because of the tail on the new comp plan. Under the old comp plan it was a motivating factor to think, I can change my income in a big way if I close a ton of business for a quarter.....although I'm still motivated in an effort to increase my comp, with the long tail on the new plan I wonder if I'll ever see the money because so many things could happen between the time I close the deal and the time it gets paid out.

I'm requesting you revisit a question I asked last month regarding the reassignment of sales territory). When Greg was let go in January of 2016, I took over the Performance Bankers account which was extremely time consuming. I asked you about getting paid on the account and you said "the comp plan says if you inherit a case via broker transition mid-year you don't get comp'd on it until you renew it. I don't consider this a BOR change (the broker of record isn't changing). On the accounts I've lost due to a BOR change, I try to handle all ervice requests, etc. until the next renewal because I know the other rep is not being comp'd on it. Greg wasn't here to handle any of the service requests so everything fell on me. I would like you to reconsider paying the rep who is servicing the account when a rep has been let go. I have close to 200 emails in my

3

"Performance Bankers" folder on outlook and I'm fairly certain I'm missing a few.  That is a lot of work not to get paid on.  The account termed 1/2017 and I'm still receiving emails from Hays.

- Producer transitions: Regional Sales Manager that inherits a case due to Broker of Record change will not be paid incentive on the case until it has renewed under their BOR assignment. Regional Sales Manager that loses a case due to Broker of Record change to another Regional Sales Manager will be paid incentive on the case until the next renewal date.

When we sat down last year in May to air issues out, I expressed disappointment that I had not received the discretionary bonus you referenced in your offer and that is included in our comp plan.  I was fairly certain I would get the bonus after my contributions to bringing Berkley on the UMR panel year one and year two I had hired a rep without needing a headhunter, completed the onboarding process with her and transitioned accounts to her that I would be losing as renewal comp, took point on the UMR RFI, participating in bringing Berkley to Lockton Dunning, I've been available to Justin to talk through several of his new business sales, fielded numerous calls from various Berkley reps wanting to know how best to work the UMR relationship, I've agreed to let JW keep the Oxarc account under his block even though it is my producer (Lockton Chicago) and I've given up over $30M in renewal income over a 3 year period.

You asked me at that time why I didn't say anything/make an argument that I be awarded it.  I am requesting that I receive this bonus for the current year.  I hope Berkley can see the value of my contributions over the last three years and I'd like to keep open communication with regards to what I feel like I have earned/contributed.

Please let me know if you have any questions.


**From:** Hoitt, James
**Sent:** Thursday, March 02, 2017 3:44 PM
**To:** Carlson, Amy; Davidson, Lee
**Subject:** RE: Sales Plan and 2017 Goal

The comp plan says that if you inherit a case via broker transition mid-year that you do not get comped until you renew it.

Jim Hoitt
Senior Vice President, Captives Division
Berkley Accident & Health
(a W. R. Berkley Company)
400 Donald Lynch Blvd
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

**rom:** Carlson, Amy
**Sent:** Thursday, March 02, 2017 3:23 PM

**To:** Hoitt, James <JHoitt@berkleyah.com>; Davidson, Lee <l.Davidson@berkleyah.com>
**Subject:** FW: Sales Plan and 2017 Goal

Hi Jim and Lee,

I have a question for you on account transitions. When a rep inherits a case due to another rep being let go, should the rep the account is transitioning to start immediately earning comp due to the fact the account is no longer assigned to a rep. I had a case that I did a ton of work on last year (literally over 50 emails) and was never paid anything for because the account didn't renew. I'm still handling issues on this account. I don't think the comp plan addresses this type of transition.

Please clarify.

**From:** Hoitt, James F.
**Sent:** Monday, May 01, 2017 1:39 PM
**To:** Carlson, Amy R.
**Cc:** Davidson, Lee D.
**Subject:** RE: Comp Plan

My answers below:

Jim Hoitt
Senior Vice President, Captives Division
Berkley Accident & Health
(a W. R. Berkley Company)
400 Donald Lynch Blvd
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

**From:** Carlson, Amy R.
**Sent:** Friday, April 28, 2017 1:43 PM
**To:** Hoitt, James F. <JHoitt@berkleyah.com>
**Cc:** Davidson, Lee D. <LDavidson@berkleyah.com>
**Subject:** Comp Plan

Jim,

I'm trying to cross reference my incentive comp. In going back through my records, I can see Cathi was referencing an employment agreement (see emails below). Do you have a copy of what this form was? I'm having trouble finding an email that provides it. Was it the comp plan that was being used at the time? If so, was it the 2012 plan?
I'm not aware of any employment agreement that we had anyone sign.

In my offer letter and in communications from you regarding compensation prior to taking this job, I was told the profit withhold referenced in the Berkley A&H Sales Rep Comp formula would be waived

5

through 2/1/2016 effective dates for both new and renewal business. We do not to have a meeting of the minds when it comes to what waiving the withhold would mean. Bottom line, how can you reduce a withhold by 50% when there was no withhold?

'' we communicated a waiver of the withhold, then we would have to live with that. Usually we waive the withhold
.hen someone is on guarantee so that might make sense. Based on that note I sent below that would presume it was
waived. Either way, since you were paid the withhold bump/bonus, you'd still have to at least pay back that component
since your L/Rs have gone the other direction. Let me get with Sean and Lee on that.

I was told last year there might be a claw back provision, but I never imaged the withhold that was waived would be money Berkley would be requesting from me. It did understanding Berkley (based on the email Sean sent last year) Berkley might request the money back they bonused last year but not apply a penalty on an aspect of the comp plan that was waived.

There have been several areas of compensation for me that have been "surprising" and honestly disappointing. I'd like to bring up all of the issues at once instead of sending several separate emails. I need to make sure I'm referencing the correct comp plans for the different time frames and that I have backup for my calculations.

Below I've included two emails that we exchanged regarding comp when I was interviewing. I've highlighted the sections we seem to have misunderstandings about. There was no mention of any penalties. The 2012 comp plan I was provided during the interview process was very complex and I relied on your calculations below as a guide post for the minimum I would make if I hit the goals you outlined. It was my understanding the waiving the withhold was a benefit I would be given while I took time building a block and managing a block with producers I didn't target or develop.
I never put the waiver of the withhold into your formal offer letter, so that was obviously overlooked.
Of course, it worked to your advantage on the first payout when the loss ratios looked favorable.
\gain, the very least this would mean that you'd still have refund the bonus portion. I think we need to
live up to what I put in writing regarding the withhold waiver, so I will work that through.

The change in comp this year to new business bonus being paid as premium is received vs. our old plan has been massively disruptive to my comp. As of the first quarter of this year, the difference in comp vs. the old plan vs. the new plan is close to $75K in my calculations. I'll provide backup for this number when I globally address the issues. I understanding the old comp plan had its failings and needed to be changed as referenced by the current problem we are having but I don't think the new comp plan is fair during the transition.
I thought we had made some accommodations to you for that transition?

From      James Hoitt/MB/BAH/WRBerkley
To:       carlson1967@yahoo.com,
Cc:       Rrobinson@berkleyah.com, Doug Taylor/MB/BAH/WRBerkley@WRBERKLEY
Date:     01/22/2014 02:59 PM
Subject:  Re: Visit to MA: Feb 10-12

we're on it. I'll catch up with Cathi on that document.

Rocko/Doug- Can you help with the PPO Networks that we have in system for IL, IN, MI, WI, IA?

I'll dig up a variety of submission/production activity reports.

Jim Hoitt
Vice President, Sales
Berkley Accident & Health
 10 Donald J. Lynch Boulevard
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Home Office:
2445 Kuser Road, Suite 201
Hamilton Square, NJ 08690

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

From:      Amy Carlson <carlson1967@yahoo.com>
To:        James Hoitt <JHoitt@berkleyah.com>.
Date:      01/22/2014 02:18 PM
Subject:   Re: Visit to MA: Feb 10-12

 xciting news.  I can't wait to meet Scott!  I booked my trip to Boston last
week.  Bethany has my itinerary.

With regards to the paperwork Berkley asked me to complete, the offer letter Cathi
provided me asked me to review and sign an Employment Agreement.  This agreement was not
included in my packet of information.  I've asked Cathi for the agreement and once I
receive it, I'll get all of the requested paperwork FedEx'd back to her.

I'd like to get the following information with regards to my territory:

Submission activity by producer
Current list of in-force accounts (carving out producers not assigned to me)
Network Evaluation Information - I'd like to try and see where we need to plug holes

Is there someone that can help me pull together the above info?

Thanks Jim.

Amy

---------------------------------------------
On Wed, 1/22/14, James Hoitt <JHoitt@berkleyah.com> wrote:

Subject: Visit to MA: Feb 10-12
To: scotty.campbell9@gmail.com, Sbyrne@berkleyah.com, carlson1967@yahoo.com
Cc: bbomengen@berkleyah.com, Rrobinson@berkleyah.com
 ate: Wednesday, January 22, 2014, 12:56 PM

Mr. Byrne
had a good suggestion to piggyback

7

Scott Campbell's (new BAH SunFran) home office trip
along with Amy Carlson's
(new BAH Chicago) first home office trip.

Amy is coming in Feb 10-12.
Let's get
the Scott-Duo in those dates as well.

Please book your flights
and cc Bethany
so we can arrange transportation.

We'll take care of everyone's hotel arrangements
once we get your flight
info. Let's attempt to be here for lunch on Monday if
possible.

We have our scheduled sales
to UW plan
presentations for those dates, which will be a great for you
guys to listen
in on each.

Other heads up: I have to
be present
at a conference in PA on Feb 12, so I'm flying out early
that day. Anytime
you spend in MA office on Feb 12 will be without me, but
will still be
a good use of time. Plan to leave after lunch time on Weds
Feb 12.

Let's all work together
on a full training
agenda, specific areas to cover, etc.

Thank you!
JIM


Jim Hoitt
Vice President, Sales
Berkley Accident & Health
400 Donald J. Lynch Boulevard
Marlborough, MA 01752
Direct: 508-573-6090
Cell: 978-660-7416
jhoitt@berkleyah.com

Home Office:
2445 Kuser Road, Suite 201
Hamilton Square, NJ 08690

Company Website: www.BerkleyAH.com
Corporate Website: www.wrberkley.com
Captive Division Website: www.benefitscaptives.com

* * * * * * * * * * * * *

CONFIDENTIALITY NOTICE: This e-mail and the transmitted
documents contain private, privileged and confidential
information belonging to the sender. The information
therein is solely for the use of the addressee. If your
receipt of this transmission has occurred as the result of
an error, please immediately notify us so we can arrange for
the return of the documents. In such circumstances, you are
advised that you may not disclose, copy, distribute or take
any other action in reliance on the information
transmitted.

*************

CONFIDENTIALITY NOTICE: This e-mail and the transmitted documents contain private, privileged and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If your receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. In such circumstances, you are advised that you may not disclose, copy, distribute or take any other action in reliance on the information transmitted.

> > Amy-
> Here is the framework of the offer I
> would make you, which spans your first 3 years with
> > us:
> > Year 1: Base of 60k. Guarantee of
> > 80k. Subsidy of 80k. That totals 220k in year
> > 1.        -If you write 5M in
> > new biz in year 1 you surpass the subsidy of 80k (5M =
> @90k
> > in commission) and therefore earn more than the
> > 220k.       - You don't have
> > to pay the subsidy back if you write less, but you only
> make
> > more than the subsidy if you sell more that that
> commission
> > value amount.
> >
> > Year 2a: (a = Assumes you write at least 2.5M in year
> 1).
> > Base of 60k. Guarantee of 80k. Subsidy of 40k. That
> ensures
> > 180k in year 2.        -If you
> renew 75% of
> > year 1 and writes 3M new you will surpass
> subsidy. Very
> > doable.       - See subsidy
> > comment second bullet point

9

&gt; &gt; above.
&gt; &gt; Year 2b: (b= Assumes you write less than 2.5M in year
&gt; 1).
&#96; &gt; Base of 60k. Guarantee of 80k. No Subsidy. That
  ensures
&gt; &gt; 140k.     - Plus residual
&gt; &gt; renewal commission from year 1, plus any new biz
&gt; &gt; comp.
&gt; &gt;
&gt; &gt; Year 3a: (a = Assumes you write 5M total new in first
&gt; two
&gt; &gt; years*). Base of 60k and Guarantee of 40k. Ensures you
&gt; 100k
&gt; &gt; as long as we hit 5M in total over 2 years. No
&gt; &gt; subsidy.    - A 4M renewal
&gt; &gt; block in going into year 3 generates 36k. Plus all new
&gt; biz
&gt; &gt; sales (1M new = @18k). Should easily have you between
&gt; &gt; 180-220k.
&gt; &gt; *BAH will review subjectively with her at end of year
&gt; &gt; 2.
&gt; &gt; Year 3b: (b = wrote less
&gt; &gt; than 5M in first 2 years*). 60k Base only plus renewal
&gt; comp
&gt; &gt; plus new biz comp.
&#96; &gt;
  &gt; My best guess for you would be 5M per year which I
&gt; think you
&gt; &gt; will hit, meaning you would surpass the subsidy each
&gt; year
&gt; &gt; anyway. Worse case you have 2 years of solid comp
&gt; &gt; protection, plus assuming the effort is there which
&gt; I've
&gt; &gt; not doubt it will be, we'll very willing to find a
&gt; &gt; solution for year 3.
&gt; &gt;
&gt; &gt; ALSO: -I'll
&gt; &gt; eliminate the profit based withhold until year 3
&gt; policies so
&gt; &gt; you will get 100% of the earned comp by year end (75%
&gt; in
&gt; &gt; advance, 25% at policy premium close). - Hitting
&gt; &gt; goals also affords chance for a subjective bonus that
&gt; can
&gt; &gt; add to potential earnings each
&gt; &gt; year.
&gt; &gt; Couple other thoughts:- I think the territory issue
&gt; (cross over from our
  &gt; other office) will be alleviated in the near future.
&gt; No
&gt; &gt; guarantee, but I expect that to resolve. - We have

> written good UMR biz this year despite
> > the imposed "non-carrier fee". We have eaten in
> > our rates if necessary. - A direct
> > voice to home office. - A chance to
> > contribute and build something- A bright
> > future for bright people. - I'm
> > at Berkley for the long haul. We are going to grow
> this
> > thing. We're having fun.
> >
> > Can you give this some thought and get back to me by
> end of
> > day on Wednesday?
> >
> > Jim HoittVice President, SalesBerkley
> > Accident & HealthJhoitt@berkleyAH.comCell:
> > 978-660-7416
> > Sent from my iPad
> >

11

> written good UMR biz this year despite
> > the imposed "non-carrier fee". We have eaten in
> > our rates if necessary. - A direct
> > voice to home office. - A chance to
> > contribute and build something- A bright
> > future for bright people. - I'm
> > at Berkley for the long haul. We are going to grow
> this
> > thing. We're having fun.
> >
> > Can you give this some thought and get back to me by
> end of
> > day on Wednesday?
> >
> > Jim HoittVice President, SalesBerkley
> > Accident & HealthJhoitt@berkleyAH.comCell:
> > 978-660-7416
> > Sent from my iPad
> >

# Exhibit 53

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 440-2018-04340 |

**Illinois Department of Human Rights** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Amy Carlson | Redacted | Redacted |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| Redacted | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Berkley Accident and Health, LLC | 500+ | 609-584-6990 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2445 Kuser Road, Suite 201 | Hamilton Square, NJ 08690 |

RECEIVED EEOC

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | APR 0 6 2018 | |

| Street Address | City, State and ZIP Code |
|---|---|
| | CHICAGO DISTRICT OFFICE |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN |
|---|---|---|---|---|
| ☒ RETALIATION | ☒ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | | | | |

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **2014** — Latest **11/18/2017**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a native-born female citizen of the United States of America over the age of 40. I began working for Berkley Accident and Health, LLC, in its Chicago office in 2014. I was treated poorly by my male peers and superiors. I was subjected to a hostile work environment and was paid substantially less than my male peers due to my gender. Many accounts in my territory that should have been assigned to me, instead went to men within the organization. I repeatedly filed complaints with Berkley's HR department regarding my poor treatment and illegal business practices within Berkley only to have the company retaliate against me.

ELIZABETH WEDDINGTON
Official Seal
Notary Public – State of Illinois
My Commission Expires Apr 13, 2021

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

3/20/2018 *(Date)* — *Amy Carlson (Charging Party Signature)*

NOTARY – When necessary for State and Local Agency Requirements

*Elizabeth Weddington*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

*Amy Carlson*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*
3/20/2018

**CARLSON DEP. EX. N**

EXHIBIT 0053

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 440-2018-04340 |

Illinois Department of Human Rights and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

As woman over the age of 40, I was paid substantially less than my similarly situated male peers, despite the fact that I was more qualified and more productive in my position than my male peers. I worked tirelessly for the sake of the Company and created relationships and opportunities which generated over $100,000,000 in revenue for the Company. However, time and time again, I was denied the fruits of my labor because of my gender and my failure to assimilate to the Company's systemic "boys' club." I witnessed similarly-situated men receive: credit for accounts they did not earn; promotions to positions that I was significantly more qualified to fill; resources in the form of back-office assistance, managerial support and underwriter support; customer opportunities and nationwide customer overrides that were routinely denied to me; and professional association participation and recognition. When I reported some of this "boys' club" behavior, my supervisors coerced me into being part of a cover-up, and the Company's Human Resources department failed to take appropriate action.

Moreover, I objected to the Company's illegal and fraudulent activities regarding certain underwriting practices and fee allocations. These practices have occurred on countless accounts. When I reported these practices to the Company, I was shouted down by my superiors and told that I "do not understand how things work." These practices are now the subject of an investigation by the Department of Labor.

ELIZABETH WEDDINGTON
Official Seal
Notary Public – State of Illinois
My Commission Expires Apr 13, 2021

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

3/20/2018 — Date — Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)
3/20/2018