**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AMY CARLSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. 20-cv-00590** |
| | ) | |
| **BERKLEY ACCIDENT AND HEALTH, LLC** | ) | **Honorable Judge Gary S. Feinerman** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Berkley Accident and Health ("BAH")[1] sells insurance, and, like many businesses, structures its operations and sales organization to meet customer demands. Plaintiff Amy Carlson ("Plaintiff"), who was one of BAH's salespersons, believes that any time BAH made a decision with respect to account assignments that negatively impacted her, BAH must have been motivated by the fact that she is a woman and not by legitimate business reasons. The undisputed evidence contradicts Plaintiff's belief.

Plaintiff contends that BAH: (1) discriminated against her with respect to pay in violation of the Illinois Equal Pay Act ("IEPA"), 820 ILCS 112/1 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-101 *et seq.*; and (2) failed to pay her certain amounts in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*.

Plaintiff's claims fail as a matter of law. Plaintiff cannot proceed with an IHRA claim because she failed to exhaust her administrative remedies, and she cannot proceed with an IEPA claim because the IEPA does not cover the alleged discrimination in account assignments that are the focus of her contentions. Notwithstanding these deficiencies in Plaintiff's discrimination claims, BAH has legitimate, non-discriminatory reasons for all of its relevant decisions, which rebut any potential prima facie case of discrimination under the IEPA or IHRA. Finally, with respect to Plaintiff's IWPCA claim, she has no contractual or other right to any of the amounts

---

[1] As explained in Defendant's Local Rule 56.1 Statement, Plaintiff contends that Defendant Berkley Accident and Health, LLC employed her, while Defendant disputes this and instead contends that Plaintiff was employed by Berkley Insurance Company in its Berkley Accident and Health operating unit. This issue of fact, however, is not material to the resolution of Defendant's Motion for Summary Judgment. In order to bypass this non-material issue while not in any way waiving its contention regarding the identity of Plaintiff's employer, Defendant will refer to the term "BAH" herein as a general reference to Plaintiff's employer.

she is seeking, and she cannot establish an IWPCA claim in the absence of a binding commitment by BAH to pay. Accordingly, summary judgment for Defendant is required.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

### Background

BAH sells stop loss and other insurance products. (UF ¶1).[2] Plaintiff worked for BAH from February 1, 2014 until November 21, 2017, when she voluntarily resigned. (UF ¶¶2, 72). Plaintiff worked as a stop loss regional sales manager—i.e., a sales representative—reporting to Vice President Jim Hoitt and later Senior Vice President Lee Davidson. (UF ¶¶2-5). As one of multiple regional sales managers, Plaintiff sold stop loss insurance policies within an assigned geographic territory. (UF ¶¶3, 10). BAH's sales organization included regional sales managers like Plaintiff as well as an "institutional unit," which had responsibility for certain accounts that desired a single point of contact with BAH nationwide. (UF ¶¶3, 14, 18). John Wapelhorst worked in the institutional unit as National Brokerage Sales Director and later as Vice President of Institutional Business. (UF ¶¶14-16). Chris Brown was BAH's President. (UF ¶2).

### The Terms Applicable to Plaintiff's Employment And Compensation Were Established In An Offer Letter And Annual Compensation Plans

Plaintiff worked under the terms of an offer letter that was the product of negotiations between her and BAH. (UF ¶¶5-6). Plaintiff received incentive compensation during her employment in accordance with compensation plans promulgated by BAH from time to time. (UF ¶¶7-8). BAH expressly reserved the right in Plaintiff's offer letter to change—at any time—the terms of the applicable incentive compensation plan. (UF ¶9).

[2] Paragraphs in Defendant's Local Rule 56.1 Statement of Undisputed Facts are cited herein as "UF ¶____."

Plaintiff's offer letter also established BAH's discretion to determine the details of her assigned territory. (UF ¶¶10-11). Plaintiff's initial territory was "assigned brokerage and TPA [third-party administrator] sources" in multiple Midwestern states. (UF ¶10). BAH assigns geographic sales territories so as to focus its sales employees on a particular area but does not rigidly award credit for accounts in a geographic territory simply because a sales representative is assigned to that territory and makes adjustments based on business circumstances—i.e., a territory assignment does not mean that a sales representative has the exclusive right to earn incentive compensation because a sale occurred in that territory. (UF ¶12).

Consistent with its discretion to assign accounts and modify territories, BAH made adjustments to account assignments and territory throughout Plaintiff's employment. (UF ¶¶10-13, 17). On two separate occasions, those adjustments benefited Plaintiff by broadening her geographic territory. (UF ¶13). On other occasions, however, BAH made decisions to assign certain accounts to others notwithstanding the fact that those accounts had operations in the geographic territory in which Plaintiff was authorized to sell. (UF ¶¶23, 25, 27, 34). These decisions are the primary focus of Plaintiff's discrimination allegations in this case.

**The Facts Pertaining to Plaintiff's Allegations of Pay Discrimination**

Plaintiff contends that she was discriminatorily denied credit for: (1) the Lockton (Xylem) account in her territory; (2) a Segal account in her territory; (3) the Stan Burt/Horton accounts in her territory; and (4) UMR direct business on a nationwide basis. (UF ¶¶21-22, 27, 32, 41). Plaintiff also contends that: (5) her female subordinate sales representative, Pam Gallo, was discriminatorily denied the opportunity to sell Minimum Essential Coverage ("MEC")

accounts in her territory; and (6) that she was discriminatorily denied reimbursement for a conference registration fee. (UF ¶¶19, 48, 56).

The Lockton (Xylem) account was a pre-existing account at the time of Plaintiff's hire, but Plaintiff believed the account would be transferred to her because it was physically located in her geographic territory. (UF ¶22). John Wapelhorst had been responsible for selling the Lockton (Xylem) account prior to Plaintiff's employment, however, and requested to continue to work with this client going forward. (UF ¶¶23-24). BAH President Brown granted Wapelhorst's request and decided that this account would remain with him because he had sold the account prior to Plaintiff's employment with BAH. (UF ¶25).

Although Segal had operations in Plaintiff's geographic territory, BAH made a decision that all Segal accounts would be handled through the institutional unit in which Wapelhorst worked and not by territory-specific regional sales managers like Plaintiff. (UF ¶¶27-31). BAH did business with Segal nationally, and BAH President Brown made the decision to assign the Segal business to Wapelhorst in the institutional unit after he learned that Segal was developing a national distribution unit with the objective to have a single point of contact with stop loss carriers like BAH. (UF ¶¶28-30). Segal was a natural fit for the institutional unit, which was already handling other clients that desired a single point of contact. (UF ¶30). Brown's decision to assign Segal to Wapelhorst impacted all of BAH's regional sales managers. (UF ¶31).

Stan Burt was an individual who worked for The Horton Group Inc. ("Horton") and later worked independently of Horton. (UF ¶33). Burt was friends with BAH's Director of Underwriting, Robert ("Rocko") Robinson, and asked to work directly with Robinson instead of through a salesperson like Plaintiff. (UF ¶34). BAH honored this request from Burt. (UF ¶¶34-

35). When Robinson left BAH, Burt asked to continue to work directly with an underwriter, and BAH continued to honor his request. (UF ¶¶36-37).

Plaintiff contends that, despite the limited geographic territory described in her offer letter, she should have received compensation for UMR direct business on a nationwide basis because she believes she was responsible for UMR doing business with BAH. (UF ¶41). No one ever promised Plaintiff nationwide compensation for UMR, however, and UMR did not want a single, national point of contact with BAH and instead worked with BAH through its regional sales managers throughout the country. (UF ¶¶42-43).

Plaintiff contends that her subordinate, Pam Gallo, was discriminatorily denied the ability to sell MEC accounts in her territory because these accounts were exclusively assigned nationally to a male representative (Scott Campbell) and that, had Gallo been allowed to make these sales, Gallo's sales would have reached the threshold at which Plaintiff, as her supervisor, would have received bonuses for two production years. (UF ¶48). BAH assigned the MEC accounts exclusively to Scott Campbell because it was a special program to test the market that involved a single producer named Stealth Partner Group with whom Campbell had a relationship and that was located in his geographic territory. (UF ¶49). Additionally, the MEC sales that occurred in the relevant territory for the two production years in question, if combined with Gallo's other sales for those years, would not have resulted in Gallo's sales for each year reaching the threshold necessary for Plaintiff to have received a bonus. (UF ¶50).

Finally, Plaintiff contends that she is owed $895 for a 2016 SIIA (Self-Insured Institute of America) conference registration fee that she paid but did not use because BAH refused to let her attend the conference. (UF ¶56). Plaintiff speculates that BAH paid the fees for one or more

male sales representatives to attend, but the only regional sales manager for whom BAH paid the registration fee for the 2016 SIIA conference was Scott Byrne, who attended only because he was substituting for Senior Vice President Davidson as a conference speaker. (UF ¶¶57, 59).

**Facts Pertaining to Other Amounts Claimed By Plaintiff**

Plaintiff seeks other amounts under the IWPCA: (1) amounts in 2016 that she claims were improperly subject to a 25% profit withhold; (2) an advance that she repaid to BAH following a change in her compensation plan in 2016; (3) compensation for UMR direct sales in her territory that would have been paid to her had she not resigned from BAH; (4) an amount that she claims was mistakenly not paid based on BAH's decision to keep reserves on an account; and (5) a payment for allegedly accrued and unused vacation.[3] (UF ¶¶45, 51, 54, 61, 63).

BAH did not apply a 25% withhold to Plaintiff's incentive compensation in 2016, as the compensation plan that applied for that year eliminated the 25% withhold on incentive compensation that had applied in prior years. (UF ¶52). The 2016 compensation plan changed the timing of when Plaintiff and others received incentive compensation—it was paid as premium was received from customers throughout the year rather than paid 75% in advance based on projected premium as it had been before—but BAH had the discretion to make these changes to the compensation plan applicable to Plaintiff under the express terms of her offer letter. (UF ¶¶9, 53-54).

---

3 In addition to these amounts, Plaintiff contends that she would be owed a "corrected profitability bonus" of $102,013, a "corrected production share" of $8,397, and a profit share contribution of $51,537 had she received the other amounts that she claims were improperly or discriminatorily denied to her. (UF ¶60). In other words, she is not making any independent claim for these three amounts, and her entitlement to these amounts is wholly dependent on her prevailing on her other claims for damages.

With respect to UMR direct business in Plaintiff's territory, the applicable incentive compensation plan did not require further payments to her following her resignation. (UF ¶¶46-47). With respect to the amount Plaintiff claims was not paid based on BAH's decision to keep reserves on an account, Plaintiff does not know why the reserves were not released, cannot identify the specific account in question, and thinks it was an inadvertent error (UF ¶61). Finally, BAH did not pay Plaintiff for any accrued and unused vacation upon her resignation because she had only a 3.75-hour vacation balance prior to the date of her resignation and she used 7.5 hours of vacation on the day of her resignation. (UF ¶¶64-75).

## ARGUMENT

### I. Plaintiff Cannot State a Claim Under the IHRA Because She Has Failed to Exhaust Her Administrative Remedies

Plaintiff's IHRA claim is barred because she failed to notify the IDHR of the EEOC's determination on her Charge of Discrimination within 30 days of receiving the Notice of Right to Sue from the EEOC. (UF ¶¶76-78). *See* 775 ILCS 5/7A-102(A-1)(1), (3) *and* 56 Ill. Admin. Code §2520.490(a)(3) ("Within 30 days after receiving the final determination from the EEOC, the complainant must submit a copy of the EEOC's determination to the Department *in order to preserve the complainant's rights under the Act.*") (emphasis added). *See also Jafri v. Signal Funding LLC*, 2019 WL 4824883, at *2 (N.D. Ill. Oct. 1, 2019). Summary judgment on the entirety of Plaintiff's IHRA claim is required for this reason alone.

### II. The IEPA Does Not Cover Alleged Discrimination in Account Assignments

Plaintiff's allegations of sex discrimination in pay focus almost exclusively on claims that certain accounts were assigned away from her (or her subordinate) because of sex. But the IEPA only applies to situations where there are disparities in the "rate of pay" between employees of

different sexes. 820 ILCS 112/10 ("No employer may discriminate between employees on the basis of sex by paying wages to an employee *at a rate* *less than* *the rate* *at which the employer pays wages to another employee of the opposite sex* for the same or substantially similar work[.]") (emphasis added). Thus, the IEPA cannot apply to situations where, as here, Plaintiff claims that certain accounts were discriminatorily assigned away from her and is not claiming disparities with respect to rate of pay. *See, e.g., Berry v. Bd. of Sup'rs of L.S.U.*, 715 F.2d 971, 976–78 (5th Cir. 1983) (recognizing, with reference to the analogous federal Equal Pay Act ("EPA"), that the EPA does not cover a claim for discrimination with respect to assigned workloads); *Caetio v. Spirit Coach, LLC*, 992 F.Supp.2d 1199, 1213 (N.D. Ala. 2014) (the EPA "does not provide relief for allegations of discriminatory work *assignments*."). Allegations of discriminatory account assignments under Illinois law are exclusively the purview of the IHRA, and Plaintiff's IEPA claim must therefore be dismissed.

## III. Plaintiff Cannot Establish A Viable Claim of Pay Discrimination Under the IEPA or the IHRA, Irrespective of Whether the IEPA Could Be Construed to Cover Her Allegations and Irrespective of Her Failure to Exhaust Her Administrative Remedies Under the IHRA

In evaluating IEPA claims, courts apply the same standards as under the federal EPA. *Bowbin v. Bulkmatic Transp., Inc.*, 2007 WL 3374402, at *5 n.2 (N.D. Ill. Nov. 13, 2007). To establish a prima facie case of pay discrimination, "an employee must demonstrate a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (internal quotation marks omitted). "If this requirement is satisfied, the burden of proof shifts to the employer to prove some neutral factor that explains the discrepancy in salary." *Id.* Differences in pay are not

discriminatory if they are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 820 ILCS 112/10(a) (Jan 1, 2019) (amended September 29, 2019).[4]

The IHRA prohibits discrimination more broadly than the IEPA, covering discrimination with respect to other terms and conditions of employment. 775 ILCS 5/2-102. Illinois has expressly adopted federal Title VII standards for evaluating employment discrimination claims under the IHRA. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178–79, 545 N.E.2d 684, 687–88 (1989). To establish a prima facie case of discrimination under the IHRA, a plaintiff must demonstrate, among other things, that "similarly situated employees of the opposite sex were treated more favorably." *Lauderdale*, 876 F.3d at 910. The employer then must "articulate a 'legitimate, nondiscriminatory reason'" for the different treatment. *Id.* "If the employer articulates a nondiscriminatory reason . . . the plaintiff must prove that the employer's justification was pretext for a decision made on prohibited criteria," and, "[i]f she cannot, her claim fails." *Id.*

Here, BAH has articulated legitimate, non-discriminatory reasons for its decisions with respect to each of the amounts that Plaintiff claims were denied to her on account of her sex. These reasons rebut any inference of discrimination, even assuming, *arguendo*, that Plaintiff could establish a prima facie case of discrimination under the IEPA or IHRA, which she cannot. Thus, summary judgment for Defendant is required.

---

4 The quoted language of 820 ILCS 112/10(a) is from the version of the IEPA in effect at the time of Plaintiff's employment. The IEPA was subsequently amended. *See* P.A. 101-177, §5, eff. Sept. 29, 2019.

### A. BAH's Decisions With Respect to the Items Claimed By Plaintiff Were Legitimate and Non-Discriminatory

#### 1. The Lockton (Xylem) Account

BAH made a legitimate business decision to assign the Lockton (Xylem) account to Wapelhorst because he had sold the account prior to Plaintiff's employment with BAH. (UF ¶¶23-25). Plaintiff's geographic territory was not exclusive, and BAH can and did exercise discretion to assign accounts based on business circumstances, not sex. (UF ¶¶10-12). In fact, Plaintiff acknowledged that, on at least one occasion, BAH assigned responsibility for a prospective account to Wapelhorst that negatively impacted a male sales representative. (UF ¶26). *See, e.g., Nichols v. Comcast Cablevision*, 84 F.Supp.2d 642, 654-55 (D. Md. 2000) ("the fact that both men and women were among the beneficiaries and victims of this practice shows that a conclusion of sex discrimination cannot be supported.").

#### 2. The Segal Account

BAH made a legitimate business decision to assign all Segal accounts nationally to Wapelhorst in the institutional unit based on what Brown learned from Segal about how it intended to structure its relationship with stop loss carriers like BAH. (UF ¶¶27-30). This decision meant that none of the regional sales managers—men and women alike—were able to sell Segal accounts in their territories. (UF ¶31). Decisions to assign accounts like Segal to the institutional unit angered both male and female sales representatives, as they lost compensation opportunities in their territories, but an enterprise-wide decision that equally impacts male and female sales representatives is not discriminatory. (UF ¶17). *Nichols*, 84 F.Supp.2d at 654-55.

**3. The Stan Burt/Horton Accounts**

The fact that Plaintiff did not receive credit for the Stan Burt/Horton accounts is not discriminatory. BAH assigned Stan Burt's accounts consistent with his requests—first to Rocko Robinson, his personal friend, and later to another underwriter. (UF ¶¶33-36). A company can legitimately assign accounts based on client wishes, a fact that Plaintiff acknowledges, and no underwriter received incentive compensation for Stan Burt's accounts. (UF ¶¶38, 40).

**4. UMR Direct Business Nationally**

Leaving aside the validity of Plaintiff's contention regarding the genesis of the UMR relationship, she has no basis to claim that it was discriminatory for BAH not to pay her incentive compensation on a nationwide basis for UMR business. No one ever promised Plaintiff incentive compensation for UMR direct business nationally. (UF ¶42). Furthermore, BAH understood that UMR, unlike Segal, desired to work with local territory representatives and not with a single, national point of contact. (UF ¶43). UMR business was therefore available to regional sales managers like Plaintiff on a territory by territory basis. (UF ¶43). Giving all of the incentive compensation for UMR sales nationally to Plaintiff would have meant that individual territory representatives would have no incentive to work with UMR in their own territories, a nonsensical outcome in light of how UMR desired to interact with BAH.

**5. MEC Accounts and the Direct Report Bonus**

BAH assigned the MEC accounts nationally exclusively to Scott Campbell because it was a special program to test the market that involved a single producer named Stealth Partner Group with whom Campbell had a relationship and that was located in his geographic territory. (UF

¶49). In any event, Plaintiff's claim regarding the MEC accounts cannot succeed because the MEC sales in the relevant territory would not have pushed Gallo over the threshold necessary for Plaintiff to earn a bonus. (UF ¶50). Any claim by Plaintiff otherwise is pure speculation. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

**6. SIIA Registration Fee**

Plaintiff's contention that BAH discriminatorily denied her reimbursement for the SIIA registration fee fails for multiple reasons. First, Plaintiff acknowledged that it was her own fault that she incurred the SIIA registration fee without determining whether BAH would allow her to attend. (UF ¶58). Second, BAH did not discriminate against Plaintiff on account of sex in denying her reimbursement for the registration fee. The only other employee in the same role as Plaintiff who attended the conference at BAH's expense, Regional Sales Manager Scott Byrne, did so only because he was asked by Davidson to substitute for him as a speaker at the conference. (UF ¶59). BAH did not pay for the registration fees of any other regional sales managers, and Byrne's situation is clearly distinguishable.

**B. Plaintiff Cannot Establish That BAH's Explanations For Its Decisions Are Pretextual**

Fundamentally, Plaintiff has no basis to claim that BAH's proffered explanations for the items above are pretexts for sex discrimination or otherwise disputed. *Lauderdale*, 876 F.3d at 910 ("On summary judgment, the plaintiff must present evidence that supports an inference that the employer was intentionally dishonest when it gave its nondiscriminatory reason."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A plaintiff cannot discharge her burden of demonstrating pretext merely by making "bald assertions" that a pay disparity was based on sex. *Markel v. Bd. of Regents of Univ. of Wisconsin Sys.*, 276 F.3d 906, 913 (7th Cir. 2002). This is

particularly true where, as in this case, BAH often made pay-related decisions that were favorable to Plaintiff, such as expanding her territory and making at least one exception to the compensation plan in her favor. (UF ¶¶13, 62). *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 150-151 (2000).

### C. The Other Amounts Plaintiff Claims As Damages In This Case Were Not Denied to Her Because of Her Sex

The other amounts Plaintiff claims as damages in this case are not tied to any claim of sex discrimination. Plaintiff acknowledges that BAH did not change its overall compensation plan for discriminatory reasons. (UF ¶55). Her claim for post-employment compensation for UMR direct sales in her territory is also not tied to any sex discrimination claim, as, per the terms of the applicable compensation plan, she was not entitled to receive future compensation when she voluntarily resigned her employment with BAH. (UF ¶46). Finally, she acknowledges that her claim for $5,739 based on BAH not releasing reserves on an account is based on an "inadvertent error" by BAH, and an error cannot be discriminatory. (UF ¶61). *Lancaster-Williams v. PODS Enterprises, Inc.*, 2010 WL 2382402 at *14 (N.D. Ill. June 10, 2010).

## IV. Plaintiff Cannot Establish a Claim Under the IWPCA

### A. Plaintiff Was Not Owed any Accrued and Unused Vacation Upon Her Resignation

Plaintiff was not owed any accrued and unused vacation following her resignation from BAH. Plaintiff's 3.75-hour vacation balance prior to the date of her resignation was exhausted by her taking vacation on the day of her resignation. (UF ¶¶64-75). Her claim that she was "working" while on vacation in Mexico does not change the fact that she was on vacation under BAH's interpretation of its vacation policy.

**B. Plaintiff Has No Claim Under the IWPCA For Any Other Amounts**

In order to state a claim for unpaid final compensation under the IWPCA, a plaintiff must establish that she is owed certain compensation under a contract or agreement with her employer. *See* 820 ILCS 115/2; *Watts v. ADDO Mgmt., L.L.C.*, 2018 IL App (1st) 170201, ¶ 14, 97 N.E.3d 75, 80. In other words, the IWPCA does not provide for relief in the absence of an employer's breach of a binding commitment—i.e., a contract or agreement.

Here, Plaintiff claims entitlement to various incentive compensation amounts, but there is no basis for her to recover any of the amounts claimed. Plaintiff's offer letter, along with the various compensation plans in effect over time, established the terms under which she was entitled to receive incentive compensation from BAH, and the rights reserved to BAH in these documents foreclose her claims. (UF ¶¶5, 7-11).

Plaintiff's offer letter made clear that her geographic sales territory encompassed only those accounts that BAH "assigned" to her within a set area that could be changed by BAH at its discretion. (UF ¶¶10-11). This means that Plaintiff has no basis on which to claim entitlement to incentive compensation for sales outside of her geographic territory—i.e., the UMR direct business nationally (which Plaintiff acknowledged was never promised to her in any event). (UF ¶¶10-11, 42). *Mooney v. Wyndham Worldwide Operations, Inc.*, 2014 WL 2959270, at *2 (N.D. Ill. July 1, 2014) (employer's discretionary right to change forecloses IWPCA claim). Furthermore, Plaintiff has no basis on which to seek compensation for accounts in her territory that were not "assigned" to her by BAH—i.e., the Lockton (Xylem) account, the Segal account, and the Stan Burt/Horton accounts. (UF ¶10).

Plaintiff complains that she did not receive certain compensation for UMR direct business in her territory following her resignation and that the change in the timing of payments in the 2016 compensation plan negatively impacted her, but, as Plaintiff acknowledges, BAH had absolute discretion to change its compensation plan at any time, which precludes her IWPCA claim. (UF ¶¶9, 46, 53-54). *Mooney*, 2014 WL 2959270, at *2 (N.D. Ill. July 1, 2014); *Rudolph v. Int'l Bus. Mach. Corp.*, 2009 WL 2632195, at *3-5 (N.D. Ill. Aug. 21, 2009); *Rakos v. Skytel Corp.*, 954 F.Supp. 1234, 1237-40 (N.D. Ill. 1996). In any event, under the compensation plan, she was not entitled to payments beyond the payment she received on November 15, 2017, as a former employee like Plaintiff is not able to perform the necessary and ongoing post-sale client service functions required by BAH. (UF ¶¶46-47). Plaintiff complains that a 25% withhold on incentive compensation should not have been applied to her in the 2016/2017 production year, but there was no such withhold under BAH's compensation plan for that production year. (UF ¶¶51-52). None of the other amounts in Plaintiff's damage calculation are recoverable under the IWPCA.[5]

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment on the entire Amended Complaint and grant such further relief as is just and proper.

---

[5] The SIIA registration fee was never promised to Plaintiff (she acknowledges that she paid the fee before checking if it would be reimbursable) and is not recoverable as "wages" under the IWPCA in any event, as the IWPCA was not amended to cover expense reimbursements until after Plaintiff's employment ended. (UF ¶58). *See* P.A. 78-914, §9.5, eff. Jan. 1, 2019. With respect to the amount Plaintiff claims is owed to her based on BAH's decision to retain reserves on an account, Plaintiff has no basis on which to claim a contractual or other right to this amount.

Dated: March 1, 2021

Respectfully submitted,

BERKLEY ACCIDENT AND HEALTH, LLC

By: /s/ W. Patrick Conlon
One of their Attorneys

Kevin D. Kelly
W. Patrick Conlon
Locke Lord LLP
111 South Wacker Drive
Suite 4300
Chicago, IL 60606
(312) 443-0217 (K. Kelly)
(312) 443-0323 (W. Conlon)
kkelly@lockelord.com
wpatrick.conlon@lockelord.com

**CERTIFICATE OF SERVICE**

I, W. Patrick Conlon, an attorney, certify that I caused the foregoing to be served upon all persons and entities authorized and registered to receive such service through the Court's Case Management/Electronic Case Files (CM/ECF) system on March 1, 2021.

*/s/ W. Patrick Conlon*